IN THE UNITED STATES DISTRICT COURT
SOUTHTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| SAMANTHA SIVA KUMARAN | \| |
| Other similarly situated Customers 1-100 | \| |
| Other similarly situated CTA's 1-100 | \| |
| NEFERTITI RISK CAPITAL MANAGEMENT, LLC | \|   Case No: 1:20:CV_____ |
| , | \|   Judge:_____ |
| *Plaintiff,* | \| |
| | \| |
| -against- | \| |
| | \| |
| | \|   **COMPLAINT** |
| NATIONAL FUTURES ASSOCIATION | \|   **JURY TRIAL DEMANDED** |
| JANE DOE 1, COMPLIANCE OFFICER NFA | \| |
| JANE DOE 2, COMPLIANCE OFFICER NFA | \| |
| TOM KADLEC, BOARD MEMBER NFA | \| |
| | \| |
| | \| |
| *Defendants* | \|, |

_____

Pursuant to Federal Rules of Civil Procedure ("FRCP") 3, and incorporating by reference the exhibits under FRCP 10(c),  Plaintiffs Samantha Siva Kumaran ("Kumaran"), Customers 1-100, CTA's 1-100, Nefertiti Risk Capital Management, LLC, allege for its complaint as follows:

## PRELIMINARY STATEMENT

1.  This lawsuit arises out of the bad faith failure of the National Futures Association ("NFA") to enforce the Commodities Exchange Act ("CEA"), and enforce numerous compliance laws, rules, and regulations under their delegated and statutory authority under 7 U.S.C. 25. Since September 2014 until present, Defendants have and are partaking in a fraudulent scheme with ADM Investor Services ("ADMIS"), the owners of the disbarred Vision Financial Markets, LLC, Robert Boshnack. Howard Rothman, John Felag, its affiliates and a network of Vision Introducing Brokers (IBs), to disseminate ADMIS' confidential customers and CTA's confidential futures accounts and trading strategies to the owners, employees and affiliates of the disbarred Vision. located in Stamford, CT and New York, NY, in violation of the CEA and Federal laws.

1

2.   Dozens of customers and CTA"s including Plaintiffs, who inadvertently opened accounts at ADMIS during the period 2014, fell victim to a fraudulent and behind the scenes scheme, whereby, ADMIS,  in exchange for financial benefits, sold and/or distributed and gave fully disclosed access to multiple of their confidential customers' and CTA's private futures account data, details of the inner workings of their trading positions, as well as their personal private data, _without the customers knowledge, permission and consent_ to Vision's owners, employees, and affiliates.

3.   Further the scheme, enabled by the NFA, solicits millions of dollars of unauthorized fees and charges, estimated to total over $50 million dollars, in violation of the Commodities Exchange Act (which are expressly not authorized by the customer or CTA) to be deducted in cash from ADMIS accounts to be used to make personal payments to Rothman, Boshnack and Vision affiliates, across interstate lines in Stamford Connecticut, and other financial benefits, which are fraudulently concealed from customers and CTA's prior to account opening;

4.   NFA, through the bad faith conduct of Tom Kadlec, who serves simultaneously on NFA's Board of Directors, Membership Committee and the CEO of ADMIS, after betraying dozens of his CTA's, by giving Vision's owners, employees and affiliates unlawful access to their confidential trading accounts, and trade secrets,  in direct unfair competition, then facilitated the registration of Vision Investment Advisors, LLC in direct competition, in express violation of the Defend Trade Secrets Act,  numerous regulatory compliance laws,  NFA Bylaws, and violation of the CEA. Without limitation, Defendants in bad faith, materially failed to enforce NFA 2-4 9061.

5.   This conduct violates the heart of the Commodities Exchange Act, which is to protect market integrity, and to promote principles of fair and equitable trade, and promote fair market competition.

## PARTIES

6.   Defendant National Futures Association ("NFA") is a private, not-for profit organization incorporated in the State of Delaware, with its headquarters and principal place of business and domicile in Chicago, Illinois. NFA is the only self-regulatory association organized under the

authority of the Commodities Exchange Act, 7 U.S.C. §21. and oversight, if any, is conducted by the United States Commodity Futures Trading Commission ("CFTC")

7. NFA Compliance Officer Jane Doe 1 is a Manager of NFA Compliance's Staff who upon information and belief has worked at NFA for over 34 years and supervised an audit of Vision IB Trey Lazzara, during the period October 17 2017 until around March 23 2018.

8. NFA Compliance Officer Jane Doe 2 is a Manager of NFA's Compliance Department who upon information and belief, is a CPA and a certified fraud examiner and who has worked at NFA for almost eight years and is aware of Vision's risk management activities. She also conducted a compliance audit and signed documents on or around dates between January 15 2019 – February 7 2019 that approved violation of numerous NFA Compliance laws, including but not limited to dissemination of Plaintiff's trading accounts to Vision affiliates without their knowledge and consent in violation of NFA 2-4 9061, and other "risk management activities" that are being fraudulently concealed from customers an CTA's in violation of NFA 2-26.

9. Thomas R. Kadlec ("Kadlec") is an individual resident of the State of Illinois, and in his individual capacity, serves on the Board of Directors of the NFA. Kadlec, has also serves on the Membership Committee of the NFA, and his duties involved approving the registration of Vision Investment Advisors, LLC, as CTA's in March 2018, who are direct competitors of the CTA's who's accounts Kadlec breached, gave their competitive trading records to Vision affiliates. Kadlec, not only is on the NFA Board of Directors, but also serves as the CEO of ADMIS.

10. Samantha Kumaran is a resident of New York City, NY which is within this judicial district. In April 2017 Kumaran became a registered member of the NFA. Prior to that she was a customer and opened an account as a customer to trade commodities futures in January 2017.

11. Customers 1-100 and CTA's 1-100 are citizens of the United States of America, and are similarly situated to Kumaran, who are also victims of the scheme. They opened accounts with ADMIS after September 2014, and were fraudulently induced by former Vision IB's and remain unaware their confidential accounts and millions of dollars have been disseminated to Vision.

12. Nefertiti Risk Capital Management, LLC was a minority women owned small business, sole proprietor and LLC, in New York NY that was a direct competitor of Vision. It was also a registered CTA. ADMIS, Vision and NFA, depleted its assets, property and trading strategies, to make the company un-operational, in deliberate and direct unfair competition, for Vision to destroy its competitors, in the scheme herein. Kumaran is the legal successor and assign of the LLC.

## JURISDICTION AND VENUE

13. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 and 7 U.S.C. §§ 13a-2(2), 7 U.S.C. 25(c).

14. Venue is proper in this judicial district under 28 U.S.C. § 1391 (b)(ii) and 7 U.S.C § 13a-2(4) because a substantial part of the events giving rise to Plaintiff's claims occurred within this district.

15. Venue is also proper under 7. U.S.C. § 25 because Plaintiff is a resident of New York State, and substantial events given rise occurred in New York City, and  which permits Plaintiff to bring this action in the venue and jurisdiction where she resides.

## LEGISLATIVE BACKGROUND

16. The Commodities Exchange Act ("CEA") broadly prohibits fraudulent and manipulative conduct in connection with commodities futures transactions.

17. The Commodities Futures Trading Commission ("CFTC") was created by Congress, as an independent agency, with broad authority to adopt rules, that are necessary to carry out the purposes of the CEA. [1] The National Futures Association ("NFA") was registered by the CFTC as the sole, nationwide, self-regulatory organization ("SRO") under the CEA in 1981.

18. While the NFA is a private organization, it is supposed to perform regulatory functions to safeguard the integrity of the derivatives markets that the CFTC would otherwise have to undertake. Under NFA Articles of Incorporation, its purpose is the adoption, administration and enforcement as to the following persons of requirements regarding fair practice and designed to

---

[1] 7 U.S.C. 12(a)(5) (1974) See generally CFTC v. Schor 478 U.S. 833, 106 S. Ct 3245,3250 92L. Ed 2d 675 (1986) (quoting H.R. Rep. No 93-975 93rd Cong 2d Sess at 1)(1974)

prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade and, in general, to protect the public interest.

19. CFTC in  OIG Audit Report dated May 31, 2017, incorporated herein by reference as Exhibit 1 has identified 31 delegations by Order for which NFA has been delegated authority.[2] Under CFTC oversight and pursuant to the CEA, CFTC has characterized those delegation into eight program areas or authority to NFA, and  four of them relevant to this action are  (i) to establish training standards and proficiency testing for persons involved in the solicitation of transactions, their supervisors and a program to audit and enforce compliance with such standards under 7 USC 21(p)(1) "*Sales Practices*";  (ii) to establish special supervisory guidelines to protect the public interest relating to the solicitation by telephone of new futures or options accounts 7 USC 21(p)(4) "*Telemarketing Supervision"*  (iii) to enforce compliance and prevent market participation fraud, and  to  protect  market  participants,  customers  and  members  and  to  design  rules  to  prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, in general, to protect the public interest and remove impediments to and perfect the mechanism of free and open futures trading (includes disciplinary processes programs) 7 USC 21(b)(7) (8)(9); ("*Compliance*"); and (iv)  to establish rules provide a fair, equitable, and expeditious procedure through arbitration or otherwise for the settlement of customers' claims and grievances against any member or employee.  USC 21(b) (10), 17 CFR 170.8. ("*Arbitration*")

20. By delegation and statutory authority from the CFTC as a State Actor, NFA's responsibilities include but are not limited to auditing and conducting examinations of members and enforcing to ensure compliance with both its own rules and CFTC rules. NFA is mandated to and has a duty to initiate disciplinary actions against firms and individuals who violate the rules.[3]

21. In addition, NFA has delegated and statutory authority as a State Actor, to enforce compliance of and handle reregistration functions for the CFTC.  OIG report Page NFA's registration functions include evaluation of candidates' fitness and the conduct of member compliance examinations

---

[2] See Exhibit 1, Page 19, -Table 6, Also Page 10 - Table 1
[3] See Exh 1, Table1, Page 10, Table 6, Page 18-19

22. By authority delegated from the CFTC under 7 USC 21(o), as a State Actor. NFA has the authority to register, register conditionally, suspend registration, place restrictions on, revoke the membership registration subject to the NFA Bylaw 301, which provide conditions therein – including that such Members cannot pose a threat to other Customers or Members.

23. Notably, in the recent audit report in 2017,  the Office of the Inspector General ("OIG") of the CFTC indicated that over the very same four areas of delegated authority, the CFTC has not provided any oversight over the last ten years, and "no report was on record". (Exhibit 1)

24. Finally, NFA is required to provide a unbiased, fair, and neutral forum for arbitration for resolution of customer and member disputes.[4] CFTC has previously received other hotline complaints related to the NFA arbitration and disciplinary programs. "*NFA arbitrations are not appealable to the Commission or to federal or state courts. As NFA does not publish its arbitration decisions, it is apparent that NFA arbitration decisions are not subject to evaluation and comment by other. CFTC documented the need for periodic oversight of NFA's arbitration program, in order to ensure that arbitrators are qualified and unbiased, and that complaining customers, as well as NFA members (and their employees), receive all due process required*" (Exhibit 1, Pg.10)

25. During the time of the events in this Complaint, no such oversight was conducted.

## FACTS

## BACKGROUND OF VISION AND THE FRAUD

26.  Vision Financial Markets, LLC located in Stamford, CT, was formerly a Futures Clearing Merchant ("FCM") registered with the NFA.

27.   On or around June 20 2014, NFA issued a public announcement available announcing that Vision Financial Markets was effectively barred from Membership   Their public filing stated that NFA acknowledged a pattern of serious disciplinary actions by regulators and that Vision Financial has had a long history of supervisory issues during its tenure as an NFA Member. It had been the

---

[4] *See* NFA s Article II, Article III, NFA Bylaw 1506, and NFA Bylaw 801, & CEA .

subject of four prior NFA Complaints -three of which charged the firm with failing to diligently supervise various aspects of the firm's operations. [5].

28. Vision Financial Market's profiles on NFA Basic Website shows the entity was subject to 172 CFTC Reparations against it as Defendant - cases brought against Vision, its management and owners by harmed customers – a firm with a serious disciplinary track record of violations, that customers, including Plaintiffs would not choose to do business.

29. In or around 2010 Vision was fined $500,000, specifically list Vision's risk management failures in options risk management on futures and caused losses to customer of millions of dollars. The risk manager of Vision at the time was John Felag, and under the supervision of Howard Rothman and Robert Boshnack.

30. Three years later, however, in or around 2013, Vision's gross negligence and failures in risk management specifically in commodities futures options trading, caused customers to lose another $2.1 million. Vision Financial Markets was fined $1,500,000 and paid approximately $2 million in customer restitution. Complaints filed cited Vision's failure to observe high standards of commercial honor, failure to observe just and equitable principles of trade, failure to maintain adequate records, and failure to supervise.

31. However despite public statements that Vision would exit the business it did not. By piercing the corporate veil, its owners Howard Rothman and Robert Boshnack, in their individual capacity, tailored a deal, in or around September 2014, by which they would simply change the name of Vision, form numerous other affiliates, including but not limited to High Ridge Futures, High Ridge Holding Company, LLC Vision Investment Advisors, and partner up with ADMIS.  Same company, new names.

32. Vision Financial Markets, LLC is still in existence and operation, continues to be subject to other fines and grievances of misconduct from the SEC[6] and CFTC [7]and is owned by Howard

---

[5] https://www.nfa.futures.org/news/newsRel.asp?ArticleID=4428
[6] https://www.goodetrades.com/2019/04/sec-fines-clearing-firm-vision-financial-markets-llc-625000-for-failures-to-file-sars-about-penny-stock-deposits/
[7] https://www.cftc.gov/PressRoom/PressReleases/7973-19

Rothman and Robert Boshnack. It still maintains the firm's operations, and most recent SEC filings show it maintains headquarters, computer assets, networks, servers, and other business operations, which are shared with its affiliates, upon which the trade secrets and other financial compensation alleged in this complaint were transferred to

33.   Concealed from the public, in what appeared to be a straight "transfer of business" to ADMIS, was that behind the scenes, Boshnack and Rothman, in their individual capacity, agreed to essentially buy their way back into the business, and provide substantial personal financial incentives and  undisclosed personal guarantees on its network of Vision IB's. Introducing Brokers that were previously clearing through Vision. ("Vision IB's).

34. The catch – once the account was opened at ADMIS - in exchange for millions of dollars of financial incentives from Boshnack and Rothman to ADMIS – ADMIS would secretively distribute its customers and CTA's confidential and proprietary financial accounts, behind the scenes, (without the customers and CTA"s knowledge, consent or authorization) to Vision and its owners, employees and affiliates, to access their trading strategies.

35.   The second catch -  ADMIS would pass through unauthorized fees to the victims, to fund Vision's owners, employees and affiliates upon belief, estimated to exceed ten  million dollars a year, to customers which it would materially and fraudulently conceal in the account opening.

36.   The third catch -  after ADMIS disseminated all its CTA's competitive algorithms to Howard Rothman and Felag, Vision set up another affiliate called Vision Investment Advisors, Inc to directly trade in competition with all the CTA's who financial accounts it had unlawfully gained access to – while ADMIS, in direct unfair market competition, continued to give Vision, preferential rates, discounted commissions, and sell-out its competitors trade secrets.

37.   This conduct directly violates the intent of the Commodities Exchange Act, thwarts fair market competitions and has harmed dozens of customers and CTA's, not just by the unlawful overcharges of $50 million dollars, but the attrition and theft of intellectual property, trading strategies and destruction of new CTA's entering the business, who's account have been pillaged and distributed to be offered to Vision to gain an unfair competitive advantage.

Page 9

38.  The fraud is perpetuated by a ring of about 80-100 former Vision Introducing Brokers ("Vision IB's") that were transferred over to ADMIS from the former Vision Financial Markets, LLC, in or around September 2014, collectively called (Vision IB's), that are located over the United States. Incorporated by reference Exhibit 2, is a list of some of the Vision IB's upon information and belief participating in the fraud.

39.  The Vision IB's  use interstate wire and telephonic communications to solicit customers to open futures trading accounts at ADMIS who by omission and fraudulent concealment then distribute them to Vision. The scheme is perpetuated with scienter to deceive. Vision IB's together with ADMIS and Vision conspire on the overcharges to be passed through to customers – ultimately to generate revenues for Vision and the Defendants.

40.  Upon information and belief, the overcharges range from 0.30cents to $6 a trade which are willfully added only *after* the account is open, in violation of NFA 2-26, and disguised as trade processing fees and transaction fees. This timeline makes it harder for customers to dispute the charges, and close the account. It also violates the CEA. As part of the fraudulent sales and solicitation, ADMIS at all times materially omits and conceals and/or misrepresents that those fees are being wired across interstate lines, with cash deductions from customer accounts to pay Vision.

41.  Further, the scheme is designed to deceive and "be careful" CTA's don't find out – as the conduct violates Federal law. Vision, ADMIS and Vision IB's and Defendants willfully conspired to reduce the overcharges to CTA's to $0.30 cents a trade, as CTA's are more price sensitive and more likely to detect the fraud if they notice higher over charges. In return Vision improperly acquire and are given unauthorized computer access, across interstate to their competitors CTA trading account. For innocent customers, also victims of the scheme, overcharges can be as high as  $6 a trade, which are being disgorged from their account, to fund Vision.

42.  Defendants meanwhile have been unjustly enriched, and the market place fraud continues to date with hundreds of customers and CTA's still unaware that ADMIS has distributed their confidential futures trading accounts to Vision..

43.  As a material part of enacting and covering up the fraud, ADMIS, its CEO an NFA Board Member, curried favor and utilized at least two long standing insider NFA Compliance Officer Jane Doe 1 and Jane Doe 2, who was "familiar with the dealings of Vision" and had knowingly participated in the fraud to violated NFA Compliance Rules to permit Vision, its officers, employees and affiliates to access customers and CTA's trade secrets, confidential trading records and privacy laws, in exchange for generating millions of dollars of revenue for the NFA.

44.  Without someone on the inside of the NFA to condone the rule violations, ADMIS, Vision and the Vision IB's would not have been able to perpetuate the fraud for over five years, and upon belief,  so far the customers and CTA's never found out.  NFA, with full participation in the conduct, wilfully in bad faith, as documented herein, failed to enforce its compliance laws.

45.  In exchange, Defendants procured millions of dollars of credit lines and financial benefits, which were material to their operating revenues.

### PLAINTIFF/TRADE SECRETS

46. Samantha Siva Kumaran ("Kumaran") is a British born, US Citizen residing in New York City, NY. Kumaran earned a First Class Masters and Bachelors, in Applied Math and Theoretical Physics from the University of Cambridge, UK.

47. Over the course of two decades, she is the sole owner and developer of analytical solutions, risk management software, and trading algorithms since 1993. Until entering the commodities futures industry in or around later 2016, Kumaran self-started a risk management software and services consultant in New York City. Her risk management strategies are trade secrets.

48. As a solopreneur, she  has consulted for a large companies, Fortune 500 companies and other clients, including Credit Suisse First Boston, AIG, Spectron Oil, FEA, Niagara Mohawk Energy Marketing, Nomura Securities, Manitoba Hydro, ABN Amro, JPMorgan, Duke Energy Field Services, Enron, Bristol Myers Squibb, Louis Dreyfus Commodities, Nexant, Fuji Securities, Market Arts Software, Risk Advisory Canada, Blue Rock Energy, Giro Credit, UMS Advisory and Winhall Consulting.

49. In 2018, Kumaran was featured as a Top 10 Enterprise Trading Risk Management ETRM risk management service provider and solution in CIO Insights

50. During the period 2011 until present date Kumaran, as the sole owner and inventor, of trading algorithms, specifically designed for the commodities options markets, and are designed to give her a competitive advantage both in risk management as well a CTA. The options modules are in direct competition with the programs that Vision was disbarred for.

51. In 2016 Kumaran took the Series 3 exam and in April 2017 Kumaran became a registered CTA. As with all CTA's, their trading strategies and algorithms are considered trade secrets, derive independent value from not being known, and are designed to give a CTA a competitive advantage to generate substantial returns and accumulate AUM from its secret sauce.

52. NFA rules, including NFA 2-24 9061 acknowledge the competitive value of a CTA's transaction record, stating it is expressly forbidden for an NFA Member to obtain those records without a CTA's permission.

53. Kumaran's CTA trading programs can be summarized as quantitative commodity options trading strategies that seek accelerated capital appreciation in short time frames, through the active trading of exchange-traded commodity options and provide a competitive advantage. Successful performance enables the investor to accumulate returns by reinvesting over a longer period, as well as take profits in shorter period.

54. The trading and risk management strategies, for the CTA, were borne from substantial investment of time and significant investment, cost, time  and development by Kumaran. They were designed and built over decades by Kumaran, and substantial time, money, research, development and highly-specialized skills, that are not easy to find, and to generate the options trades to give Plaintiff  a commercial competitive analytical advantage.

55. At all times Kumaran has protected this information under strict Non-Disclosure Agreements, non-compete and non-reverse engineering provisions, requiring the signing of express confidentiality agreements, and protecting its use and dissemination, and further took steps to rarely disclose the information. Plaintiffs do not disclose the trade secrets, except under the

express rubric of its own restrictive non-disclosure agreement. Further Plaintiffs restrict access to all its Confidential Information on its servers, including but not limited to password access, restrictive access to drives.

56.   At no time, either prior to, during or subsequent to the events hereunder did Kumaran assign ownership, right, title or interest to the IP to any person, corporation or legal entity. Kumaran in her individual capacity remains the sole owner in all IP interests.

57. In order to form the businesses, Kumaran, individually and friends and family as partners agreed to assist with financial capital and labor sweat equity estimated of significant amounts of capital to help form the business. Kumaran, in her individual capacity, also invested IP, as a capital contribution, which was valued separately and significant in long term business value, the partners agreed would have significant initial capital contribution value.

58. Kumaran had never heard of Vision before entering the futures business. She was an outsider and a newcomer and like many of the other victims, new to the industry.

### HOW PLAINTIFF SUCCUMB TO THE FRAUD

59.   During the period around December 2016 until January 2017, using interstate and wire communications to Kumaran in her offices in New York City, Trey Lazzara, at Lazzara Consulting, Inc located in Austin Texas, one of the Vision IB's involved in the scheme, and an unregistered Associated Person, Julie Villa,  used fraudulent sales and promotional telemarketing pitches, to introduce and solicit the sales to ADMIS in violation of the NFA 2-29, NFA 2-26. Villa also materially concealed her past with the futures industry, by using a duplicate LinkedIn profiles and also omitted her role at Lazzara.

60.     On dates including December 18, 2016, January 18, 2017, January 22, 2017  January 30, 2017 Lazzara and Villa fraudulently concealed and materially omitted, while maintaining active communications with Visions team, that by virtue of opening an account at ADMIS, Kumaran's account would immediately be disseminated to Vision in Stamford CT who were inherently interested in acquitting Kumaran's risk management and options trading strategies.

Page 13

61.     Lazzara and Villa repeatedly made overt fraudulent representations using interstate and wire communications to induce Kumaran to open the account at ADMIS,  including artificially lowering commission, on January 30 2017, blatantly lying about the risk management program, policies and procedures, in violation NFA 2-26 / CFTC 1.11, CFTC 1.55 and CFTC 33.7.

62.     Once Kumaran had opened the account, the account was secretly, immediately turned over to Vision to unlawfully scrutinize the trading strategies on or around January 31, 2017.

63.     In a repeated and persistent pattern of fraud and deceit, on dates including January 31, 2017 February 1, 2017, March 8, 2017, March 21, 2017, March 23, 2017, and April 10, 2017, Trey Lazzara, using interstate and wire communications from his offices in Austin Texas, to Kumaran in her offices in New York City, to conceal the activity by omission and deception used acronyms such as "risk guy", "dev team", "tech team" to disguise Vision's involvement, cutting and pasting emails so as to pretend they originated from ADMIS; masking domain names; making numerous oral and written misrepresentations; deliberately pretending that "*John from risk*" works at ADM; when in fact it was John Felag; materially in some communications deliberately misrepresenting Vision as "ADM risk" and "ADM" and/or a "division of ADM". The CEA prohibits fraud and deception. Lazzara at all times, materially omitted and fraudulently concealed Vision's access.

64.   Kumaran, during the period January 30 2017 until around June 20, 2017 documented numerous errors and omissions, and gross negligence in the risk management procedures, that violated CME margin rules. Such exhibits were emailed to Lazzara as gross mishandling on the account – unknown to Kumaran was behind the scenes – risk had been outsourced to Vision.

65.   Despite Kumaran's repeated questions and documented evidence of screenshots replete with errors and omissions, violating exchange rules, and scores of risk management errors that violated CME 980 and CME 982, Lazzara persisted in the fraud, at all times concealing it was Vision's grossly negligent and unqualified risk team, who were behind the scenes impostering the risk management program.  The errors were upwards of 200% of  account value, violating the CEA.

66.   On or around April 20, 2017 Kumaran's CTA account was proving out and showing higher than average returns in its options trading strategies, at over 12% over sixty days.

67.   On or around May 2, 2017 – competitors and strangers - Boshnack, Felag and Vision who had been granted unauthorized computer access into their competitors Kumaran's CTAs trading account, in violation of NFA Rules,  willfully and intentionally tampered with financial controls, added on further unauthorized fees, and tortiously interfered with and sabotage their competitors, Kumaran's CTA's trading performance, in express violation of the CEA, and direct espionage.

68.   Further, on or around May 2, 2017 Vision and its affiliates, to deliberate thwart competition of Kumaran CTA's account, began withdrawing and scalping additional cash deductions from Kumaran's CTA performance records (after wrongfully acquiring inside access to the account from ADMIS),

69.    In further malfeasance, wrongdoing, without Kumaran's knowledge and consent, Boshnack and Rothman, were tampering with, interfering with, violating exchange rules, and in gross negligence and errors and omissions, misstating margin by over $134,000 on a $25,000 account and using unreasonable, non-exchange complaint procedure to inflate Kumaran's account – with detrimental effects. Lazzara and ADMIS never issued a margin call violating the CEA.

70.    At all times, including on May 15, 2017 and May 16, 2017, using interstate wires and mail communications, Lazzara persisted in the fraud, deceit and misrepresentation, to conceal Vision affiliates access and their grossly negligent, deliberate and material meddling in its competitor CTA's account, which was expressly forbidden under exchange rules, and instead fraudulently misrepresented that ADMIS had authorized an intraday credit line. The information was false.

71.    Upon belief, Boshnack and Felag had unlawfully manipulated credit without consent or authorization, causing material harm and sabotage to a competitor Kumaran's CTA account.

72.    On or around May 17, 2017 and again on June 16, 2017 Kumaran in New York, spoke to Dave Glancy in Chicago, IL, at ADMIS risk department. Glancy, also, by fraudulent concealment, intentionally omitted and failed to disclose that Vision affiliates had been outsourced risk.

73.    On or around June 25 2019 Kumaran closed the account at ADMIS, citing gross negligence in the risk department and still materially unaware of Vision affiliates access to the account.

74.    On or around August 20 2017 Kumaran through reconciliation and audit, detected that cash balances in the account ending balances did not tie out, and that unauthorized fees and payments had been made to deplete its CTA performance by over 3.4% over forty five days, to deplete its competitive valuation in direct and targeted unfair market competition.

75.    On or around September 20, 2017 Kumaran uncovered that unauthorized access had been given to its account to third parties, Vision's owners and affiliates and started to confront Lazzara.

76.    On or around September 20, 2017, September 27, 2017 and September 29, 2017 after multiple emails, seeking explanations from her broker Lazzara, how unauthorized third parties Vision affiliates had access its accounts, and demanding to know what their financial interest was in her proprietary trading records as a CTA, Kumaran was alerted to the fraud. (**See Exhibit 3**)

77.    Lazzara on or around September 27, 2017 tried to blame others " he was following risk management procedures of ADMIS to give confidential emails related to Kumaran's trading account to Vision's affiliates' risk management procedures he had materially concealed at account opening, and were mandatory to be disclosed under NFA Rule 2-26 / CFTC 1.11, 1.55 and 33.7.

78.    On or around October 12, 2018 ADMIS,  admitted that it had shared the trading strategies of Kumaran's CTA account with its competitors Vision, its owners, employees and affiliates – in arrangement for them to provide risk management services. The risk management services performed were grossly negligence, by unqualified personnel, replete with errors and omissions, and egregious violations of the CME rules, to use non-compliant

79.    It was apparent that Kumaran's was one of many customers and CTA's that ADMIS had been giving backdoor access to Vision, to unlawfully acquire the trading strategies and financial information of its confidential futures customers' accounts. Kumaran, a registered CTA and NFA Member had not authorized such conduct, and it was fraudulently concealed.

## NFA COMPLIANCE FAILS TO ACT

80.  On or around September 27, 2017 when Kumaran first learned that its account had been unlawfully distributed to Vision's affiliates, without its consent, it also reached out to the NFA hotline, to inquired, what approvals existed by NFA, for ADMIS to distribute customer accounts

to Vision affiliates. Kumaran noted it was a new CTA, was new to the futures industry, had never heard of Vision, just found out they had a nefarious background with multiple disciplinary actions.

81.   On or around September 27, 2017 and September 29, 2017 Kumaran in New York City, communicated with a Ms. Funda Agkok ("Agkok") in the NFA Compliance department. Agkok was sent exact copies of communications dated September 29, 2017 between Kumaran and Lazzara, and therefore Agkok and NFA Compliance had actual, direct and constructive knowledge that a CTA's account was being shared with the employees owners of the disbarred Vision, without its knowledge, consent and authorization, in violation of NFA 2-4 9061(*See* **Exhibit 4**)

82.   However at the time Plaintiff initiated the call, the NFA, and its Board Member Tom Kadlec and other compliance staff, already knew of the market place fraud. Unknown to Plaintiff, in fact since September 2014 until the time of the call or around September 2017, NFA, ADMIS and Vision and its network of IB's had reaped approximately $10 million dollars a year to support the commodities futures industry, and overcharges of transaction fees, and NFA Fees.

83.   NFA to facilitate customers and CTA"s not finding out that ADMIS was distributing customer and CTA accounts to Vision, substantially and directly omitted any reference or link to the arrangement on NFA's Basic Website, so any Customer, CTA or Member, inquiring about ADMIS or the Vision IB"s had no knowledge or history of the relationship and transfer of customer accounts to Vision affiliates, owners and employees.

84.   Instead of providing assistance, Agkok intentionally failed to respond to any of the reasonable questions that were posed by Kumaran, despite her duty to enforce compliance laws, including its September 27, 2017 and September 29, 2017 emails which stated in part

> (a)  *I am seeking the NFA Rules and other laws that prohibit an IB from failing to respond to a Customer regarding questions on their account (b) I am specifically looking for the NFA Rules, or Commodity Exchange Act Rules, or CFTC Rules or all applicable Financial Institution Rules, that protect a customer's confidential information and trading data records from being disclosed or disseminated to unauthorized third parties (including other brokers, IB's) without the customer's knowledge or consent. And;  (c.) I need to find the specific statutes or laws that protect my financial data.*

85.   Agkok knew the NFA were involved, and knew that customers finding out would expose, wrongdoing and participation from the NFA itself. Instead, of investigating, Agkok and various other NFA Compliance Officers, instigated a cover-up and were on alert that customers (at least one) had uncovered the scheme, and needed to keep it concealed from the public. A material part of not permitting other customers and CTA's to find out was to induce Kumaran into NFA Arbitration.

86.   Plaintiff received no answers, no information, no assistance, no guidance as to where it could find public information on how such conduct was permitted under NFA Compliance rules. It wasn't. And NFA knew that they would be liable if others found out and dug deeper.

87.   The fraudulent conduct to harm thousands of customers and CTA's had been going on for close to three (3) years and was generating millions of dollars of revenue for the NFA, NFA's ADMIS' board member  and substantial revenue in Membership Dues and transaction fees from allowing all the Vision IB's to partake in the fraud.

88.   Intentionally knowing that the conduct violated multiple NFA compliance rules, and in bad faith failing to enforce them, NFA did not contact Plaintiff once for any more information. NFA requested no follow up information from Plaintiff, about the numerous allegations about fraudulent sale and solicitation, unauthorized fees, and dissemination of trade secrets.

89.   At the time of Plaintiff's phone-call, upon information and belief NFA was also in breach of its own compliance obligations. NFA had *never* conducted an audit of Lazzara since Vision was disbarred, had not met the minimum frequency requirements to audit, were in violation of commission delegation.  Examinations are a delegated function by the CFTA to be performed by NFA in its function as DSRO to ascertain members' compliance with CFT reg 17 CFR 1.52(c).

90.   In fact, Lazzara and numerous other Vision IB's had not been audited ___*ever*___ since the transfer in 2014, in violation of CFTC's delegated authority for over three (3) years, since their transfer from Vision. Therefore NFA had also violated 17 CFR 1.52(c). (iv) (B) in failing to enact their compliance and examination audit to supervise Vision IB's.

91.  As Agkok had intentionally failed to respond to her questions, and failed to enforce rules Kumaran followed up on or around October 19, 2017 and communicated with NFA Compliance Officers Tom Paschen and Jay Bond. Upon belief, Bond is a certified fraud examiner for over 10 years and manages and oversees risk-based operational and financial audits of NFA Member Firms to ensure compliance with NFA Rules, CFTC Regulations and industry standards.

92.  Bond and Pashcen, NFA Compliance staff, again received constructive information that a CTA"s trading account, had been disseminated to Vision, its owners, employees and affiliates, in violation of NFA Rule 2-4, 9061, and the risk management was replete with errors and omissions, violations of the CME rules of posting margin, and other NFA rule violations they had a duty to enforce. Kumaran posed specific questions that privacy laws had been violated that third party NFA-Members, disbarred Vision had obtained access to a CTA's trading record without consent.

93.  NFA again intentionally failed to respond to Kumaran's questions and in bad faith intentionally failed to enforce the rules they had a duty to do. NFA knew that any answer would implicate their own liability and vacated compliance duties to respond.

94.  NFA never followed up with Plaintiff on how its CTA strategies had ended up in the hands of its competitors, disbarred Vision, violation they had a duty to enforce, and despite the charred disciplinary record that Vision had, deliberately contradicting the false and misleading narrative and NFA's own public announcements that anyone "doing business with High Ridge, would have access to Vision's background".

### NFA - JANE DOE 1- BEHIND THE SCENES

95.   Unknown to Plaintiff, instead NFA instigated a cover-up, during the period on or around October 17 2017 until around March 13 2018, NFA Compliance Officer Jane Doe 1 ("NFA JD1"), and conducted a superficial compliance examination of Trey Lazzara. The audit however was not designed to legitimately investigate any of the conduct Kumaran alerted them to, but to cover up, and to conduct an incomplete one-sided investigation and to rubber-stamp, NFA's compliance with its own DSRO frequency requirements.

96.  Although the NFA's investigation into Lazzara directly involved and was commenced only after Kumaran reported misconduct on a CTA's property and rights, that clearly violated NFA2-4, NFA 2-26 and NFA 2-2, NFA deliberately did not contact Plaintiff once or provide Plaintiff with notice of the investigation. NFA also intentionally failed to ask for two-sided explanation of the material allegations of compliance violations, including dozens of jpgs of evidence of margin calculation errors on  Kumaran's account and even though it was a first ever audit on a Vision IB.

97.  NFA and NFA JD1, intentionally chose to exclude Plaintiff from participation in any investigation, as that directly implicated NFA's own wrongdoing, thereby obtaining only a one-sided review of the facts, so that, purposefully none of Kumaran's actual allegations could be properly reviewed or considered, and to shield NFA's own complicit-ness and failure to enforce compliance laws and willful participation in the scheme.

98.  Further, NFA, intentionally took actions to conceal the investigation from Kumaran and to procure an outcome that did not equally enforce the rights of all. The same allegations occurred in another action against the NFA, Effex where NFA failed to conduct an investigation that properly included evidence from the persons actually harmed.

Wide Spread Evidence of Fraud

99.  At the time of NFA *first-ever* examination, screen shots from Lazarra's computer, evidence the NFA had direct, actual and constructive knowledge, that Lazzara's fraudulent conduct had impacted and  defrauded dozens if not more of his customers, and CTA's who had no knowledge that their confidential trading accounts had been disseminated to Vision, and who had not approved fees across interstate lines, to fraudulently transfer moneys to Vision affiliates.

100. NFA also had material and direct knowledge, that Lazzara, in participation with ADMIS, Vision had gouged, through multiple customer's accounts being defrauded, an estimated excess of $100,000 in authorized fees a year from Lazzara only, from his customers and CTA's in express violation of the Commodities Exchange Act, and NFA Compliance Rules 2-26, which in turn generated substantial revenues and operating fees for the NFA.

101. NFA knew customers had not been disclosed this information at account opening in violation of the express sales and promotional requirements required under the CEA and NFA had an affirmative duty to enforce the fraud and compliance laws. (NFA 2-29. NFA 2-26, NFA 2-2)

102. The NFA obtained direct financial benefit, in substantial operating revenues to the NFA, These fraudulent financial deductions were also being used to directly pay Robert Boshnack, Howard Rothman and Vision, without the customers and CTA's knowledge, authorization and consent, who were using back-door deals with ADMIS, "credit lines" and "guarantees" to NFA Board Members, which in turn were illicitly propping up the futures industry, funding operative revenues of the NFA, to buy themselves back into the industry after being disbarred.

Motivation to Defraud

103. The illegal conduct and NFA violations to in bad faith intentionally not enforce compliance laws provided concrete benefits to the NFA, not just in the operating revenues they collect from every trade and every futures customers, but also directly of financial value and benefit to the salaries of executives in  the NFA and the operating revenues, upon which NFA relies.

104. Public records show NFA's CEO, Dan Roth, earned $655,771 in salary, bonus and benefits for the year ended June 30, 2013, according to an IRS filing.[8] Recent press articles, show that Tom Sexton, the current CEO of the National Futures Association, brings home $763,023.[9] Comparatively, SEC Chairman Jay Clayton's salary for this year is $176,900.

105. The NFA to support its lavish salaries, funded solely by membership dues and fees it charges to futures. Despite the salaries, public records show that NFA posted cash reserve losses of over $1mm in 2017 and 2018 also posted financial losses in 2017 and 2018 during the period.

106. It also lowered the risk of NFA's public reputation if it could avoid another financial debacle like Peregrine by acquiring credit lines. However, new customers and CTA property and interests were being distributed, without  regard for their rights, in violation of the law, to protect the NFA's operating revenues and lavish executive salaries. .

---

[8] https://www.chicagobusiness.com/article/20150117/ISSUE01/301179981/national-futures-association-wrestles-with-alphametrix-aftermath,
[9] https://www.barrons.com/articles/finra-reports-loss-but-ceos-pay-rises-51562188487

107. NFA needed the money, and needed to participate in the scam, because the illicit arrangement between–ADMIS, Vision and Vision IB's contributed million dollars of revenue to the futures business, and also propped up an estimated hundreds of millions of credit lines to the NFA itself, a concrete benefit, and after the Peregrine disaster, where billions of losses occurred under NFA's negligence, NFA benefitted not just from direct financial revenue, but could protect its reputation, and self-preservation from being a benefactor of the illegal credit lines of Vision.

108. However, in exchange, NFA in bad faith willfully failed to  enforcing its laws, and NFA sold out hundreds of small customers and CTA's, exerted eminent domain on their assets, and property, and confidential financial data, and in exchange for the millions dollars of credit lines, intentionally and willfully failed to enforce its compliance laws, in bad faith, for years, knowingly violated the CEA, and allowed Vision, to gain access to customers and CTA's financial trading accounts, in express violation of NFA 2-24, and the Defend Trade Secrets, multiple privacy laws,.

109. NFA knowingly and actively participated with ADMIS and Vision, to fraudulently conceal the arrangement from customers, was willing to sell out small customers, small businesses and CTA's, to protect its own reputation and as result thwarted fair market competition, damaged small businesses, condoned illegal activity, in order to generate operating fees and unauthorized revenue.

110. Because the NFA controlled the audit and compliance, they acted with material intent to make sure that the customer and CTA would never find out, including expose the NFA's participation in the scheme. Further they used the NFA Arbitration forum as a mechanism to control the proceedings and shield themselves from liability.

111. NFA and ADMIS, to generate ill-gotten operating, fees and fund excessive NFA salaries, caused irreparable harm and damages to  small customers, directly and deliberately thwarted fair market competition, failed to enact the laws and governance to procure favors to insiders at the expense, or small customers and businesses.

112. Public reports show a pattern of NFA not protecting the interests of smaller customers. Peregrine customers like Kevin O'Brien, of Naples, Fla., who once had as much as $250,000 at PFGBest, say they will never invest in futures again. Mr. O'Brien tried in vain to withdraw money

from his PFGBest account last year, but a firm representative always had excuses for not returning the money, he says.  "I don't feel that oversight was there," Mr. O'Brien says. "I feel like I'm just a small player on the block and no one gives a crap about our interests." [10]

113. Small businesses, and minority women customers were not a priority of NFA, who allowed only inside favors from a network of insiders, including NFA Board Members, who sat on committees. Similar conduct occurred with Peregrine where insiders who funded parties, and sat on boards and got a free pass on compliance laws.

114. Similarly Kumaran was a small business, and sole-proprietor, a minority woman, with a small trading account. ADMIS, who's CEO Mr. Tom Kadlec, is an NFA Board Member  and Vision, were operating a scheme that generated over $10 million dollars a year in illicit fees for the NFA, and providing credit lines also in the million dollars to buy themselves back into the industry – substantial financial incentives.

## NFA JD1 PERPETUATES THE SCHEME

115. At the time of the audit, NFA and NFA JD1 had actual and constructive knowledge of Kumaran's call to the NFA compliance line,  compliance violations, they were in receipt of the communications from Kumaran including those dated September  29, 2017 to Agkok, (*See* Supra), and on or around October 17, 2017 requested from Trey Lazzara, copies of all communications, emails and documents related to Kumaran's account. Therefore again, NFA had constructive knowledge of all the activities related to the account outlined multiple regulatory violations including those of mishandling margin and violations. (*See* Supra)

116. At the time of the audit, NFA Jane Doe 1 had actual and constructive knowledge of the Kumaran's call to the NFA compliance line on or around September 27, 2017 and reporting of violations of NFA compliance laws, including but not limited to the dissemination of CTA's trading records, without its permission, authorization and consent to Vision, who were also NFA Members, in violation of NFA 2-4 Interpretive Notice 9061.

---

[10]  https://www.chicagobusiness.com/article/20120713/NEWS01/120719875/peregrine-bankruptcy-raises-questions-about-nfa-cftc

Page 23

117. Not only had Agkok provided NFA JD1, with the emails and correspondence from September 20, 2017 and September 27, 2019  that Kumaran had the NFA, that Kumaran had supplied during its call to the NFA Compliance, those emails outlined multiple regulatory violations including those of mishandling margin and violations of NFA 2-26/ CFTC 1.11, CFTC 33 and CFTC 1.55. NFA under rule 2-26 are require to enforce those laws.

118. However NFA and NFA JD1 were willfully not intending to enforce Compliance laws.

119. On or around October 17, 2017 and or around February 23 2018, unknown to Plaintiff, NFA JD1 with actual, direct and constructive knowledge of the foregoing conduct, directly participated in and facilitate perpetuation of the fraud, in bad faith willfully failed to enforce the Commodities Exchange Act, and NFA Compliance Laws including but not limited to;

a.     NFA 2-26 including without limitation CFTC 1.11, CFTC 1.55 and CFTC 1.57 which required Lazzara and ADMIS, disclose customers, *all* its risk management policies and procedures, *prior* to opening the account;

b.     NFA 2-4 Int Not 9061 which states  it is a NFA Compliance violation for NFA Members Felag and Vision owners, affiliates to obtain a CTA's trading records without their permission;

c.     NFA 2-4 Int Not 9005 and NFA Rule 2-26 / CFTC Part 33.(7) which required that Lazzara disclose all the costs and transaction fees and trade processing fees (being deducted from Kumaran's CTA record to pay Vision) prior to the account being open, and that any arrangement that is likely to deceive customers is a violation of NFA Requirement;

d.     NFA 2-2 which makes it an NFA Compliance Rule violation to in any manner deceive, cheat or defraud another NFA member or commodities futures customer;

e.     NFA Margin Handbook and NFA Financial Handbook Section 7, which mandated that Lazzara and ADMIS, issue margin calls directly to Kumaran, and not to Robert Boshnack,  an arrangement which to a material failure to enforce exchange compliance laws in Performance Bond margin and failure to issue margin calls under CME 980, CME 982.

f.     NFA 2-26 17 CFR 1.57 and 7 USC 2 (c.)(v)(IV) and which prohibited strangers, Vision, its owners, affiliates and employees from directly  or indirectly extending, or maintaining credit

to or for, or collecting margin on Kumaran's account. It also prohibited them from having discretion on Kumaran's account, as well as power of attorney to handle margin calls.

120. Not only did NFA and NFA JD1 perpetuate violation of numerous NFA Compliance Rules the very rules they had a duty to enforce, NFA JD1 failed to abide by multiple Federal laws, that protect the integrity of customers personal financial data, confidential information as well as their proprietary trading records and transaction history. For example for CTA's, professional traders, who were direct competitors of Vision Investment Advisors, LLC, Felag and Boshnack, another CTA, Federal law prohibits the unauthorized dissemination of a CTA's trade secrets to their competitors, under 18 USC 1831 el seq, across interstate lines under the Defend Trade Secrets Act.

121. NFA and NFA JD1's conduct infringed the very heart of the Commodities Exchange Act, that the NFA 7U.S.C.1,§5 was enacted to promote "fair market competition" and to protect the interests of market participants, to promote responsible innovation and fair competition among market participants. The purpose of the NFA's Articles of Incorporation[11] Section 1(a) public interest…is The adoption, administration and enforcement as … regarding fair practice and designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade and, in general, to protect the public interest"

122. In fact, the report also does not recommend that. Lazzara disclose to its customers the role that Vision plays with respect to risk management activities, including handling margin matters involving Lazzara's customers' accounts that are cleared through ADMIS. Defendants intended to conceal the activity, as they knew many customers would close their accounts if they found out.

123. By intentionally failing to enact the foregoing compliance laws, the NFA had a duty to enforce, NFA and NFA JD1 directly aided and abetted and provided substantial assistance in perpetuate the fraud on customers and CTA's. Such actions involve material violations of the Commodities Exchange Act, and material, intentional and bad faith failures of the NFA, NFA Jane Doe 1, to enforce NFA compliance rules to propagate the scheme NFA and ADMIS and Vision.

---

[11] https://www.nfa.futures.org/rulebook/index.aspx

124. As a result of NFA bad faith failure to enforce its laws, Kumaran and other customers and CTA's have suffered irreparable harm in loss of their confidential and trade secrets, financial losses in their trading accounts, deplete losses in performance records, damages to their good will and other impacts to the their CTA careers, financial losses to their property, livelihoods and investments in the futures industry, as well as other significant damages.

## INDUCED INTO ARBITRATION

125. On or around March 14, 2018 unaware of any of the activities of NFA JD1, and not having received any follow up from the NFA about its September 2017 phone calls, Kumaran called the NFA again to inquire about the compliance violations. On or around March 16, 2018, via teleconference in New York City, Kumaran spoke again to NFA Compliance staff Sebastian Waliczek and Muhammad Afzal located in New York City, NY.

126. On or around March 25 2018, Afzal and other NFA Compliance officers received documents that showed direct evidence of violations, including but not limited to facts that (a) Plaintiff, a registered CTA, had its confidential and trade secret information transaction history, sent to Vision without its knowledge consent and authorization in violation of NFA 2-4  9061 and; (b) Kumaran, without disclosure, consent and permission, was charged unauthorized fees that were being deducted to compensate Vision in violation of NFA 2-26.  Afzal was also provided full and advance knowledge and evidence of a list of about thirty pages of NFA Rules violations that Kumaran would allege against ADMIS and Vision affiliates, which were not being enforced.

127. Even though Afzal had material knowledge about the activities of NFA JD1, it concealed the information from Kumaran, and stated the matter was closed – failing to elaborate.

128.   On or around March 25, 2018, Afzal stated that NFA does not investigate compliance complaints unless NFA receives Arbitration Fees, and NFA would need payment of $9,500 before looking into the material violations discussed. NFA's requests to be "paid to investigate" legitimate compliance complaints violates the NFA's mandate and statutory obligations.

129.    Afzal also stated that once complaints are filed at the NFA Arbitration, he would then be able to access them, because Arbitration complaint were also sent to NFA Compliance for review, and that only when a Plaintiff paid its fees to the NFA Arbitration does the Compliance review it.

130.    No-one at the NFA had responded once to its legitimate questions on how it was possible for the employees and owners of the disbarred Vision, to be accessing its confidential trading account of another CTA, without its permission, as specifically prohibited under the rules.

131.    NFA Compliance Staff Agkok, Bond, Pashcen, Afzal deliberately took actions to conceal information, NFA JD1, and failed to respond to and answer legitimate questions and emails, (as to which rules protect CTA's confidential information), materially concealed information, and induced Kumaran into a biased and evidently partial proceeding.

132.    Prior to selecting the NFA Arbitration Forum, could not have uncovered the fraud upon due diligence, prior to initiating the Claim. Therefore the fraud was (1) not discoverable upon the exercise of due diligence prior to the arbitration; (2) materially related to an issue in the arbitration; and (3) established by clear and convincing evidence[12].

133.    In fact Afzal went as far as to demand more money for the NFA, and stated that the only way NFA would investigate a "compliance complaint" is after Kumaran paid $9,500 to the NFA Arbitration department. Since at the time Kumaran had no knowledge of the NFA's complicit involvement, it was induced to bring the Arbitration at the NFA, (as opposed to any other forum) because it was deliberately misled, that the NFA would only look into and enforce compliance violations if it brought the NFA Arbitration, and paid money to the NFA.

134.    On or around May 22 2018 Kumaran arranged to be wired $9,500 to the NFA Arbitration department, and paid the fees Afzal stated were requisite to NFA enforcing compliance violations.

135.    On or around June 8, 2018 Kumaran electronically filed its final complaint (after being granted three tolling extensions) with the NFA Arbitration department citing multiple violations

---

[12] 9 U.S.C.A. § 10(a)(1).

of the Commodities Exchange Act, and the scheme by ADMIS, Vision and numerous Vision IB's, to defraud customers and CTA's.

136.   Kumaran at the time, had no idea that NFA was a participant in the fraud and other alleged conduct. If it had known it would have selected an alternate forum.

137.   NFA Arbitration stated  it has no electronic storage system, and no method of archiving, and no computer records of arbitrations, no file management access, no record of a docket, and keep no copies of paper copies sent in Arbitration. Plaintiffs are required to print and use postal mail to send copies of pleadings to the NFA. The NFA keeps no records, provides no  transparency of what is sent, dates sent, to whom and what is included.

138.   On or around June 15, 2018 the NFA Arbitration department stamped the paper copy of the Complaint as "Received".

139.   Once NFA received its money, Afzal and his compliance staff, never contacted Kumaran about its complaint and never investigated again.

140.   On or around July 6, 2018 after an extraordinary delay of twenty one (21) days, of no communication, NFA stated it had read the Complaint, without service.

141.   On or around August 6, 2018 NFA served the Complaint on ADMIS, Vision and other Defendants. NFA never filed a copy of what was included in service, and did not include the exact copy of what was served. The letter contained a scheduling order.

NFA UNSUPERVISED ARBITRATION

142.   On or around September 21, 2018 ADMIS and NFA began a process of flagrant disregard for the NFA Arbitration rules, a process that lasted months, to deny Plaintiff's due process rights and to obstruct fair and equitable justice in an NFA controlled Arbitration Forum. NFA had still failed to appoint an Arbitration Panel, even though now for over three months, in violation of the Federal Arbitration Act, and delegated and statutory authority responsibilities.

143.   NFA Arbitration failed to respond to procedural emails, failed to provide a transparent record of service-of-process, maintained repeated ex-parte telephonic communications with ADMIS and its counsel, and went as far as to leak information to ADMIS (advance of any

announcements) of NFA Arbitration locations and venue, in advance of Kumaran being notified. Upon belief, NFA included various unorthodox items in service that were never part of the Complaint, and provided only ex-parte records with ADMIS.

144.    ADMIS and Vision affiliates intentionally ran amok of the  NFA Arbitration rules – which had no Panel oversight – without consequence and penalty by NFA. NFA permitted ADMIS and Vision to conceal material evidence, hide documents, and violate NFA rules such as NFA 7(A)(2).

145.    With bias and evident partiality, ADMIS obstructed material evidence, that would expose NFA's approval of "guarantee" agreements, between Rothman, Boshnack and Vision affiliates on Kumaran's account – fraudulently concealed at account opening - which were due October 5, 2018. In material bias and conflict of interest, NFA failed to enforce its rules 7(a)(2). NFA did not enforce its rules on its NFA Board Members Kadlec.

146.    Plaintiff filed a Motion to Compel ten (10) days later on October 15, 2018. NFA again acting without authority from a Panel, because there was no Panel, failed to provide oversight and the motion was left to languish. In fact the motion languished for over *365* days. was not until the stay of this proceeding, production never was forthcoming, in a material abuse of power and violation of its delegated authority to provide a fair and neutral arbitration.

147.    NFA continued to overstep its bounds, to prejudice Kumaran's rights, on or around November 1, 2018 by acting without Panel arbitrarily ruled that Plaintiff could not make a statutory claim to recover legal fees if it was assisted by counsel. Such actions violated Plaintiffs due process and statutory rights, were deliberately to prejudice Plaintiff to not have the benefit of lawyers during discovery deadlines.

148.    This cause significant harm and damage in prejudice to Plaintiff by not having the benefit or assistance of counsel, who though they could not make a claim for legal fees, during the issuance of discovery requests due on December 4, 2018. Kumaran filed the requests unaided.

149.    In an "Panel-less" forum, NFA continued to acted as the sole-arbitrator, issuing rulings, violating procedures, and with material bias, negligence and violation of the Federal Arbitration

Act, taking over 275 days to actually appoint a Panel, to cause financial harm and obstructions to Kumaran a sole proprietor in enforcing its rights.

### THE FRAUD WAS UNCOVERED

150.   On or around February 26, 2019 - Plaintiff uncovered for the first time, during discussion of document production and discovery, that NFA itself, had participated in the scheme with ADMIS, to disseminate customer and CTA's confidential trading accounts to Vision and learned there was a direct conflict of interest in the NFA Arbitration Forum administering the proceeding.

151.   Plaintiff also shockingly learned that ADMIS intended to produce documents, that demonstrated NFA's complicit conduct in the scheme, material failures to enforce NFA compliance laws.

152.   Further Kumaran learned for the first time that NFA employees would be called as defense witnesses in the NFA controlled Arbitration forum. Kumaran became aware that NFA were liable, jointly and severally as a party and defendant in the case and there was a conflict of interest.

153.   Promptly, on or around March 1 2019, Plaintiff sent a Non-Public Information request to the NFA to request all <u>public and non-public</u> documents related to the registration of Vision affiliates. NFA therefore became aware, that Plaintiff was seeking documents that exposed their direct and substantial assistance in the fraud. ( *See* **Exhibit 5)**

154.   Despite the request, Plaintiff received no such non-public documents. Plaintiff only public registrations which answered none of Plaintiff material requests in Items 1-10.

155.   On or around March 5, 2019, Kumaran was advised that ADMIS would produce the foregoing documents showing NFA was liable for the conduct on or around March 12, 2019. Further ADMIS had stated it intended to call NFA compliance officers as "defense witnesses" in the NFA arbitration.

156.   At this time, NFA had thus far, failed to appoint a Panel in the proceeding for now over 274 days, despite it being ***eight months*** since its received the Complaint, willfully denying Kumaran's rights to a "fair, expeditious, hearing" as mandated under the NFA's required obligations and bylaws, and articles of incorporation and in violation of the Federal Arbitration Act.

157.   One day before ADMIS was supposed to produce the foregoing documents, NFA suddenly circumvented the process, now over 274 days since the June 8, 2018 filing of the complaint, on or around March 11, 2019 NFA suddenly announced it had announced a Panel. Plaintiff never received the documents.

158.   NFA then set about a unreasonable and procedural biased set of protocols, to unfairly administer the NFA-controlled NFA Arbitration forum, to diminish Kumaran's rights and procure an outcome that would protect the NFA's liability including (a) Plaintiff Motions to Compel had been left to languish without enforcement for now over six(6) months permitting, NFA, ADMIS and Vision to conceal material evidence; (b) NFA arbitrarily attempted to vary Rule 7(h) to schedule out of sequence the one-and-only pre-hearing conference, which under the rules is due after 30 days after the Motion to Compel, again to obstruct due process rights to discovery.

## JANE DOE 2 – PARTICIPATION IN THE FRAUD

159.   On or around April 6, 2019, in further discussion of discovery items,  Kumaran learned for the first time that an NFA employee and compliance officer Jane Doe 2 ("NFA JD2") had been a material part of the scheme for over four years, acting in conspiracy with ADMIS and Vision to not enforce NFA compliance laws, and to permit dissemination of the customer accounts. and that ADMIS intended to call NFA JD2 as a "defense" witness.

160.   Upon information and belief, on or around January 15 2019 until around February 7 2019, NFA JD2 had also conducted an onsite audit and compliance examination of Vision affiliates. Upon information and belief, NFA JD2, was part of the Compliance team responsible for and had a duty to enforcing compliance with NFA rules and CEA by Vision, its owners, employees and affiliates and was a routinely familiar with the operations of Vision affiliates, since Visions' reregistration in September 2014. fraudulently acquiring customer and CTA's accounts, for profit.

161.   Upon information and belief, on or around February 9, 2019, NFA JD2's signature on documents related to the audit, shows NFA submitted compliance examination questions to Vision affiliates, that requested they answered questioned that relate  "how they handle margin calls and risk management on behalf of ADMIS customers and CTA's". This question, directly evidences

that NFA and NFA JD2 were fully aware that ADMIS had materially outsourced and delegated authority on its material risk management and material margin activities to Vision.

162.   NFA JD2 had a duty and a statutory obligation to enforce the compliance laws.

163.   At the time of this audit, NFA and NFA JD2,  including but not limited to numerous other NFA Compliance Officers, Agkok, Afzal, Waliczek, Paschen, Bond, and NFA JD1 had material actual, direct and constructive knowledge that Plaintiff as a CTA had documented to NFA compliance staff that Vision affiliates were accessing customers' and CTA's without their knowledge, consent and approval in violation of NFA 2-4 9061, and that ADMIS and Visions IB"s were fraudulently soliciting and marketing accounts, while making material omissions in and fraudulently concealing, disclosures that the risk management and margin activities were being materially outsource to Vision affiliates.

164.   The fraudulent concealment and decision to outsource the handling of margin calls, and risk management services to the unqualified management team of the employees of the disbarred team at Vision was material. Even more paramount was Vision's blemished management team had previously caused over $2million dollars of losses to futures customers and resulted in their entity being effectively disbarred. They had a long track record of serious disciplinary actions, that CTA's did not want to do business with. This made disclosure even more paramount and material.

165.    Documents in NFA's possession showed the rogue risk management operation, was being handled by unqualified personnel, with gross negligence, was replete with errors and omissions, violated exchange margin rules, in breach of the Commodities Exchange Act, CFTC, NFA Rules.

166.   On or around February 7,  2019,  upon information and belief, NFA Jane Doe 2 signed her name on documents showing NFA's approval in response to the question on how they handled margin calls and risk management on behalf of ADMIS customers that ADMIS had delegated John Felag and Vision affiliates were authorized, to

   a.   place trades on behalf of ADMIS customers and CTA's  account - <u>without the customers and CTA's knowledge, authorization and consent;</u>

b. liquidate ADMIS customers' and CTA's account - <u>without the customers and CTA's knowledge, authorization and consent;</u>

c. add buying power, extend or add credit to a ADMIS customer and  CTA's confidential account, <u>without the customers and CTA's knowledge, authorization and consent;</u> and/or

d. take other actions in their sole discretion, related to margin activity, <u>without the customers and CTA's knowledge, authorization and consent;</u>

167.    The foregoing authorizations are an express violation of the Commodities Exchange Act, and multiple compliance rules under the CFTC and NFA Rules. Without limitation, the grant of power of attorney to permit Vision affiliates and Felag to liquidate a customer's account, or place trades on behalf of a customer, or extend credit to a customer, can only be granted with the customers' written authorization and consent. NFA JD2 had actual and constructive knowledge that Kumaran never granted any such power of attorney or authorization.  Neither had the other customers or CTA's who had no knowledge that ADMIS were engaged in this.

168.     Further NFA JD2, intentionally failed to enforce CEA 7 U.S. Code § 2  and 15 U.S.C. 78g(c)(2)(B)[13] that prohibits Felag and Vision affiliates extending credit and violating exchange margin rules. Defendants had constructive knowledge that the risk procedures violated CME exchange rules, as documented in emails to NFA JD1, and failed to comply with the laws.

169. At the time of the audit NFA JD2, and NFA also had actual, direct and constructive knowledge that (a) Kumaran and other Plaintiffs had never consented, granted permission or had knowledge that the unqualified management team of the disbarred Vision, had been delegated authority by ADMIS to handle margin calls and provide risk management services which being done in violation of NFA 2-26/CFTC 33.7, 1.11, 1.55 and NFA 2-29; (b) Kumaran and other customers and CTA's had not granted permission for John Felag and other Vision affiliates, employees and owners to access to trading records, as is expressly mandated under NFA 2-4/9061

---

[13] 15 U.S. Code § 78g - (2) Margin regulations (A) Compliance with margin rules required: It shall be unlawful for any broker, dealer, or member of a national securities exchange to, **directly or indirectly, extend or maintain credit to or for, or collect margin from any customer on, any security futures product unless such activities comply with the regulations.**

and 18 U.S.C.1831 el seq  and; (c) Kumaran and other customers and CTA's had not received the material account disclosures related to ADMIS risk policies and procedures and it was a violation of NFA 2-29 and NFA 2-2 to fraudulently conceal such activities amongst the other violations that had been reported to the NFA Compliance Department. (*See* Supra)

170.  Not only was this delegation of authority, fraudulently concealed from customers, NFA JD2, in bad faith, intentionally failed to enforce, NFA 2-26/CFTC 1.55(k)(11),(i) and (l) whereby ADMIS and Vision IB's concealed material facts and accepted money from customers it without complying with the mandatory disclosures all information ADMIS' **current risk practices, controls and procedures**, to  be provided to customers prior to account opening.

171. Instead, ADMIS and Lazzara went out of their way to deceive and conceal Vision's prominent and material role in the risk management. NFA and NFA JD2, also had direct and constructive evidence that Lazzara repeatedly and persistently, using interstate and wire communication partook in fraudulent conduct, to deceive, conceal and misrepresent Vision's role, in violation of the anti-fraud provisions of the CEA. making it unlawful to cheat, deceive or make false statements or defraud a commodities futures customer under **CEA 4(b)(2) / 7 U.S.C. § 6b (2)** as well as **NFA Rule 2-2** Not only did the evidence show that Lazzara had intentionally deceived Kumaran, the documents showed that the rogue risk management services were replete with errors and omissions, and violated exchange margin rules.

172.  Upon information and belief, NFA JD2 had been approving bulk transfers of payments from ADMIS to Vision affiliates, which were financial transactions that were fraudulently concealed from customers, across interstate lines, in the millions of dollars, and had constructive knowledge, that customers and CTA's were deceived of the source, ownership, or control of the proceeds.

173. Kumaran, and other Plaintiffs would never have opened the accounts at ADMIS if they had known. As a result Kumaran and Plaintiffs have been significantly harmed.

174. NFA were motivated to conceal the activity from customers and CTA's, as they knew that not only hundreds of customers and CTA's would close their business at ADMIS if they found out, NFA had a financial and vested interest to generate operating fees and revenues, estimated to be

in the millions of dollars a year, in keeping the activity fraudulently concealed. Therefore NFA, ADMIS, Vision and the Vision IB's conspired and acted together to keep the illegal activity and violations of the CEA, fraudulently concealed from customers and CTA's.

175. NFA JD2, was an instrumental part and facilitator on the inside of the scheme, in and faith repeatedly, intentionally and willfully failed to enforce the NFA Compliance Rules, the CEA and other Federal laws, to keep the illegal activities concealed, so that the participants of the fraud, could generate millions of dollars of unlawful profits and fees, including the NFA.

176. However NFA JD2, acting in concert with Vision affiliates, ADMIS and other Vision IB's had been failing to enforce the CEA, permitting hundreds of customer and CTA's account opened at ADMIS, to be distributed without knowledge, consent and authorization to the unqualified management team of the disbarred Vision.

## MATERIAL CONFLICTS OF INTEREST AND PROCEDURAL BIAS

177.    On or around April 9, 2019 Plaintiff documented in letter to NFA, that Plaintiff had been made aware  of a material conflict of interest, and notified NFA Arbitration staff, that (a) ADMIS was producing documents to implicate NFA was liable for its own rule violations, and there was material conflict in the NFA role in the proceeding and its own liability under 7 USC 25; (b) subpoenas needed to be issued against NFA JD2, under NFA Rule 701(c) for its own employees participation in the scheme, and (c) issues had been raised about NFA had violated its own rules and Bylaws, related to the re-registration of Boshnack and Rothman

178.    Despite multiple reassurances to Kumaran that NFA would schedule a preliminary hearing conference so that Kumaran could address the material conflicts of interest directly with the Panel, the conference never materialized.

179.    Instead NFA continued to vary and modify its procedures in an arbitrary and ad-hoc fashion.  subject Kumaran to multiple procedures abuses of law and violations of due process rights that demonstrated bias toward ADMIS, and to cover-up and conceal NFA"s wrongdoing,

180.    NFA continued to arbitrarily vary the sole prehearing conference that the rules state is intended to be scheduled for thirty (30) days after Motions to Compel, to resolve last portions of discovery and Plaintiff rights to material evidence, was done in advance of any discovery.

181.    On or around July 12 2019, NFA denied Kumaran due process rights to receive or record audio tapes of oral argument and a hearing on a motion Plaintiff filed. The Panel was not consulted on the decision and the request concealed. This ruling violates standard procedures of comparable Arbitration Forums such as FINRA 12606. NFA rules are notably deficient, without appeal rights, and permit NFA arbitrator powers without checks and balances, and supervision, to conceal documents, not tape testimony, which propagates their own fraud and corruption.

182.    On or around June 8, 2019 Plaintiff filed a motion referred to several exhibits, appendices, and discovery items, that, in accordance with NFA's written representations to Kumaran, NFA were responsible to submit and provide to the Panel, "all information and documents timely" with Plaintiff's motions. To continue to prejudice and interfere in Plaintiff's due process rights, for over 68 days during June 8 2019 – August 20 2019, NFA materially failed to supply over a dozen exhibits to the Panel and failed to maintain a docket with transparency of what was forwarded.

183.    On or around Jun 18, 2018, NFA arbitrarily and prejudicially granted another extension of over 280 days, to favor its board member Tom Kadlec, to obstruct documents that could implicate the NFA's violations of the law. Plaintiff filed yet another Motion to Compel ***after eight months*** of not enforcing a prior to Motion to Compel. Instead, without Panel rulings.

184.    In an oral argument on or around July 15, 2019, NFA concealed and materially withheld exhibits and evidence submitted in motion dated June 8 2019 to the Panel. Kumaran was fraudulently misled Kumaran, that the Panel had received the information, and prejudiced Kumaran in the oral argument.

185.    On or around August 15 2019, after concealing numerous referred to exhibits, and documents contained in a June 8 2019, the NFA, only after being asked to certify the docket, supplied the necessary documents, severely prejudicing and materially violating due process to conceal information from the Panel for 64 days.

186.    On August 20 2019, after the Panel had considered all arguments, and four days before a ruling, NFA supplied the exhibits, of material prejudice to Plaintiff.

### NFA WHISTLEBLOWER ALERT OF CORRUPTION

187.  On or around August 16, 2019 Plaintiff Kumaran, coincidentally and concurrently, after a networking referral in London, UK met by chance, a former NFA Board Member, Mr. James Koutoulas, Esq.  The intent of the meeting was to discuss Kumaran's CTA trading record, while both were in London and possible business avenues with Koutoulas's futures firm Typhon. Prior to the meeting Kumaran had no knowledge of Koutoulas' past or role at the NFA.

188.  At the meeting, Koutoulas voluntarily disclosed he was a former NFA Board Member and on the Executive Committee, during the time Vision was disbarred in June 2014, and its affiliates were re-registered in September 2014.  His role amongst other duties, was to advocate the rights of CTA's within the NFA, a class of participant that Plaintiff became registered as in 2017.

189.  During the meeting, Kumaran discussed her trading programs and Koutoulas inquired of Kumaran why her account was closed at ADMIS. In compliance with CFTC and NFA Rules, which prohibit a CTA to not materially omit facts, Kumaran truthfully disclosed that the account was closed because ADMIS had admitted in writing on October 12 2018 that ADMIS shared her confidential trading CTA strategies and outsource risk management to the owners and employees Vision, without Kumaran's authorization in violation of numerous compliance, privacy and regulatory laws, and the matter was before NFA Arbitration. CFTC rules require that no information be presented to NFA Members that is misleading or contains material omissions.

190.  Koutoulas stated he had no knowledge of any legitimate risk management outsourcing at ADMIS to Vision and he was shocked that ADMIS were disseminating customer accounts to the former management team of Vision, without customers' knowledge, consent and permission.

191.  Koutoulas also stated that he had a conflict of interest to speak out against ADMIS. Upon information and belief, Typhon relies upon capital and Assets Under Management ("AUM") that ADMIS raises. Koutoulas utilizes ADMIS for futures execution services and ADMIS has participated, sponsored, or co-hosted several educational and capital intro events with Typhon.

192. However, Koutoulas spoke negatively about the integrity and reputation of Howard Rothman, Robert Boshnack and Vision. Koutoulas stated that his own company, Typhon refused to even onboard traders who came from Vision, and cited their long standing unethical conduct and serious disciplinary track record of compliance violations. NFA Basic lists Boshnack, Rothman and/or Vision being the Defendant of over 172 CFTC reparations.

193.  Koutoulas then volunteered new pieces of information that  in his capacity of NFA Board Member, he had gained access to various inside dealings of the NFA decision making process and operations.

194.   He continued to voluntarily disclosed inside information that while he was a former NFA Board Member, the NFA Board was not even consulted and did not approve the re-registration of High Ridge Futures, Howard Rothman and Robert Boshnack.  He stated that "back-door" decisions were made, and, using British semantics, stated that there was huge "internal row" at the NFA Board level about the decision to allow Vision to simply change the name of the company and pierce the corporate veil, and everyone opposed the re-registration.

195.  He then reasserted that both himself and other NFA Board Members were outraged that Vision was simply allowed to change its name, and re-register, and NFA failed to conduct due diligence on the harm that could ensue and the re-registration of Rothman and Boshnack and Vision affiliates, was done expressly *without* NFA Board Approval.

196.   Such actions constitute intentional and willful violation of NFA Bylaws, and CEA rules, which specifically the associated harm and threat to the public, CTA's and customers.

197. The re-registration specifically required an investigation into whether Boshnack and Rothman posed a threat in the future to other Members.  NFA failed to conduct any investigation under NFA Bylaw 301(e)(1)[14]. Vision's affiliates, Boshnack, Rothman and Felag, have posed a significant threat to NFA Members, and Customers,  since 2014 until present.

---

[14] NFA Bylaw 301(e)(1) required that reregistration was subject to the provisions of Section 17(b)(3) of the Act, upon a finding by the Membership Committee (See Chapter 7) that the reason for ineligibility does not cause the person to pose a threat to Members, Associates or customers.

198. NFA Board did not consent to the violation of NFA Bylaws and CEA rules, and the associated harm and threat to the public, CTA's and customers.

199.  NFA also failed to do a thorough fitness examination as they stated publicly in their June 20, 2014 order.[15]

200.  According to Koutoulas, people weren't even consulted, decisions were made behind closed-doors, and NFA Board were furious about the decision. Instead the decision of re-registration was made in a "private settlement" behind closed doors, with a few insiders at the NFA, where Boshnack, Rothman and Vision affiliates, to avoid exculpation, and personal liability, pierced the corporate veil, and essentially bought their way back into the business, by offering financial incentives to NFA and ADMIS.

201.  The NFA has a long standing policy of re-registering persons, who have a prior track record of serious disciplinary violations. Since NFA's operating expenses are paid for by membership fees and dues, they have a vested interest to allow registrations, and collect fees from ongoing business – despite how diabolical a disciplinary track record they have.

202. Koutoulas, then on his own initiative, volunteered he was an NFA whistleblower, (blowing the whistleblower on the NFA to the CFTC) and had made his whistleblower allegations public.

203.  Koutoulas has publicly stated NFA is run as a clubby environment where leadership decisions are made behind closed doors.[16]   Koutoulas, on public record, was highly critical of the NFA's internal procedures, rules of conduct and governance, and alleged there was misconduct by Senior Management. He raised the issue that the NFA was "corrupt" and that no oversight existed on NFA internal procedures, and decisions were made in a closed door environment.

204.  Koutoulas advised Kumaran that the compliance officers had demonstrated failures to enforce market rules and were inept. He also advised Kumaran, that the NFA was unsuitable regulator, that would not enforce justice to Kumaran's claims in an NFA Arbitration forum, and there were material conflicts of interest in them protecting their interests.

---

[15] https://www.nfa.futures.org/news/newsRel.asp?ArticleID=4428
[16] https://mrtopstep.com/mf-global-advocate-koutoulas-at-center-of-controversy-again/

205.  Koutoulas, a former NFA Board Member, then suggested that Kumaran should report NFA misconduct to the CFTC whistleblower protection program, and should file for whistleblower protection against the NFA,

206.  Upon information and belief Koutoulas disclosures to Kumaran were a breach of his own non-disclosure agreement he had with the NFA, and may have posed liability to him for his voluntary admissions.

207.  Public records show that Koutoulas reported allegations of corruption and mismanagement at the NFA. This allegations included insider dealings, as well as unfair processes at the NFA.

### PEREGRINE / MFGLOBAL

208. The NFA has been subject to previous accusations of failed oversight. In the Peregrine debacle in 2013, it was accused of falling short in its attempt to keep tabs on brokers and asset managers, more than a year after the collapse of one brokerage under its oversight that cost clients hundreds of millions of dollars.[17]

209. Peregrine Financial Group, known as PFG, failed due to a 20-year fraud that the company's founder perpetrated despite yearly audits by the NFA. In Peregrine, it was found out NFA's discovery of shortfalls dated back more than two years and press articles queried  "How does this go on year after year and you don't find out?" said one longtime lawyer for the futures industry. "The regulators need to be held responsible.[18]

210. In a similar pattern of conduct, where cozied-up insiders get a free pass on compliance audits, the CEO of PFG, who served on NFA's advisory committee, his entity Peregrine was given a clean bill of health in January 2013, despite doctored bank statements and fraudulent conduct – significant harm to futures customers.[19]

211. Similarly Defendant Kadlec, President of ADMIS, also serves on the NFA Board of Directors, and also now on the Membership Committee, despite conflicts of interest, has disenfranchised

---

[17] https://www.reuters.com/article/us-nfa-director-peregrine/u-s-futures-industry-regulator-nfa-comes-under-fire-from-within-idUSBRE97S17M20130829
[18] https://www.cnbc.com/id/48135999
[19] https://www.cnbc.com/id/48176094,

thousands of his customers and CTA's and small businesses, who entrusted funders to ADMIS, and has turned over secretively and illegally all their confidential and proprietary trading data to Vision, and racked up $10 million dollars a year in fraudulent fees to these victims, to generate payments to owners disbarred, and NFA..

212.   On or around August 29, 2019 James Koutoulas emailed Kumaran and recommended all concerns about the NFA be filed at the CFTC Whistleblower enforcement office.

213.  On or around August 30, 2019, the day after this email, Kumaran was subject to threats, intimidation by ADMIS citing personnel defamation if Kumaran spoke to anyone truthfully about its CTA account being given to Vision affiliates. ADMIS, initiated legal notice to Kumaran, in her individual capacity, voiding the Arbitration, consenting to jurisdiction of Federal Court.

214.  On the same date, as a cause of ADMIS's notice of legal action, Kumaran issued parallel litigation notice to Defendants NFA of this action. The Panel also ruled, it had *no jurisdiction* over the threats initiated by ADMIS. This was also material conflict of interest.

### LACK OF DUE PROCESS IN ARBTRIATION

215.  Shortly thereafter, NFA continued its arbitrary and ad-hoc governance and failure to allow due process rights to Kumaran. Motions dated September 3, 2019 were withheld and NFA Board Members granted over 16 days to respond, instead of the standard 10 days.

216.  On or around September 10, 2019, ADMIS, and its CEO and NFA Board Member, willfully failed to produce the guarantee agreements and other documents governing Visions unauthorized access to Kumaran and other customer's accounts that NFA had approved and were fraudulently concealed at account opening and willfully defied and violated NFA Rule 7(a)(2)

217.  ADMIS and Kadlec, were granted another 340 days extensions and were permitted for months to violate Arbitration rules, and continued to fail to produce documents that implicated the NFA. There were no consequences or penalties.

218.  On or around September 16, 2019 Kumaran issued a **third** notice of default, and Motion to Compel noting that 11 months of delays had been granted by the NFA to its NFA Board Members,

and documented more failure to enforce NFA's own rules to protect self-incriminating documents in violation of the Federal Arbitration Act.

219.  NFA also failed to enact procedures to permit Motions to Compel to languished at the NFA, without ruling, one on October 15 2018 now for over 11 months, and a second on June 16 2018, in violation of Kumaran's due process rights. The proceeding were not  a neutral arbitration forum. NFA was actively bending its rules to procure bias to ADMIS to conceal and not afford justice.

### NFA SUBPOENAS IN NFA ARBITRATION

220.  On or around September 16, 2019 Kumaran issued a subpoena for the Panel to order Mr. James Koutoulas, Esq, former NFA Board Member, and NFA whistleblower to produce documents and provide testimony and video-taped deposition in NFA Arbitration related to his allegations made in London, where he cited corruption and failures by the NFA to comply with laws, including NFA's actions the reregistration of Howard Rothman and Robert Boshnack.

221.  The NFA, unlawfully withheld the subpoena and did not forward it timely to the Panel, to prejudice Kumaran's discovery, deadline due on October 2 2019. Instead NFA violated NFA Rule 9(7)(d) to provide time to try to oppose the subpoenas.

222.  On or around September 19 2019, Kumaran filed a *first subpoena* on the NFA itself, intended for timely review by the Panel. The subpoena was seeking the non-public records related to the registration of Vision and documents that would evidence NFA's role in the approvals to disseminate customers confidential trading records to Vision. (***See* Exhibit 5**).

223.  NFA again unlawfully withheld the subpoena from the Panel and (without ruling by the Panel), granted arbitrary extensions to NFA legal counsel, generously affording an additional 11 days to object to subpoenas. Such actions were prejudicial and not permitted under Rule 9(7)(d). This materially impeded Plaintiffs discovery rights which had a deadline of October 2, 2019 .

224.  On or around September 24, 2019, ADMIS also to attempted to squash subpoenas, and stated they intended *to request NFA's employees be called to testify at a hearing"* as defense witnesses, in an NFA Arbitration. ADMIS's admissions exemplified the material conflict of NFA employees defending ADMIS, further supporting the allegations of NFA knowledge and complicit

participation in the fraud[20] NFA continued to abuse the bias in the NFA controlling the NFA Arbitration Forum, where their own wrongdoing was being enjoined in the liability.

225.  On September 25 2019, ADMIS filed more unauthorized communications with NFA legal staff, Mr. Brockway, now trying to block more subpoenas in an NFA Arbitration, stating "*It is critical that Mr. Brockway be made aware of our very serious concerns with regard to releasing the information sought by Kumaran.*" The information would directly show NFA's participation to defraud hundreds of ADMIS customers and CTA's, in unfair market competition.

226.   On or around September 27 2019, Kumaran issued a *second* subpoena against the NFA, requiring NFA Compliance staff, Jane Doe 1 and Jane Doe 2, produce documents directly related to the conduct alleged above including in Paragraphs 119-120 and Paragraphs 168-171.

227.   At that time by on or around September 29, 2019 NFA continued to violate the Arbitration Rules, and had in bad faith, materially concealed and withheld from the Panel ***three*** NFA Subpoenas including one video deposition request from a former NFA Board Member. This was with the material and willful delay to miss the October 2, 2019 discovery deadline and in violation of the Federal Arbitration Act.

228.   NFA legal counsel, Mr. Brockway,  in its response on September 30 2019, amongst other refusals to produce documents, specifically failed to identify or produce any documents that existed showing that NFA had conducted a "through fitness examination" of Vision, its owners, employees and its affiliates, prior to reregistering them.

229.  NFA then set forward arbitrary rules and ad-hoc procedures, designed to protect NFA interests and liability and again violated Kumaran's due process rights and impossible scheduling.

230. On October 1, 2019 (again usurping, ruling from the Panel), NFA themselves ruled on scheduling, and Kumaran was given an unreasonable and impossible, prejudicial same day

---

[20] *ADMIS email dated September 25, 2019 - As previously stated, the issue which is obviously triggering Claimant's information requests appears to largely be Ms. Kumaran's disbelief that the NFA was aware of the bulk transfer of customer accounts from Vison to ADMIS, and the involvement of High Ridge Futures with those accounts going forward following that transfer.  Accordingly, Respondents will shortly be asking the Panel to request that an NFA employee possessing the relevant knowledge appear at the hearing to provide that information.*

deadline of six (6) hours to protect its rights whereas, NFA Legal staff were granted a lenient 14 days, in express violation of NFA  9(d)(7). and unlike other comparable forums like FINRA which set clear response times of 5 days[21], Brockway should not even have been permitted to oppose.

231.  This again was materially prejudicial, nearly impossible, "same day deadlines", were an abuse of power, and directly harmed Kumaran's rights to make a living, and rights to life, liberty and property, a direct violation of due process rights, and attempted to deny Kumaran material evidence and impeded Kumaran's rights to discovery before the October  2, 2019 deadline and willfully impaired its due process rights to receive material evidence.

### OCTOBER-  NFA SUBPOENAS

232.   On or around October 9, 2019, NFA continued to conceal from the Panel, a **second** subpoena  to be issued on the NFA, to produce documents exposing their participation in the fraud. NFA in bad faith continued to arbitrarily varying its Arbitration rules, without ruling from the Panel, to permit bias for NFA legal staff for over *14 days*.

233.   On or around October 10, 2019, in material conflicts of interest in the NFA Arbitration, the Panel issued a subpoena and video deposition of NFA Whistleblower and former NFA Board Member, Mr. James Koutoulas, to provide video-taped testimony, who had alleged corruption in an NFA Arbitration Forum to be provided within 24 days. (*See* **Exhibit 6**).  The order was withheld by the NFA for 24 hours.

234.   On or around October 10, 2019, in material conflicts of interest in the NFA Arbitration, Panel finally granted a first subpoena on the NFA itself in to produce the documents under the non-public information request that had been submitted on March 1, 2019. (**See Exhibit 7**)  The order was withheld by the NFA for 24 hours.

235.   On or around October 10, 2019,  also Panel finally granted in part after over 360 days, of violations of NFA Rule 7(a)(2) to not produce "the guarantee agreements whereby ADMIS, acting in civil conspiracy with the NFA. The order was withheld by the NFA for 24 hours. **( Exhibit 8)**

---

[21] https://www.finra.org/rules-guidance/rulebooks/finra-rules/13503

236.   While the Panel's ruling were being concealed from Kumaran, on or around October 10, 2019 NFA legal staff, Mr. Brockway attempted to block the *second* subpoena, after being granted, more favors and exceptions from NFA Rules, opportunities to oppose the subpoena, prior to service shielding the NFA from liability and material conflicts of interest, stating NFA cannot be enjoined as a party in an NFA Arbitration. (***See* Exhibit 9**).

237.   Brockway's letter wished to conceal material evidence containing the signatures of NFA JD1 and JD2, on documents authorization unfair market competition and NFA's participation with Vision and ADMIS to disseminate customer accounts, for NFA's profits, in violation of the law. Brockway's opposition contained numerous straw-man arguments, failed to respond to bias and corruption, instead attempting to state NFA could not possibly in a party in an NFA arbitration.

238.   On or around October 14, 2019, Kumaran issued a reply and response in opposition to NFA legal staff Blake Brockway. (***See* Exhibit 10**).

239.  This memo argued, material conflicts of interest in the NFA's role in the NFA Arbitration, and that the rule of arbitration and this canon of judicial ethics rest on the premise that any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias. It was not the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another. [22]

240.  On or around October 16 2019, the Panel accepted Kumaran's opposition and response brief which laid out legal argument material conflicts in NFA's role to administer the Arbitration and motion to order the subpoenas against the NFA, and gave the NFA five (5) days until October 21 2019 to respond to the allegations of material conflicts of interest, bias and fraud.

241.  On or around October 21, 2019,  NFA failed to file a response to Kumaran's opposition and response brief, and notably did not oppose the material conflicts of interest and allegations of fraud, corruption and bias in the NFA Arbitration, as was requested by the Panel.

---

[22] Commonwealth Coatings Corp. v. Continental Cas. Co., 89 S.Ct. 337,340,393 U.S. 145, 150 (U.S.Puerto Rico 1968)

242.  If Kumaran's arguments and allegations of wrongdoing and violations of the CEA, notably by NFA Jane Doe 1 and NFA Jane Doe 2 raised in the October 14, 2019 memo were frivolous and unfounded, NFA were afforded an opportunity and had an legal obligation, to respond – and to provide information to support its neutrality in administering the Arbitration.

243.  Instead NFA did not respond. NFA failed to offer one factual piece of evidence in contradiction, failed to provide one legal argument to its defense, and intentionally, in bad faith, chose not to respond, in violation of its own duties of impartiality and neutrality, and obligations to not condone bias, fraud and corruption under the Federal Arbitration Act.

244.  On or around October 21, 2019, NFA Arbitration staff, continued their bad faith conduct, and instead tried to withhold signature on the Panel's already ordered NFA Subpoena, to arbitrarily add another ten (10) days extension for NFA's legal staff Blake Brockway to respond. Kumaran again objected to the repeated procedural violations on October 22, 2019 and demanded the orders be sent to the Panel for signature.

245.  On or around October 22, 2019 Kumaran notified the NFA to forward both the outstanding subpoenas to the Panel for ruling and signature. NFA Arbitration staff, again materially tried to delay, withhold signature on the Panel's already ordered NFA Subpoena, to arbitrarily add another ten (10) days extension for NFA's legal staff Blake Brockway to respond, until October 31, 2019. This conduct again violates the NFA Arbitration Rules.

246.  On or around October 22, 2019, fearful of retribution from the NFA, and in accordance with the suggestion of NFA Board Members' suggestions, Kumaran filed, in its individual capacity for whistleblower protection under the CFTC enforcement against the NFA, under the Commodities Exchange Act, for its participation in the fraud with ADMIS under 17 CFR 165.

### NFA Demands Ten Thousand Dollars For NFA Whistleblower to Testify

247.  On or around October 23, 2019 NFA and its NFA Board Member subject Kumaran to more violations of due process, and to obstruct testimony in violation of the Federal Arbitration Act.

248.  NFA and  NFA Board Member and NDA Whistleblower Mr. James Koutoulas Esq, then tried new techniques to obstruct subpoenas by demanding Kumaran, wire $12,589.50 to his

personal PayPal account, in exchange for him to comply with the Panel subpoenas, and testify and provide video-taped online deposition (for less than half-day) which would expose corruption against the NFA, in a conflicted NFA Arbitration Forum.

249.  Such demands were extortion, demonstrated corruption at the NFA to violate the Federal Arbitration Act,  9 U.S. Code § 7, where witness fees, are not permitted to exceed witness fees before the United States Courts.[23]  Since Koutoulas' testimony was related to his role as an NFA Board Member and Executive Committee, his legal fees and expenses, if any, as approved, are subject to indemnification by the NFA  and not Kumaran individually under NFA Bylaw 1401.

250.  NFA in bad faith failed to enforce its NFA Rule 2-5 which requires NFA members cooperate in good faith with subpoenas related to alleged oversight corruption and NFA Bylaw 1401 and other Federal witness rules, whereby NFA's own board member James Koutoulas had been subpoenaed to provide online video-testimony to expose NFA corruption at NFA.

251.  Kumaran agreed to pay "costs" of the deposition. Under Federal Arbitration Act, costs shall mean reasonable out of pocket "costs" and **excludes** legal fees. Kumaran agreed to pay reasonable out-of-pocket costs of the video deposition fee, including but not limited to cost of the deposition and transcript fees. Since the Arbitrators had agreed the deposition could be done online, also agreed to costs reasonable taxi fare to and from the deposition.  Kumaran also agreed to pay a reasonable witness fee which under 28 U.S.C. § 1821 should not exceed $40 per day.[24] There was no basis for NFA to gouge legal fees or first class airfares, for NFA Board Member's attorneys to fly to New York  in violation of the Federal Arbitration Act.

252. Upon belief, Koutoulas was in breach of his own NFA Board Member Confidentiality Agreement, when he volunteered numerous inside pieces of information in London in August 2019, and to protect his own wrongdoing, was now attempting to walk back his own liability, and

---

[23] https://www.law.cornell.edu/uscode/text/9/7 -  The fees for such attendance shall be the same as the fees of witnesses before masters of the United States courts.

[24] A witness shall be paid an attendance fee of $40 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance.

set up procedural obstacles, to testify in an open-forum NFA Arbitration, as a NFA Whistleblower. NFA's procedures itself to have not one but two NFA Whistleblowers, conduct depositions under NFA supervision, were laced with optics of conflict of interest.

253.  As a result Kumaran never received the material evidence timely, as it refused to subject to extortion of over ten thousand dollars for testimony of an NFA Board Member, NFA violated Federal laws, without oversight, and obstructed Panel orders to willfully undermine justice.

## NFA ARIBTRATION PROCEEDING STAYED – CONFLICTS OF INTEREST

254.  On or around October 31 2019 the Panel signed an order for a ***first subpoena*** to be issued directly to the NFA in an NFA Arbitration Forum, as ADMIS. The Order was served upon the NFA on November 1 2019. (***See*** **Exhibit 11**)

255.  On  or around November 1, 2019, in that Order, the Panel acknowledged the allegations against the NFA and review of Kumaran's October 14, 2019, motion related  to conflicts of interest in the NFA Arbitration Forum, which NFA failed to oppose or file a response to on October 21, 2019. The Panel ruled  "*We have no jurisdiction over that matter. The Panel would entertain a request by Claimant at this time to stay these arbitration proceedings (or if it wishes to withdraw the claims with or without prejudice) while it seeks relief against the NFA in the proper forum.*"

256.  On or around November 4,  2019 the Panel ordered in part a ***second subpoena*** on the NFA in an NFA Arbitration Forum, for the NFA to produce documents, that required production of documents related specifically to NFA Compliance Officers, and their participation in the violations of the Commodities Exchange Act, failure to enforce NFA rules and disseminate customers, and Kumaran's confidential trading account to Vision. (***See*** **Exhibit 12**)

257. Despite Plaintiffs multiple requests to stay the proceeding on November 5, 2019 and November 8, 2019 and seeking clarification, NFA did not respond timely to communications, and it is unclear of NFA withheld timely those communications from the Panel.

258.  In a final attempt to prevent due process, NFA denied Kumaran the right to appear at oral argument, and object to an overly broad, blanket Gag-Order designed to cover-up and conceal the scheme. The Order and Kumaran's opposition were never permitted for oral argument.

259. After 523 days ADMIS produced only one material document. It was heavily redacted, redacting everything related to disseminating customer accounts. It is filed under seal. **Exhibit 13**

260. On or around November 18, 2019,  the granted the stay of the proceeding before the NFA Arbitration, pending action this Court against NFA, while it seeks relief against the NFA in the proper forum, effective November 13, 2019. (**See Exhibit 14).**

261. This action ensues.

### CAUSES OF ACTION

### COUNT 1 – VIOLATION OF THE COMMODITIES EXCHANGE ACT

262.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

263.    Pursuant to 7 U.S.C. § 25(b)(2), a registered futures association that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce that is required under 7 U.S.C. § 21 shall be liable for actual damages sustained by a person resulting from such failure to enforce or enforcement of such bylaw, rule, regulation, or resolution.

264.    Defendants, over the consistent period of over five (5) years, individually and jointly have intentionally and in bad faith, failed to enforce, and violated the CEA, numerous NFA and CFTC compliance rules and regulations that they had a duty to enforce including but not limited;

a.    NFA 2-26 including without limitation CFTC 1.11, CFTC 1.55 and CFTC 1.57 which required Lazzara and ADMIS, disclose customers, *all* its risk management policies and procedures, *prior* to opening the account[25];

a.    NFA 2-4 Int Not 9061 which is a NFA Compliance violation for NFA Members Felag and Vision owners, affiliates to obtain a CTA's trading records without their permission;

b.    NFA 2-4 Int Not 9005 and NFA Rule 2-26 / CFTC Part 33.(7) which required that Lazzara disclose all the costs and fees, transaction fees and trade processing fees (being deducted from

---

[25] CFTC 1.55 (k) ..disclosures about risk policies *prior* to a customer entrusting funds to an FCM were prerequisite and CFTC 1.55.(l) .. expanding upon such information as necessary to keep such disclosure from being misleading whether through omission or otherwise

Plaintiff's accounts to pay Vision affiliates) *prior* to the account being open, and that any arrangement that is likely to deceive customers is a violation of NFA Requirement;

c.   NFA 2-2 which makes it an NFA Compliance Rule violation to in any manner deceive, cheat or defraud another NFA member or customer; the unlawful violation of the anti-fraud provisions of the CEA 7 USC 6(b)(2);

d.   NFA 2-29 which prohibits the fraudulent sales and telephonic sales and marketing communications by a network of Trey Lazzara and other Vision IB's; and NFA Bylaw 801 which prohibited solicitations from unregistered AP's Julie Villa

e.   NFA Margin Handbook and NFA Financial Handbook Section 7, which mandated that Lazzara and ADMIS, issue margin calls directly to customers, and not to Robert Boshnack, an arrangement which to a material failure to enforce exchange compliance laws in Performance Bond margin and failure to issue margin calls under CME 980, CME 982.

f.   NFA 2-26 17 CFR 1.57 and 7 USC 2 (c.)(v)(IV) and which prohibited Vision, its owners, affiliates and employees from directly  or indirectly extending, or maintaining credit to or for, or collecting margin on Kumaran's account. It also prohibited them from having discretion on Kumaran's account, as well as power of attorney to handle margin calls.

g.   the unlawful and unauthorized dissemination of customers and CTA's personal financial data, social security numbers, net worth, financial balances, names, addresses, telephone numbers and other personal and confidential information in violation of CEA;

265.   Defendants, have also, participating in the scheme with ADMIS, Vision and Vision IB"s to a participate in direct unfair market competition, and a deplete innovation in the market from CTA's, in violation of the CEA. 7 U.S.C. § 6b (2)

266.   Defendants had an affirmative and statutory duty to enforce the CEA, enforce compliance NFA Bylaws and Rules. Defendants have wrongfully profited from their conduct and have caused Plaintiff damages and irreparable harm, as well as irreparable loss of its competitive advantage and loss of trade secrets to Vision, its owners, employees and affiliates.

267. As a result of NFA bad faith failure to abide by it duties, and failure to enforce the CEA, and NFA Rules and other laws. Plaintiffs have suffered irreparable harm in loss of their confidential and trade secrets, financial losses in their trading accounts, deplete losses in performance records, damages to their good will and other impacts to the their CTA careers, financial losses to their property, livelihoods and investments in the futures industry, as well as other significant damages. Plaintiff's Customers 1-100 and CTA's 1-100 have also collectively suffered damages and financial harm exceeding $50 million in overcharges to Vision affiliates and Boshnack.

268. Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT 2 – VIOLATIONS OF DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

269.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

270.    Under the CEA, the CFTC in Exhibit 1 has identified 31 delegated and statutory authorities to Defendant NFA as a State Actor  including but not limited to enforcing a fair, equitable, and expeditious hearing under the Federal Arbitration Act, and enforcing compliance laws.

271.    NFA is subject to the due process requirements of the Fifth and Fourteenth Amendment to the Unites States Constitution in connection with the foregoing delegated authorities. The Fifth Amendment provides: "[N]or shall any person . . . be deprived of life, liberty, or property, without due process of law[.]" and Fourteenth Amendment provides: "Nor deny to any person within its jurisdiction the equal protection of the laws."

272.    Defendant NFA failed to provide Kumaran, and NRCM, due process of the law, failed to provide equal protection of the NFA rules, and repeatedly, arbitrarily, in order to prejudice Kumaran's rights, and procure procedural advantage to its NFA Board Member Kadlec, obstructed delayed, repeatedly failed to enforce or varied its rules, processes and procedures.

273.    Among other things, such conduct included failing to enforce NFA rules on discovery  for 404 days, failing to appoint a Panel for 275 days, failing to failing to enforce **four** Motions to

Compel for over 13 months to produce contracts exposing the fraud, withholding exhibits form the Panel, concealing dockets, cancelling conferences, denying Kumaran rights to receive oral transcripts, setting forward arbitrary procedures to prejudice Kumaran, provided 30 days notice to ADMIS of oral argument but only 5 days to Kumaran, provided NFA legal staff 14 days to oppose subpoenas, and Kumaran only 6 hours delaying subpoenas to the Panel by weeks, maintaining ex-parte communications with ADMIS, leaking information to ADMIS, overriding Federal statutes for the claims for legal fees, failing to enforce NFA 2-5, attempting to extort over ten thousand dollars in exchange for adverse testimony from NFA whistleblowers on corruption failing to enforce NFA Rule 7(a)(2), 7(h), granting favorable extensions to NFA Board Members, concealing information from the Panel, and failing to provide any transparency, dockets, documentation or records, including services of process.

274.    NFA through their biased, evidently partial conduct and materially failed to abide by the FAA violated Kumaran's due process rights, and failed to enforce impartiality to the Arbitration.

275.    NFA subject Plaintiff to arbitrary and ad-hoc procedures. unreasonable 6hr schedules, obstructed material evidence, acted with secrecy, lack of transparency, inside dealing, routinely flouted their rules, failed to enforce laws, concealed documents, and violated their own Arbitration rules under the Federal Arbitration Act, in an unsupervised forum that was tantamount to abuse and harassment, to interfere in Kumaran's rights to property and liberty and rights to make a living.

276.    In violation of the due process clause, NFA has failed to adopt rules, provisions or procedures that address NFA's own conflict of interest or liability in the proceeding, or that provides any due process protections to prevent or redress the type of injury Plaintiffs have suffered. As alleged herein, NFA does not provide sufficient safeguards to prevent unconstitutional conduct. NFA Arbitration has failed to stay current and falls far below acceptable standards such as FINRA, CPR or AAA, and has failed to provide a remedy for members who are impacted by NFA's own wrongdoing under 7 USC 25. NFA's Arbitration program has been unsupervised by the CFTC since 2008 and subject to other complaints for due process without redress. (Exh 1 Pg10)

277.   Plaintiff's due process rights and equal rights to the law were violated. NFA were not neutral,  had a direct pecuniary interest in the outcome, and violated due process to cover up their participation in fraud and caused Plaintiff damages and irreparable harm.

278.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT 3 – AIDING AND ABETTING IN FRAUD

279.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

280.   Defendants, individually and collectively, had actual, direct and constructive knowledge of the fraud and fraudulent scheme as fully alleged above.

281.   Defendants had an affirmative and statutory duty to enforce the CEA, enforce rules and laws, and enforce compliance NFA bylaws, rules, regulations and requirements including the anti-fraud provisions. Defendants in bad faith, willfully failed to enforce the CEA, NFA rules and bylaws, and Federal laws and therefore provided substantial assistance in aiding and abetting in the fraud, as listed supra Paragraph 262.

282.   Defendants have wrongfully profited, received concrete benefits, from their aiding and abetting in fraud, and took substantive actions to enable the fraud to perpetuate and have caused Plaintiffs substantial damages and irreparable harm.

283.   As a result of NFA bad faith failure to abide by it duties, and failure to enforce the CEA, and aiding and abetting in fraud, Kumaran and other customers and CTA's have suffered irreparable harm in loss of their confidential and trade secrets, financial losses in their trading accounts, deplete losses in CTA performance records, damages to their good will and other impacts to the their CTA careers, financial losses to their property, livelihoods and investments in the futures industry, as well as other significant damages. Plaintiffs Customers 1-100 and CTA's 1-100 have also collectively suffered damages and financial harm estimated to exceed $50 million in overcharges being concealed to pay Vision its owners, employees and affiliates.

284.    Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT 4  - MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT  ("DTSA")

285.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein;

286.    Plaintiff Kumaran's and other CTA's transaction records and risk management strategies are trade secrets are (1) non-public information; (2) protected by reasonable measures; and (3) and which derive independent economic value, actual or potential, from not being known to other persons, who can obtain economic value from its disclosure or use. of the information.

287.    Plaintiffs took and takes reasonable measures to maintain the secrecy of its trade secrets. Such measures include, but were not limited to: (1) limited access to confidential information; (2) requiring third-parties to execute strict non-disclosure agreements before being allowed to access the information; and (3) requiring passwords for access to such information.

288.    Defendants misappropriated trade secrets by deliberate actions which include but not limited to: (1) Kadlec's acquisition of Plaintiff's IP using improper means, including by fraudulent inducement of futures trading account, fraudulent sales and telephone solicitation of NFA Members,  and fraudulent concealment of Vision's access to CTA's strategies; (2) Defendants breach of the CEA, NFA Rules, CFTC Rules, compliance duties and Federal laws and confidential relationship and obligations of the SRO to maintain the secrecy and restrictive covenants of customer trade secrets; (3) ongoing use and profit for Kadlec and all Defendants and their conspirators own economic benefit without the express or implied consent of Plaintiffs; all in violation of the Defend Trade Secrets Act  "DTSA" for use in interstate commerce.

289.    Defendants have wrongfully profited from their misappropriation and have caused Plaintiff Kumaran and CTA's damages and irreparable harm. in loss of their confidential and trade secrets to their competitors, Vision, and affiliates Vision Investment Advisors and depletion of their competitive advantage in Stamford CT.

290.    Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT 5 – AIDING AND ABETTING IN MISAPPROPRIATION OF TRADE SECRETS UNDER DEFEND TRADE SECRETS ACT

291.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

292. In the alternative  to the Count 4, Plaintiffs pleads aiding and abetting of misappropriation.

293. For the reasons included by reference in   Paragraphs 284-287 Plaintiffs' confidential information and trade secrets were misappropriated by conspirators ADMIS, Vision, Vision IB's, and Kadlec across interstate lines to Vision, its owners, employees, and affiliates in Stamford, CT

294.  Defendants had direct, actual and constructive knowledge of the misappropriation, as evidenced at length in this Complaint.

295. Defendants had an affirmative duty to enforce NFA 2-4 9061 to enforce rules and laws the prohibit a CTA's trading record being supplied to another NFA member without their permission.

296. Defendants Kadlec and NFA knowingly assisted in registering Vision Investment Advisors, after misappropriating dozen of customer and CTA's competitive trading strategies in direct unfair market competition, for use, profit and gain, in violation of DTSA.

297. Defendants have wrongfully profited from misappropriation and have caused Plaintiff damages and irreparable harm . As a result of Defendants bad faith failure to abide by it duties, and failure to enforce the CEA, and aiding and abetting in misappropriation, Kumaran and other customers and CTA's have suffered irreparable harm in loss of their confidential and trade secrets, to their competitors, as well as other significant damages;

298. Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT 6  - CIVIL CONSPIRACY

299. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

300. Defendants entered into an agreement with ADMIS and Vision, its owners, employees and affiliates and Vision IB's, to allow them to violate NFA compliance rules, and violate the CEA, to (a) distribute customer and CTA' confidential trading secrets and futures accounts to Vision; (b) overcharge fees between 0.30 cents and $6.00 for compensation to unauthorized third parties; and (c) other misconduct alleged herein, so that Defendants and ADMIS could procure financial credit lines and guarantees from Vision's owners, and support the futures industry; and cause Defendants to not enforce the CEA; ("Agreement to Not Enforce")

301. Defendants, individually and jointly acted in furtherance of their Agreement to Not Enforce, by, among other things, coordinating: (i) failing to audit Vision IB's in accordance with the minimum frequency requirements ; (ii) covering up and failure to enforce NFA compliance laws, as stated in Paragraphs 262-263 and otherwise above; and (iii) using the NFA Arbitration Forum, to cover-up fraud, and not enforce fair, expeditious and equitable procedures and justice, but a mechanism where the NFA could control, impede, obstruct and prejudice Plaintiff's rights, and procure an outcome to protect NFA and its conspirators, in the Agreement to Not Enforce.

302. Defendants intentionally performed the actions set forth in paragraphs 298 and 299 above.

303. Defendants have wrongfully profited from their civil conspiracy and have caused Plaintiffs damages and irreparable harm.

304. Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT 7 - RICO

305. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

306. Over a pattern of continuous conduct commencing in or around September 2014 until present date, Defendants, each individually playing a role, engaged in a scheme with ADM Investors Services, Vision's owners, employees and affiliates and a network of IB's from Vision, (collectively the "Enterprise"), in exchange for financial benefits to Defendants, using predicate acts of wire fraud, mail fraud and fraud to steal competitors trade secrets under 18 USC 1831,

and money laundering to defraud new commodities futures customers and CTA, for their profit, gain and financial benefit.

307. At all times relevant herein, the Enterprise engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

308.   The scheme involves using interstate wire and mail communications, to fraudulently induced new customers, CTA's start-ups including Plaintiff, to open commodities futures trading accounts at ADMIS, whereby, in violation of the law, while materially concealed, that Vision, its owners, affiliates, employees would (a) gain fully disclosed access to their accounts and trade secrets in violation of 18 USC 1831  (b) would unlawfully deduct cash payments out of their accounts across interstate lines to make payments to Vision and (c)

309.   The Defendants each agreed to further, facilitate, support, and operate the Enterprise.    As such, the Defendants conspired to violate 18 U.S.C. § 1962(c)

310.   The Enterprise, fraudulent sales and telephonic solicitations to open commodities trading account at ADM Investor Services and disguise that (a) fees and overcharges would be funneled across interstate lines to make personal compensation to Vision's owners and others in the Enterprise (b) CTA's trading strategies and trade secrets, would be unlawful dissemination across interstate lines and improperly acquired by Vision and its affiliates and (c) and each of the Defendants individually and jointly permitted the Enterprise to operate, by their direct participation in the scheme to intentionally fail to enforce the CEA and NFA rules that prohibit the conduct, as alleged in Paragraphs 262-263 and otherwise herein.

311.   Defendants directly acquired financial benefit from the scheme. The predicate RICO acts set forth herein were carried out on a continued basis for more than a four-and-a-half-year period, were related and similar and were committed as part of the ongoing scheme of Defendants, one or more of the Vision IB's   to fraudulently induce accounts to ADMIS and then unlawfully disseminate CTA's strategies to Vision, and unlawfully deduct cash and transfer it to Vision, and, if not stopped, such acts will continue into the future;

312. Upon information and belief, this pattern of activity poses a specific threat of repetition extending indefinitely into the future, and continued to harm to the present day;

313. The Defendants fraudulently to collect unauthorized fees and deductions, estimated to be more than $50 million dollars over five years, in violation of the Defend Trade Secrets Act, the Commodities Exchange Act, Federal and State law, and the CEA and transfer those funds, under false pretenses, and without the customer and CTA's knowledge and approval to Vision, its owners, affiliates and employees.

314. The scheme therefore also underpins unlawfully money laundering Plaintiffs cash from its customers futures accounts, across interstate commerce, which directly depleted the profits of their accounts and the performance record of their trading activities, as well as stole the trading strategies. Defendants knew that the transaction involved such proceeds would be wired across interstate to Vision owners and affiliates and made persistent and repeated attempts to fraudulently conceal. Vision IB and ADMIS, enabled by Defendants, intended to promote the carrying on of the specified unlawful activity and knew the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds -  namely Rothman and Boshnack.

315. Plaintiffs have been damaged as a direct and proximate result of a violation of the Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961-1968) ("RICO") and by reason of this conspiratorial conduct whereas Plaintiffs have been induced to open accounts at ADMIS, and unwittingly contribute and disclose trades secrets, assets, capital, property, goodwill, and irreparable loss of competitive trade secrets to Vision as a result of Defendants' unlawful conduct described herein.

316. By virtue of this violation of 18 U.S.C. § 1962(d), Defendants have wrongfully profited from their civil conspiracy and have caused Plaintiffs damages and irreparable harm. Defendants are jointly and severally liable to Plaintiffs and Plaintiffs are entitled to recover from each three times the damages sustained, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

317. Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT 8 - INTERFERENCE WITH ECONOMIC ADVANTAGE

318.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

319.  Plaintiffs Kumaran and CTAs  had a reasonable expectation of deriving income from acting as a CTA and forming a commodities hedge fund with competitive options strategies throughout the world and/or careers as CTA's.

320.  Defendants were aware that Plaintiff Kumaran and CTA's had a reasonable expectation of deriving income from acting as a CTA and forming a commodities hedge fund with competitive options strategies throughout the world.

321. Defendants actions have prevented, and obstructed and otherwise irreparable harmed Plaintiff CTA's and Kumaran from fully maximizing its economic advantage as a CTA;

322.  Defendants have wrongfully profited from their interference with economic advantage and have caused Plaintiff damages and irreparable harm as a result of Defendants interference with Plaintiff CTA and Kumaran's economic advantage;

323. Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief that this Court render a judgment against Defendants, jointly and severally, whereby:

324.  Declaratory Relief that the NFA is permanently enjoined from administering any arbitrations related to the conduct described in this Complaint, for claims under which it is jointly and severally liable as a Defendant, with material conflicts of interest, and the Court is granted jurisdiction over the NFA Arbitration 18 ARB 5, which was stayed effective Nov 13, 2019. (See Exhibit 13)

Page 59

325.  Damages in the amount of a full refund of all fees paid to the NFA, related to the foregoing Arbitration in the amount of $9,500, and all related costs, expenses and losses incurred therein;

326.  Damages in the amount of a refund of all NFA Membership Fees, Dues and other Fees, collected by the NFA, for all commodities trading accounts involved in the scheme;

327.  Damages in the amount of all reimbursement of all financial losses and reductions of economic advantage, for all commodities trading accounts involved in the scheme;

328.  Damages in the form of disgorgement of all profits gained by each Defendants from the fraudulent conduct from the accounts fraudulently induced hereunder;

329.  Damages calculated as by loss of property, assets, livelihood and liberty, including loss of businesses, loss of CTA revenue, and intellectual property, in an amount to be determined at trial;

330.  Damages in the form of loss of capital, loss of income, loss of economic advantage, interruptions to business, irreparable losses for trade secrets in an amount to be determined at trial;

331.  Exemplary damages including  but   not   limited to all special, indirect, punitive, consequential or other damages as permitted by Federal Law and Statute;

332.  Attorney Fees, Costs and Expenses of this action as permitted under Federal Law and Statute;

333.  Post and Pre Judgment Interest;

334.  All other relief,  remedies and rights available in law and equity as this Honorable Court shall determine;

PLAINTIFF DEMANDS TRIAL BY JURY


In accordance with ECF Rule Addendum  Dated April 1, 2020 and Covid 19, this Pleading is signed and filed electronically on May 8, 2020

Electronically Signed

//S//Samantha Siva Kumaran   *Samantha Sivakumaran*

Dated: New York, New York

May 8, 2020.