# EXHIBIT A – SUMMARY OF REPLY TO NFA

SAMANTHA KUMARAN

## EXHIBIT A  - SUMMARY OF KEY DEFICIENCIES IN MR. BOYLE'S MOTION

Plaintiffs note that aside from being an improperly filed Motion to Dismiss, which procedurally should be filed as a 12(b)(6), Defendant's motion provides no contest to subject matter jurisdiction. In this Exhibit A, the Court is alerted to the following deficiencies in Mr. Boyle's response, which will briefed more fully in reply.

*Mr. Boyle's Arguments Against Bad Faith Standards Fail to Differentiate between Discretionary and Non-Discretionary (Section III (A)(B))*

*Given that subject matter jurisdiction is uncontested* under 7 USC 25(b)-(d) Mr. Boyle attempts to argue a motion to dismiss under 12(b)(6). In doing so, he  fails to address the correct standard of bad faith and fails to draw distinction between Plaintiff's complaint that pleads *non-discretionary* violations of the NFA rules, bylaws and regulations versus all the cases he cites which are for *discretionary* violations. Mr. Boyle's letter is therefore materially deficient as it fails to provide a detailed analysis of the actual rules being violated and whether NFA's enforcement of those rules is *discretionary* or *non-discretionary*. It is only upon that analysis can the proper standard of bad faith be determined.

First the Court didn't address any of these facts or law in it's Order. If the Court is now to incorporate Mr. Boyle's new 12(b)(6) arguments on failure to plead a claim, the first key determination on how to apply the bad faith standard, the Court is required to make a detailed determination (and rule-by-rule analysis of each rule and/or bylaw) and whether the duties being alleged as violated are *discretionary* or *non-discretionary*.  Therefore Mr. Boyle's citation of *Brawer*, *DGM* and *Western* are inapplicable as he only applies his 12(b)(6) legal analysis to *discretionary* actions or inactions. All of the rules and laws cited in the Complaint ¶264-265 and otherwise – as explained in detail below – are *non-discretionary*.

NFA themselves have argued in other proceedings, that the standard of bad faith needs to be differentiated between *discretionary* and *non-discretionary*. Therefore Mr. Boyle is in fact judicially estopped from arguing a different position in this District. In Mr. Boyle's Reply Memorandum April 19, 2019 in Troyer vs. NFA 16-Cv-146, Mr. Boyle admits "Under the CEA, NFA cannot be liable unless it acted in "bad faith." 7 U.S.C. § 25(b)(4). *Bosco v. Serhant*, 836 F.2d 271 (7th Cir. 1987), establishes that negligence is sufficient to satisfy the "bad faith" requirement *only* if NFA allegedly violated a *non-discretionary* duty; bad faith beyond negligence is necessary if NFA allegedly violated a *discretionary* duty." (*See* Mr. Boyle Reply Memorandum April 19, 2019).  In that motion, Mr. Boyle expressly argued, preventing him from arguing differently in this District, that the standard of bad faith is lower – and be as low as "negligence" if it  applies to bad faith for *non-discretionary* duties.

The NFA have in fact been held liable and subject to a different standard. (*See* Troyer vs. NFA) Magistrate Judge Susan Collins ruled in September 26 2019, that Courts employed a ***dual*** standard when considering the term "bad faith" for purposes of 7 U.S.C. § 25(b)(4): [I]n the present setting, involving an exchange's failure to enforce its rule in accordance with the exchange's own interpretation, the courts, including our own, have treated the term bad faith as if it read negligence. *Bosco v. Serhant*. Thus, if an exchange's regulation imposes a duty that the exchange should know is being flouted, the exchange is acting wrongfully—in an attenuated sense, perhaps, but one sufficient under the cases we have cited to demonstrate bad faith. ***The test is different*** if the exchange injures a trader ***through the exercise of a discretionary power***, such as the power to take emergency actions to prevent substantial losses; then more must be shown to constitute bad faith—either that the exchange acted unreasonably or that it had an improper motivation.  (*See* Troyer)

Therefore Mr. Boyle is judicially estopped from presenting contradictory arguments and not applying the distinction of *non-discretionary* rules and *discretionary* rules as he is quite aware the bad faith standard is distinct (*See Supra* Boyle Reply Mem. Of Law April 2019, Troyer vs. NFA)

Even in the case cited by Mr. Boyle in *Brawer vs. Options Clearing Corp* the Court acknowledged two different set of standards in determining the bad faith for *discretionary* vs. *non-discretionary*.  In *Brawer*, the Court ruled that the relevant by-laws obviously gave AMEX and OCC great *discretion*. However they were explicit that "Under a different rule, a different sort of duty might obtain. *See Baird,* 141 F.2d at 244.".  Plaintiffs case at hand is completely opposite. Unlike Amex and OCC, where the express bylaw analyzed gave the exchange "sole discretion" on when and whether to implement the rules, the case is inapposite here. The NFA has no discretion whatsoever in applying CFTC regulations or its other rules and bylaws, such as taking "unauthorized fees" out of traders accounts, or disclosing the risks and giving competitors unauthorized access to traders account – or the numerous other specific NFA Rules listed as violated. (*See* for example ECF1 ¶264, ¶ 168-176)

### *Each of Plaintiff's Rule Violations were Non-Discretionary*

Mr. Boyle's arguments are inapplicable because Plaintiffs complaint makes clear that all of the NFA Rule Violations and violations of CFTC Statutes and CEA listed in ¶264-265 and elsewhere throughout the Complaint were *non-discretionary.* Further before applying a Motion to Dismiss*, the* Court is required to take a detailed review of the violations cited and analyze each one of the NFA Rules, CFTC Rule and other CEA rule. Without limitation to each rule violation that needs to be examined, Plaintiff has included below three examples.

### *Rule Violation 1 ECF 1 ¶264*

The Complaint pleads violation of NFA 2-26 including without limitation CFTC 1.11, CFTC 1.55 and CFTC 1.57 which required Lazzara and ADMIS, disclose customers, all its risk management policies and procedures, prior to opening the account; (CFTC 1.55 (k) ..disclosures about risk policies prior to a customer entrusting funds to an FCM were prerequisite and CFTC 1.55.(l) .. expanding upon such information as necessary to keep such disclosure from being misleading whether through omission or otherwise)

Plaintiffs assert this is a *non-discretionary* rule. NFA are obligated to abide by CFTC requirements. Therefore the standard of bad-faith is for *non-discretionary* violations. Mr. Boyle is silent upon and fails to provide a defense or rebuttal to the well-plead allegation of NFA's failure to enforce or aiding-and-abetting in violation of NFA 2-26/CFTC 1.11 and CFTC 1.55. Therefore the standards of bad faith in his response are inaccurately applied for *non-discretionary* rules.

### *Rule Violation 2 Complaint ECF1 ¶264*

The Complaint pleads violation of NFA 2-4 Int Not 9061 which is a NFA Compliance violation for NFA Members Felag and Vision owners, affiliates to obtain a CTA's trading records without their permission;

Plaintiffs assert this is a *non-discretionary* rule. NFA2-4 Int Not 9061 makes it an express rule violation and impermissible for another NFA Member to obtain a CTA"s records without permission. Since this rule is binary (meaning either it is permissible or impermissible) the rule is *non-discretionary.* Therefore the standard of bad-faith is for *non-discretionary* violations.

Mr. Boyle is silent upon and fails to provide a defense or rebuttal to the well-plead allegation of NFA's failure to enforce or aiding-and-abetting in violation of NFA 2-4. Therefore the standards of bad faith in his response are inaccurately applied for *non-discretionary* rules.

### Rule Violation 3 ECF1 ¶264

The Complaint pleads violation of NFA 2-4 Int Not 9005 and NFA Rule 2-26 / CFTC Part 33.(7) which required that Lazzara (the broker) disclose all the costs and fees, transaction fees and trade processing fees (being deducted from Plaintiff's accounts to pay Vision affiliates) prior to the account being open, and that any arrangement that is likely to deceive customers is a violation of NFA Requirement;

Plaintiffs assert this is a *non-discretionary* rule. NFA are obligated to abide by CFTC requirements. Therefore the standard of bad-faith is for *non-discretionary* actions. Mr. Boyle is silent upon and fails to provide a defense or rebuttal to the well-plead allegation of NFA's failure to enforce or aiding-and-abetting in violation of NFA 2-4/9005 and NFA Rule 2-26/CFTC 33.7. Therefore Mr. Boyle's standard of bad faith is inapplicable and does not belong in this Motion.

### Even Under A Discretionary Standard Mr. Boyle's Arguments Fail

In the alternative if the Court is to apply a *discretionary* standard to the rules that were violated (which in fact would be arguably incorrect) Plaintiffs will still explicitly demonstrate to the Court that Mr. Boyle's counterargument, (*in* an appropriate 12(b)(6) motion) of "knowledge" and "ulterior motive" still fail. Not only does this not apply to the correct standard of bad faith for *discretionary* actions, the facts have also been inaccurately construed in his response. The Complaint is well-plead.

### Mr. Boyle's Argument of Knowledge Fail

First, Mr. Boyle attempts to argue that Complaint did not sufficiently plead "Knowledge". Even though this argument is inappropriate and only belongs in a 12(b)(6) motion, Mr. Boyle bases his argument by capitalizing on a "typo" of June 2019 instead of June 2017 to rearrange the timeline in the Complaint and mislead the Court that activities occurred after the account was closed. (*See* Boyle Mem. Pg. 8 and Footnote on Pg.9.) Since the Court already pointed out an innocuous typo of June 2019 which should have been written as June 2017 (Order at 3, Footnote 5) – Mr. Boyle ignores this finding – and at best unproductively – uses the typo to somehow claim that the NFA only had knowledge in September 2017 and that the causes of losses thereafter were with Plaintiff's eyes wide open. The argument is nonsensical. Plaintiffs did nothing with their eyes wide open.

### Complaint Pleads NFA Knowledge and Participation Since September 2014

The Complaint is clear and makes well-plead allegations that NFA had "Knowledge" and participated in the scheme since <u>September 2014.</u> The Complaint makes specific references that date of "Knowledge" of the fraud by NFA was <u>September 2014.</u> (¶1,¶2, ¶11, ¶34,¶38,¶82,¶159 (pleading Knowledge for over four years), ¶160 – noting specifically Jane Doe 2's knowledge since September 2014 - ¶306) The facts show that Plaintiffs were only alerted to the fraud and participation of NFA on February 26, 2019. (ECF1 ¶150-¶152) Mr. Boyle's response fails to make one mention of the fact that it was ADMIS that admitted the NFA was explicitly liable and were to be defense witnesses. (See ECF1¶151¶152,¶155,¶159, ¶224 – noting the footnote 20 states explicitly that ADMIS own emails show "Knowledge dating back to the bulk transfer of customers from Vision which occurred <u>on September 2014</u>) ). Promptly thereafter on March 1, 2019 sent in prompt notification of evident partiality seeking documents, that ADMIS had admitted existing dating back to <u>September 2014</u> (¶224, ¶151, *See* Exhibit

5). Further evidence of knowledge and liability dating back that far are included to communications to the Panel *See* ECF1, Exhibit 10 Pg.31-32, also Pg.23 – again demonstrating knowledge since <u>September 2014</u> and activities that had been conducted for five (5) years. ADMIS admissions (which as a separate note were included in emails to Plaintiffs that were not included in the Complaint) specifically stated that NFA's "Knowledge went back 4.5 years" and started in September 2014. This is also documented in the request in Exhibit 5, for example showing the exact dates of documents dating <u>back 5 years</u>. Other evidence are the subpoenas issued by the Arbitrators – also clearly demonstrating to the Court that NFA had knowledge and actively participated in the fraud, since September 2014 (*See* Exhibits 5, 10, 11, 12) The correct timeline, as pled in the Complaint shows clearly that the NFA had Knowledge of the fraud expressly dating back to <u>September 2014.</u> Therefore the Complaint adequately pleads that the NFA had "Knowledge" since September 2014. Notably it is explicit that NFA Jane Doe 2 and Tom Kadlec (and ADMIS also admitted it was the NFA who had knowledge) – key participants in the fraud are clearly alleged to have been participating and knowledge of the fraud since 2014. As a direct result of their failure to enforce the rules and laws Plaintiff's account suffered actual losses – and liability is valid. NFA can't completely disown the conduct of the key personnel and discovery (*See* Exhibits 10,11,12 and ¶166) will clearly show how far back *all* the NFA's conduct and signatures went. This had been going on for 5 years. Therefore the Complaint pleads Knowledge well.

### *Mr. Boyle's Argument of Ulterior Motive Also Fail*

While Plaintiff will more fully expand upon this point its reply, Plaintiffs alert the Court that Mr. Boyle's argument on ulterior motive are also irrelevant or inaccurate. First the standard of bad faith for violation of *non-discretionary* rules is much lower and can be met even with a pleading of negligence. Therefore Mr. Boyle's cited cases related to ulterior motive are irrelevant as they are <u>only</u> applicable to rules are being violated under *discretionary* authority. Under the facts of this case, Plaintiff has shown that the NFA rules, bylaws and regulations were *non-discretionary*. This error is material.

Even if the Court were to erroneously adopt a *discretionary* rule standard, the pleadings for ulterior motive are well plead. Mr. Boyle cites *DGM Investments* that the sole or dominant reason [for violations of *discretionary* rules] must be "[S]elf-interest or other ulterior motive unrelated to ***proper*** regulatory concerns" (*Emphasis added*). However Plaintiff has made clear the activities and schemes described in the Complaint aren't related to ***proper*** regulatory concerns. They are related to illegal, fraudulent activities and improper activity. As an example, for illustrative purposes, if a Customs and Excise Officer following "***proper*** regulatory concerns" charges a customer an import and excise tax of $150 for every imported painting. This would be called an ***proper*** regulatory concern. If however, a select group of Customs and Excise Officers were adding an unauthorized $750 which is prohibited under the rules, or worse, removing $750 of property from customer's luggage without their knowledge and consent – that would not be considered a legitimate or ***proper regulatory activity***. The Complaint makes clear that all the activities related to Vision are improper, fraudulent and illegal. Therefore the ulterior motive – is based on generating revenues from fraud and illegal activity – and cannot be considered ***proper*** regulatory concerns. And Mr. Boyle's examples are therefore not applicable. Nonetheless the Complaint also pleads more than just generating illegal and improper revenues. Other illicit and concrete benefits, including those of Defendant Tom Kadlec are also mentioned. (¶45, ¶102 – credit lines and guarantees – noting these credit lines were also illegal and violated exchange margin rules, ¶69, ¶103-¶106 credit lines, operating losses of the NFA exceeded $1mm in 2017-2018).  The

Complaint is explicit the revenue is generated through fraud and illegal activity. (*See* ¶ 102 – fraudulent financial deductions, ¶103 – illegal conduct, ¶83 – fraudulent conduct to harm customers)

Mr. Doyle's excuse that charging operating revenues is part of the ordinary role of the NFA and can't be held bad faith is false. NFA's bylaws, regulations, mandate and ability to operate only allows ***legal*** activity and compliance with the CEA - not illegal and fraudulent activity. The Complaint not only specifically pleads the activity is being conducted with fraud, the activity is being done in violation of the rules, bylaws and regulations and CEA, is illegal and unauthorized – to generate illicit revenues for all. Therefore it is not *ordinary* regulatory activity to base is operating revenue on "ill-gotten" gains, unauthorized fees, fraudulent conduct and illegal activity. This is not a "proper regulatory activity".

*Mr. Boyle Argument on Actual Damages is Incorrect*

Mr. Boyle's argument on actual damages is also incorrect and seeks to confuse the Court on the overcharges and unauthorized fees being unlawfully being taken out of traders' accounts as not being trading loss damages. They are trading losses. Mr. Boyle frequently acknowledges these are "*unauthorized fees.*" The Court should duly note that the word "*unauthorized fees*" is repeated at multiple times in Mr. Boyle's motion (*See* Boyle Mem. Pg. 7, Pg. 8) and not once does Mr. Boyle deny or argue to the Court that these weren't *unauthorized fees.* The Court should also note that the words "*unauthorized fees*" are an oxymoron to be used together with the words "*proper regulatory activity*". The two are an irreconcilable. The conduct alleged in this Complaint is not "*proper*" regulatory activity but "*improper*" regulatory activity.

To explain more simply to the Court, essentially the CTA and customer traders' accounts being held at ADMIS are being operated as an unregulated slush-fund– *without proper controls or regulations* - in express violation of the Commodities Exchange Act. Even the proprietary trading data, transaction data and privacy financial data (such as names, social securities and financial information) are not being protected – *with proper controls or regulations.* Under the CEA the NFA has a *non-discretionary* duty to enforce those controls, rules and regulations. As a direct consequence of deliberately not applying controls or regulations on ADMIS's trading accounts – unlawful profits are taken by the NFA and Vision – with them being able to unlawfully dip into the slush fund – for illegal profit - without the customers (traders) knowledge or consent. The Complaint alleges the conspirators knowingly and directly withdraw or deduct money out of a traders' accounts in express violation of the CEA and the NFA Rules– causing significant financial trading losses to traders as well as reducing their competitors trading value. They were also gaining unlawful access to their competitors trading strategies. The Complaint is explicit to this point. Plaintiffs state that in just 45 days trading profits of over 3.4% of the account value were unlawfully taken from Plaintiff's trading account. (*See ECF1* ¶74).

Therefore these are directly causing trading floor reductions of profits, and losses.

As a further simplified example for the Court, take a scenario where Plaintiff is a competitive CTA and can generate returns of 25% a year. On a $100,000 account its trading account would generate $25,000 of trading profits in a year. The Complaint pleads that the scheme depletes the trading account profits by 3.4 % evert 45 days (approximately 18% a year) (ECF1¶74). This is a significant depletion and is a direct and actual reduction of trading profits, in this case reducing the actual trading profits by $18,000 to $7,000. This is not only a direct and actual trading loss  - but the trading losses and trading depletions of competitors trading account cause direct unfair market competition, getting to the heart of

the Commodities Exchange Act. As a result of the scheme, instead of a CTA posting a trading performance record of 25% a year ($25,000) traders are being forced to reduce their profits (which they never consented to - and a violation of the CEA -) to 7% a year ($7,000). This is significant in a competitive industry and creates an unfair market playing field, where traders base their livelihood on the performance of their returns. Further the $18,000 in this example are direct trading losses unauthorized and without consent taken from the trading accounts. Additional losses are caused by the illegal margin activity being conducted and failure to enforce margin exchange rules of over $134,000. (ECF1¶67-69). That caused Plaintiff's direct losses in its account. That is why other brokers (ECF17) are complaining about $100,000 of deductions (trading losses to their customers). Over the last five years, unauthorized trading deductions have exceeded $50 million (Exhibit 10, Pg.9). Mr. Boyle does not even dispute this fact.

Further supporting evidence in the Complaint makes clear that the actual theft from trading accounts across all the brokers customers and traders exceeds $10 million a year. (Exhibit 10, Pg.9) The conduct has been going on for five(5) years. (¶264) Other brokers are coming forward also admitting that over $100,000 of illegal trading deductions were taken from their accounts. (*See* Exhibit 2, Exhibit 10 Pg, 9). That is why there is an allegation of over $50 million in illegal and unauthorized trading reductions (Losses) and actual damages of depleting trading accounts of customers and CTA's. (¶3, ¶37). As for liability and damages under 7 USC 25 these amounts are actual trading losses and are the total amounts of trading floor damages in the aggregate. These monies were *unlawfully extracted from* customer and CTA's accounts as illegally forced trading losses or trading reductions to their profitability.

Notably Defendant Tom Kadlec, a key instigator of the scheme is missing in action in this response. The Court should note that Mr. Boyle's response is completely silent on and almost "disowns" Mr. Kadlec, who serves simultaneous as the CEO of ADMIS, where the trading accounts are being depleted from – never once disputing that the fees were "unauthorized". NFA is also silent on the conduct of the two compliance officers who are individuals, even if the violations could be considered at a lower standard of negligence – let alone with fraud or improper motive and Plaintiffs causes of action are well pled. The Court should take note of Arbitrators own subpoenas on *signatures* from NFA's own compliance officers ¶166 and Exhibits 11 and 12 sufficiently problematic that Arbitrators themselves noted potential conflicts of interest and evident partiality. Mr. Boyle remains silent on evident partiality, FAA and the collaterally estopped issues. Mr. Boyle does not even address the Compliance Officers signatures on documents ¶122-¶124

Where innovative traders like Plaintiffs are having losses forced upon them by their competitors, and then, their competitors allowed to compete with them. Mr. Boyle also fails to address the registration of Vision Investment Advisors also as CTA's. There was also an unauthorized loss of trading strategies and trade secrets. After depleting their competitors trading performance they are they are then permitted to directly compete. (¶ 4, ¶9, ¶31, ¶36, ¶120). Using the example above, not only is the CTA's account profitability being reduced from 25% to 7%, the perpetrators then compete with them. If their own trading (VIA) account post returns at 15% a year, they now have an unfair competitive advantage, not only by their depletion of their competitors funds, but also by suffocating their competitors performance, as well as theft of their trade secrets. All three of these things violated the CEA (¶121 – and are at the heart of the *non-discretionary* rules of fair market competition that NFA is obligated to enforce. They also are forcing small businesses out of the market. (*See* Att. 5) 7U.S.C.1,§5 was enacted to promote

"fair market competition" and to protect the interests of market participants, to promote responsible innovation and fair competition among market participants. The purpose of the NFA's Articles of Incorporation11 Section 1(a) public interest…is..The adoption, administration and enforcement as … regarding fair practice and designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade and, in general, to protect the public interest."

### *Corporate Veil Piercing and Bad Conduct of Vision:*

Finally the Court is alerted to the Business Conduct Complaints filed against Vision and the public announcements disbarring them. (*See* Attachments 2 and 3). Screen shots from the NFA's Basic Website demonstrates to this Court a serial pattern of unscrupulous, bad faith and illegal conduct resulting in over 172 CFTC Reparations cases against Howard Rothman and Robert Boshnack and fines in the millions. (*See* Attachment 4). The Court is directed also to the expulsion from the industry of Vision (*See* Attachment 5) and fines – exceeding $1.5 million, and assurances from the NFA that customers doing business with High Ridge (the corporate veil piercing entity) would have access to information about Vision. Plaintiff also attaches its dissolution notice. (*See* Attachment 6).

Plaintiffs on the other hand have ***zero*** compliance violations. Plaintiffs have ***zero*** disciplinary actions. Plaintiffs have ***zero*** reparations or complaints against them. Plaintiffs in fact have ***zero*** counterclaims against them.

Also filed is the agreement to pierce the corporate veil between ADMIS and Vision's owners Howard Rothman, Robert Boshnack and its various new entities which is simply started up a operating under a new name, to continue new illegal activities with ADMIS – now under their ***individual names*** (*See* Attachment 7) When it is convenient to the regulator, the regulator routinely permits corporate veil piercing – without impact to the individuals – and the sponsoring entity is disregarded.

The document is filed under seal as ADMIS, Vision and NFA went to no small measures (without showing of any good cause or injury) to place an overly broad Gag Order (¶258-¶259) – to stop customers and traders uncovering their accounts have been and are being unlawfully turned over to Vision. Plaintiffs dispute the legality of the NFA Gag-Order and will move to overturn in subsequent motion to the Court. For now, the document is filed under seal even though Plaintiffs object and believe it should be filed in the public domain and there is no good cause for this document to not be scrutinized.

### Individual Rights are Preserved:

The Court should also be aware of the distinction of the individual traders (Kumaran/ CTA) and the prior sponsoring entity (NRCM). At the NFA, any number of entities can sponsor a trader. In this case the registered CTA is Kumaran (individually) and is the CTA. Kumaran is now sponsored by Nefertiti Asset Management, LLC ("NAM") a Delaware LLC.

Plaintiff has also attached the notice of dissolution which is to be filed at New York State. Plaintiffs complaint was filed on May 8, 2020 and it had under Rule 4, up to 90 days to serve and amend. It was in the process of filing the Notice of Dissolution which it intended to do this summer. Plaintiff had until August 8, 2020 to do that, but the process was interrupted because the Court's ruling came out on July 4, 2020 which is why it was not completed prior to this briefing.

Page 8

### Typical Hedge Funds Structure Has Multiple Entities

Defendants NFA are also fully aware of the hedge funds structure that Plaintiffs have in place. Also what has confused the Court is that Nefertiti has several separate and distinct entities. The correct registrant now is Nefertiti Asset Management, LLC. ("NAM"). NAM became registered at the NFA in June 2020. (NFA ID 0531175). The commodities options fund is Nefertiti STORM Commodities Options Fund ("STORM Fund, LP"). (NFA ID 136864) This also is registered at the NFA as Pool. Kumaran as an individual trader, is now affiliated with NAM (and not NRCM). NAM is both a CPO and CTA. Further the individual that is the actual trader is Kumaran (CTA).

### *Individual Claims Are Not Impacted*

Further the Court should be fully aware that Kumaran individually is registered as a ***trader. Individuals*** are listed as CTA's. Individuals can be sponsored by multiple entities. Kumaran is now sponsored by Nefertiti Asset Management, LLC ("NAM") a CPO/CTA.  It was previously sponsored by the entity which was NRCM which was also a CTA. NRCM is no longer registered it has been delisted.. It would be impossible for a "inanimate" entity to place trades. The actual trader on the account was Kumaran. (CTA). An entity cannot place trades without an actual trader. Therefore the trader who owns that CTA performance record is Kumaran. A trader can be sponsored by many entities. Therefore the "sponsor" is just the entity sponsoring the actual trader. **NAM** is the current sponsor of Kumaran. Both Kumaran and NAM are now registered entities at the NFA. Because NAM has new investors and business partners, none of the liabilities and assets of NRCM were assigned to NAM. Everything was assigned to Kumaran individually. ¶12. The Complaint is clear that Kumaran is the legal successor and assign. The NFA and Mr. Boyle are aware that Kumaran's registration is now with NAM. The language in ¶57 specifically refers to "businesses" **– pural.** The Complaint (apologizing) was not clear to distinguish between the various entities. It is NAM in which other investors, partners made contributions. Also Kumaran still retains sole ownership of the IP and trading strategies. (¶56). NAM is *not* the successor and assign of NRCM. NRCM has withdrawn and is deregistered at the NFA as the entity is being dissolved. The agreement with the new investors and partners of NAM is that Kumaran, individually is the sole successor and assignee of NRCM, so as not to burden the other investors and partners with prior business that led to such destruction with ADMIS. The Complaint is explicit to that ¶12. NAM cannot be forced to undertake assignment of the prior business or it would cause harm to the new investors and partners. ADMIS agreement also permits legal successor, assignee or personnel representative. (See ECF17)

### *Mr. Boyle's Does Not Address Subject Matter Jurisdiction Under FAA*

*Because the NFA has no subject matter jurisdiction defense under the FAA,* it then tries to improperly slip past a 12(b)(6) failure to plead claim on fraud that Arbitrability is an issue. This argument is impermissible and procedurally should be disregarded. If the Court is to consider Mr. Boyle's improper arguments Plaintiffs will show the Court explicitly that Mr. Boyle's  arguments fails.

First the Court should note that Mr. Boyle fails to dispute subject matter jurisdiction under the Federal Arbitration Act. The point of the motion before the Court's Order is related to FAA. Mr. Boyle fails to raise any argument whatsoever that subject matter jurisdiction falls squarely in this jurisdiction. (*See* Pltf. Mem. Section B, Pg 9, Section C, Pg. 15, Section D, Pg. 29) NFA's argument on Arbitrability is incomplete, fails to address the issues briefed in Plaintiff Mem. In Pg.9 Mr. Boyle rests his *sole* argument that Arbitrability is not an issue, because he claims "fraud was not pled with peculiarity." The Court did not raise an issue of failing to plead fraud with peculiarity and it is also wholesomely improper

to be raised in this reply as it needs to be filed in a 12(b)(6) motion. Further Plaintiffs argue, that fraud is pled with peculiarity by reference in the related cases and can easily be incorporated by reference therein. (*See* 20-CV-03781 ¶123-138, ¶145-150,  *See* also ECF1 ¶59-75, ¶125-136)

More importantly, NFA omits and fails to make one counter argument or defense to any of the other numerous issues with Arbitrability that were raised in Plaintiffs motion (*See ECF17 Pg34-36, Section F*). Mr. Boyle fails to defend the Collateral Estoppel. (*See* ECF17 Pg.29-32). A manifest error. He fails to defend that almost all the parties are not subject to binding Arbitration agreements. (*See ECF17*, Pg.36). He fails to counter that Class Action Arbitrability is impermissible. (*See  ECF17.* Pg. 32-34). He fails to defend the obligation to disclose material conflicts of interest. He fails to counter the obligations cited in (*See ECF17* Pg.16-18 - where Arbitrators have an obligation to investigate the material conflicts of interest. *Applied Indus. Materials Corp.,* 492 F.3d at 137 ) He fails to defend the bias and evident partiality extensively briefed in Plaintiff motion. (*See ECF17*Pg.19-22). He does not even respond to the salient subject matter jurisdiction related to reasonable appearance of bias, resulting in fundamental unfairness. (*See ECF17* Pg.22). As stated in *Commonwealth Coatings Corp.,* the Court also rejected the argument that Congress intended "to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another". Mr. Boyle has no defense against to this.

Mr. Boyle makes not one reference to the admissions of guilt by ADMIS or the fact that NFA employees are to be called as *defense witnesses* (¶152-155)– accused of being direct and active participants in the scheme for over 5 years. (¶ 44, ¶264 )The conduct alleged violated 7 USC 25(b) and numerous CEA and NFA Rules and violations. (See ¶264-265). These are *non-discretionary* rules the NFA failed to enforce. Plaintiff has alleged the parties are jointly and severally liable and respectfully requests to permit discovery on what documents were signed by the NFA and when. (See Exhibits 5, 11, 12 and ¶166). Defendant Tom Kadlec is notably missing in action from all these briefings. The attachments 2-6 are self-explanatory. Plaintiff is wrongfully being painted as the villain.

## Conclusions

Mr. Boyle does not even dispute subject matter jurisdiction in this District under the FAA. Therefore Plaintiffs motion for reconsideration should be granted as it is unequivocally there is subject matter jurisdiction in the Court.  Further as indicated above Plaintiffs will successfully defeat Mr. Boyle's 12(b)(6) motion disguised as a response.

Because of the extensive new 12(b)(6) arguments, Plaintiffs respectfully seek an extension until **August 30, 2020 (**an extension of thirty (30) days**)** or in the alternative if the Court deems that too long, until **August 14, 2020** (or a fourteen (14) days extension as the Court deems appropriate) to respond to this reply - so that it fairly protect its rights to defend these inappropriate Motion to Dismiss arguments and not be prejudiced.

<u>Defendants NFA and Mr. Boyle consent to this request, and agree I should have as long as I need.</u>

Respectfully submitted,  // SSK// Samantha Siva Kumaran