**NATIONAL FUTURES ASSOCIATION**
**BEFORE THE**
**BUSINESS CONDUCT COMMITTEE**

FILED

MAY 1 8 2011

NATIONAL FUTURES ASSOCIATION
LEGAL DOCKETING

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| VISION FINANCIAL MARKETS LLC ) | |
| (NFA ID #208888), ) | |
| ) | |
| HOWARD M. ROTHMAN ) | NFA Case No. 11-BCC-003 |
| (NFA ID #178238), ) | |
| ) | |
| and ) | |
| ) | |
| MICHAEL P. DOHERTY ) | |
| (NFA ID #220401), ) | |
| ) | |
| Respondents. ) | |

## COMPLAINT

Having reviewed the investigative report submitted by the Compliance Department of National Futures Association ("NFA"), and having found reason to believe that NFA Requirements are being, have been or are about to be violated and that the matter should be adjudicated, NFA's Business Conduct Committee ("Committee") issues this Complaint against Vision Financial Markets LLC ("Vision"), Howard M. Rothman ("Rothman") and Michael P. Doherty ("Doherty") (collectively, "Respondents").

## ALLEGATIONS

## JURISDICTION

1.  At all times relevant to this Complaint, Vision was a futures commission merchant ("FCM") and commodity pool operator NFA Member. As such, Vision was and is required to comply with NFA Requirements and is subject to disciplinary proceedings for violations thereof.

2.   Between April 2006 and September 2010, Vision guaranteed a number of introducing brokers ("GIBs"), including 20/20 Trading Company ("20/20"), Statewide FX, Inc. ("Statewide"), Vista Trading Advisors, Inc. ("VTA") and Investors Trading Institute ("ITI").  Vision also guarantees Direct Futures LLC ("Direct"), which had a New York branch office from April 2008 to May 2010.

3.   At all times relevant to this Complaint, Rothman and Doherty were listed principals and registered associated persons ("APs") of Vision and NFA Associates.  As such, Rothman and Doherty were and are required to comply with NFA Requirements and are subject to disciplinary proceedings for violations thereof. Vision is liable for violations of NFA Requirements committed by Rothman and Doherty in the course of their activities on behalf of Vision.

## BACKGROUND

4.   Vision has been a Member of NFA since 1988 and an FCM since 1990.  It is headquartered in New York City and maintains three branch offices – two in Chicago and one in Stamford, Connecticut.  As of January 20, 2011 Vision had five listed principals and 28 APs.  According to Vision's November 24, 2010 annual self-exam questionnaire submitted to NFA, Vision had approximately 12,800 customers and charged commissions as high as $99 per round turn.  Vision conducts its retail brokerage business through a network of approximately 130 GIBs in various locations all over the country.  That GIB network generated approximately $42 million in commissions between January and June 2010, of which Vision received $13.5 million.  Vision has been the subject of three previous Complaints brought by this Committee, in 1993, 1996 and 2000, which were all resolved through agreed settlements.

5.   Rothman is Vision's president and has been a listed principal and registered AP of

Vision since the firm's inception.  In addition to his general duties as Vision's

president, Rothman is also specifically responsible for supervising the operations

of Vision's main office in New York City and its Stamford, Connecticut branch

office.  Rothman owns 10% or more of Vision.

6.   Doherty is a senior vice president of Vision and reports to Rothman.  He has been

a listed principal of Vision since 1993 and an AP of the firm since 1994.  NFA's

Online Registration System lists him as its primary contact person for compliance,

enforcement, arbitration and registration issues.

7.   NFA's Compliance Department became concerned with the adequacy of Vision's

efforts to supervise the activities of its GIBs due, in part, to a spate of five

Complaints that were issued by this Committee during 2010 against Vision GIBs

20/20, Statewide, VTA, ITI and Direct (for activities by APs at Direct's New York

City branch).  All five of the Complaints alleged that the GIBs employed deceptive

sales solicitations.  In addition, three of the GIBs were alleged to have

recommended trading strategies that maximized commissions without concern for

the best interests of their customers.

8.   NFA undertook a review of Vision's supervision of its GIBs and concluded that

Vision rarely expressed concerns to any of its GIBs regarding questionable trading

activity and/or sales practices.  On the few occasions that Vision expressed

concerns there was little or no follow through to see that problems were remedied.

Overall, NFA concluded that Vision and Doherty's supervision of Vision's extensive

GIB network was materially deficient and that Rothman's supervision of Doherty's

compliance initiatives related to Vision's GIBs was materially deficient.

**APPLICABLE RULES**

9.   NFA Compliance Rule 2-9(a) provides that each Member shall diligently supervise
its employees and agents in the conduct of their commodity futures activities for or
on behalf of the Member.  Each Associate who has supervisory duties shall
diligently exercise such duties in the conduct of that Associate's commodity futures
activities on behalf of the Member.

**COUNT I**

**VIOLATION OF NFA COMPLIANCE RULE 2-9(a): FAILURE TO SUPERVISE.**

10.   The allegations contained in paragraphs 1 through 7 and 9 are realleged as
paragraph 10.

11.   The Respondents were responsible for supervising the activities of Vision's GIBs to
ensure that they complied with NFA Requirements.  The Complaints issued by
NFA against 20/20, Statewide, VTA, Direct and ITI during 2010 provide ample
evidence that the Respondents failed in material ways to meet their supervisory
obligations.  All of the Complaints charged the GIBs with making misleading
solicitations.  Further, although Vision had the obligation to review trading in its
GIBs' customer accounts to detect abusive trading patterns, three of the
Complaints included allegations of numerous trade recommendations that
enhanced commissions at the expense of the customers' best interests.  In
addition, one of the GIBs was also charged with using deceptive promotional
material and all five were charged with failing to diligently supervise their own
operations.  The inadequacy of Vision's supervision of its GIBs is further illustrated
by the cursory and ineffectual nature of Vision's on-site GIB audits, including audits
of three of the GIBs that were named in NFA Complaints during 2010.  Overall, the

Respondents' day-to-day monitoring efforts and their implementation of on-site audit procedures were inadequate to provide an appropriate and effective level of supervision over Vision's extensive GIB network.

12. NFA's Board of Directors ("Board") has issued an Interpretive Notice entitled "Commissions, Fees and Other Charges" which, in pertinent part, provides that it is a violation of the high standards of commercial honor and just and equitable principles of trade required of NFA Members to engage in trading practices or recommend transactions or strategies to retail customers that are intended to increase the amount of commissions and fees generated, without serving any economic or other purpose for the customers. The Notice identified large spread positions, butterfly spreads or deep out-of-the money options as examples of trading approaches that have been used by a few Members in apparent schemes to maximize commissions without regard to the customers' best interests.

13. In addition, in 1992, NFA's Board of Directors issued an Interpretive Notice entitled "Compliance Rule 2-9: Supervision of Branch Offices and Guaranteed IBs" which, among other matters, requires guarantor FCMs such as Vision, as part of their day-to-day oversight of their GIBs, to monitor trading activity in customer accounts introduced by its GIBs. It specifically requires guarantors to review and analyze such trading activity on a regular basis in order to highlight those accounts which may require further scrutiny. The Notice provides that:

> There are a number of calculations and comparisons which can be performed to flag accounts for follow-up or further monitoring. For example, significant losses, commission charges or number of trades should be reviewed for inappropriate trading strategies. ... Appropriate supervisory personnel at the remote location should be notified of questionable account activity. Measures should be taken to follow-up, such as reviewing order tickets and trade blotters,

discussing the activity with the broker or contacting the
customer.

14. The Respondents failed in their duty of diligent supervision of Vision's GIBs 20/20,
Statewide and VTA, in part, in that they failed to effectively review the trading
strategies and trade recommendations made by those GIBs so as to determine if
they were appropriate trading strategies.  Had the Respondents performed the
level of review and analysis required by the Board with regard to the trading
strategies and trade recommendations used by 20/20, Statewide and VTA, they
would have found that their APs routinely made trade recommendations to their
customers that maximized commissions without regard for the customers' best
interests and would have been in a position to initiate remedial action.

15. Specifically, the Respondents failed to diligently supervise trading strategies
recommended by 20/20 in that they failed to detect and/or take effective remedial
measures regarding 20/20's recommendations to its retail customers that maximized
commissions without regard for the best interests of the customers.  Such strategies
and trades included: (1) option spreads which resulted in immediate losses since the
commissions and fees charged exceeded the premium collected on the short leg of
the spread; (2) strategies that either stood no possibility of returning a profit or
required dramatic moves in the underlying position to avoid sizable losses; and (3)
strategies where alternative strategies would have given the customer the same
market exposure while costing them far lower commissions.  Examples of strategies
and trades recommended by 20/20 which NFA alleged to be in violation of NFA
Requirements can be found in the Complaint issued by this Committee against
20/20 which can be viewed on NFA's website at
http://www.nfa.futures.org/basicnet/CaseDocument.aspx?seqnum=2359.

16. The Respondents further failed to diligently supervise trading strategies and recommendations used by 20/20 in that Vision's June 2007 audit report of 20/20 cited the firm for failing to monitor trading activity in IRA accounts that were introduced to Vision and referenced an IRA account that had "traded down" from almost $336,000 to less than $8,000. Vision and its principals did little if any follow-up to ensure that the warnings to 20/20 had been heeded. Indeed, just two months after the audit report was issued, another 20/20 customer deposited the entire balance of his IRA ($31,541) into his trading account at Vision and was charged $11,167 in commissions and fees on the very first day that his account traded. He paid almost $15,000 in commissions and fees (47.5% of his equity) during the first two weeks of trading.

17. The Respondents failed to diligently supervise trading strategies recommended by Statewide in that they failed to detect and/or take effective remedial measures regarding Statewide's recommendations to its retail customers that maximized commissions without regard to the best interests of the customers. Such routinely recommended strategies included the trading of option and bull call option spreads to customers that had little chance of being profitable due to their high breakeven points. That the strategies were designed to maximize commissions without regard for the best interests of Statewide's customers is amply illustrated by the fact that customers using Statewide's recommendations, on average, needed to experience returns of over 30% in order to overcome commissions and fees to make a profit. In some instances, customers had to experience returns as high as 50% to make a profit on their option spreads. Examples of strategies and trades recommended by Statewide which NFA alleged to be in violation of NFA Requirements can be found in the

7

Complaint issued by this Committee against Statewide which can be viewed on NFA's website at http://www.nfa.futures.org/BasicNet/CaseDocument.aspx?seqnum=2681.

18.  The Respondents failed to diligently supervise trading strategies recommended by VTA in that they failed to detect and/or take effective remedial measures regarding VTA's recommendations to its retail customers that routinely maximized commissions without regard to the best interests of the customers.  Such recommendations included the trading of bull call spreads and out-of-the-money options that routinely needed returns of from 20% to more than 70% simply to recover the cost of commissions and fees.  Examples of strategies and trades recommended by VTA which NFA alleged to be in violation of NFA Requirements can be found in the Complaint issued by this Committee against VTA which can be viewed on NFA's website at http://www.nfa.futures.org/basicnet/CaseDocument.aspx?seqnum=2512.

19.  The Interpretive Notice entitled "Compliance Rule 2-9: Supervision of Branch Offices and Guaranteed IBs" also requires guarantor FCMs, such as Vision, to review the sales solicitation practices used by its GIBs.  This Notice provides that the individuals conducting the on-site review should monitor sales solicitations while at the GIB and that interviews with selected customers should be conducted concerning the solicitation process and the handling of the customer's account.  In addition, the individuals at the GIB responsible for supervising sales solicitations should be identified, and the method by which sales solicitations are supervised should be reviewed for adequacy.

20.  The Respondents failed to diligently supervise the sales solicitations employed by APs of Vision GIB 20/20 in that they failed to detect and/or take effective remedial measures with respect to deceptive and misleading solicitations which included: (1)

8

the presentation of a misleading and exaggerated view of profit potential; (2) misrepresentation of the substantial risk of loss associated with options trading; (3) suggestions that an account opened through 20/20 was a good way for customers to invest their IRA retirement funds when the AP knew that virtually all of 20/20's customers lost money; (4) failure to explain to customers the impact of commissions and fees on their profit potential; and (5) failure to disclose to prospective customers that the vast majority of 20/20's customers lost money.

21. The Respondents failed to diligently supervise the sales solicitations employed by APs of Vision GIB Statewide in that they failed to detect and/or take effective remedial measures with respect to deceptive and misleading solicitations which included: (1) exaggeration of the profit potential and downplaying of the risk of loss of trading futures and options; (2) failure to disclose that nearly 95% of Statewide's customers lost money in 2009; and (3) failure to make adequate disclosures of and/or clearly explain the way in which commissions would be charged and how they would affect the trading, including any likelihood of achieving a profit, in customers' accounts.

22. The Respondents failed to diligently supervise the sales solicitations employed by APs of Vision GIB VTA in that they failed to detect and/or take effective remedial measures with respect to deceptive and misleading solicitations which included: (1) the use of patent lies; (2) failure to balance the presentation of profit and loss potential; (3) highlighting of profitable returns that had no relationship to the actual performance experienced by VTA's customers; (4) gross misrepresentations of APs' expertise and their success in helping customers to achieve significant profits in the past; (5) suggestions that well-known events and seasonal trends that were

already reflected in the market could be exploited for significant profits; and (6) failure to make adequate disclosures of and/or clearly explain the way in which commissions would be charged and how they would affect the trading, including any likelihood of achieving a profit, in customers' accounts.

23.  The Respondents failed to diligently supervise the sales solicitations employed by APs at Vision GIB Direct's New York City office in that they failed to detect and/or take effective remedial measures with respect to deceptive and misleading solicitations which included: (1) suggestions that prospective customers could make returns of 40% to 200% investing with Direct without providing adequate risk disclosure to these prospective customers; (2) the highlighting of significant potential profits without informing customers that Direct's customers routinely suffered significant losses; and (3) suggestions that well-known events and seasonal trends that were already reflected in the market could be exploited for significant profits.  Examples of solicitations made by Direct which NFA alleged to be in violation of NFA Requirements can be found in the Complaint issued by this Committee against Direct which can be viewed on NFA's website at http://www.nfa.futures.org/basicnet/CaseDocument.aspx?seqnum=2533.

24.  The Respondents failed to diligently supervise the sales solicitations employed by APs of Vision GIB ITI in that they failed to detect and/or take effective remedial measures with respect to deceptive and misleading solicitations which included: (1) a false representation that a customer had made $10,000 on one transaction involving coffee futures; and (2) claims that past customers had routinely achieved substantial profits and that trading through ITI was likely to produce easy and substantial profits without disclosure of the risks involved in such trading or that, in

reality, in 2007 and 2008, 92% of ITI's customers lost money and experienced trading losses totaling more than $1.2 million. Examples of solicitations made by ITI which NFA alleged to be in violation of NFA Requirements can be found in the Complaint issued by this Committee against ITI which can be viewed on NFA's website at

http://www.nfa.futures.org/basicnet/CaseDocument.aspx?seqnum=2524.

25. The Interpretive Notice entitled "Compliance Rule 2-9: Supervision of Branch Offices and Guaranteed IBs" also requires guarantor FCMs, such as Vision, to review and approve promotional material used by its GIBs prior to its first use and requires that promotional material be approved by appropriate supervisory personnel. It instructs further that guarantor audits should be designed to ensure that the GIB is not using any promotional material that has not received prior approval.

26. The Respondents failed to diligently supervise the review and approval of promotional material used by Vision GIB ITI in that they failed to detect and/or take effective remedial measures with respect to ITI's MySpace webpage which included the deceptive and misleading claim that, by trading with ITI, a profit of "$1,000,000 is possible!"

27. By reason of the foregoing acts and omissions, Vision, Rothman and Doherty are charged with violations of NFA Compliance Rule 2-9(a).

## PROCEDURAL REQUIREMENTS

### ANSWER

You must file a written Answer to the Complaint with NFA within thirty days of the date of the Complaint. The Answer shall respond to each allegation in the

Complaint by admitting, denying or averring that you lack sufficient knowledge or information to admit or deny the allegation.  An averment of insufficient knowledge or information may only be made after a diligent effort has been made to ascertain the relevant facts and shall be deemed to be a denial of the pertinent allegation.

The place for filing an Answer shall be:

> National Futures Association
> 300 South Riverside Plaza
> Suite 1800
> Chicago, Illinois  60606
> Attn: Legal Department-Docketing
>
> E-Mail: Docketing@nfa.futures.org
> Facsimile: 312-781-1672

Failure to file an Answer as provided above shall be deemed an admission of the facts and legal conclusions contained in the Complaint.  Failure to respond to any allegation shall be deemed an admission of that allegation.  Failure to file an Answer as provided above shall be deemed a waiver of hearing.

## POTENTIAL PENALTIES, DISQUALIFICATION AND INELIGIBILITY

At the conclusion of the proceedings conducted as a result of or in connection with the issuance of this Complaint, NFA may impose one or more of the following penalties:

(a)     expulsion or suspension for a specified period from NFA membership;

(b)     bar or suspension for a specified period from association with an NFA Member;

(c)     censure or reprimand;

(d)     a monetary fine not to exceed $250,000 for each violation found; and

(e)     order to cease and desist or any other fitting penalty or remedial action not inconsistent with these penalties.

The allegations in this Complaint may constitute a statutory disqualification from registration under Section 8a(3)(M) of the Commodity Exchange Act.  Respondents in this matter who apply for registration in any new capacity, including as an AP with a new sponsor, may be denied registration based on the pendency of this proceeding.

Pursuant to the provisions of Commodity Futures Trading Commission ("CFTC") Regulation 1.63, penalties imposed in connection with this Complaint may temporarily or permanently render Respondents who are individuals ineligible to serve on disciplinary committees, arbitration panels and governing boards of a self-regulatory organization, as that term is defined in CFTC Regulation 1.63.

NATIONAL FUTURES ASSOCIATION
BUSINESS CONDUCT COMMITTEE

Dated: 05/18/2011      By: _____
                            Chairperson

M:/pmr.Complaints.Vision, Rothman & Doherty 2011 FINAL.docx

**AFFIDAVIT OF SERVICE**

I, Nancy Miskovich-Paschen, on oath state that on May 18, 2011, I served a copy of the attached Complaint, by sending such copy in the United States mail, first-class delivery, and by messenger service, in envelopes addressed as follows:

Kenneth F. Berg, Esq.
Ulmer & Berne LLP
500 West Madison Street
Suite 3600
Chicago, IL 60661

Nancy Miskovich-Paschen

Subscribed and sworn to before me
on this 18th day of May 2011.

Notary Public

OFFICIAL SEAL
MARY A PATTON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8/28/2013

14