**NATIONAL FUTURES ASSOCIATION**
**BEFORE THE**
**BUSINESS CONDUCT COMMITTEE**

FILED

SEP 1 1 2013

NATIONAL FUTURES ASSOCIATION
LEGAL DOCKETING

In the Matter of:

VISION FINANCIAL MARKETS LLC
(NFA ID #208888),

STEVEN M. SILVER
(NFA ID #240051),

    and

BRUCE NEWMAN
(NFA ID #86676),

    Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

NFA Case No. 13-BCC-018

## COMPLAINT

Having reviewed the investigative report submitted by the Compliance Department of National Futures Association ("NFA"), and having found reason to believe that NFA Compliance Rules ("NFA Requirements") are being, have been, or are about to be violated and that the matter should be adjudicated, NFA's Business Conduct Committee issues this Complaint against Vision Financial Markets LLC ("Vision"), Steven M. Silver ("Silver") and Bruce Newman ("Newman").

## ALLEGATIONS

## JURISDICTION

1.    At all times relevant to this Complaint, Vision was a futures commission merchant ("FCM") and commodity pool operator NFA Member. As such, Vision was and is required to comply with NFA Requirements and is subject to disciplinary proceedings for violations thereof.

2.      At all times relevant to this Complaint, Silver was a principal and an associated person ("AP") of Vision and an NFA Associate.  As such, Silver was and is required to comply with NFA Requirements and is subject to disciplinary proceedings for violations thereof.  Vision is liable for violations of NFA Requirements committed by Silver during the course of his activities on behalf of Vision.

3.      At all times relevant to this Complaint, Newman was an AP of Vision and an NFA Associate.  As such, Newman was and is required to comply with NFA Requirements and is subject to disciplinary proceedings for violations thereof.  Vision is liable for violations of NFA Requirements committed by Newman during the course of his activities on behalf of Vision.

## BACKGROUND

4.      Vision is headquartered in Stamford, Connecticut and has been a Member of NFA since February 1, 1988.  Vision has had a long history of supervisory issues during its tenure as an NFA Member.  In fact, it has been the subject of four prior NFA Complaints – three of which charged the firm with failing to diligently supervise various aspects of the firm's operations.

5.      The first NFA Complaint against Vision was issued in 1993 and alleged that the firm and one of its principals used deceptive promotional material and failed to adequately supervise.  Vision settled that action by paying a $100,000 fine and agreeing to a one-year freeze on adding guaranteed introducing brokers ("GIBs").  The second NFA Complaint against Vision was issued in 1996 and alleged, among other matters, that Vision failed to diligently supervise two GIBs.  Vision settled that case by paying a $75,000 fine.

2

6.    The third NFA Complaint against Vision was issued in 2000 and alleged that Vision used misleading promotional material.  Vision settled the 2000 case by paying a $200,000 fine and agreeing to submit promotional material to NFA for pre-approval prior to using such promotional material.  The fourth and most recent NFA Complaint against Vision was issued in 2011 and alleged that Vision and two of its principals failed to supervise five of the firm's GIBs, all of which had been the subject of NFA Complaints alleging sales practice abuses.  Vision settled the 2011 case by paying a $500,000 fine, agreeing to a two-year moratorium on adding GIBs, and initiating supervisory reforms.

7.    A substantial part of Vision's business involves recommending commodity trading advisors ("CTAs") to its customers.  One of Vision's recommended CTAs is Ace Investment Strategists LLC ("Ace"), a CTA NFA Member since 2003.  Yu Dee Chang ("Chang") is the sole owner, president and an AP of Ace and an NFA Associate.  In addition to Ace, Chang is the president and an AP of Chesapeake Investment Services, Inc. ("Chesapeake"), a GIB which shares office space with Ace in Vienna, Virginia.  Chesapeake has been guaranteed by Vision since August 1997 and is among Vision's largest GIBs.

8.    NFA began an exam of Ace on September 12, 2011.  At the time of the exam, Ace had fourteen different managed account programs with more than 1,600 customers and a total of $89 million under management.  Although Ace manages customer accounts that are carried by several FCMs, the vast majority of its managed accounts are carried by Vision.  In fact, as previously alleged, Vision promotes Ace on its website as one of its recommended CTAs.  Although Ace

does not require it, its customers are encouraged to open their managed accounts at Vision. As a result, a substantial percentage of Ace's managed accounts (447 at the time of NFA's exam) are introduced to Vision by Chang's IB firm, Chesapeake. Many of Ace's other managed accounts are introduced to Vision by other Vision GIBs. Overall, Vision carried approximately 90% of Ace's managed accounts at the time of NFA's exam.

9.  In connection with their numerous managed account programs, Ace maintained a governing account at Vision which served as a holding account for bunched orders (i.e., discretionary orders that include the trades of multiple customers) executed for Ace's managed account programs between October 2008 and September 12, 2011.

10. Many of the bunched orders that Ace placed for its managed account customers resulted in split fills (i.e., the trades within the bunched order were filled at different prices). When a split fill occurred, if the exchange which executed the bunched order used an Average Price System (as describe, below), then the Average Price System would determine the "average price" to be allocated to customers who participated in the bunched order.

11. In calculating the average price for split fills, the exchange – in accordance with its  "Average Price System" – would calculate the average price of the trades in the bunched order; then round the average price to the nearest price increment at which the contract in question traded on the exchange. For example, if the contract involved in the bunched order traded on the exchange in minimum price increments of $.05, and the average price on a split fill was calculated to be a

price that fell between the minimum price increments (e.g., $1.98), then that average price would be rounded up or down to the nearest $.05 price increment depending if the bunched order involved buy or sell orders.  Thus, a buy order with an average price of $1.98 would be rounded up to $2.00 and a sell order with an average price of $1.98 would be rounded down to $1.95.  After determining the rounded average price, the exchange would communicate the average price or, where appropriate, the rounded average price to Vision.

12.   Because of the rounding process, there were resulting cash residuals (i.e., the difference between the actual average price and the rounded average price).  In the above example, the cash residual would be $.02 for buy orders (the difference between the actual average price of $1.98 and the rounded average price of $2.00), and the cash residual for sell orders would be $.03 (the difference between the actual average price of $1.98 and the rounded average price of $1.95).  These cash residuals belonged to the customers who participated in the bunched order that resulted in the residuals.

13.   In this case, instead of using the average price calculated by the exchange, Ace would, itself, calculate the average price for split fills, purportedly based on fill information they received from the executing broker.  Ace would then report the average prices, which it had calculated, to Vision which would report the prices to customers on their account activity statements.

14.   The cash residuals resulting from a split fill were required to be allocated, in a timely fashion, among the customer accounts which participated in the bunched

order that generated the cash residuals.  However, Ace did not handle the cash residuals in this manner.

15.    Instead of contemporaneously distributing cash residuals to the participants in a bunched trade, on a trade by trade basis, Ace let residuals accumulate in the governing account for extended periods that sometimes lasted several months. Ultimately, on an apparently random day, Ace would instruct Vision to distribute some or all of the accumulated residuals – not to the participants who participated in the bunched order that produced the residuals but, instead – to the participants in a bunched order that was executed the previous day.  This haphazard and irrational method of allocating residuals allowed customers who had not participated in the earlier bunched order that generated the cash residuals to nevertheless receive such residuals if they were included in the bunched trade from the previous day.  At the same time, customers who participated in the earlier bunched order which generated the residuals would not receive the residuals to which they were entitled if they were not included in the previous day's bunched order.

16.    Not only did Ace improperly allocate the residuals that it distributed to customers but it also failed to make any allocation at all of approximately $1.6 million of residuals held in the governing account.

17.    In addition to Ace's practice of retaining residuals in the governing account for extended periods and then improperly allocating some of the residuals, while permanently retaining others, there were other – equally, if not more, serious – irregularities involving the governing account.  As alleged above, Ace would

6

report trade prices to Vision for bunched orders and, often, these prices were different from the trade prices reported by the exchanges. The next day, Vision would reconcile these different prices by crediting or debiting the governing account the amount of the price difference between the trade prices reported by Ace and the prices reported by the exchanges. (Such credits and debits are hereinafter referred to as "trade breaks".) During the life of the governing account, these trade breaks resulted in a net credit of almost $463,000 to the governing account. However, Ace never distributed the net trade break credit to customers – to whom it belonged – but retained it in the governing account and, over time, misappropriated it for its own use.

18.     The misappropriation of the net trade break credit – as well as the unallocated cash residuals – was the result of Ace using the governing account as an error account to resolve error trades and, in some instances, as a proprietary account in which Ace placed what amounted to proprietary trades. Due to such activity, Ace dissipated approximately $2.1 million of the net trade break credit and unallocated residuals in the governing account – which rightfully belonged to customers – by improperly using these assets to cover losses incurred by the error and proprietary trades Ace had placed in the governing account.

19.     In addition to everything else, on several occasions, Ace also included in bunched orders non-discretionary, customer directed, trades for customer accounts introduced by its affiliated IB, Chesapeake, which accounts Ace had no authority to trade. Specifically, on at least four occasions, the accounts of non-

discretionary customers of Chesapeake were improperly included in the same bunched order as the accounts of Ace's managed account customers.

20. Ace's governing account at Vision was open for nearly three years and during that time Vision personnel communicated with Ace about its governing account – and engaged in other activities related to such account – almost on a daily basis. This put Vision in a unique position to detect and stop the abuses involving Ace's governing account including the improper allocation, and dissipation, of residuals – as well as the dissipation of trade break credits – which should have been distributed to customers.  Yet, Vision chose to ignore the recurring anomalies in Ace's governing account and, at least with respect to the arbitrary and improper allocation of residuals, even participated in such activity.  As a consequence, Vision breached its obligation to uphold high standards of commercial honor and just and equitable principles of trade.  In addition, Vision and at least two members of its supervisory staff (viz., Respondents, Silver and Newman) also failed to diligently supervise Vision's operations as they related to the Ace governing account.

## APPLICABLE RULES

21. NFA Compliance Rule 2-4 provides that Members and Associates shall observe high standards of commercial honor and just and equitable principles of trade in the conduct of their commodity futures business.

22. NFA Compliance Rule 2-10 provides, in pertinent part, that each Member shall maintain adequate books and records necessary and appropriate to conduct its business including, without limitation, the records required to be kept under

Commodity Futures Trading Commission ("CFTC") Regulations 1.18 and 1.32 through 1.37.

23.    NFA Compliance Rule 2-9(a) provides that each NFA Member shall diligently supervise its employees and agents in the conduct of their commodity futures activities for or on behalf of the Member.  Each Associate who has supervisory duties shall diligently exercise such duties in the conduct of that Associate's commodity futures activities on behalf of the Member.

## COUNT I

## VIOLATION OF NFA COMPLIANCE RULE 2-4: FAILURE TO OBSERVE HIGH STANDARDS OF COMMERCIAL HONOR AND JUST AND EQUITABLE PRINCIPLES OF TRADE.

24.    The allegations contained in paragraphs 1 and 4 through 21 are realleged as paragraph 24.

25.    Between October 2008 and September 12, 2011, Ace's governing account at Vision was credited with $3.1 million in residuals and approximately $500,000 in a net trade break credit.  However, only $1.5 million of the combined $3.6 million in residuals and the net trade break credit was ever distributed to Ace's customers and the remaining $2.1 million was dissipated as a result of losses incurred by error and proprietary trades that Ace placed in the governing account.

26.    Although Ace maintained an error account at Vision at the same time that the governing account was open, it was virtually never used.  Instead, Ace used the governing account as if it were an error account to offset positions, and allow other positions to expire worthless.  The following are examples of trades that

were made in error and should have been moved to Ace's error account but

instead were offset at a loss in Ace's governing account:

- On July 5, 2011, Ace purchased 311 July 11 S&P put options with a strike price of 1260. Three of these contracts remained in the governing account and on the following day were offset for a net loss of $337.50.

- On July 6, 2011, Ace sold 191 July 2011 S&P end of month call options with a strike price of 1235. Nineteen of these contracts remained in the governing account and were offset the same day for a net loss of $1,900.

- On June 30, 2011, a day trade was placed in the governing account selling and buying 305 July 2011 S&P call options with a strike price of 1230. This trade resulted in a net loss of $7,625 to the governing account.

- On August 2, 2011, a day trade was placed in the governing account selling and buying 5 October NY Crude Oil call options with a strike price of 110. This trade resulted in a net loss of $600 to the governing account.

All of the above losses – which should have been borne by Ace – were covered,

instead, by the unallocated residuals and the net trade break credit in the

governing account.

27.    Ace also let trades remain in the governing account – instead of moving them to

Ace's error account – until such trades expired worthless. The following are

examples of some of the trades which expired worthless in the governing

account:

- On August 9, 2011, 5 August 2011 S&P call options with a strike of 1275 were purchased at a cost of $973.85. These contracts were left in the governing account until they expired worthless on August 22, 2011.

- On June 27, 2011, 1 June 2011 S&P End of Month put option with a strike of 1185 was purchased at a cost of $119.77. This option

was left in the governing account and expired worthless on June
30, 2011.

- On June 29, 2011, 4 June 2011 S&P End of Month call options with
  a strike of 1315 were purchased at a cost of $679.08.  This trade
  expired worthless on June 30, 2011.

All of the above losses, which resulted from trades that expired worthless, should

have been borne by Ace.  Instead, Ace used the unallocated residuals and the

net trade break credit in the governing account – which belonged to customers –

to cover these losses.

28.   There were also instances when Ace used the governing account to place trades

that were in effect proprietary trades and many of these trades also experienced

losses.  In these instances, Ace would specifically instruct Vision to allocate part

of a bunched order to individual customers and part to the governing account,

which was maintained in Ace's name.  Thus, these trades, which were allocated

directly to the governing account, were for all intents and purposes proprietary

trades of Ace.  Following are some examples where Ace engaged in what

amounted to proprietary trading in the governing account:

- On July 7, 2011, Ace provided Vision with allocation instructions for
  a trade involving the purchase of 418 July 2011 S&P put options
  with a strike price of 1210.  The allocation instructions listed one of
  the 418 contracts to be allocated directly to the governing account.
  That one contract was later sold for a loss to the governing account
  of $87.50.

- On July 7, 2011, Ace provided Vision with allocation instructions for
  a trade involving the purchase of 52 July 2011 S&P put options with
  a strike price of 1200.  The allocation instructions called for four of
  the contracts to be allocated directly to the governing account.
  These four contracts were sold for a loss to the governing account
  of $400 on July 13, 2011.

As was the case with the error trades, the losses from the proprietary trades should have been borne by Ace but, instead, were covered by the unallocated residuals and the net trade break credit in the governing account.

29.   Newman was the individual at Vision who dealt with Ace's orders and who was charged with ensuring that Vision was in balance with the exchanges where Ace's orders were executed.  Ace would occasionally give Newman verbal instructions to initiate the distribution of a specified amount of the cash residuals that had accumulated in the governing account since the last distribution had been made.  On these occasions, Ace would give Newman an order ticket number, along with a list of accounts that had participated in that order and a list of the specific shares of the cash residuals that each of the participating accounts should receive.  Newman would find the ticket number on Vision's system and allocate the cash residuals in accordance with Ace's instructions.

30.   As previously alleged, most of the cash residuals that were randomly distributed by Vision and Newman from Ace's governing account had actually been generated by previous bunched trades that had been placed since the last distribution.  Yet, neither Ace nor Vision made any attempt to ensure that all of the participants in those earlier bunched trades received their rightful share of the cash residuals when they were finally distributed.  The untimely and sporadic manner in which residuals were allocated is underscored by the fact that – although Ace's managed account programs traded frequently – there were only two days during 2011 when any meaningful distributions of residuals were made

and only 23 days, during the entire three years that Ace's governing account was

in existence, when substantial distributions of residuals were made.

31.     Ace's method of distributing residuals in its governing account was neither fair nor

equitable.  As described earlier, some residual credits were owed to accounts that

had already closed and those closed accounts never received their rightful share of

the residuals that were distributed.  Other accounts that were not yet open at the

time that the residuals were generated were nevertheless allocated residuals

because they happened to participate in the trade that Ace arbitrarily chose to

determine who would receive a residual distribution.  In addition, open accounts

that had participated in earlier bunched trades (which resulted in residuals that

were retained in the governing account), but who were not included in the trade

that Ace arbitrarily selected for purposes of deciding who would receive a share of

the residuals, received no share of the accumulated residual payout.  Further, no

attempt was made to accurately calculate the percentage of the accumulated

residuals that should be paid to customers.

32.     Vision was fully aware of, and complicit in, Ace's wrongful method of allocating

residuals in the governing account.  Vision knew that residuals were not distributed

when they were initially credited to Ace's governing account, but rather, were

improperly distributed after being accumulated in the governing account over

extended periods.  Yet, Vision allowed this practice to continue for approximately

three years.  In fact, Vision was a key player in implementing this practice as it was

Vision who actually allocated the residuals among customers in accordance with

Ace's instructions.  By actively participating in, and making no effort to stop, Ace's

improper method of allocating residuals, Vision breached its obligation as an NFA Member to uphold high standards of commercial honor and just and equitable principles of trade.

33.    Vision also failed to uphold high standards of commercial honor and just and equitable principles of trade by knowingly allowing Ace to engage in activity in the governing account that should only have been allowed in an Ace error or proprietary account and, thereby, facilitated the dissipation by Ace of approximately $2.1 million of unallocated residuals and the net trade break credit from the governing account, which should have gone to customers.

34.    By reason of the foregoing acts and omissions, Vision is charged with violations of NFA Compliance Rule 2-4.

## COUNT II

## VIOLATION OF NFA COMPLIANCE RULE 2-10: FAILURE TO MAINTAIN ADEQUATE RECORDS AND MAKE APPROPRIATE INQUIRIES.

35.    The allegations contained in paragraphs 1, 4 through 20 and 22 are realleged as paragraph 35.

36.    NFA Interpretive Notice 9029, entitled NFA Compliance Rule 2-10: the Allocation of Bunched Orders for Multiple Accounts, addresses several issues relating to the allocation of bunched orders and compliance with CFTC Regulation 1-35(a-1)(5).  The Notice provides that CTAs bear responsibility for the allocation of each bunched order; however, it also provides that FCMs, such as Vision, have certain related obligations.  Those obligations include, among others, ensuring that they receive sufficient information from the CTA to allow them to perform their functions as they relate to the allocation of bunched orders.  The Notice also

14

requires FCMs that have notice of unusual allocation activity to make a reasonable inquiry and, if appropriate, refer the matter to the proper regulatory authorities. However, Vision failed to meet these obligations.

37.   Vision did not always have the information that it needed to adequately perform its functions relative to the allocation of bunched orders. For example, there were at least seven instances (June 20, July 7, August 1, August 10, August 29, August 30, and September 2, 2011) when Vision did not receive allocation instructions from Ace on the same day as a bunched trade. In fact, on August 1, 2011, Vision did not receive allocation instructions until three days after the bunched trade was made.

38.   During NFA's exam, NFA asked Vision for certain exchange reconciliations (trade break reports), which Vision used to make adjustments necessary to balance its books with the exchange. Specifically, NFA asked for trade break reports for November 2008. Vision responded that it did not have any trade break reports prior to January 2010. Further, Vision was unable to produce trade allocation instructions for residual distributions made on July 28 and September 12, 2011, purportedly due to the fact that too much time had passed since those distributions were made.

39.   Vision had actual or constructive knowledge of the improper activity in the Ace governing account. As the carrying broker for such account, Vision knew that the governing account was established to hold and allocate bunched trades. In addition, Vision – as an experienced FCM – knew, or certainly should have known, that standard industry practice dictated that residuals resulting from split

fills should be allocated to customer accounts on a virtually simultaneous basis but that Ace retained these residuals in the governing account for extended periods.

40.     Furthermore, Vision – as the party that actually allocated the residuals from the governing account to customers, in accordance with Ace's instructions – also knew that, after accumulating in the governing account, residuals were distributed to customers in an arbitrary and capricious fashion without regard to whether the customers who received the residuals were entitled to them or if other customers – not included in the distribution – should have received a share of the residuals.

41.     Moreover, Vision knew or should have known that Ace was using the governing account as though it were an error account and, in some instances, a proprietary account.  Specifically, Ace would, on occasion, use the governing account to offset trades and allow trades to expire worthless.  At times, Ace would also instruct Vision to allocate what amounted to a proprietary trade of Ace to the governing account.  Vision also permitted residuals from the governing account to be distributed to accounts that Vision knew or should have known were owned by non-discretionary customers of Vision's GIB, Chesapeake, which is controlled by Chang, Ace's owner and president.

42.     As alleged above, there were numerous red flags raised concerning the activity in Ace's governing account which were known to Vision.  As such, Vision was required to make a reasonable effort to determine if fraudulent or otherwise improper activity was taking place in Ace's governing account.  At the very least,

such an inquiry would have revealed that residuals were being improperly retained for extended periods before being distributed – and then on a haphazard basis – and that other residuals were never distributed to customers but retained in the governing account where, along with the net trade break credit, they were slowly and steadily dissipated by Ace as a result of it engaging in activity of a type that should have only occurred in an error account or proprietary account.

43. However, Vision failed to make an adequate inquiry into Ace's activities with respect to the governing account and, instead, for nearly three years permitted Ace to use the governing account any way it wished including mishandling the distribution of residuals and dissipating unallocated residuals and the net trade break credit.  There were even instances where Vision actively assisted Ace in its improper activities including carrying out its instructions to distribute residuals to customers on a completely arbitrary basis without regard to whether such customers were even entitled to receive such residuals.

44. Had Vision acted responsibly, it could have potentially stopped the financial damage to customers caused by Ace's improper activities with regard to the governing account and saved customers some, if not all, of the money that they lost through the improper allocation of residuals and the dissipation of unallocated residuals and the net trade break credit.

45. By reason of the foregoing acts and omissions, Vision is charged with violations of NFA Compliance Rule 2-10.

## COUNT III

## VIOLATION OF NFA COMPLIANCE RULE 2-9(a): FAILURE TO SUPERVISE.

46.    The allegations contained in paragraphs 1 through 20 and 23 are realleged as paragraph 46.

47.    Vision AP Newman was the individual who was responsible for the daily balancing of Ace's accounts.  He also supervised other individuals who assisted him in that function.

48.    Silver served as Vision's chief operating officer ("COO") from 2006 through on or about July 21, 2011.  His tenure as COO encompassed most of the time when Vision, Newman and Ace were mishandling Ace's governing account, for which Silver was ultimately responsible for supervising.

49.    The allegations contained in paragraphs 25 through 33 and paragraphs 36 through 44 are realleged as paragraph 49.

50.    Vision, as the carrying broker for Ace's governing account, knew or should have known that Ace was improperly allowing residuals to accumulate in the governing account for extended periods.  Vision also knew or should have known that nearly $3.6 million was credited to the governing account as a result of residuals and the net trade break credit, while only approximately $1.5 million of this money was distributed to customers and the remaining approximately $2.1 of this money was lost as a result of improper trading activity in the governing account which should have only occurred in Ace's error account or proprietary account instead of in the governing account which was supposed to be solely used for the benefit of customers.

51.   Vision had sufficient information necessary to question Ace's allocation of residuals to customers, the adjustment of prices reported to customers due to trade break adjustments, and Ace's improper trading activity in the governing account that ultimately resulted in the loss of $2.1 million of unallocated residuals and the net trade break credit that rightfully belonged to customers. However, Vision, Silver and Newman took no steps to remedy any of these apparent deficiencies. Instead, Vision and its personnel actually assisted Ace in distributing residuals to customers in a patently unfair manner.

52.   Vision had long standing relationships with both Ace and Chesapeake. Vision guarantees Chesapeake and carries all of its customer accounts. The diligent supervision by Vision of Ace and Chesapeake required Vision to have controls in place to ensure that trades placed by Ace for its managed accounts did not also include non-discretionary trades for customer accounts introduced by Chesapeake which Ace had no authority to trade. However, on at least four instances, the accounts of non-discretionary customers of Chesapeake were included in the same bunched order as the accounts of Ace's managed account customers.

53.   Based on the foregoing facts and circumstances, it appears that Vision, Silver and Newman failed to adequately supervise Vision's operations as they related to Ace's governing account.

54.   By reason of the foregoing acts and omissions, Vision, Silver and Newman are charged with violations of NFA Compliance Rule 2-9(a).

## PROCEDURAL REQUIREMENTS

### ANSWER

You must file a written Answer to the Complaint with NFA within thirty (30) days of the date of the Complaint.  The Answer shall respond to each allegation in the Complaint by admitting, denying or averring that you lack sufficient knowledge or information to admit or deny the allegation.  An averment of insufficient knowledge or information may only be made after a diligent effort has been made to ascertain the relevant facts and shall be deemed to be a denial of the pertinent allegation.

NFA staff is authorized to grant such reasonable extensions of time in which an Answer may be filed as it deems appropriate.

The place for filing an Answer shall be:

> National Futures Association
> 300 South Riverside Plaza
> Suite 1800
> Chicago, Illinois  60606
> Attn: Legal Department-Docketing
>
> E-Mail: Docketing@nfa.futures.org
> Facsimile: 312-781-1672

Failure to file an Answer as provided above shall be deemed an admission of the facts and legal conclusions contained in the Complaint.  Failure to respond to any allegation shall be deemed an admission of that allegation.  Failure to file an Answer as provided above shall be deemed a waiver of hearing.

### POTENTIAL PENALTIES, DISQUALIFICATION AND INELIGIBILITY

At the conclusion of the proceedings conducted as a result of or in connection with the issuance of this Complaint, NFA may impose one or more of the following penalties:

20

(a)     expulsion or suspension for a specified period from NFA membership;

(b)     bar or suspension for a specified period from association with an NFA Member;

(c)     censure or reprimand;

(d)     a monetary fine not to exceed $250,000 for each violation found; and

(e)     order to cease and desist or any other fitting penalty or remedial action not inconsistent with these penalties.

The allegations in this Complaint may constitute a statutory disqualification from registration under Section 8a (3) (M) of the Commodity Exchange Act. Respondents in this case who apply for registration in any new capacity, including as an AP with a new sponsor, may be denied registration based on the pendency of this case.

Pursuant to the provisions of CFTC Regulation 1.63, penalties imposed in connection with this Complaint may temporarily or permanently render Respondents who are individuals ineligible to serve on disciplinary committees, arbitration panels and governing boards of a self-regulatory organization, as that term is defined in CFTC Regulation 1.63.

NATIONAL FUTURES ASSOCIATION
BUSINESS CONDUCT COMMITTEE

Dated:  09/11/2013        By: _____

                                        Chairperson

m/rvh/Vision Complaint (9-3-31)

21