Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMANTHA SIVA KUMARAN | |
| NEFERTITI RISK CAPITAL MANAGEMENT, LLC | Case: 1:20:CV-03668-GHW-SDA |
| | Judge: Gregory H. Woods |
| *Plaintiffs,* | Magistrate: Stewart D. Aaron |
| | |
| -against- | |
| | |
| NATIONAL FUTURES ASSOCIATION | |
| TOM KADLEC, CEO OF ADMIS AND | |
| BOARD MEMBER NFA | **FIRST AMENDED** |
| VILIA SUTKUS-KIELA, | **COMPLAINT** |
| COMPLIANCE OFFICER NFA | **JURY TRIAL DEMANDED** |
| NICOLE WAHLS, | |
| COMPLIANCE OFFICER NFA | |
| *Defendants* | |

Pursuant to Federal Rules of Civil Procedure ("FRCP") 15, reference and the heightened pleading standards of FRCP of 9(b), and incorporating by reference the exhibits under FRCP 10(c), other filings on this docket and related cases via ECF the fraud provisions of the CEA Section 4(b), and pursuant to Section 22(b) of the Commodities Exchange Act, permitting private rights of action by traders against a registered futures association, Plaintiffs Samantha Siva Kumaran ("Kumaran") a registered commodities trading advisor ("CTA") and Nefertiti Risk Capital Management, LLC ("NRCM"), a former registered commodities trading advisor CTA, dissolved by reason of the allegations herein, allege for its first amended complaint as follows:

*1 - PRELIMINARY STATEMENT*

1.  This lawsuit arises under Section 22 of the Commodities Exchange Act, and the willful and bad faith failure of the National Futures Association ("NFA"), the sole registered futures association and their compliance officers or Board members, to enforce the numerous of the non-discretionary mandatory compliance laws, bylaws, rules, and regulations under their delegated and statutory authority under 7 U.S.C. 25 compliance rules under the Commodities Futures Trading Commission ("CFTC", or "Commission") and Commodities Exchange Act ("CEA" or "Act").

2.  This case stems to the heart of the Commodities Exchange Act ("CEA"), and the non-discretionary, mandatory obligations of the NFA to ensure "fair market competition" and compliance with the rules, regulations of the Commission and NFA's own bylaws, rules, regulations. NFA's own

1

Page 2

articles of incorporation define its purpose as the adoption, administration and enforcement as to the following persons of requirements regarding fair practice and designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade and, in general, to protect the public interest. (*See* NFA Article III   https://www.nfa.futures.org/rulebook/index.aspx)) No such conduct was observed in this case.

3.   Plaintiffs during the time of the events were and are registered members of the NFA. Plaintiff Kumaran, individually, remains a registered Commodities Trading Advisor ("CTA") for which all membership dues have been paid in full. NFA has gladly accepted the fees. Congress created a private right of action in Section 22(b) of the CEA, for traders against a registered futures association who knowingly violate or fails to enforce its rules, and for traders who are injured accordingly.

4.   Plaintiffs pled a detailed case in related cases 20-CV-03873 and 20-CV-3871, meeting the heightened pleading standards of Fed.R.Civ.Proc 9(b), replete with dates, times, speakers and specifics where the owners and employees of an disbarred FCM called Vision Financial Markets, ADM Investor Securities ("ADMIS), by and through a former Vision broker called Trey Lazzara, perpetrated a fraud. The Conspirators, using misstatements, fraudulent omissions, misrepresentation and numerous violations of the CEA, that the NFA was obligated to enforce, repeatedly and persistently concealed from Plaintiffs that Boshnack, Rothman, Felag and various competitors, (who also run affiliates that are direct CTA competitors) would, among other things,  (i) unlawfully obtain trading strategies from Plaintiffs' proprietary options trading CTA account, (ii) deduct trailing commissions and unauthorized fees, (iii) reduce profitability of Plaintiffs directly competing CTA account and track record performance, and (iv) unlawfully tamper with and manipulate margin on their competitors account to force losses. (v) engage in direct unfair competition to front-run Plaintiff.

5.   ADMIS, Vision and Lazzara's primary defense in this case has been that the NFA were participants in the scheme, knew about the conduct and willfully failed to enforce their rules, hence invoking Section 22 of the CEA. Defendant Kadlec who operates with two roles, maintaining both his role as CEO of ADMIS and acted at all time with private interest, claims are brought both in his role as an NFA Board Member and simultaneously in his role as a private actor with commercial interests.

6.   As stated in related cases, this action involves a wide-spread, fraudulent scheme, perpetuated by all Defendants for over more than five (5) years to defraud and induce commodities futures customers

Page 3

to open accounts at ADMIS, from which they would wrongfully engage in unfair market competition and improper acquisition, dissemination and use of their competitors trading records, trading strategies, and trade secrets, tortious interference in their competitors' trading advantage, illegal withdrawal of trading profits and unlawful deduction of unauthorized fees from their competitors accounts and other unlawful conduct in violation of the Commodities Exchange Act, using predicate acts of wire fraud and violations of the Defend Trade Secrets Act, in interstate commerce, without the customers knowledge, consent and permission, in direct unfair competition, to owners, employees and affiliates of the disbarred FCM, Vision Financial Markets, LLC and all its alter-ego affiliates listed herein.

7.   Since the trade secrets, trading strategies, and other proprietary information were disseminated to and utilized in Stamford, CT, and other branch offices across the U.S., their actions violated the Defend Trade Secrets Act which provides for a federal, private, civil cause of action for trade-secret misappropriation in which "[a]n owner of a trade secret that is misappropriated may bring a civil action, if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."18U.S.C.§§ 1831 *et seq*. It also constitutes a predicate act for a RICO violation.

8. Defendants and Co-conspirators, have defrauded not just Plaintiffs, but hundreds of other customers and CTA's, who, since September 2014, have been injured by defendants' scheme to fraudulently obtain accounts and then conceal their ongoing enterprise and association in fact to deplete profitability and damage the trading performance of CTA's that compete with Vision; unlawfully disseminate and transfer the competitive trade secrets of CTA's and Plaintiffs' to Vision, and to withdraw unauthorized fees to Vision estimated to exceed $10 million dollars; and then to use their trade secrets in direct competition, in various CTA business arms, in and also in their own trading programs in violation the Racketeer Influenced and Corrupt Organizations Act, 18 U .S.C. §§ 1691 el seq. ("'RICO'"), the Defend Trade Secrets Act 18 U.S.C. §§1831 et seq, the Commodities Exchange Act, and New York General Business Law section 349.

9.   There tortious acts, directed, enacted and supervised in the scheme, by NFA together with Boshnack, Kadlec, Rothman and Felag the instigators of the scheme, were in direct unfair competition in the commodities futures markets and have harmed customers and CTA's (a) improperly acquired, disseminated and used, the confidential and proprietary trade secrets of trading strategies, records, and risk management strategies of their competitor, CTA's and customers, for use in interstate

Page 4

commerce, and then, in direct competition formed a computing CTA called Vision Investment Advisors, Inc and ; (b) through the trading of numerous proprietary accounts under the family offices of Rothman, Boshnack and other affiliates named as defendants, used and incorporate the proprietary trading strategies and risk management strategies in direct competition;  (c) materially took actions to harm their competitors CTA's, by the diversion of Assets Under Management "AUM" by having direct acquisition of their trade secrets, diverting capital raise away from their competitors, and improperly acquired access to all their confidential and proprietary trading record, (d) to deplete the performance history of their competitor CTA's, including Kumaran, to diminish their profitability of as much as 12% in return a year, by suppressing performance of their trading account, in unfair market competition, (e) to extract an amount estimated to be over $50 million in dollars of unauthorized fees

10. The scheme solicits hundreds of millions of dollars of unauthorized revenue in fees and charges, estimated to total over $10 million dollars a year, in violation of the Commodities Exchange Act (which are expressly not authorized by the customer or CTA) to be deducted in cash from ADMIS accounts to be used to make personal payments to Rothman, Boshnack and Vision affiliates, across interstate lines in Stamford Connecticut, and other financial benefits, which are fraudulently concealed from customers and CTA's prior to account opening;

11. Further, after NFA, Kadlec and its Conspirators deceived and betrayed hundreds of its customers and CTA's by secretively giving Vision's owners, employees and affiliates unlawful access to their confidential trading accounts, and trade secrets, and disseminating their confidential and proprietary trading strategies to their competitors in Stamford CT, ADMIS' CEO Tom Kadlec, on the Membership Committee of the NFA, then facilitated the registration of Vision Investment Advisors, LLC, a direct competitor, as a CTA, having unlawfully acquired all ADMIS' CTA's trading data in violation of the Defend Trade Secrets Act numerous regulatory compliance laws,  and violation of the CEA. Without limitation, Defendants in bad faith, materially violated NFA 2-4 9061.

12. This conduct violates the heart of the Commodities Exchange Act, which is to protect market integrity, and to promote principles of fair and equitable trade, and promote fair market competition, and constitutes fraud and deceptive trade practices.

13. Additionally, the illegal conduct, has allowed the disbarred Vision's owners, employees and affiliates, to engage in direct unfair market competition, acquire access to their competitors CTA's trade secrets, while simultaneously using the information to create an unfair competitive advantage

Page 5

in another alter-ego affiliate business called a CTA Referral business. Meanwhile, while start-up CTA's are harmed, ADMIS and its conspirators to amass approximately $10 million a year of unauthorized fees and continues to amass illegal unauthorized fees, being passed through to ADMIS accounts to fund Vision's new businesses, depleted the performance of its competitors by as much as 18% a year, and continue to, destroy fair market competition amongst CTA's, and small businesses.

14. As a material part of enacting and covering up the fraud, ADMIS, CEO Tom Kadlec is also an NFA Board Member, curried favor and utilized at least two long standing insider NFA Compliance Officers, who were familiar with the dealings of Vision and had knowingly participated in the fraud to violated NFA Compliance Rules to permit Vision, its officers, employees and affiliates to access customers and CTA's trade secrets, confidential trading records and privacy laws, in exchange for generating millions of dollars of revenue for the NFA.[1]

15. Without someone on the inside of the NFA to condone the rule violations, ADMIS, Vision and the Vision IB's and LCI would not have been able to perpetuate the fraud for over five years, and upon belief,  so far the customers and CTA's never found out.  NFA, with full participation in the conduct, willfully in bad faith, as documented herein, failed to enforce its compliance laws.

16. Plaintiffs incorporate by reference related case ADMIS FAC ¶¶58-¶¶100 with identical facts repeated.

### *NFA'S ROLE IN THE SCHEME*

17. NFA's involvement case begins in or around June 2014, and continuing until present date NFA, Kadlec, Wahls and Kiela, together with their Co-Conspirators, enacted a fraudulent scheme, to operate a group of commodities futures trading accounts, that were opened through a sub-group of market participants called "*Vision brokers*" and subject them to an inequitable and non-complaint set of market participation rules. NFA accepted a direct pecuniary benefit of $1.5 million to permit known bad actors to remain registered in the futures business.

18. NFA's involvement in this scheme and its liability under the CEA, occurs in three (3) phases. The first phase occurred between June 2014 until September 2017 whereby the NFA, approved oversaw, and knowingly participated in numerous agreements. Those agreements included at least (a) a Settlement Agreement dated on or around June 20, 2014 for which NFA received $1.5 million dollars

---

[1] 20 CV 03668 DKT 1

Page 6

in pecuniary benefits, (b)a Guarantee and Fee Agreement dated August 28, 2014 (incorporated by reference ECF31)  and (c) an undocumented, oral, illegal, risk services "arrangement" that violated numerous laws, including CFTC Reg 1.11, 1.14, and CFTC 1.55, agreed to on or around November 1, 2014,  that the CFTC, as alleged, has no knowledge of.

19. The latter agreement, upon belief, gave Boshnack and his affiliates fully disclosed access to his competitors CTA's trading accounts, and permitted him to act outside of his expelled registration status as an FCM, and unlawfully continue to extend margin and credi ton traders accounts, and perform other functions that the Vision Risk Group was disbarred for and expressly violate the express registration laws and rules of the CEA.

20. The conduct of Conspirators to disseminate CTA's accounts to their competitors who run a competing  CTA Referral, without their knowledge and consent is not just fraud, and prohibited under the NFA Rules, but also constitutes anti-trust activity. ADMIS unlawfully used its position as FCM, to disseminate CTA's accounts to directly competing CTAs at Vision to give them an unfair competitive advantage.

21. To the extent these "agreements"  permitted Vision to receive "trailing fees and commission" in perpetuity from traders accounts that were opened at ADMIS, NFA were required to enforce that these arrangements were disclosed to traders and consents granted. They were not.

22.  To the extent these agreements permitted Vision to receive access to their competitor CTA's trading records and provide other margin services on traders' accounts, NFA were required to enforce that those activities were disclosed to traders and consents granted. They were not

23. To the extent that monies were being purloined from CTA"s trading profits, or margin activity was occurring outside of exchange rules, NFA had a non-discretionary duty to enforce those rules and disclose them to traders. They were not.

24. And finally, because Vision was disbarred, and the Vision Risk Group was deemed unqualified and unfit, having caused millions of dollars of customer losses, NFA was required to enforce that their registration complied with the law, and did not posed an ongoing threat to customers. Without limitation the margin activity alleged herein was noncompliant and violated mandatory exchange rules. This complaint alleges NFA failed, in all aspects.

25. NFA, as a party to the Settlement Agreements for which they received $1.5 million dollars, and as the sole registered futures association responsible for the enforcement of NFA' Members

Page 7

compliance with their own requirements and bylaws, are not permitted to set up unorthodox "undocumented" arrangements that violate the CEA and give "preferential" treatment to one set of market participants in exchange for financial benefits.

26. By permitting Vision's associated persons to remain in the business, NFA had mandatory and statutory obligations to enforce the laws of the CEA and make sure that any agreements or arrangement of *Vision brokers*, were also in full compliance with NFA Rules, CFTC Rules and the participation rules of the CEA, and did not pose a threat to other customers and traders.

27. NFA's failures to enforce, include without limitation primary non-discretionary rule under NFA 2-26 (which includes subparts CFTC 1.55(k)(l)and (i)) which required disclosures to traders and CTA's of the activities of Vision. Additional non-discretion disclosure laws include NFA 2-4 9005, NFA 9065 and CFTC 33.7 all of which require that NFA and its compliance officers enforce that traders are disclosed all "fees and commissions" prior to opening accounts, as well as account access..

28. Instead, NFA participated in the scheme to knowingly and intentionally violating the foregoing laws and rules, engaged in the fraudulent conduct to make sure traders and CTA's including Plaintiffs were not disclosed or not consented to the unlawful arrangements and as a direct and proximate result, caused significant harm and damage to Plaintiffs as alleged herein.

29. The second phase, started around September 29, 2017, when Plaintiffs uncovered the scheme involved the "cover-up" up phase. Upon information and belief, Kumaran was the first CTA to uncover the scheme. Kumaran has an extensive risk management consulting background, and was able to document with evidence, that the so called 'oral risk services' (illegally outsourced to the disbarred *Vision Risk Group*) were being performed by unqualified personnel, replete with errors and omission, with gross negligence, on materially deficient electronic platforms and violating exchange margin rules. (See e.g. Vision FAC¶238-278, incorporated by reference herein) Vision have not disputed or defended the extensive errors and omissions in their MTD thereby waiving their defenses.

30. Plaintiffs also documented unauthorized withdrawals of fees and monies, and depletion of their performance track record by over 3.4% in 45 days, as well as unlawful tampering with fees and margin once the account turned profitable on May 2, 2017. (See e.g. Vision ¶331). Vision have not disputed the withdrawal of fees of 3.4% over 45 days tin their MTD thereby waiving their defense.

31. Vision and ADMIS have repeatedly stated NFA had knowledge of and approved the illegal conduct. The conduct as alleged herein violates numerous rules, laws, regulations, bylaws of the CEA.

Page 8

32. After Plaintiffs documented complaints, instead of investigating the complaints, NFA who had full knowledge of its operations, instigated a "cover-up" which further violated Plaintiffs rights. NFA continued to conceal that they had failed to enforce Plaintiffs CTA rights to disclosures. Instead of enforcing compliance laws, NFA directly making fraudulent statements and omissions to induce Plaintiffs to only pursue claims in the "NFA-controlled" Arbitration, whereby they stated only if Plaintiffs paid another $9,500 to the NFA, they would only then investigate the compliance laws.

33. In the third phase, NFA used the unregulated and closed-door Arbitration proceeding, to limit any culpability to them and denied Plaintiff a right to an unbiased and fair adjudication. Section 22(b) and under 7 USC 21(b)(10) and Article III (c) , NFA is required by law, to provide a "fair", "expeditious" and "efficient" resolution of disputes. NFA is also required to disclose its conflicts of interest. NFA also failed to enforce 7 USC 21(k) and Article III and comply with the disclosure of the FAA..

34. NFA, as a party to the activity, failed to address the material conflicts of interest, and instead during the evidently partial proceeding, took overt actions to procure procedural advantage to its Conspirators, and engaged in other biased conduct, including without limitation, concealing information from the Panel permitting ADMIS to not produce the G&F Agreements for over 523 days, and defying Panel Orders to not produce any documents to support the existence of a so-called risk services agreement. The Arbitration Panel issued subpoenas on the NFA, and stayed the proceeding in November 2019, as material conflicts of interest were cited, so that Plaintiffs could bring this action in District Court. As a result of the extraordinary misconduct in Arbitration, Plaintiff NRCM was dissolved. NFA retained all the fees. Plaintiffs filed this action on May 8, 2020

35. Jurisdiction over the NFA and its officers is exclusively in District Court.

## *II - PARTIES*

36. Defendant National Futures Association ("NFA") is a private, not-for profit organization incorporated in the State of Delaware, with its headquarters and principal place of business and domicile in Chicago, Illinois. NFA is the only self-regulatory association organized under the authority of the Commodities Exchange Act, 7 U.S.C. §21,  and oversight, if any, is conducted by the United States Commodity Futures Trading Commission ("CFTC").

37. Vilia Sutkus-Kiela ("Kiela") is an individual resident of the State of Illinois and is a Senior Compliance Officer and Manager of NFA Compliance's Staff who has worked at NFA for over 34 years. Kiela and other NFA auditors managed and supervised an audit of Vision IB Trey Lazzara and

Page 9

LCI during the approximate period October 17 2017 until  around March 23 2018 and other audits of *Vision brokers* during the period 2014 – 2017 that approved the unlawful conduct..

38. Including other audits which Keila oversaw between 2014-2017, additionally, Kiela signed documents in or around March 23, 2018, after she had reviewed all emails, statements, activity and communications related to Plaintiffs' account, indicating that NFA and Kiela knew and approved of the material allegations herein, including overcharging of fees, margin activity in violation of exchange rules, and errors and omissions and dissemination of trade secrets across interstate lines. Kiela knowingly land intentionally failed to enforce the NFA compliance rules.

39. Nicole Wahls  ("Wahls") is a resident of the State of Illinois and was an NFA Compliance Officer. Wahls resigned from the NFA in February 2020. Wahls was a Manager of NFA's Compliance Department who is a CPA and a certified fraud examiner and who had worked at NFA for almost eight years and is the key NFA compliance officer responsible for the audit and supervision and enforcement of rules, regulations and laws on  aware of Vision's risk management activities.

40. During the period approximately, starting  2014 – 2020 Wahls was the Compliance Office was mainly responsible for enforcing the compliance laws on High Ridge Futures, Boshnack, Rothman and Felag and their affiliates. During multiple audits, Wahls repeatedly approved and rubber-stamped the illegal conduct alleged in this complaint, including but limited to (i) trailing fees and commissions from customer accounts to pay Vision without consent and disclosure and (ii) dissemination of trading strategies of CTA's without consent and disclosure and (iii) the undocumented, rogue, *Vision Risk Group* in their margin activities, that continued in violation of their registration. Wahls had full knowledge that the CTA"s had not consented, authorized or been provided the non-discretionary and mandatory disclosures required by CFTC 33.7, CFTC 1.11, CFTC 1.55, 1.57 and other compliance laws listed as Violations herein and continued to fail to enforce the rules.

41. Wahls has been called as a key "defense" witness for ADMIS's conduct. Wahls also conducted a compliance audit and signed documents on or around dates between January 15 2019 – February 7 2019 that approved violation of numerous NFA compliance laws, including but not limited to dissemination of Plaintiff's trading accounts to Vision affiliates without their knowledge and consent

Page 10

in violation of NFA 2-4 9061, and other risk management activities that are being fraudulently concealed from CTA's in violation of NFA 2-26.

42. Thomas R. Kadlec ("Kadlec") is an individual resident of the State of Illinois, and in his individual capacity, serves on the Board of Directors of the NFA. Kadlec, also serves as the CEO of ADMIS, and direct and pecuniary private interests in the scheme. Kadlec, has also serves on the Membership Committee of the NFA, and his duties involved approving the registration of Vision Investment Advisors, LLC, as CTA's in March 2018, who are direct competitors of the CTA's who's accounts Kadlec breached, gave their competitive trading records to Vision affiliates.

43. Claims against Kadlec, are brought in his private and commercial capacity as CEO of ADMIS as well as under Section 22 of the CEA. Federal law RICO claims are brought in his private capacity.

44. Samantha Siva Kumaran ("Kumaran") is a resident of New York City, NY which is within this judicial district. In July 2016 Kumaran passed the Series 3 and on February 2017 Kumaran began her registration at the NFA. Her registration April 2017 Kumaran became a registered member as a Commodities Trading Advisor of the NFA. Kumaran's individual NFA registration is under **both** her full name and abbreviated name Samantha Siva and Samantha Siva Kumaran.

45. Kumaran also since 1993 has run a successful risk management software and consulting boutique in NYC and has over twenty years C-Level risk analytic and modelling experience in Wall Street and other Utilities. Kumaran is the sole owner, author and inventor of the trade secrets trading strategies and CTA trading program that owns the track record and risk management strategies. Kumaran, individually remains an individual NFA Member and registered CTA and is now sponsored by Nefertiti Asset Management, LLC. Kumaran is a direct competitor of Boshnack, Rothman, Felag, HRF and HRHC.

46. Many of the account documents were opened in Kumaran's individual name. Kumaran was therefore jointly an account holder at ADMIS. Kumaran originally thought the accounts were sole-proprietor accounts as many of the forms were opened in Kumaran's individual name.

47. Nefertiti Risk Capital Management, LLC was a single member LLC, in New York NY that was also registered as a CTA and was a direct competitors of Vision defendants. It was also a registered CTA. As a result of the fraud herein, Conspirators depleted its assets, and property, to make the company un-operational, in deliberate and direct unfair competition, for Vision to destroy its competitors, in the scheme herein. Kumaran is the legal successor and assign of the LLC.

Page 11

### III - JURISDICTION AND VENUE

48. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 and 7 U.S.C. §§ 13a-2(2), 7 U.S.C. § 25(c).

49. Venue is proper in this judicial district under 28 U.S.C. § 1391 (b)(ii) and 7 U.S.C § 13a-2(4) because a substantial part of the events giving rise to Plaintiff's claims occurred within this district.

50. Venue is also proper under 7. U.S.C. § 25 because Plaintiff is a resident of New York State, Plaintiffs NRCM was registered in New York City, and substantial events given rise occurred in New York City, and  which permits Plaintiff to bring this action in the venue and jurisdiction where she resides.

51. This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

52. The amount in controversy exceeds $75,000. On the morning of May 17, 2017 Plaintiffs were reported profits of $58,371.10. On the close of account Plaintiff were reported 1099 losses of -$34,551.68. Unauthorized margin inflations that violate non-discretionary exchange rules were added by disbarred Vision owner to Boshnack exceeded $134,000. The net MTM loss reported to Plaintiff was $92,922.78 not including other unauthorized fees and disputed withdrawals purloined from the account and overcharges to the NFA. State law claims for misappropriation and other trade secrets for causes where no immunity is granted damages also exceeds $1,000,000.

53. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. and under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq* because they arise under the laws of the United States. Federal law claims are brought against Kadlec in his private and commercial capacity and not against NFA and their compliance officers.

54. This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a). Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

55. Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Southern District of New York is the district where one or more the Defendants reside

Page 12

and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred;

56. Jurisdiction and Venue is proper for Defendants Tom Kadlec, Vilia Sutkus-Kiela and Nicole Wahls under  7 USC § 25(b)(3) as applies directly to directors, employees and committee members of the registered futures association. [2]

### IV - LEGISLATIVE BACKGROUND

57. The Commodities Exchange Act ("CEA") inherently prohibits and decries fraudulent, deceitful and dishonest conduct in connection with commodities futures transactions.

58. The Commodities Futures Trading Commission ("CFTC") was created by Congress, as an independent agency, with broad authority to adopt rules, that are necessary to carry out the purposes of the CEA. [3] The National Futures Association ("NFA") was registered by the CFTC as the sole, nationwide, self-regulatory organization ("SRO") under the CEA in 1981.

59. While the NFA is a private organization, it is supposed to perform regulatory functions to safeguard the integrity of the derivatives markets that the CFTC would otherwise have to undertake. However the NFA is not the ultimate authority on the rules set forth under the CEA and the NFA must follow the CFTC direction and order, and enforce rules encoded in the statute by the Commission. NFA has the non-discretionary duty and statutory obligation to enforce majority of the rules.

60. Unless ordered by the Commission under 7 USC 21(k), NFA has no authority and absolutely no discretion to vary, alter, abrogate any rule of the CFTC, except by written order of the Commission. As alleged in this action, NFA repeatedly violated it duties, violated the Commission rules and CEA, failed in its ministerial and statutory obligations to uphold the laws, rules, regulations, bylaws and knowingly and intentionally overstepped its authority, and acted without order of the Commission.

61.  In doing so, NFA knowingly set up a scheme, for fraudulent and illegal purpose, where certain market participants, Co-Conspirators, were permitted to act with a different set of unauthorized rules,

---

[2] 7 USC § 25 §(b)(3 Any individual who, in the capacity as an officer, director, governor, committee member, or employee of registered [2] entity or a registered futures association willfully aids, abets, counsels, induces, or procures any failure by any such entity to enforce (or any violation of the chapter in enforcing) any bylaw, rule, regulation, or resolution referred to in paragraph (1) or (2) of this subsection, shall be liable for actual damages sustained by a person who engaged in any transaction specified in subsection (a) of this section on, or subject to the rules of, such registered entity or, in the case of an officer, director, governor, committee member, or employee of a registered futures association, any transaction specified in subsection (a) of this section, in either case to the extent of such person's actual losses that resulted from such transaction and were caused by such failure or violation
[3] 7 U.S.C. 12(a)(5) (1974) See generally CFTC v. Schor 478 U.S. 833, 106 S. Ct 3245,3250 92L. Ed 2d 675 (1986) (quoting H.R. Rep. No 93-975 93rd Cong 2d Sess at 1)(1974)

Page 13

and illegally outside of their permitted registrations, and instead created a deliberate unlevelized playing field for market participants. This caused significant harm to CTA's (Plaintiffs) who were entering the markets, violating the promotion of "innovation" and fair market competition of CTA's. 62. NFA's rules also mandate the adoption, administration and enforcement of **uniform,** industry-wide requirements regarding the dealings and relations between and among Members and the <u>protection of customers</u>. (*See* Article III – NFA Articles of Incorporation)  NFA 2-4 "to observe high standards of commercial honor and just and equitable principles of trade in the conduct of their commodity futures business and swaps business". <u>No such conduct was observed in this case.</u>

63. NFA instead engaged in direct unfair competition by willfully, intentionally and fraudulently disseminating the confidential and proprietary trading strategies and trade secrets of traders, and newcomer CTA's directly to previously disbarred NFA members, operating outside their registration authority, and ran directing competing CTA referral services, and for use, profit and gain in directly competing CTA's who had directly competing interests. NFA themselves acknowledge the value and confidentiality of CTA's trade secrets – NFA 2-4 9061 - acknowledging that a CTA's trading records, and transaction history is a trade secret, and expressly protect their rights to their confidentiality.

64. CFTC in OIG Audit Report dated May 31, 2017, incorporated herein by reference as ECF1, Exhibit 1 has identified 31 delegations by Order for which NFA has been delegated authority.[4] Under CFTC oversight and pursuant to the CEA, CFTC has characterized those delegation into eight program areas or authority to NFA, and  four of them relevant to this action are  (i) to establish training standards and proficiency testing for persons involved in the solicitation of transactions, their supervisors and a program to audit and enforce compliance with such standards under 7 USC 21(p)(1) "*Sales Practices*";  (ii) to establish special supervisory guidelines to protect the public interest relating to the <u>solicitation by telephone of new futures or options accounts</u> 7 USC 21(p)(4) "*Telemarketing Supervision"*  (iii) to enforce compliance and prevent market participation fraud, and to protect market participants, customers and members and to design rules to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, in general, to protect the public interest and remove impediments to and perfect the mechanism of free and open futures trading (includes disciplinary processes programs) 7 USC 21(b)(7) (8)(9); ("*Compliance*"); and (iv)  to establish rules provide a fair, equitable, and expeditious procedure through arbitration or otherwise for the settlement

---

[4] See ECF1 Exhibit 1, Page 19, -Table 6, Also Page 10 - Table 1

Page 14

of customers' claims and grievances against any member or employee. USC 21(b)(10), 17 CFR 170.8. ("*Arbitration*").

65. By delegation and non-discretionary statutory authority from the CFTC, NFA's responsibilities include but are not limited to auditing and conducting examinations of members and enforcing to ensure compliance with both its own rules and CFTC rules. NFA is mandated to and has a non-discretionary duty to enforce the rules and to initiate disciplinary actions against firms and individuals who violate the rules.[5]

66. In addition, NFA has delegated and statutory authority, to enforce compliance of and handle reregistration functions for the CFTC.  (*See* ECF1 Exhibit 1**)**. NFA's registration functions include evaluation of candidates' fitness and the conduct of member compliance examinations – including in their own Compliance Manual to determine the threat they pose to other customers.

67. By authority delegated from the CFTC under 7 USC 21(o), NFA has the authority to register, register conditionally, suspend registration, place restrictions on, revoke the membership registration subject to the NFA Bylaw 301, which provide conditions therein – including that such Members cannot pose a threat to other Customers or Members.

68. Notably, in the recent audit report in 2017,  the Office of the Inspector General ("OIG") of the CFTC indicated that over the very same four areas of delegated authority, the CFTC has not provided any oversight over the last ten years, and "no report was on record". (*See* ECF1, Exhibit 1)

69. Under the CEA Section 22, as an important criteria of the mandatory obligations to members, as listed in  NFA's bylaws, rules, and regulations under the laws it is mandatory to enforce 7 USC 25(b) it is obligated to Article III (c) to adopt and administer a <u>fair and equitable</u> procedure through arbitration or otherwise for resolution of claims and grievances between Members. Since Member have no ability to it has no obligation to settle or resolve grievances between Non-Members such as High Ridge Holding Company, Vision Financial Markets, LLC,  the private trading arms of Boshnack Family, LLC, Rothman Family, Julie Villa or numerous unregistered Vision affiliates.

70. NFA is required to provide a <u>unbiased, fair, and neutral forum</u> for arbitration for resolution of customer and member disputes.[6]  NFA's bylaws, rules and regulation that is given by Article III(c).[7]

---

[5] See Exh 1, Table1, Page 10, Table 6, Page 18-19
[6] *See* NFA s Article II, Article III, NFA Bylaw 1506, and NFA Bylaw 801, & CEA .
[7] Article III **(c) Arbitration.** The adoption and administration of a fair and equitable procedure through arbitration or otherwise for the voluntary settlement of customers' claims or grievances against Members described in paragraph (a) above, their employees, and Associates, in accordance with Section 17(b)(10) of the Act, or claims or grievances of such Members or Associates against customers,

Page 15

are also governed under Section 22 in the obligations of the NFA to enforce "fair" and "equitable" procedures. Plaintiffs, as traders, and as paying Members, are reliant on the NFA's neutrality and lack of bias, to enforce the rules, as required by statue in an unbiased manner, also in accordance with Federal law. Any failure to enforce Article III to not provide paying members and traders of the NFA, rights to a "fair", "expeditious" and "equitable" procedures, where the Co-Defendants are entitled to deference, is a violation of traders due process rights and violation of Section 22, for NFA's failure to enforce its rules and regulations under Article III, giving rights for a private right of action.

71. CFTC has previously received other hotline complaints related to the NFA arbitration and disciplinary programs.

> "*NFA arbitrations are not appealable to the Commission or to federal or state courts. As NFA does not publish its arbitration decisions, it is apparent that NFA arbitration decisions are not subject to evaluation and comment by other. CFTC documented the need for periodic oversight of NFA's arbitration program, in order to ensure that arbitrators are qualified and unbiased, and that complaining customers, as well as NFA members (and their employees), receive all due process required*" (Exhibit 1, Pg.10)

72. NFA was well aware of the lack of oversight on its Arbitration program by the Commission, and during the time of the events in this Complaint, no such oversight was conducted.

73. NFA violated its own bylaws and overstepped its authority to breach Article III(c), and it rights of due process to Plaintiffs, both registered traders and members, instigating "unfair" and "inequitable" and illegal procedures as part of the scheme to cover up and conceal their own violations of the Act.

### *V- PLAINTIFFS TRADE SECRETS*

74. Samantha Siva Kumaran ("Kumaran") is a British born, US Citizen residing in New York City, NY. Kumaran earned a First Class Masters and Bachelors, in Applied Math and Theoretical Physics from the University of Cambridge, UK.

75. Plaintiff includes by reference 20-CV-3873 ADMIS Section V ¶26-¶57 and 20-CV-3871 Vision SectionIV ¶32-37, FAC, on "Trade Secrets" which are common facts to both Complaints, and incorporates by reference in detail.

---

or claims or grievances between or among such Members or Associates: *Provided, however*, no such procedure shall apply to the settlement of a claim or grievance where the parties, by valid and binding agreement, have committed themselves to the resolution of such claim or grievance in a forum other than NFA, or where parties having claims or grievances between or among themselves are required by Contract Market rules to submit the controversy to the settlement procedures of such Contract Market.

Page 16

76. Plaintiffs transaction records, trading strategies and risk management strategies constitute competitive commercially sensitive information, including trade details, formulae, compilations, programs, methods, techniques, or processes, that give them an economic advantage, and are trade secrets and are (1) non-public information; (2) protected by reasonable measures; and (3) and which derive independent economic value, actual or potential, from not being known to other persons, who can obtain economic value from its disclosure or use. of the information.

77. Plaintiffs trade secrets, include without limitation its trading strategies and risk management strategies and constitute competitive commercially sensitive information, including trade details, transaction history, trading records, trading executions, strategies, timing, formulae, compilations, methods, techniques, or processes, that give them an economic advantage and that derive independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secrets' disclosure.

78. The NFA Rules specifically recognizes a CTA's transactions records, and trading strategies as a trade secret, and that the trading strategies, and performance records of a traders and CTA fall under the definition of "trade secret". NFA rules, including NFA 2-4 9061 acknowledge the competitive value of a CTA's transaction records, stating it is expressly forbidden for an NFA Member to obtain those records without a CTA's written permission, that NFA is required to enforce.

79. Plaintiffs have maintained this information in confidence and it is not generally known to other persons or the public who could obtain economic value from the disclosure or use of such information. Plaintiff derive substantial economic advantage over their competitors who do not know how to use it and who do not have access to it. Plaintiffs took and take reasonable measures to maintain the secrecy of its trade secrets. Such measures include, but were not limited to: (1) limited access to confidential information; (2) requiring third-parties to execute strict non-disclosure agreements before being allowed to access the information; and (3) requiring passwords for access to such information.

80. The trading and risk management strategies, for the Plaintiffs CTA, were borne from substantial investment of time and significant investment, cost, time and development by Kumaran. They were designed and built over decades by Kumaran, and substantial time, money, research, development and highly-specialized skills, that are not easy to find, and to generate the options trades to give Plaintiff a commercial competitive analytical advantage. Its competitors Vision were not able to develop these independently or successfully as is documented by their substantial prior losses in

Page 17

options trading for which they were disbarred, and their documented errors and omissions in risk management services.

81. A substantial investment of time, money, cost, development over a long period of time, was invested by Plaintiff Kumaran to develop the trading strategies, risk management strategies that gives Plaintiffs a valuable, unique competitive advantage to compete as a trader in the commodities futures industry and a  risk management professional. Kumaran also invested substantial capital, money and time to register as a CTA, and start commodities hedge funds under the name Nefertiti, from which is could derive substantial economic advantage as an entrepreneur and small business owner in NYC.

82. At all times Kumaran has protected this information under strict Non-Disclosure Agreements, non-compete and non-reverse engineering provisions, requiring the signing of express confidentiality agreements, and protecting its use and dissemination, and further took steps to rarely disclose the information. Plaintiffs do not disclose the trade secrets, except under the express rubric of its own restrictive non-disclosure agreement. Further Plaintiffs restrict access to all its Confidential Information on its servers, including but not limited to password access, restrictive access to drives.

83. At no time, either prior to, during or subsequent to the events hereunder did Kumaran assign ownership, right, title or interest to the IP to any person, corporation or legal entity. Kumaran in her individual capacity remains the sole owner in all IP interests.

84. Kumaran's CTA trading and risk management strategies can be summarized as quantitative commodity options trading strategies that seek accelerated capital appreciation in short time frames, through the active trading of exchange-traded commodity options and provide a competitive advantage, for both S&P Options, Crude Oil and Gold. Successful performance enables the investor to accumulate returns by reinvesting over a longer period, as well as take profits in shorter period. Plaintiffs fully disclosed their application to S&P Options as they launched their CTA.

85. Kumaran is also the owner and independent develop of a Top 10 award winning ETRM and risk software analytical tool, designed for commodities options and risk in the futures markets. Kumaran's extensive consulting experience in risk services spans two decades including clients such as Credit Suisse First Boston, AIG, Spectron Oil, FEA, Niagara Mohawk Energy Marketing, Nomura Securities, Manitoba Hydro, ABN Amro, JPMorgan, Duke Energy Field Services, Enron, Bristol Myers Squibb, Louis Dreyfus Commodities, Nexant, Fuji Securities, Market Arts Software, Risk Advisory Canada, Blue Rock Energy, Giro Credit, UMS Advisory and Winhall Consulting.

Page 18

86. HRHC are also direct competitors in their provision of risk management services and software. HRHC and Vision affiliates are also direct competitors in options trading, run a registered CTA and CPO in direct competition with Plaintiffs, and also engaged in direct competition with a vested business interest in a HRHC CTA Referral service. NFA was required to protect CTA's from participation that invokes unfair competition requiring disclosures at all times.

87. Kumaran had never heard of Vision before entering the futures business. She was an outsider and a newcomer and like many of the other victims, new to the industry.

### *A – BACKGROUND OF THE SCHEME*

#### *SECTION I  - BACKGROUND OF VISION AND THE FRAUD*

88. Vision Financial Markets, LLC located in Stamford, CT, was formerly a Futures Clearing Merchant ("FCM") registered with the NFA.

89. NFA's involvement in the scheme started in or June 2014, after the conclusion of a Business Conduct Compliant which commenced in 2013 was filed against a Vision Financial Markets, LLC.

90. On or around June 20 2014, NFA issued a public announcement available announcing that Vision Financial Markets registration as a Futures Clearing Merchant, was deemed effectively barred from Membership. Their public filing stated that that Vision was terminated from Membership and NFA acknowledged a pattern of serious disciplinary actions by regulators and that Vision Financial has had a long history of supervisory issues during its tenure as an NFA Member. It had been the subject of four prior NFA Complaints -three of which charged the firm with failing to diligently supervise various aspects of the firm's operations. [8] (See **Attachment 4**)

60  Vision Financial Market's profiles on NFA Basic Website shows the entity was subject to an extensive 172 CFTC Reparations against it as Defendant – resulting serial predatory cases brought against Vision, its management and owners by harmed customers - a firm with a serious disciplinary track record of violations, that traders, including Plaintiffs would never have chosen to do business. [9]

61  Also attached and incorporated by reference hereto is a synopsis of disciplinary conduct and customer complaints again Vision, Rothman and Boshnack that the CFTC provided related to about

---

[8] https://www.nfa.futures.org/news/newsRel.asp?ArticleID=4428

[9]  A complete set of facts related to Vision and its affiliates is included by reference in related complaint 20-CV-3871 First Amended Complaint ("FAC") and incorporated herein. Vision 20-CV-03871 - FAC ¶39-¶131

Page 19

134 of the 172 complaints, over 85% of them cited claims of "*misrepresentation*" and "*non-disclosure*" and "*unauthorized trading*" with fraudulent activity dating back to 1993. (**See Attachment 1**).

62  NFA, in its final BCC complaints, cited Vision's gross negligence and failures in risk management specifically in commodities futures options trading, caused customers to lose another $2.1 million. Vision Financial Markets was fined $1,500,000 and paid approximately $2.1 million in customer restitution. The Complaints filed cited Vision's failure to observe high standards of commercial honor, failure to observe just and equitable principles of trade, failure to maintain adequate records, and failure to supervise. (See **Attachment 2**)

63  It was noted in the 2011 BCC, that NFA merely fined Vision and ordered it to "implement updated or revised supervisory procedures with respect to the supervision of" its guaranteed introducing brokers - thus conceding Vision did not have reasonable procedures in place at the time it brought its complaint. However, rather than expelling Vision, it allowed the firm to continue processing trades which not more than two years later, led to millions of dollars of losses. (*See* **Attachment 3**)

64  Recently there have been a growing number of Complaints filed in District Courts under Section 22 of the CEA, whereby NFA, has been subject to allegations of frequently allowing "bad actors" to re-register under a different names, without supervision of their registration activities, despite prior affiliations with firms that had caused substantial losses to customers.[10] Those perpetrators then assume the same bad faith conduct, causing further customer losses. Herein are similar allegations of NFA's "pattern" of registering persons and AP's without due diligence of their ongoing threat to customers.

65  Given Vision's history of serial perpetrators of compliance laws, NFA's own Bylaws 301(a)-(e.) and its public announcements made on June 20, 2014, required it to conduct thorough fitness examinations and also ensure that Boshnack, Rothman and Felag would no longer pose a threat to customers. (See **Attachment 4**).

66  However as alleged herein no such fitness examination was done, specifically on the *Vision Risk Group* and moreover their re-registration was unlawful as it willfully continued to allow them to operate outside of the compliance laws. Instead of being terminated as an FCM, (registering now only as IB's) they continued to act as a defacto-FCM, hiding behind ADMIS, extending margin and credit

---

[10] See *See Troyer vs. National Futures Association 16-cv-00146*, Order denying Motion to Dismiss dated February 14, 2018

Page 20

and guarantees on customer accounts, and receive trailing fees and commissions, items expressly prohibited once they are permanently revoked from registration as an FCM. (*See* Section 11 herein).

67  NFA's pattern has been that once a company was expelled (or is about to be expelled) it reaches a settlement (for which the NFA procures additional fees) and the individuals simply start up or join another entity and continue the same bad faith conduct. NFA alleges their excuse is the "individuals" themselves did not "cause" the expulsion, and only the entity is liable. However, there are growing complaints, and now District Court complaints, that NFA's registration process violates the CEA, fails to protect customers and CTA's from ongoing threats, and in this complaint, Plaintiffs alleges that *after* re-registration, NFA, went further, to knowingly allow market participants to engage in illegal and fraudulent conduct, and knowingly violate the CEA.

68  Prior complaints against Vision in 2011 date back to 1993 (including those brought by the NFA themselves, and the well-documented CFTC synopsis of 132 reparations) show that Boshnack and his team, have adopted a serial pattern and escape hatch of paying substantial fines to settle cases,  so as to avoid personally liability and remain individually registered as market participants, despite a long resume of fraudulent bad faith and inequitable conduct. (See **Attachment 1,  5 and 6**),

69  Therefore despite serial disciplinary actions, and customer reparations complaints filed against them citing "*fraud*" and "*misrepresentation*" and "*non-disclosure*",   Robert Boshnack, Howard Rothman, John Felag, and various "new entities" re-registered at the NFA, same people, same management, same company just a new name, calling themselves "High Ridge Holding Corporation" and "High Ridge Futures" paid off a large $1.5 million settlement and came back to life. VFM never dissolved remains in existence and instead became a subsidiary of the HRHC.

70  On or around June 19, 2014, a former NFA Board Member, prior to the announcement becoming public, James Koutoulas also voiced concerns and complaints about the NFA's decision to re-register Vision – citing "same company – "new name". In his emails, he cited that the Board were never consulted and that executives were furious – and it made the "NFA look terrible" –" and that "Vision was the worst". (See **Attachment 20 – filed under seal**).

71  This case therefore stems from what appears to have become NFA's trade craft, AP's, (despite affiliation with <u>expelled entities</u>) are routinely allowed to just re-register <u>individually,</u> without proper due diligence, under a new company name, and simply perpetrate the same predatory conduct under a new company name, causing substantial harm, this time to Plaintiffs. NFA is alleged to not have

20

Page 21

protected its traders, especially CTA's from these "known bad actors" and appears more interested in clocking in numbers of registrations, rather than upholding the laws and rules, and standards of good faith required to participate in the industry.

72  NFA around this same time had recently come from scrutiny under the significant Peregrine debacle, in 2013, which led to hundreds of millions of dollars of losses for customers and the futures industry. Peregrine Financial Group, known as PFG, failed due to a 20-year fraud that the company's founder perpetrated despite yearly audits by the NFA.[11]

73  In that case, significant questions were raised about NFA's competence or ability to audit and supervise its members. In Peregrine, it was found out NFA's discovery of shortfalls dated back more than two years and harmed customers queried  "How does this go on year after year and you don't find out?" said one longtime lawyer for the futures industry. "The regulators need to be held responsible. (*See* Id)

74  In a similar pattern of conduct, it was alleged that the CEO of PFG was a an insider who had  a free pass on compliance audits and also who served on NFA's advisory committee, his entity Peregrine was given carelessly given a clean bill of health in January 2013, despite doctored bank statements and fraudulent conduct – significant harm to futures customers.[12]

75  As fallout from the Peregrine disaster, the futures industry had taken a significant revenue hit, and customer and brokers were exiting the business. Just eight months prior to the Peregrine blowout, MFGlobal also filed for bankruptcy causing over $1.6 billion dollars of losses to customer accounts.[13]

76  During each of the years 2014, 2015, 2016, and 2017 which is the period the fraud started and up to when Plaintiffs fell victims to the scheme, NFA publicly disclosed on its Form 990 that its net revenue was declining by tens of millions of dollars on a year-after-year basis starting in 2014, and was negative in 2015, 2016 and 2017. (Hitting negative $10 million in 2016 the year Plaintiffs solicited its account).  Incorporated by reference are publicly filed 1099's in Form 990 (**Exhibit 7**).

77  Therefore the history and conduct supports that NFA continued to have a motivation, to re-register persons to maintain the shortfalls in revenues in the futures industry, however as alleged herein, in this case, it was done so, with  the willful failure to observe the compliance laws and with knowing illegal and fraudulent conduct. This action alleges a continuation of NFA's past conduct of routinely

---

[11] https://www.cnbc.com/id/48135999
[12] https://www.cnbc.com/id/48176094,
[13] https://www.ft.com/content/7f7c2d74-d027-11e1-bcaa-00144feabdc0

Page 22

registering or re-registering bad-actors without doing due diligence or upholding the compliance laws, as they are supposed to, or enforcing the mandatory non-discretionary compliance laws on their conduct once they are members again, causing significant harm to customers, CTA's and Plaintiffs.

78  Plaintiffs both are registered members and CTA's. Their failure to enforce the CEA gives cause of action under Section 22.

79  The scheme in this Complaint alleges financial benefit (from illegal activities) to generate over a billion dollars of futures revenue – at which smaller customers and Plaintiffs were significantly harmed. The Complaints also alleges the unlawful revenue generated from the scheme herein exceeds $10 million dollars a year, and has amassed over six years over $60 million dollars of income. As pled in detail herein, the revenues herein were unlawfully and fraudulently obtained, impermissible and violated numerous aspects of the Commodities Exchange Act, that the NFA, as the sole registered futures association, has a mandatory, statutory and non-discretionary duty to uphold.

80  NFA's conduct with Vision financial markets, LLC in this case, is pled with repeated acts of fraud and bad faith perpetrated on customers and CTA's *after* their registration in November 2014.

### SECTION 2 -  NFA ACCEPTS $1.5 MILLION DOLLAR SETTLEMENT

81  Consistent with this pattern of registration, on or around June 20, 2014, by public announcement NFA accepted a $1.5 million dollar Settlement, with known perpetrator Robert Boshnack and Howard Rothman, allowing them to remain individually as participants in the futures industry and just start a new entity. (*See* **Attachment 4**)

82  In exchange for that substantial payment, as a condition of that Settlement, NFA were required to enforce that Boshnack, Rothman, Felag and any future entities would remain subject to compliance with the CEA, and CFTC Rules.  Boshnack and Rothman were permitted to remain in the business and set up various new affiliates under a new umbrella called High Ridge Holding Company. VFM also became a subsidiary of HRHC, and several other shell entities were formed – namely High Ridge Futures – all the same personnel as the Vision – that caused over $2.1 million of dollars in customer losses due to negligence and failure to observe just and fair principles of fair trade.

83  Any Settlement to which NFA was a party, and ongoing participation by Boshnack, Rothman, Felag and their affiliates is required at all times to remain in compliance with the laws, rules, regulations, bylaws, and requirements of the Act.

Page 23

84  When NFA executed the deal, they were well aware of two key facts. One, already disclosed in the BCC 2013 NFA recognized that a significant part of Vision's former business came from the CTA Referral services. (*See* **Exhibit2, Pg.3 ¶7**) Therefore NFA knew that the CTA referral service, invoked a significant competitor interest in the performance and track record of CTA's and posed material conflicts of interest in Boshnack, Rothman, Felag and Vision's group accessing competitors accounts – in unfair market competition.

85  The second key fact NFA were aware of when they effectively disbarred Vision from the industry in June 2014, was that <u>hundreds of introducing brokers</u> that previously cleared through Vision (the Vision IB's) contributed hundreds of millions of dollars of revenue to the clearing business. The BCC 2011 also noted, that substantial commissions of over $42 million dollars were charge in just 6 months.  **(See Exhibit 3, Pg. 2 ¶4)**

*SECTION 3 – HIGH IRDGE AND VISION RISK GROUP DEEMED UNFIT TO UNQUALIFY AS FCM AND REGISTRATION AS FCM PERMANENTLY REVOKED*

86  At the time of the June 20, 2014 announcement, Boshnack, Rothman and Felag had planned to simply change their name, start a new FCM called High Ridge. (See **Attachment 4**)

87  Each class of registrant in the commodity markets, for example FCM, IB, CTA or CPO is carefully defined under the Act, with only an FCM being permitted to accept and handle customer orders, as well as extend credit or margin on behalf of customers, and only IB's and FCM's of customers, who open account directly with the IB and FCM can collect trailing fees and commissions, all of which need to be disclosed in full, prior to opening the account.

88  FCM's only also have strict requirements for the operations of their risk management group, as well as mandatory disclosures to customers. The risk management qualifications are without limitation set forth in CFTC 1.11-1.15, CFTC 1.55, and CME 982, 980 ,932, 930, 901, 984A and also 7 USC 6

89  According to public statements on the website NFA represented they were obligated to conduct a "thorough fitness examination" on the associated persons AP's of Vision, which included the *Vision Risk Group*,  in order for them to qualify as registered person with their new entity High Ridge Futures to be qualified to registered again as an FCM. (*See* **Attachment 4**)

Page 24

90  However between June 20, 2014 and on or around August 15, 2014, NFA determined  the blemished group of Boshnack, Rothman and Felag and the *Vision Risk Group*, were not qualified to re-register ever again as a an FCM, and on or around August 15, 2014, <u>permanently denied registration</u> of Boshnack, Rothman, Felag or any of their new alter-ego entities to act or participate as a Futures Clearing Merchant ("FCM").

91  Therefore on or around August 15, 2014, in permanently disbarring Rothman, Boshnack and Felag, from being Associated Persons or their new entities as a FCM, NFA deemed them including the *Vision Risk Group*, "unqualified" and "unfit" to handle customer moneys as an FCM, in any capacity again, thereby deeming their operations unfit to operate as a registrant of a FCM.

92  The NFA specifically noted, Vision was laced with disciplinary actions, its compliance department was concerned with Vision's efforts to supervise its brokers, and the lack of adequate supervision led to flurries of five separate complaints against Vision brokers, for failure to supervise trading strategies, and deceptive sales and solicitations (See **Attachment 2, 3, 5 and 6**)

93  In each of the charges, the Business Conduct Complaints charged Vision and thus the *Vision Risk Group* they they  specifically alleged to have failed to diligently supervise or implemented adequate risk management in specifically options trading strategies – noting specifically the failures and material inadequacies in options trading strategies. *See* **Attachment 3  ¶12,¶15-¶18.** Notably Vision Risk Group's inadequacies and delinquency in having appropriate procedures, management in options trading causing significant customer losses, for which Felag was so-called Vision Chief Risk Officer.

94  The failure of Vision to handle customer money was notably centered around options trading. It was noted that in the 2011 Business Conduct Complaint, Vision was fined $500,000, specifically list Vision's risk management failures in options risk management on futures and caused losses to customer of millions of dollars. The risk manager of Vision at the time was John Felag, and under the supervision of Howard Rothman and Robert Boshnack. (***See*** **Attachment 3**).

95  As stated supra, the 2013 Business Conduct Complaint (only two years later), however, repeated the allegation of misconduct, this time citing Vision's gross negligence and failures in risk management specifically in commodities futures options trading, which again caused customers to lose another $2.1 million. Vision Financial Markets was fined $1,500,000 and paid approximately $2

24

Page 25

million in customer restitution, citing Vision's failure to observe high standards of commercial honor, failure to observe just and equitable principles of trade, among other things.

96  Multiple of the prior disciplinary Complaints against Vision, also named Boshnack individually and Rothman individually for their role in negligence and failure to observe equitable principles of just and equitable trade.. Fines and settlements were routinely paid by Boshnack, to avoid a final liability**. (***See* **Attachments 5 and 6**).

97  Therefore NFA's decision to expel Vision for poor risk management, notably in options trading, as an FCM was material. Their own expulsion made it permanently prohibitive to act in any capacity for an FCM, let along in options risk management.

### *SECTION 4 -  HIGH RIDGE REGISTERS AS AN IB*

98  Once the NFA permanently denied membership of Boshnack, Rothman, Felag and their future new entities High Ridge Futures (owned and controlled by HRHC) to participate ever again as an FCM, instead the Vision team, decided a new track, which was to register as an Introducing Broker ("IB"). This involves a completely different category of registration and market participation, which specifically prohibited them acting as an FCM, and managing customer funds or participating in fees.

*99*  Under the IB registration status, this class of registration, prohibited them from managing and extending credit to customers as an FCM, or continuing to receive fees and commission on unaffiliated customers' accounts without their knowledge and consent. *See* CFTC Reg 1.57(c)
> *An* underlined *introducing broker* *may not accept any money, securities or property (or extend credit in lieu thereof) to margin, guarantee or secure any trades or contracts of customers, or any money, securities or property accruing as a result of such trades or contracts:*

100  Under the regulations, NFA is required to enforce, without limitation, NFA 2-26, CFTC Reg 1.57(c) and 7 USC 2 (c.)(v)(IV) HRF its owners, affiliates and employees were prohibited thereafter from ever directly or indirectly extending, or maintaining credit to or for, or collecting margin on a traders' account. (Including Plaintiffs). It also prohibited them from having discretion on Plaintiffs' account, as well as power of attorney to handle margin calls.

101  Instead, as an IB, they would only be subject to the market participation rules of an IB, and be able "refer" customers to a registered FCM, namely ADMIS.

102  Accordingly, on or around August 21, 2014 Felag and their new entity High Ridge Futures applied instead for registration solely as an IB, permanently unable to act as an FCM, in the futures

Page 26

markets. As former Associated Persons ("AP's) of a disbarred VFM, any registration of Boshnack, Felag, and Rothman required a heightened standard of governance that they would not pose a threat to customers. *See* NFA Bylaws 301 (a)-(e).

103. On or around September 12. 2014 shortly thereafter John Felag began to transfer his registration to High Ridge to act and participate in the market solely as an IB. That membership was finalized on October 12, 2014.

104. As an IB, the quality and capabilities of the former *Vision Risk Group* were  no longer required under the market participation rules as IB's are not required to perform services as an FCM.

105. After the permanent disqualification of High Ridge, to register as an FCM in or around August 18, 2014, NFA, now needed to find another FCM who would purchase or acquire the expiring clearing business – and the thousands of customers and brokers -  from outgoing FCM Vision, who were, at least on paper, permanently exiting the clearing business.

### *SECTION 5 - PROBLEM STARTED WHO WAS TO PAY FOR THE CREDIT LINES*

106. Upon this decision to revoke registration, in or around August 2014, out of various FCM's who may have solicited the expiring business, public announcement showed it was ADM Investor Securities ("ADMIS") who made a successful offer or entered the negotiations to acquire the expiring futures clearing customer and IB's who formerly cleared through the now disbarred VFM.

107.  When ADMIS entered the picture, negotiations or discussions commenced on the acquisition and transfer of the former clearing business of VFM to clear through its own network, and what due diligence or conditions would occur on the thousands of customers and IB's brokers that were previously clearing through Vision Financial Markets and who were now left without a clearing home.

108  In the past, public records show that many of the former *Vision brokers* themselves had been subject to multiple disciplinary actions, many of them disbarred for misleading "sales and solicitations" and numerous of them permanently disbarred. (*See* e.g. Statewide FX, ITI, District also disbarred [14]).  Previously only the ostensibly problem-laced VFM had provided a clearing mechanism for what could be viewed as these "sub-prime" brokers that formerly cleared through VFM.

---

[14] See Att2 ¶7 NFA's Compliance Department became concerned with the adequacy of Vision's efforts to supervise the activities of its GIBs due, in part, to a spate of five Complaints that were issued by this Committee during 2010 against Vision GIBs 20/20, Statewide, VTA, ITI and Direct (for activities by APs at Direct's New York City branch). All five of the Complaints alleged that the GIBs employed deceptive sales solicitations. In addition, three of the GIBs were alleged to have recommended trading strategies that maximized commissions without concern for the best interests of their customers.

Page 27

109 While the transfer of high net worth customers or institutions may have been smooth and easily facilitated, the problem arose when VFM's permanent expulsion led to transfer of the approximately one hundred or more *Vision brokers*, that lacked adequate credit worthiness, that were now left without a clearing arrangement or "home" when Vision the former FCM was disbarred.

110. As explained in detail in related case 20-CV-03871 Vision FAC ¶70-81 incorporated by reference herein), majority of those foregoing former *Vision brokers* that were to be transferred to ADMIS were usually one or two man sole props, small businesses who did not have sufficient credit worthiness or financial capital to clear their commodities futures trades independently – or through many other FCM's.

111. Therefore the existing *Vision IB broker* network (that remained in or around June 2014) was vast and contained several hundred brokers. Thousands of customers that previously cleared through the Vision brokers, would also need clearing arrangements. NFA noted in its 2011 Complaint, that the *Vision broker* network in 6 months alone, generated approximately $42 million in commissions between January and June 2010 of which Vision received $13.5 million. (See **Attachment 3, ¶4**)

112  NFA, ADMIS and Kadlec recognized that a significant source of futures clearing revenue – about $100 million a year in commissions - estimated to be over $1 billion m dollars of gross revenue a year– came from the *Vision brokers*, who used to clear through the now disbarred VFM and they needed to solve the problem of losing that entire segment of clearing business of those brokers. And without a home, or a clearing merchant, these 100 or more  *Vision brokers* and all their customers may not be able to remain in the business.

113  NFA knew that these brokers, if they didn't have credit, could cause a billion dollar exit of customers and brokers from the industry, and many of the Vision brokers, would lose their livelihood. These brokers also constituted substantial fees and revenue for the NFA and futures industry. NFA needed to make sure that the subprime Vision brokers, and their thousands of customers found a way to remain in the futures industry – and someone had to pay for it or finance it.

114  During the period June 20, 2014 until on or around August 30 2014 after ADMIS agreed to transfer the former clearing business of Vision, ADMIS upon information and belief conducted its own due diligence and went through carefully all the former *Vision brokers*, and the ones they would agree to guarantee. Those brokers would be Guaranteed at ADMIS.

Page 28

115   What was left, was estimated to be about one hundred and forty five subprime *Vision brokers*, who did not have the credit lines to support ADMIS' requirements of clearing agreements. The credit lines and financial minimums of under the CEA are set forth in 7 U.S. Code § 6f. However many FCM's like ADMIS, require IB's to post additional credit and margin guarantees to secure their accounts. Incorporated by reference here in the standard IB Agreement by ADMIS with one IB Lazzara, and in Paragraph 23 sets forth an additional credit deposit to be paid to ADMIS, to secure the clearing arrangements. (See **Attachment 8 Pg 6, ¶23**)

116   Consistent with statements made by other ADMIS IB's, under ADMIS policies, an introducing broker (IB) who wishes to clear through ADMIS, is required to post additional funds which are greater than the exchange minimums. Upon information and belief,  the subprime remaining 100 or so *Vision brokers,* who did not qualify to be guaranteed - did not have those additional funds. (*See* Att. 8 ¶23).

117   Therefore the *first* problem, was that in order for those Vision brokers to be included in the transfer to ADMIS, someone had to agree to the additional funds to secure those credit lines and guarantees in ¶23 of the IB agreement.

118   As learned later in the agreements produced, negotiations resulted in that ADMIS <u>would not</u> provide the credit to secure the creditworthiness of the former *Vision brokers*. Neither did the parent company ADM agree to acquire the credit risk of the *Vision brokers* despite the fact that the transfer of business and would generate hundreds of millions of dollars of commissions. This was testimony to the lack of creditworthiness.

119   Because ADMIS had already determined that it did not deem them credit worthy, ADMIS then materially refused, as part of the transfer of business to obtain, fund and provide the guarantee to secure the creditworthiness of the former Vision IB's these Vision brokers were "subprime" or a Class D debt, ADMIS would not also guarantee the former subprime *Vision broker* unless another counterparty would.

120   ADMIS instead, wanted a risk-free credit line from the subprime former *Vision brokers* to clear. Therefore, in what appears to have been closed-door negotiations and settlement, it was agreed that in exchange for millions of dollars of credit lines, and securing their ability to be re-registered in the futures business, Boshnack and Rothman, and their new entity High Ridge Holding Corporation agreed to provide guarantees and credit behind the brokers – and remain in the futures business.

Page 29

121   In other words, NFA knew that there could be a billion dollar default, or exit from the business of many brokers and/or their customers, unless they solved the problem of finding a source of credit guarantee on the brokers. Thousands of customers that cleared through the Vision brokers, also could not clear directly through ADMIS and had to be opened through an IB, so they needed the guarantees.

122   Upon belief, many of those former brokers, including, Lazzara were also indebted to Vision for the referral, and many IB's and brokers who's account had been opened through the now disbarred FCM Vision, had an obligation to pay trailing fees and commission to Boshnack. Therefore Lazzara, and the other Vision IB's also owed Boshnack  and Rothman a part of their business.

123   Therefore, as part of the "bulk-transfer" agreement, since ADMIS as a material part of the deal would not provide credit, that ADMIS, NFA, Kadlec, Boshnack, Felag, Rothman and Vision, negotiated, and enacted in the agreements, that in addition to the $1.5 million direct and pecuniary financial benefit to the NFA of the Settlement, Boshnack, Rothman would both personally and individually, and their new affiliates owned by HRHC, guarantee the credit worthiness of the approximately 100 Vision Brokers – estimated to be in the amount of up to an estimated $100 million. This is no small amount.

124   Any agreement that the NFA was party to, or approved had to remain in compliance with the CEA, laws of the exchange, CFTC and NFA rules, as well as the protections to new customers, traders and CTA's.

### SECTION 6 - SECOND PROBLEM WHO PAYS FOR THE GUARANTEES AND CREDIT LINES?

125   The *second* problem arose, in determining how Boshnack, Rothman et al were going to be compensated for their offer to become  "bankers" for the futures industry after being disbarred, and their willingness to fund the subprime Vision brokers and on-paper generosity. Despite conducting his company in such a disdainful manner that it was disbarred, Boshnack and Rothman now wanted to convert their role, to that of a financier, and "banker" and leverage their way back into the futures business – in exchange for which – instead of paying a penalty for being disbarred – they would be paid handsomely – and make money out of being kicked out.

126   Ordinarily when a company secures credit, capitalization or funding (such as Softbank provided funding or credit to WeWork it is the responsibility of receiver (in this case ADMIS) to pay the

Page 30

interest or repayment of the funds. Boshnack et al's source of funding was not for free and clearly Boshnack and his affiliates wanted to be paid handsomely for providing credit and guarantees to ADMIS.

127   In the above example, if WeWork secures funding from Softbank, WeWork can't then, (without disclosure and consent) in exchange for their credit lines or to pay the interest on the funding, decided to illegally dip into their confidential <u>customer's</u> property, assets and funds and withdraw capital and profits, purloin their bank accounts, to pay the interest on their loan, and they certainly can't raid their customer' offices for their proprietary information and trade secrets, to disseminate to their competitors as a form of repayment, <u>without their customers express, knowledge and consent</u>. That is in effect what ADMIS did.

128   The second problem then arose as was <u>who</u> was going to pay for the credit lines support the one hundred or so Vision Brokers from Boshnack.  Boshnack. clearly wanted to be paid a "dividend" or a piece of the pie – and any such arrangement had to be in compliance with the laws of the CEA.

129   With Plaintiffs alleged as unscrupulous conduct, ADMIS (and ADM) however again, were apparently unwilling to pay the interest for the credit lines, and unwilling to deplete their own profitability from the deal in clearing revenue. ADMIS sought the benefit of the $100 millions of commissions on a risk free and interest free basis, and instead willing to penalize the customers, traders and CTA's, whom they knew would be newcomers and start-ups (including Plaintiffs) to pay their debt.

130   So it was arranged that "trailing fees and commission" would be taken from traders accounts on a in perpetuity basis. The problem with that arrangement is that customers needed to consent to it and were entitled to full disclosure of the arrangements prior to opening the accounts.

131   While on paper and in public announcements, ADMIS were willing to transfer the exiting Vision FCM business, and acquire the "credit-worthy" customers, in the background they were unwilling to transfer the risk and credit of the hundreds of Vision subprime brokers.

132   Since ADMIS were unwilling to either reduce their own clearing revenue and commissions from the subprime broker, or pay for the risk of the credit of the subprime, uncreditworthy, *Vision brokers*, and because the NFA did not want to lose the hundred million dollar stream of futures industry – (and billions of dollars of gross revenue)– they recognized that many of the brokers would default, they came up with another method of payments, that they would pass through all the

Page 31

"additional" fees to the customers. This would make up the shortfall of income to Boshnack of about $10 million dollars a year.

133   Therefore, upon belief, to make up the revenue shortfall for Boshnack, Rothman, Felag,  HRHC (their reincarnation of Vision) and numerous other affiliates, instead of being told to "exit the futures clearing industry" now used their significant leverage in their credit lines on the *Vision brokers*, (that no other FCM would secure) and intended to make money out of  the deal of being disbarred.

134   Therefore ADMIS, NFA, Boshnack. Rothman. Felag and Kadlec, intentionally determined that the only way to get the deal done, and pay for the credit lines, is that they would pass through the credit risk and interest payments or "trailing fees and commission" on the unsuspecting "new customers" and "new traders" (which later included Plaintiffs) who subsequently opened accounts through the *Vision brokers.*

135   To solve the funding problem, the Co-Conspirators, also later determined that the monies could be withdrawn  from the customers, without their consent who knew nothing about the arrangements.

136  It was therefore agreed, in or around August 20, 2014, by counterparts NFA, Boshnack, Rothman, Felag, Kadlec, HRHC and ADMIS, that instead they would knowingly transfer the obligation of payment of fees to customers and traders (which later included Plaintiffs in 2017). However as the conduct evolved, this started being done <u>without disclosing them</u> <u>or seeking their</u> <u>consent, and this conduct was illegal</u>. This constituted an intentional, illegal, and bad faith violation of the multiple Commodities Exchange Act laws. (NFA 2-26, CFTC 1.55, CFTC 33.7, NFA2-2, NFA 2-3 NFA 2-4 9005, NFA 2-37(g), 7 USC 6(b). 7 USC 13 etc.) It is black-letter law such conduct is prohibited. (See Section 11 herein).

137  Since the Conspirators knew and/or started to realized that most likely new customers, new traders and new CTA's would not consent to this agreement, especially given Vision's disciplinary conduct and being disbarred, and they would be significantly harmed as their trading profits depleted, if they were giving the opportunity to opt-out, which is a requisite for them to create the revenue stream from the Class D customers, as the deal progressed, with scienter, they carefully planned to keep the disclosures concealed – and not seek the customers consent. This is illegal.

138  Therefore with intent and deceit to treat the pool of accounts to defraud the start-up customers, traders as well as new CTA's and conceal <u>and not seek consent</u>. NFA also knew about (Vision in their

Page 32

MTD have admitted to NFA's full knowledge of the activities) and therefore participated in the fraud, to knowingly conceal the arrangements from the customers.

139   The Co-Conspirators, therefore knowingly and illegally treated these Class D customer accounts, opened through *the Vision brokers*, as an unregulated slush fund, that they could fraudulently and outside of their proper regulatory operations, not subject to the mandatory non-discretionary disclosure and other laws of the CEA, to unlawfully pay for the *Vision brokers* credit lines. The conduct was illegal and expressly prohibited from not being disclosed, prior to opening accounts, to the customers, traders and CTA's.

140   It was also with forethought that since the most of the Vision customers, clearing through the subprime brokers, were mostly start-ups, newcomers, (like Plaintiffs) and coming through subprime brokers, and were viewed as Class D customers, many with net worth of less than $100,000, many of whom were new to the futures industry, they were unlikely to question or detect the fees. ("Victims")

141   The Conspirators secretively connived that "newcomers" or start-up CTA's, Victims,  would likely not know the intricacies of the industry or expected not be experts in the CFTC compliance laws, or not have sufficient capital to enforce their rights legally and were " "expendable" to be used as collateral damage to fund the scheme, the Conspirators decided to purloin their assets and property.

142   NFA, also knew that without executing guarantee, a significant dent and loss of potential review of subprime Vision brokers, and who did not have collateral to participate in the futures markets Because ADMIS, and NFA, would not secure the credit, NFA were reliant on the guarantees an credit lines of Bohsnack and Rothman the parties agreed to a new set of agreements.

143   But with full knowledge and direct participation to not enforce the compliance laws, NFA, Kadlec, determined, that in order for the customers, traders and CTA to not opt-out, (as many of them would never have agreed to the higher charges, or to do business with a disbarred entity of Vision) all Conspirators, agreed to fraudulently conceal the arrangements and payments from the customers and traders. This constitute fraud. That way, the customers, and traders would have no option but to pay or be trapped into paying the subprime credit lines to Boshnack and Rothman.

144   The fraudulent and illegal scheme makes substantial unlawful revenue to all Conspirators, including the NFA (even though the revenue is illegally and unlawfully obtained).

145   Violating the disclosure laws, was an instrumental part of the scheme. To unlawfully obtain the Boshnack and Rothman revenue, the parties and Co-Conspirators, fraudulently and illegally agreed

Page 33

and continued to (including to present date) conceal the agreements from all new customers and traders, so that they could use the monies in the subprime accounts (the Dark Pool - an unregulated slush fund from which they could purloin monies and unauthorized fees, to compensate Boshnack and Rothman. However, the unauthorized fees are not disclosed to the customer – nor are the recipients being Vision owners disclosed.  Later the arrangement expanded to provide other concrete anti-trust benefits, such as fully disclosed access to Boshnack of his competitors CTA trading accounts – and the scheme relied upon fraudulent concealment.

146   NFA, Kadlec, ADMIS, Boshnack, Rothman , HRHC and Felag agreed to use the subprime accounts as a dark pool, shielded from the laws of the CEA, to pay the illegal benefits to Boshnack for securing the credit ("a Dark Pool").

147   As a direct and proximate result of NFA's failure to enforce the non-discretionary disclosure laws, Plaintiffs have suffered substantial damages as outlined here in Section 25.

### SECTION  7 - G&F Agreements

148    In or around August 28, 2014, in accordance with the above, ADMIS, agreed to accept a "bulk transfer" of *all* customers and *Vision brokers* to now clear through ADMIS.  The agreement was memorialized in a Guarantee and Fee Agreement ("G&F Agreement", incorporated herein by reference previously **filed under seal -  *ECF31*)**) dated also August 28, 2014, by and between ADMIS, Kadlec, Boshnack, Rothman, and HRF (owned by HRHC) .

149   The terms of the G&F Agreement permitted Rothman (individually), Boshnack (individually) and HRF (owned by HRHC) to guarantee the accounts of hundred or more *Vision brokers* that were transferred to ADMIS. The ownership of HRHC was material. NFA also knew that HRHC ran a directly competing CTA referral basis that would be in direct competition with the many of the new CTA's that subsequently opened accounts.[15]

150   Any agreement approved by the NFA had to be in compliance with the Commodities Exchange Act, and the NFA were obligated to enforce the rules, regulations, bylaws under the G&F Agreement, to ensure fair market competition, fair and equitable market participation. That agreement also is expressly required to comply with the laws, rules and regulatory requirements of the Act.

---

[15] (See Att2, NFA acknowledging on Pg.3 ¶7, that significant revenue comes from Vision CTA referral business, and in Vision FAC Exhibit 11, by virtue of restructuring HRHC maintained ownership of the CTA referral business).

Page 34

151  NFA had approved now two agreements that permitted disbarred members to remain participants, both of which NFA, is required to enforce their own compliance. *First,* the Settlement Agreement date June 20, 2014, for which they procured financial benefit of $1.5 million dollars, and also a *second,* Guarantee and Fee Agreement signed on or around August 28, 2014 between ADMIS, Boshnack, Rothman and HRF (owned by HRHC) that permitted the "bulk transfer" of former Vision customers to ADMIS.

152  To the extent the G&F Agreements and/or Settlement Agreement, permitted Boshnack, Rothman, individually and their new alter-egos HRF and HRHC, on an ongoing basis, to receive "trailing fees and commissions" to be deducted from other competitor CTA's and traders accounts, and share in the profits and purloin funds form traders accounts, those "trailing fees and commissions" <u>were mandatory, black-letter law to be *disclosed*</u> to traders *prior* to them opening accounts. The agreements required the Consent of the customers, and traders and CTA's going forward. The G&F Agreements, did not permit the ongoing purloining of trading profits and sharing in profits from their competitors profits <u>without customers express written Consent</u>. (See e.g. NFA 2-3, 2-26, 2-29) [16].

153  The parties clearly, on paper at least, contemplated and recognized the need for customers to know, and included language that this agreement may leave the door open to or lead to fraudulent sales and solicitation as it is noted that the parties clearly included provisions that ADMIS was required under NFA 2-29 to not deceive customers in its solicitation about the existence of these G&F Agreements.( *See ECF31* .¶2.4 ¶2.3, ¶2.5)

154  On paper at least, the G&F Agreement, looked like it had to be in compliance with the laws, and everyone would fully disclose the arrangements, and no CTA or trading data would be shared. Boiler-plate language was even and added to the G&F Agreements that all parties had to remain in compliance with the laws, rules, consents, regulations and requirements of the CEA, including but not limited to the disclosure laws, and clearly requiring customer consents.

### 7.(i) Disclosure of Fees was Mandatory

155  It is black-letter law that all fees and commissions, and charges from a traders account be disclosed prior to opening accounts. (*See* e.g. NFA 2-4 9005, CFTC Reg 33.7 and CFTC Reg 1.55,

---

[16]NFA 2-3 No Member or Associate shall share, directly or indirectly, in the profits or losses accruing from commodity interest trading in any account of a customer carried by the Member, or another Member,unless the customer's prior written authorization is therefore obtained.

Page 35

Reg 1.57) which are non-discretionary rules required by the Commission on all introducing brokers and ADMIS to disclose **all fees and charges** prior to commencement of accepting funds).

156  Multiple CFTC rules require that ADMIS and Lazzara disclose all and any material relationships, including but not limited to those related to fees and risk management prior to Plaintiffs opening the account. (*See* CFTC 1.11,  CFTC 33.7(b), CFTC 1.55, CFTC 1.56(b), CFTC 1.57).

157  NFA rules go further,  NFA 2-4 Int 9005 makes it a compliance violation that any fee structure that is deceiving will subject the person to a disciplinary violation.

158  It is also black-letter law that it is <u>unlawful</u> to withdraw money and steal funds from customers , traders and Plaintiffs accounts, and share and withdraw profits from Plaintiffs without **written** consent under NFA 2-3, and it is fraud to deplete cash reserves under Commission Rules. 7 U.S. Code § 13 which makes it illegal to steal and purloin Plaintiff's asserts and money in excess of $100, and 17 USC 13(b) makes it unlawful for the willful violation of all CEA rules and laws [17]

159  But in reality no disclosure were being made, no consents were granted to withdraw monies and fees, an fees were ever disclosed, customers, Plaintiff were willfully deceived of the activity and had no idea about any G&F Agreement. The Conspirators already determined that any "new" customer or "new" trader like Plaintiffs would not <u>voluntarily</u> agree to substantial overcharges and fees (amounting to $10 million dollars a year) to be paid to Boshnack and Rothman, infamous charactore (disbarred from Vision) when they could easily take their business elsewhere or find another FCM.

160  Therefore the Conspirators did not want to lose customer and traders, and relied upon the concealment of the arrangements, to fraudulent attract customers, traders and Plaintiffs to open accounts with Vision brokers.

161   NFA was by law, obligated to enforce those mandatory, non-discretionary rules, and a statutory obligation to make sure the disclosures to customers were occurring and that the Conspirators had the obtained the mandatory customers consent and made the requisite disclosures.

162  However at no time since 2014 until present did NFA or Kadlec enforce these compliance laws, as they were willfully part of the scheme to conceal. NFA <u>knew</u> the disclosures were not being made,

---

[17]  7 U.S.C. 13Any person registered or required to be registered under this chapter, or any employee or agent thereof, to embezzle, steal, purloin, or with criminal intent convert to such person's use or to the use of another, any money, securities, or property having a value in excess of $100, which was received by such person or any employee or agent thereof to margin, guarantee, or secure the trades or contracts of any customer or accruing to such customer as a result of such trades or contracts or which otherwise was received from any customer, client, or pool participant in connection with the business of such person. The word "value" as used in this paragraph means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

Page 36

and NFA willfully, wantonly and in bad faith knowingly participated in the non-disclosure of the withdrawals of monies from CTA's without their knowledge, consent and permission. (See NFA 2-3, NFA 2-4 9061, CFTC 33.(7), CFTC 1.55, CFTC 1.57, NFA 2-29, NFA2-26, and others)

163   The scheme in fact relied upon on the opposite - that NFA and Kadlec would willfully and intentionally fail to enforce its compliance laws, and therefore permit the unregulated pool of *Vision broker* customers and traders (usually start-ups and small companies) being used as a sort-of unregulated slush fund to compensate Boshnack, Rothman and HRHC and their funding to continue.

164   NFA's knowledge and intentional failure to enforce was bad faith, fraudulent and constituted illegal activity, and at a minimum was grossly negligent, given these were disbarred persons.

165   As a result of Defendants' failures to enforce have caused Plaintiffs significant damages herein.

### 7.(ii) Services did not include risk services but only sales and marketing

166   In addition, the G&F permits Boshnack, Rothman and Vision to "preserve their relationship" with their _prior_ Vision brokers and customers – a substantial source of revenue. (ECF31 p1) However makes no mention of _new_ customers such as Plaintiffs who entered the business in 2017. NFA were required under law, to protect customers, traders and CTA's from fraudulent and deceptive practices.

167   The G&F Agreement, to preserve these relationships, permitted Boshnack and his newly created affiliates to provide "*sales and marketing services*" – with such sales and marketing services only permissible if they are in full compliance of the CEA. The G&F Agreement only permitted them to provide a limited scope of services to refer business to ADMIS. The G&F Agreements _did not cont1emplate or approve in any manner the provision of risk management services_ or any other form of services. (See G&F, ECF31¶2). (ECF31, ¶2.1, ¶2.2)

168   Therefore, notably the G&F Agreement _did not contain any provisions that provided for risk management services._ The only services permitted under Section 2.1 and Section 2.2 of the G&F are "*sales and marketing*" – in compliance with the laws.

169   Also, the G&F agreements expressly _did not permit and did not authorize in any manner, the dissemination of CTA's and competitors confidential and proprietary trading accounts to High Ridge_, Felag, or his directly competing businesses, Vision CTA Referral. To the contrary, Section 7 of the G&F Agreement, provides, that the _only_ business records, that HRF can access are the total commissions and fees, and expressly prohibited the access and disclosures of trade secrets and CTA

Page 37

and customer transactions. The parties clearly recognized the sensitivity of business records, and therefore Section 7, made clear that Vision was entitled to <u>no access to customer accounts</u>.

170   Specifically, and materially the G&F Agreement did not contain any provisions that permitted disclosure of CTA's or customers confidential proprietary transaction records, and CTA's trade secrets. The agreements did not permit sharing of Plaintiffs trading strategies or account data.(*See* G&F,ECF31 ¶7)

171   Other language also prohibited sharing of CTA data. For instance Section 2.4(d) also requires that HRF comply with the applicable rules, and regulations of the CEA, and NFA 2-4 9065 prohibits dissemination of CTA records without consent. The G&F Agreements specifically prohibited the disclosure of CTA's trading history and activity, as **Section 2.4.(d)** is clear that all transactions and participation  - must comply with the rules and regulations. (See ECF31 ¶2.3(e), ¶2.4(d))

172   The G&F Agreements, also contemplated the importance of disclosures, and included specific language in **Section 2.3(g)** that documented the requirement for ADMIS to comply NFA 2-29 – which expressly prohibits marketing and solicitations that are in anyway misleading. NFA 2-29 in salient part states that No FCM, IB, CPO or CTA Member or Associate shall use any promotional material that: (1) is likely to deceive the public; (2) contains any material misstatement of fact or which the Member or Associate know**s omits a fact if the omission makes the promotional material misleading**; and also under NFA2-29(a) includes that shall make any communication related to its commodity interest business that: **(1) operates as a fraud or deceit.** Other prohibited language is included in NFA 2-2 with broad anti-fraud protections for NFA Members.

173   But as clearly pled in related Complaint 20-CV-3873 ADMIS, (Incorporated by reference herein in related case ADMIS 20-CV-3873 **ECF15 Exhibit 5 and other Exhibits 1-4**) ADMIS and Kadlec, however made no changes to their promotional and marketing literature, and knowingly and intentionally failed to disclose to any new customer and new traders, any of the information, about their material affiliation with Vision. There was no inclusion about material individual guarantees on their traders accounts or the ability to deduct trailing fees and commissions. This information was material, as traders, would not have agreed to open accounts.

174   Further incorporated by reference herein from Related Complaint 20-CV-03871 – ADMIS FAC ¶77-¶100 which describes in detail the fraudulent sales and solicitations, and design of the scheme to target and fraudulently induce accounts – none of which complied with NFA 2-26 or NFA 2-29.

Page 38

175  NFA had a statutory, non-discretionary duty to enforce the rules, including NFA 2-26, and NFA 2-29 that any agreement to provide credit line to introducing brokers, had to be compliant with the laws of the CEA, and any arrangement could not be in anyway misleading, deceiving to traders, and all commercial arrangements, including withdrawal of funds from a professional traders accounts, or in other ways impacted a customers or traders doing business with that broker, had to be disclosed. As part of the scheme NFA, Kadlec, Wahls and Kiela, knowingly and intentionally failed to enforce without limitation mandatory and non-discretionary compliance laws NFA 2-29 and NFA 2-26.

176  These terms in the agreements were material because any requirements that a third party beneficiary (Rothman, Boshnack and HRF) was to receive a substantial "trailing commission or fees", under the rules of the CFTC and also NFA Rule – is a mandatory disclosure requirement, that the NFA, were obligated to enforce. Meaning, if, the G&F Agreements, also executed in August 2014, permitted that all customers and commodities traders that **forever** opened accounts through a Vision broker, in perpetuity afterwards, would be required to pay a "trailing commission and fee" to Boshnack. Rothman and HRHC, then under the express non-discretionary laws of the CFTC and CEA, those fees and recipients had to be disclosed – including to Plaintiffs. They were not disclosed.

177  The G&F Agreements also required express compliance with the CEA and under CFTC 1.55, CFTC 33.7 and NFA 2-26 required express disclosure to customers and traders and Plaintiffs *prior* to opening accounts of their existence and all fees being charged and diverted to Vision thereafter.

178  NFA knowingly and intentionally failed to enforce compliance therein. Once the G&F Agreements were executed NFA was obligated to enforce their compliance with the CEA, Commission rules and compliance laws. NFA, had a statutory and mandatory duty to enforce that customers, traders and CTA's were disclosed this information prior to account opening in violation of the express sales and promotional requirements, and disclosure of fees required under the CEA and NFA had an affirmative duty to enforce the fraud and compliance laws. (NFA 2-29. NFA 2-26, NFA 2-2, CFTC 1.55, CFTC 33.7, CFTC 1.11).

179  The scheme in total, generates an estimated tens of millions of dollars year in unauthorized fees, and millions of dollars of business for Conspirators as well as substantial otherwise not obtained revenue to the other participants of the scheme, the former Vision IB's, including Lazzara, as well as the NFA itself, who knowingly and intentionally failed to enforce the compliance laws, to knowingly participate in the concealment, omission and failure to disclose of the agreements. (As outlined in 20-

Page 39

CV-03668, ECF1)  the disclosures of the fees, dissemination of accounts, rogue risk services, and enforcement of anti-fraud provisions are black-letter law under the CEA to be enforced). including but not limited to under CFTC Rules, 33.7 and also NFA Rule 2-4/Int 9005[18]

180   Defendants and the other Co-Conspirators, willfully participated in the scheme to defraud, to unlawfully "entrap" new traders in these fraudulently accounts with ADMIS and Kadlec to create illicit profits, not authorized by the CEA, which in turn, to unfairly provide Vision and HRF defendants an unfair competitive advantage in exchange for their financial benefits.

181   However under no circumstances did these G&F Agreements (See ECF31) provide access to Boshnack, Rothman and HRHC their competitors confidential data  and trading records. (ECF31  ¶7

*SECTION 8 -  Specific Victims of the scheme were professional traders and CTA's.*

8.(i) G&F Agreements were never enforced

182   NFA, Kadlec and Defendants knowingly failed to enforce the disclosure and consent laws related to the G&F Agreements.

183   NFA, ADMIS, Boshnack, Rothman, Felag, and Kadlec, realized that if new customers, traders or CTA's were given the option to "opt-out", they would choose not to do business with the former *Vision brokers*, or ADMIS, or the Visions owners and most certainly not agree to significant overcharges (as high as $6 a commissions, and depleting CTA profits by has high as 6%-18%) that was required to be paid to Boshnack, that they would not have had to pay if they took their business elsewhere. (As incorporated in related complaint, ADMIS FAC ¶77-¶100,  the range of high fees)

184   All Conspirators operated with scienter and deceit to conceal the G&F Agreements and they knew they intended to not seek consent from customers for their authorization to withdraw fees from customers and traders accounts and the conduct was expressly prohibited under the rules of the CEA and CFTC. As stated supra, the Dark Pool, or unregulated slush fund was necessary for them to repay the large credit lines being funded by Boshnack, Rothman and HRHC.

185   Therefore the parties had no intention of abiding by the disclosure laws or seeking the consents from  customers  or  traders.  They  certainly  would  not  agree  to  their  trading  accounts  being

---

[18] **NFA Compliant Rule 2-4  Interpretive Notice 9005** (Board of Directors, effective June 1, 1986; revised July 24, 2000) NFA Compliance Rule 2-4 requires that each FCM Member, or in the case of introduced accounts, the Member introducing the account make available to its customers, **prior to the commencement of trading**, **information concerning the costs associated with futures transactions**.[1] Any such arrangement **which is intended to or is likely to deceive customers is a violation of NFA Requirements and will subject the Member to disciplinary action**.

Page 40

disseminated to Vision. The Conspirators, however, knew that if they actually went out to seek the consents, the traders and customers would opt-out. So, even though on paper, the agreements stated that each party to the Agreement, was required to seek the consent of the customers, traders and CTA"s opening accounts through *Vision brokers*, in reality, subsequent to November 1, 2014 after the effective date, it was intended that no consents were sought.

186   In all cases the communications were fraudulent and intended to deceive, and are expressly prohibited under 7 USC 6(b) and other anti-fraud laws including NFA 2-2 and NFA 2-29.

187   But the Conspirators were heavily reliant on the several hundred million dollars of credit lines and Guarantees from Boshnack[19]. Without the subprime customers paying for the Boshnack credit lines, the scheme would never have worked, So the parties never intended, to seek their consent.

8.(ii) Boshnack's directing competing activities led to antitrust activities

188   When Vision was disbarred in 2013, NFA also admitted "A substantial part of Vision's business involves recommending commodity trading advisors ("CTAs") to its customers." *(See Vision,* Exhibit 2 Pg.3 ¶7). Thereby NFA acknowledged the direct conflict of interest, competitive business lines, and substantial economic interest Vision, its owners and affiliates had in CTA programs, generating substantial revenue.  By virtue of the so-called "settlement", Boshnack was permitted to continue this CTA referral business, now under the operation of High Ridge Holding Company. Same company new name. HRHC also owns HRF and is the parent company.

189   NFA and Kadlec knew or should have known there was a material conflict of interest but yet failed to put in safeguards or protect CTA's from the conflict of interest. Instead, they willfully violated the basic premise of the fair market competition, which would cause harm specifically to CTA's. This was an express and fundamental violation of the Articles of Incorporation (See Article IIIa). of the NFA whereby they were deliberately transferring the competitive advantage of CTA's to their competitors, suppressing their track records of performance by 6-18% a year, and producing a more favorable returns to HRHC CTA's, by the unlawful depletion of profits from their competitors.

190   But Boshnack, Rothman and HRHC had also demonstrated an obsessive and peculiar, anti-trust competitive interest in his competitors CTA performance, and "studying" their trading patterns.

191   Boshnack's marketing literature and promotional literature that NFA were fully aware of, and incorporated by reference herein 20-CV-03871 Vision FAC ¶96-125 includes Boshnack and his

---

[19] Boshnack includes by reference Boshnack, Rothman and HRHC but for simplification is replaced now with Boshnack

Page 41

teams' obsession to acquire CTA's trading records. His public statements in literature include "Our selection process *spares no expense or effort in finding CTAs*." (Emphasis added, *See* Vision FAC, Exhibit 5, Pg 16-17).

192   NFA knew of the conflicts of interest, and the significant harm and threat posed by Boshnack, Rothman and HRHC's and their competing businesses to CTA's, but failed to enforce any protections to CTA's as required in their mandatory articles of incorporation and bylaws to protect customer and traders from unfair competition.

193   And now since being disbarred as an FCM, NFA, Kadlec knew and should have known that Boshnack's competitive revenue and perpetuation in the market place, came from his CTA business – putting him in direct conflict of interest and direct anti-trust and unfair competition to maintain HRHC involvement in anyway with other CTA's accounts, or tampering with their performance.

8.(iii) CTA's were a specific class of Victim

194   Commodities Trading Advisors, ("CTA's), who were newly registered or just entering the business were a specific class of victim of the scheme. Professional traders rely upon building their revenue and livelihood from a successful performance track record of trading performance were additionally harmed, by unauthorized and non-consented withdrawals to pay for the illegal funds.

195   The scheme to defraud and conceal the fees from CTA's as a particular class of customers was done with scienter. As pled in detail in related Complaint (ADMIS FAC¶87-97) so as not to be detected by CTA's, the Co-Conspirators,  decided lower the overcharges to $0.30cents for CTA's (instead of $6 which they planned for customers) as "they are more price sensitive" and more likely to go undetected. These actions, to connive to lower fees "so as to be undetected" demonstrates the scienter, and intent to conceal, at which the Conspirators wanted to conceal the fees, from CTA's and were Boshnack's specialized target to lower the profitability of his competitors.

196   Incorporated by reference herein 20-CV-03872 ADMIS¶77-¶100 also explains how Boshnack and his team, planned with deceit and scienter to determine the level and degree of illegal and unauthorized price fees between customer and traders. The foregoing pleads in detail the plan to defraud,  Boshnack conspired for the fees to go undetected, and for CTA's who are more price sensitive to not "notice" the fees. In order to not get the necessary consent form traders, the scheme was designed to slip more easily past them. This conduct is illegal and fraud. Vision have not defended or disputed the fees in their MTD, thereby waiving their defense.

Page 42

197  HRHC were operating behind the scenes, with specific interest not just in their competitors CTA's performance, but also ways to deplete it, and as had not yet been negotiated, ways to acquire their records. HRF and Felag (also with vested management interest in the HRHC, as stated on the NFA Basic website) were used as the front persons in the scheme to deplete the CTA's.

198  To create the unfair competition, professional traders and CTA's were intentionally <u>not</u> given the opportunity to opt out of the fees (as is required by law), and were <u>not</u> given the opportunity to opt-out in accordance with the privacy laws or the disclosure laws. Professional traders depended on and relied on the profits of their accounts to be successful, and the laws of the CEA makes it mandatory to not disclose these fees.

199  CTA's who intend to solicit capital, and provide performance tear sheets, compete heavily on the most attractive track records, in a blood thirsty competition of who can generate the highest performance in annual returns with the lowest risk.

200  However, by layering on more and more unauthorized fees, to deplete the performance, at-will, by Boshnack who ran the competing HRHC CTA service, was willfully able (without consent) to add fees to suppress his competitors in the Vision broker accounts, at any time, and for any purpose, especially when their competitors account was turning profitable. This activity again was illegal.

201  As example, of how the unfair advantage is created, a trader posting annual returns of 25% a year versus 7% a year is far more likely to attract capital and draw AUM and build their business. On a $100,000 trading account posting $25,000 a year in returns (25%) which would be a highly competitive returns, that CTA and Plaintiffs rely upon in their raising capital, building their Assets Under Management ("AUM") and attracting customers and clients. By HRHC and Boshnack, withdrawing, by way of example $18,000 of fees (18%) to reduce that amount to $7,000 would leave the CTA posting an annual performance of only 7%. This is direct unfair competition and why the disclosure laws in the CEA, and CFTC make it mandatory to disclose all fees, prior to opening an account.

202  Incorporated by reference herein, Vision FAC ¶293-¶297 documents that midway through trading on May 2, 2017, only after Plaintiffs CTA account was proving profitable and more profitable than HRHC CTA's, randomly additional fees were added to suppress the accounts by 3.45% every 45 days (about 18% a year). This procures direct unfair competition on HRHC's competing business.

Page 43

203   Other traders have reported that a business model of Boshnack, as a perpetrator of CTA's, is to front load their performance records by 6% luring them with promises of being able to raise $10 million. Incorporated by reference herein Vision FAC ¶100-101).  However in those cases the CTA must consent and agree to these fee charges, and they are then enticed with $10 million of AUM.

204   The scheme to not disclose and knowingly not consent from traders, was also corroborated by other *Vision brokers*, who started to detect the overcharges and fees were over $100,000 a year on their account. When they challenged the fees, ADMIS severed their relationship stating the fees were "non-negotiable".

205   Traders and CTA's in the industry were well aware of Boshnack fee penalties – stating their account had been "Visioned" – meaning front-loaded with fees as high as 6% making it almost impossible for them to trade profitability. But in Plaintiffs' case – and the new G&F arrangements – the Co-Conspirators, never sought the CTA's consent, thereby unlawfully suppressing their profits in direct unfair competition to Boshnack's HRHC CTA referral service. When HRHC saw a competing CTA was posting more lucrative returns (as was the case in Plaintiffs account between January 2017-April 25, 2017  with return of over 12% in 60 days, immediately after and starting May 2, 2017 more unauthorized fees were added to suppress the account – amounting to unlawful withdrawals of over $1,200 and 3.45%, and caused havoc to knock the participants out of the game, and give more favorable rates to HRHC CTA Referral traders.

206   NFA and Kadlec knew or should have known there was a material conflict of interest but yet failed to put in safeguards or protect CTA's from the conflict of interest. Instead, they willfully violated the basic premise of the fair market competition, which would cause harm specifically to CTA's. This was an express and fundamental violation of the Articles of Incorporation (See Article IIIa). of the NFA whereby they were deliberately transferring the competitive advantage of CTA's to their competitors, suppressing their track records of performance by 6-18% a year, and producing a more favorable returns to HRHC CTA's, by the unlawful depletion of profits from their competitors.

8.(iv) The Scheme to Defraud was Carefully Planned and done intentionally

207   The scheme to not disclose and knowingly not consent from traders, was also corroborated by other *Vision brokers*, who started to detect the overcharges and fees were over $100,000 a year on their account. When they challenged the fees, ADMIS severed their relationship stating the fees were "non-negotiable".

Page 44

208   The scheme also operated by included the overcharges and illegal fees on Day 2, after opening the account, making it much harder for CTA's or traders to close or dispute the charge, due to the higher switching costs. (See also 20-CV-03873 ADMIS FAC ¶89-97). Once the account was already open, Co-Conspirators planned with scienter to add the Boshnack fees on the second day or third day, therefore making it much harder for a customer to go through the hassle of closing its account.

209   Notably in Plaintiffs accounts, overcharges and additional fees were also charged on the second or third day, and when questioned, the Vision brokers dishonestly called them "exchange clearing costs". In addition even more trade processing fees on Plaintiffs account were charged on May 2nd, 2017. By using the second of the month, or the second day, the fees were more likely to go undetected, and the fraud successful, as the Co-Conspirators knew that most traders, who usually check their end-of-month statements carefully, would be less likely to catch the overcharges on the 2nd of the month. Further this would also decrease the likelihood of customers and traders closing their accounts.

210   The scienter, fraud and deceit of the scheme also involved a cover-up or set of excuses if a customer questioned or noticed the charges midway through the trading. The first "excuse" made was to call the fees "exchange clearing costs" or "clearing costs". Since exchange costs are a mandatory exchange imposed fees, this further deceived the customers to thinking they were part of the mandatory exchange fees. Other excuses, if customers or traders pressed, was to call them "billing errors". Many of the market participants weren't savvy enough to look further into the legalities or compliance of what fees were being charged. (*See* also Exhibit 9, ¶2, ADMIS FAC ¶90)

211   Plaintiffs received the same "lines" of excuse when they detected the fees, including blatant fraudulent explanations that they were charges from the exchange or "errors". Plaintiffs had a right to opt-out of such an unfair billing and anti-competitive performance. This was material information that needed to be disclosed.

212   Boshnack, Rothman and HRHC's trade processing and transaction fees were not disclosed, and added-at-will to cause damage, violated market participation rules, and were added without disclosure and without consent, procuring upon him and his affiliates a direct competitive advantage.

213   HRHC's then took their G&F Agreements to create an undisclosed, at-will, unfair depletion of CTA's highly competitive trading records for his unfair advantage and to procure a monopoly and benefit to his HRHC CTA referral service.

Page 45

214   Therefore all Conspirators, planned to conceal the fees using illegal methods and excuses. But with fraud, scienter and intent to keep other CTA market participants suppressed, for Boshnack's competitive advantage and his HRHC CTA referral business, the Co-Conspirators, fraudulently and illegally conspired to conceal the information from CTA's, thereby procuring a direct and deliberate unfair competitive advantage.

215   NFA and Kadlec's fraudulent, illegal and bad faith failure to enforce the compliance laws of disclosure, the fraudulent concealment caused significant harm and damage to Plaintiffs.

8.(v) Conduct was also harmful to CTA's in their own disclosures

216   CTA's were harmed in other ways too. Both reputationally and in their requirements to disclosed. Most CTA's including Plaintiffs had other reasons  why they would never have agreed to do business with or want to be affiliated with Vision, or any of their AP's or personnel. Vison had significant reputation damage in the industry and were blemished market participants that had been disbarred.

217   With Visions' tarnished background, and pattern of market abuses of 172 CFTC reparations cases, with several of them citing "*non-disclosure*" and "*misrepresentation*", (See Att. 1) Commodities Trading Advisors,  who were under professional obligations to disclose to their own investors and customers who their business counterparts are, in their own CTA disclosures, also would not have agreed to do business with a disbarred entity, Boshnack and his already severely blemished marketers. CTA mandatory disclosure laws. (See NFA 2-34)

218   After being disbarred, because no one was "choosing" to do business with Boshnack, HRF and his affiliates, they only way they could perpetrate and acquire their competitors accounts was through subterfuge and fraud.

219   Other NFA Board Members, including a James Koutoulas, whom Plaintiffs coincidentally met with in person in London in August 2019, also stated that his company Typhon capital, never onboards traders from the disbarred Vision. Koutoulas stated he had no knowledge of any legitimate risk management outsourcing at ADMIS to Vision and he was shocked that ADMIS were disseminating traders CTA accounts to the former management team of Vision, without their knowledge, consent and permission.

220   Koutoulas advised negatively about the integrity and reputation of Howard Rothman, Robert Boshnack and Vision. Koutoulas stated that his own company, Typhon refused to even onboard

Page 46

traders who came from Vision, and cited their long standing unethical conduct and serious disciplinary track record of compliance violations. NFA Basic lists Boshnack, Rothman and/or Vision being the Defendant of over 172 CFTC reparations.

221   Therefore Plaintiffs as CTA's would never have consented to do any business relationship with the Vision Risk Group, or HRHC or Boshanck, which is why the Conspirators went to no small measures to keep the arrangements fraudulently concealed and not seek CTA's consent.

222   This conduct has also caused significant reputational damages and good will damage to Plaintiffs who will have to disclose all this activities (as will other CTA's that uncover what is happening). Since the CTA disclosures are also mandatory requirements, Conspirators were even more carefully to keep the activities concealed from professional traders.

223   This is also because Boshnack and his affiliates were unlawfully acquiring all the inner workings and trade secrets of their competitors and CTA's as an extra benefit for their credit lines. Also the G&F Agreements specifically prohibited HRHC, and Boshnack and any of its subdivisions from acquiring access to those CTA accounts.

224   Boshnack's interest in creating more favorable rates and unfair competitive advantage with CTA's is also documented in Section 5.3 of the G&F (ECF31) procuring "Special High Ridge rates" for he and his wifes' personal commodities trading advisors, while simultaneously depleting the annual profitability of his competitor CTA"s without disclosure and consent.

### 8(vi) - Right to Know

225   NFA and Kadlec's bad faith failure was directly harmful to "innovation" and "fair market competition" and CTA's. Professional traders, CTA's and Plaintiffs had a non-discretionary, statutory right to know *prior* to opening the account (i) that they would be charged additional fees and commissions which would be diverted to Boshnack, HRHC and his affiliates; (ii) that the credit and guarantees on the account was being sourced from disbarred owners of a prior FCM that was kicked out of the industry for dishonorable conduct and disciplinary violations; (iii) the parties of interest of their account were direct competitors and ran a directly competing HRHC CTA referral services; and (iv) as was later negotiated all their proprietary trading strategies would individual credit lines to compensate Boshnack personally for his credit lines and all their proprietary trading strategies would be disclosed to a competing CTA referral service by Boshnack under later their own directly competing CTA Vision Investment Advisors.

Page 47

226   The start-ups, and directly targeted CTA's were the most harmed, because their livelihoods and revenue and performance, relied upon the profitability of their trading strategies, the performance mark of their CTA programs. This arrangement however had to be fully disclosed to all CTA's traders and customers, prior to opening accounts at ADMIS that NFA had an mandatory obligation to enforce.

227   This is precisely the rights Congress gave to traders and CTA's under Section 22 of the CEA, to ensure the registered futures association deploys uniform market rules, prevent fraudulent and abusive solicitations and withdrawals of money – and to foster fair market competition.  It is also why the CEA requires disclosures to CTA as mandatory– and not to enable one set of rules for those who pay more money to the regulators or who are "bankers" or sit on Boards or who have cozied up relationships with long-time insiders - to have a different set of more favorable market participation rules.

228   NFA and Kadlec's willful participation in the scheme, failed to grant CTA's the equal right to be entitled to full disclosure from the FCM or the Introducing Broker, prior to opening account the chance to decline to do business with FCM and move their accounts elsewhere.

229   So as not to divert or lose customers and CTA's,  that the *Vision brokers* brought into the industry, and the significant – potentially hundred millions of  dollars -  of clearing revenue – the NFA agreed to use these Class D *Vision broker* subprime accounts, as an unregulated slush fund – from which the unauthorized withdrawal of their customer and CTA funds to make the payments to Boshnack could be made.

230   As stated supra, the scheme intended to make up the shortfall of income to HRHC, Boshnack and their ventures from his FCM being disbarred of up to $10 million a year. Because they had substantial leverage and financial  to offer the creditworthiness to hundreds of millions of dollars of clearing revenue, NFA, and the other Conspirators were beholding to him to offer him terms, that could make the deal work.

231   It was carefully and purposely planned that the only way to make up that shortfall and pay the guarantees was through the unknown and unauthorized payments from unwitting customers, traders and start-ups including new CTA's (including Plaintiffs') who would not be able to opt-out. The conduct to conceal HRHC, Boshnack and Rothman's involvement was a clear antitrust and competitive fraud, with CTA's a specific class of victim who were harmed.

Page 48

232   The decisions made by NFA, ADMIS, Kadlec, Boshnack, Felag, Rothman and HRHC, to withdraw, and purloin monies from competitive traders profits, contravenes the material laws of fair markets competition, but also constitutes theft and is illegal. It is forbidden under 7 U.S.C. 13(b)(1) and also unlawful under NFA' own rules – without limitation NFA 2-3.  It is debilitating and direct anti-trust and anti-competitive for another Member, to deplete that CTA performance by 18% a year,

233   In total the illegal fees generated through the scheme are estimated to be not less than $10 million a year, depleting traders and CTA"s performance by between 6-18% in unfair market competition, under which ADMIS, and Boshnack derive substantial unfair market share. Since the scheme started in September 2014, the total fees amassed to date are estimated to exceed $50 million. In motion responses MTD, Vision, no one denied or defended the unlawful withdrawal of fees or disputed the allegations of unlawful withdrawals, thereby waiving their defenses.

### *SECTION 9 - SEPTEMBER 2014 THE RISK AGREEMENT*

234   The G&F Agreements as they were executed on August 31, 2014 however expressly granted <u>no rights whatsoever the right to access its competitors or CTA's business records</u> or trading data (*See* Section 7). The G&F Agreements also on paper required full disclosure to customers and traders and CTA's of the agreements and "trailing fees and commissions".

235   The G&F Agreements made no mention or addressed the conflicts of interests in Boshnack, Rothman and HRHC's new market monopoly ambitions which was in its CTA referral business. They also stated that any additional of fees or promotional activities needed to be in compliance with the law – which would have prohibited. for example, the sort of unlawful tampering and midway through addition of fees on May 2, 2017 on Plaintiffs' CTA account just as it had proven out 3 months of profitability by HRHC CTA's conflicting business interests.

236   Based on the "on-paper" compliance of the G&F Agreements, in or around September 2014, NFA, began the re-registration of Boshnack, Rothman, Felag, and HRF. Notably it was decided that HRHC, the owner of the CTA Referral business <u>was not a registered participant. This means that HRHC was not an NFA member, and not subject to its rules.</u>

237   Since it was determined that Boshnack would be providing the funds to guarantee of *Vision Brokers,* subject to compliance with disclosures. the former Associated Persons of the disbarred Vision then began their reregistration into the NFA as market participants, this time expressly limited to the role of an Introducing Broker ("IB").

Page 49

238  Since the deal was publicly announced on September 1, 2014 and was <u>contingent on</u> HRF, Rothman and Boshnack's registration as an AP to be completed, several hundred brokers and thousand do customers were handing in the balance of the deal being closed. (*See* **Attachment 10))**

239  Any role out of the G&F Agreements, as stated in Section ¶1 was "contingent on" HRF (owned by HRHC) being able to register as IB's. In other words, in a *tail-wagging the dog scenario*, the registration of these participants was <u>a necessity</u> in order for the Guarantees to go into effect, and hundreds of subprime brokers to remain in the business. (See ECF31, ¶1)

240  Therefore, after execution of the G&F Agreements, all persons formerly associated with the now disbarred Vision, began the process of applying for registration at the NFA, this time solely as the capacity as Introducing Brokers ("IB").  Any registration required specific scrutiny and due diligence by NFA that they would not pose a threat to other market participants and they were expressly prohibited from conducting activities on behalf of an FCM.

241  On or around August 22, 2014 HRF applied for membership as an IB and on October 17, 2014 HRF was granted registration only as an IB. However NFA did not conduct any further due diligence or conflicts of interest on HRF interfering in CTA accounts, and NFA conducted no "thorough fitness examination" on the ongoing activities of HRF and HRHC in the CTA referral business or their affiliate trading arms.  The registration contradicted their public announcements in June 20, 2014 that any registration of HRF would be subject to a "*thorough fitness examination"*. NFA's statements were false and not corrected in October 2014, when they re-registered HRF, as an IB, without any fitness exam on its ongoing activities that interfered with its competitor CTA accounts.

242  On or around October 17, 2014  John Felag was approved to register as an IB, the head of the *Vision Risk Group*, that resulted in over two millions of dollars of customer losses that was instrumental in  them being disbarred, and became registered as an IB. NFA again conducted no fitness examination or due diligence on Felag's risk management activities, his risk group, or compliance with laws and exchange, to validate that he could no longer pose a threat to other customers.

243  HRF and Felag's registration was expressly only permitted to be that of an IB. Under this new registration they were now prohibited from performing margin, guarantee and extend credit on customer accounts. Their ability to participate as an FCM was permanently revoked.

Page 50

244   Because Boshnack, Vision, Felag, Rothman and all their future entities had been permanently disbarred from participating as an FCM, their registration required specific scrutiny and due diligence that they would not pose a threat to other market participants. They were no longer allowed to be an associated person of an FCM.

245   Based on the G&F Agreements, Boshnack and Rothman were now back in good graces, and had now successfully converted their roles to be that of a "banker" to ADMIS and NFA and to fund their activities and all Conspirators were substantially reliant on these credit lines.

246   As stated supra,  the acquisition of subprime *Vision brokers* contributes to about one hundred and forty five (145) of the three hundred (300) ADMIS's Introducing Broker business and generated hundreds of millions of dollars of commission revenue on a risk free basis. ADMIS and Kadlec were also materially reliant on the source of funds from Boshnack to acquire approximately 1/3 of their business, estimated to be over  $100 million of gross revenue a year, and over a billion dollars of transactions to the futures industry.[20]

247   In addition upon information and belief, because their capital was supporting substantial trading clearing business, upon information and belief, HRCH, Boshnack and Rothman individually, also contributed to ADMIS's mandatory CME capital to guarantee the futures business in the clearing to the exchange. One of the FCM rules of participation is that all FCM's have to post additional guarantees to the CME to secure the defaults and trading liquidity of the markets. In addition, upon belief,  as an additional deal sweetener, Boshnack, Rothman and HRHC, offered to and did agree to post additional margin, on behalf of ADMIS for their depository contributions to the CME for exchange liquidity.

248   Kadlec, in his role as CEO, therefore had agreed to a "risk free" business on the *Vision brokers*, now had relatively no skin in the game on the Vision broker customer and trader accounts, and Boshnack and HRHC (running a directly competing CTA business) were to wear all the risk.

249   Accordingly the directly competing profitability of HRHC was germane and of clear motivation to Conspirators, as they were providing substantial liquidity to the markets and it was in NFA, Kadlec and all Conspirators interest to provide an unfair competitive advantage to HRHC.

---

[20] As stated supra, according to NFA's disclosures  in 2010 alone generated shy of $50 million dollars of commissions within 6 months which would now be paid to ADMIS.

Page 51

250   As the final deal terms of Boshnacks' or HRHC's funding role was ironed out, underscored in the consideration was that now HRHC was wearing tremendous risk and exposure in their guarantees on thousands of brokers and hundreds of *Vision brokers* accounts, and the indemnification thereof, it was determined, that the result of any business decision made by ADMIS on extending credit would or could result in substantial unauthorized drawdowns or risks to Boshnack or HRHC or his team.

251   In other words, Boshnack, HRHC and his team negotiated that without actual transparent access to the *Vision brokers'd customers'* trading accounts, the deal was an inequitable sharing of risk and exposure and the previous terms were unfair.  Since Boshnack was "blindly" liable for the risk on the customer accounts of the *Vision brokers*, but had no say or no transparency in the activities in those account or way of determining the exposure. he was reliant on the business decisions of ADMIS, and could be exposed to millions of dollar of drawdowns on ADMIS' risk departments decisions or failures thereof.

252   Therefore a new and material part of the finalization of Boshnack and his affiliates role, was to require and renegotiate that if he was to wear the risk, credit, and guarantee the default of thousands of customers and traders of the Vision brokers, he needed to "be involved" and directly monitor the risks on the account. These terms had not been negotiated or agreed to in the G&F Agreements.

253   Noting that the G&F Agreement dated August 28, 2014 , expressly <u>prohibited disclosures of customer and trading trade secrets</u>, and account details (**Section 7** of the G&F). Further consent had to be granted by the customers and CTA's that would subsequently grant Boshnack, Rothman and HRHC's new terms, to grant access to his competitors including CTA's trading accounts. Further any such arrangement had to be disclosed, not just to the CFTC (Reg 1.11. 1.55) and CME, and comply with exchange rules, <u>it also had to be disclosed to traders, and CTA's including Plaintiffs</u>. It was not.

254   The terms were upon belief a deal-breaker, as without Boshnack's credit, none of the *Vision brokers* and customers would have finalized their clearing agreement with ADMIS. As stated above, NFA, Admis, Kadlec, HRHC, Boshnack, and Rothman were aware that there would be a billion dollar exit of customer and brokers from the market if the deal was not closed. (See Supra)

255   HRHC and Boshnack also had significant "leverage" now the clock was ticking since the September 1, 2014 had already been announced and hundreds of brokers were reliant on the deals going through so they could continue clearing, and there was a November 1, 2014 implementation date that hundreds of brokers would exit if these funds were not provided.(ECF31,¶1)

Page 52

256   Boshnack to further solidify the buy-in from the NFA, it was later learned by Plaintiffs, that he sold his participation, as a "second set of eyes"  and that the *Vision Risk Group* would a "layer of protection to the markets" by having the *Vision Risk Group*, in addition to the ADMIS risk group, backstop the customers and  traders. Ignoring the elephant in the room, that it needed traders' consent.

257   At the time, NFA had just recovered from two significant market debacles in 2013 and also just nine months earlier a $1.6 billion dollars loss from MF Global. This provided additional motivation for why NFA saw benefit and bought into the concrete benefits of having additional "market support" –regardless of who it was from – and in this case from disbarred owners Boshnack, NFA, and Kadlec, to secure the much-needed credit lines – estimated to be over a hundred million dollars.

258   But this explanation was not permissible under the strict market participation rules that NFA was required to enforce. First it needed customer and CTA's permission and consent, which most likely would not have been granted. And second, as *Vision Risk Group* and its affiliates had been permanently disbarred for causing sizable customer losses and failure to protect assets and funds, and deemed "unfit" to participate as an FCM, rendering any of their risk management observation totally unnecessary, impermissible under the CFTC registration rules, and a liability not an asset to the markets. Their sole registration as an IB, <u>prohibited</u> them from handling customer money and stepping into the shoes" behind the scenes as a secret FCM.

259   Since Vision and its associated person had been expelled, they were no longer legally able to participate in the capacity of an FCM. This also meant they were not able to perform functions such as extend, margin and credit customers' accounts or gain access to their business data.

9.(i) The oral risk services arrangement was born

260   Therefore on or around October 2014, to "get around the compliance laws"  it was conceived that HRHC, through its wholly owned subsidiary HRF would become a "risk service provider" to ADMIS, and in exchange obtain access to all of ADMIS's proprietary customer and CTA records.

261   In other words, the same *Vision Risk Group* who had been disbarred permanently as an FCM, would hide-behind-the-scenes of ADMIS, another FCM and continue to provide essentially the same de-facto FCM functions of managing risk for the customers, determining decisions on extending credit and margin– except this time, all fraudulently concealed. This arrangement, as described herein, was illegal.

Page 53

262   The terms of the arrangement went further - granting HRHC and Boshnack, the discretionary authority to provide FCM-related functions manage margin (without consent) and unlawfully provided them fully-disclosed access to their competitor CTA's accounts, thereby behind-the-scenes acquiring access to all their competitors CTA's real-time transaction data, granting a clear unfair market competition advantage to HRCH and its competing CTA business.

263   Boshnack, Rothman, Felag and his HRHC affiliates, with a deadline looming for a deal on by November 1, 2014 as inked in the G&F Agreements (see ECF31, ¶1) then negotiated, that in order for them to continue their Guarantees, negotiated an "orally-arranged" risk service provider that would unlawfully, and behind-the-scenes, provide them

   (i)   full transparency into all the confidential and proprietary trading accounts, business data, transaction records and trade secrets of  customers (including their competitor CTA"s);

   (ii)   the discretionary authority and ability to add and extend credit, in their discretion, to traders accounts, and/or determine the risk threshold on traders accounts since he was wearing the risk on the account;

   (iii)   the ability to place traders and/or liquidate accounts to minimize their risk;

   (iv)   the discretionary authority to add or remove buying power, or extend margin and;

   (v)   to take other actions he deemed fit, in his sole discretion, on the *Vision broker* traders accounts.

264   Under CFTC Reg 1.57(iv), it is expressly clear that an IB is not permitted to act on behalf of an FCM. Therefore NFA and Kadlec's approval of this deal was impermissible under the Act.

265   It is black letter law that their registration participation forbade these activities, and performing other FCM related functions and the Associated Persons were only registered as IB's.

266   Because the Conspirators knew this participation was illegal, and that their subsequent registration was only as that of an IB, the CEA and CFTC rules expressly prohibit an IB, from adding or extending margin and credit on behalf of customers' accounts, they collectively conspired and agreed to keep the entire risk services agreement, an "oral arrangement" and not traceable by signed written agreement, and upon information subsequently learned it was not even disclosed to the Commission or CME.

267   Further the arrangement was also impermissible as NFA had already deemed the *Vision Risk Group*, Boshnack, Felag and Rothman, permanently disbarred and not qualified to act as an FCM.

Page 54

Therefore it was not permissible for them to violate their registration authority, and hide behind ADMIS, (behind the scenes step into the shoes of ADMIS) and wrap themselves (white labelled) in an ADMIS wrapper, but continue to act in the same manner as Vision, extending and managing margin on customers, and deducting trailing fees and commissions, Those grant of rights are only for registered participants of FCM's.

268   Therefore since NFA and Kadlec, knew the arrangement was illegal, they intentionally and fraudulently concealed the arrangement from documentation – deeming the services an "oral arrangement" that violated the commodities exchange act. This again was against the laws, rules and regulations of the Commodities Exchange Act.

269   However, because Vision were expelled, under the express laws and rules of the CFTC and CEA these rights of participation were unlawful.

270   Therefore all Conspirators knew and fraudulently intended, and intended not to seek consent and disclose the arrangement.

271   NFA willful and bad faith failure to enforce these laws caused significant damages and harm to traders, including Plaintiffs who fell victim to Vision's illegal market participation as a disbarred FCM.

9.(ii) NFA knowingly violates NFA 2-26 and  CFTC 1.11

272   To perpetuate the concealment of prohibited conduct, NFA and Kadlec, intentionally did not comply with the Commission rules to disclose the so-called oral risk services and knowingly circumvented their statutory disclosures. The foregoing orally arranged, so-called risk services were illegal and impermissible under the laws of the Act and Commission for multiple reasons.

273   First, CFTC regulations require that all aspects of an FCM's (in this case ADMIS's) risk management program ("RMP") are disclosed to the CFTC under Reg 1.11 and any material changes thereto are also disclosed and approved by the CFTC. This disclosure to the CFTC also requires mandatory disclosure of Material Affiliated Persons and most importantly, that all aspects of risk are disclosed to the customer. (See CFTC Reg 1.14 and  Reg 1.55).

274   Compliance with CFTC Reg 1.11 –1.15, and 1.55  are non-discretionary rules of the NFA and NFA has no discretion to circumvent and must enforce these requirements.

275   Starting in or around November 1, 2014 when the "oral arrangements" were approved, NFA and Kadlec (acting as CEO) then intentionally violated their statutory and ministerial duties under

Page 55

NFA 2-26 and enforcing compliance by the Conspirators with numerous Commission regulations, including but not limited to CFTC Reg 1.11, and CFTC Reg 1.55.[21]

276   This produced a deliberate unfair market participation advantage to Conspirators.

277   The CEA is expressly clear that only an FCM, or someone granted registration in the capacity as an FCM, as the authority and unlawful for Boshnack and his Vision risk personnel, to margin, secure or guarantee the trades of customers without registration as an FCM and since their registration was revoked – it was a deliberate violation of the CEA. (*See* 7.U.S.Code §  6d(a)(1)and (2))[22].

278   NFA knew that Boshnack, Felag, Rothman and HRHC were providing material margin related functions and outsourced fully-disclosed risk services on CTA's account, without their knowledge and consent, in a capacity they were disbarred for, and NFA were obligated to enforce that ADMIS update its RMP to include these disclosures to the CFTC that all their customer and CTA's that their accounts were being "outsourced" and handled in margin and risk by a disbarred *Vision Risk Group*.

279   Boshnack and his affiliates had been permanently disbarred as an FCM, and never again allowed to be registered or act in any capacity as an FCM, it was unlawful for them to act or participate in any manner, as market participants undertaking the roles of guaranteeing, extending margin and credit on customer accounts Boshnack and his affiliates ability to extend margin and credit on customers and traders accounts was unlawful and also expressly not permitted by the rules.

280   Under the NFA non-discretionary requirements, NFA 2-26 requires members to comply with CFT Reg 1.11 (c.) ADMIS was required to establish, maintain and enforce a system of risk management policies and procedures in a risk management program "RMP" and maintain written

---

[21] RULE 2-26. FCM AND IB REGULATIONS.  [Adopted effective January 24, 1985. Effective date of Amendments: February 1, 1996; August 29, 1996; July 24, 2000; August 21, 2001; and July 12, 2014. Any Member or Associate who violates any of CFTC Regulations 1.11, 1.33, 1.55, 1.56, 1.57, 1.65, 155.3, or 155.4, as applicable, shall be deemed to have violated an NFA Requirement.
[22] 7.U.S.Code §  6d  (a)(1)Futures commission merchant registration requirements; duties of merchants in handling customer receipts. It shall be unlawful for any person to be a futures commission merchant unless— (1)  **such person shall have registered, under this chapter, with the Commission as such futures commission merchant and such registration shall not have expired nor been suspended nor revoked**; and
7.U.S.Code §  6d (a)(2)  Futures commission merchant registration requirements; duties of merchants in handling customer receipts.   **It shall be unlawful for any person to be a futures commission merchant unless (2) such person shall, whether a member or nonmember of a contract market or derivatives transaction execution facility, treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer.**

Page 56

policies and procedures that describe the RMP – noting that <u>material changes to the RMP</u> had to be approved in writing by the governing body of the FCM and disclosed to the CFTC. [23]

281   The CFTC did not order or abrogate its rules under CFTC 21(k) and did not order or approve this conduct. NFA Rule 2-26, CFTC Reg 1.11 and NFA were not permitted to not conceal or permit conduct that concealed disclosures of the illegal and rogue risk department.

282   As Plaintiffs spoke to the CFTC in May 2018 to Ms. Frances Gonzales, the director of oversight of ADMIS's risk program (See 20-CV-3783 FAC, ECF15. Exhibit 5, ¶39-¶42) they confirmed they had no knowledge of any outsourcing of risk services by ADMIS to the former personnel of Vision, and its new affiliates HRHC, HRF, Boshnack. Rothman and Felag, and it was not in the RMP.

283   Therefore under CFTC Reg 1.11 no such oral-risk services was approved by the CFTC or CME, especially not approved any "arrangement", that allowed dissemination of CTA"s including Plaintiffs' account to Vision Risk Group, without their knowledge and consent, and was not in compliance with CFTC 1.11 or contained in the RMP.

284   NFA also knowingly failed to enforce compliance of CFTC Reg 1.11 (b) which requires by definition that included in the RMP is a definition of all "*business units*" to include any person, "*division*", group of personnel that extends credit in lieu of property to margin contracts, is defined as a business unit whether identified or not and included any personnel exercising direct supervisory authority on the performance of the  risk services. [24]

285   Notably, on Plaintiffs account, Lazzara, one of the *Vision brokers*, who was well aware of the illicit risk management program outsourcing to disbarred owners of Vision, referred to them as a "*business unit*" of ADMIS in his emails to Kumaran on September 29, 2017 when the scheme was uncovered, and also as a "*division of ADMIS*" in emails on January 31, 2017. *Business unit* and

---

[23] CFTC Reg1.11(c) Risk Management Program. (1) Each futures commission merchant shall establish, maintain, and enforce a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities of the futures commission merchant as such. For purposes of this section, such policies and procedures shall be referred to collectively as a "Risk Management Program."   (2) Each futures commission merchant shall maintain written policies and procedures that describe the Risk Management Program of the futures commission merchant. (3) The Risk Management Program and the written risk management policies and procedures, and any material changes thereto, shall be approved in writing by the governing body of the futures commission merchant.

[24] CFTC 1.11 (b) Definitions. For purposes of this section:  (a) (1) Business unit means any department, division, group, or personnel of a futures commission merchant or any of its affiliates, whether or not identified as such that:  (b) (i) Engages in soliciting or in accepting orders for the purchase or sale of any commodity interest and that, in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; or …(iii) Any personnel exercising direct supervisory authority of the performance of the activities described in paragraph (b)(1)(i) or (ii) of this section.

Page 57

*divisions* are defined terms under CFTC Reg 1.11 requiring disclosures on the RMP, and the requirement of enforcement of rules by the NFA thereunder under NFA 2-26.[25]

286   NFA, Kadlec and Conspirators also materially failed to enforce other Commission regulations as part of the overt acts to conceal the unauthorized, non-registrant participation, including other material provisions of the RMP under CFTC Reg 1.11. No such services would have been permitted.

287   Further disclosures were willfully not made. Under CFTC Reg 1.14 (a)(2) all affiliated persons that are Material Affiliated Persons were also required to be disclosed and approved to the CFTC, (including with organizational chart or personnel) which included Boshnack, Rothman and Felag. Under the legal relationship of the ADMIS agreements to have hundreds of *Vision broker* customer and trader accounts guaranteed by Vision's owners, individually, Rothman and Boshnack, Reg 1.14(a)(ii) ADMIS were significantly financially dependent on the Vision Risk Group, and vice versa. Under CFTC Reg 1.14 a(iii) ADMIS also relied exclusively on the operational support of the Vision Risk group, for its day-to-day risk service activities in connection with the ADMIS risk management and the financing of thousands of CTA accounts made ADMIS financially dependent on the Boshnack, Rothman and the Vision Risk Group. [26]

288   Therefore, under CFTC Reg 1.14 all of the operations and reliance on *Vision Risk Group* to handle and manage risk on daily basis and provide services had to be disclosed to the Commission, and were a required disclosure of Vision personnel as Material Affiliated Personnel. But because Vision had been disbarred as well as its affiliated persons, any such arrangement, for them to continue to act behind the scenes as a defacto FCM would have been denied or prohibited.

289   NFA and Kadlec (acting as CEO of ADMIS) continued to violate the mandatory requirements of CFTC 1.11-1.14 by permitting unqualified and grossly negligent personnel from Vision's Risk

---

[25] On September 29, 2017 Lazzara stated "there is nothing wrong with ADMIS outsourcing services to a "business unit". and also stating on or around January 31, 2017, "I work with a division of ADMIS that is heavily focused in managed futures", while knowingly and intentionally fraudulently concealed that he was working the former Vision Risk Group. Plaintiff also alleged in the related case, those statements were fraudulently concealing that Boshnack and Rothman and their affiliates, were not a "division" of ADMIS, but a legally separate and distinct entity, operating directly competing businesses without any corporate ownership by ADMIS.

[26] CFTC Reg 1.14(a) Material Affiliated Person shall involve consideration of all aspects of the activities of, and the relationship between, both entities, including without limitation, the following factors:  (i) The legal relationship between the futures commission merchant and the affiliated person;  (ii) The overall financing requirements of the futures commission merchant and the affiliated person, and the degree, if any, to which the futures commission merchant and the affiliated person are financially dependent on each other; (iii) The degree, if any, to which the futures commission merchant or its customers rely on the affiliated person for operational support or services in connection with the futures commission merchant's business; (iv) The level of market, credit or other risk present in the activities of the affiliated person; and (v) The extent to which the affiliated person has the authority or the ability to cause a withdrawal of capital from the futures commission merchant.

Page 58

Group, which ran the FCM ins such a manner that it was disbarred, and caused customer losses <u>of over $2 million</u> with multiple citations of failure to supervise in the risk group.

290   The failures to enforce by NFA and Kadlec also violated CFTC Reg 1.11(d), especially in light of the diabolical track record of Vision in causing customer losses, and their own evaluation in 2013 and 2014 that they were deemed "unfit" and "unqualified" to act or participate again handling customer funds as an FCM.

291   NFA were aware of Vision's extraordinarily disastrous background and failure to safeguard customer property and known material deficiencies in the outcome of its risk services, (including losses in 2011 BCC $500K and more losses in 2013 BCC of $2.1 million, NFA also had a duty to and were required under their registration duties to make sure that registration of Boshnack, Rothman, Felag and the Vision Risk Group "did not pose a threat" to other members.[27] (**See Att 2,3 5, and 6**)

292   The risk manager of Vision at the time was John Felag, and under the supervision of Howard Rothman and Robert Boshnack.  NFA specifically noted, Vision was laced with disciplinary actions, its compliance department was concerned with Vision's efforts to supervise its brokers, and the lack of adequate supervision led to flurries of five separate complaints against Vision brokers, for failure to supervise trading strategies, and deceptive sales and solicitations (Att 2¶7)

293    In each of the charges, Complaint charged *Vision Risk Group* were specifically alleged to have failed to diligently supervise or implemented adequate risk management in specifically <u>options trading strategies</u> – noting specifically the failures and  material inadequacies in <u>options trading</u> strategies. See Att 2 ¶12,¶15-¶18. Notably *Vision Risk Group's* inadequacies in delinquency in having appropriate procedures, management in <u>options trading causing</u> significant customer losses, for which Felag was so-called Vision Chief Risk Officer.

294   NFA was also responsible to enforce the rules, regulations, as required under the CEA, in its duties to re-register and permit former Associated Persons and supervisors (Boshnack, Rothman and Felag) of Vision Financial to remain registered.  Boshnack and Rothman were also under a heightened scrutiny and a higher standard, given that Boshnack and Rothman were AP's (Associated Person) and supervisors, of an entity that had caused significant customer losses and had been required to pay $2.1 million in customer restitution. (See Attachments 2, 3)

---

[27] NFA Bylaw 301 (e).(i))

Page 59

295   Any registration of persons who were formerly associated with disbarred or expelled entities, were required to undergo additional registration rigor and to ensure that they were not a cause of the expulsion and/or that they contributed to the expulsion by engaging in conduct inconsistent with NFA rules regarding the just and equitable principles of trade. *See* 7U.S.C.§21(b)(3), NFABylaw 301(a)(ii)(A)-(E).

296   Further, under the non-discretionary requirement of Bylaw 301(c) and (e), NFA failed to audit, investigate or remove the supervision powers of John Felag, as "Chief Risk Officer" of the Vision Risk Group, who had been at the helm of and caused significant customer losses over a long period of time during Vision Financial Markets negligent and inadequate protection of customer funds.

297   In fact NFA had already determined the opposite - that *Vision Risk Group* were deemed unqualified and unsuitable to handle customer monies on behalf of an FCM in August 20, 2014, thereby expelling and disbarring them permanently. *NFA Bylaw 301(e)* specifically required, a heightened due diligence by NFA ensure that their re-registration would pose no further threat to customers and market participants.

298   But NFA, in granting re-registration to Felag and HRF, with full knowledge they would be continuing these illicit services, failed to conduct any due-diligence on the qualification and capabilities of the risk group, or they would not continue to pose a threat to customers  (violating NFA Bylaw 301(e), and violating the non-discretionary rules of CFRC Reg 1.11(d).

299   Neither did NFA conduct any thorough fitness examination on the accuracy or compliance of the margin methodologies used by the Vision Risk Group, which were also documented as fabricated and a systemic risk to CTA's as they violated CME Span. NFA thereby failed to do any due-diligence whatsoever in permitting the unqualified and unfit Vision Risk Group, to simply change its name, and white-label itself behind ADMIS – now without the registration to do so.

300   As a result of NFA's knowing and willful violation of the registration rules NFA Byles 301(a)-(e) Plaintiffs have suffered significant harm and damages.

301   The CFTC has recognized the importance of accurate and risk management by setting forth a mandatory requirement that any persons in the risk management group must possess suitable skill and qualifications to provide the services on behalf of the FCM. CFTC Reg 1.11 (d) requiring the risk

Page 60

departments have "qualified personnel" and "sufficient authority" and "other resources to carry out the risk management program".  [28]

302   But as documented in related Vision Complaint the risk services being performed were replete with errors and omissions, were grossly inaccurate and were performed not in compliance with margin exchange rules. Incorporates by reference 20-CV-03871 Vision FAC ¶239, ¶261– demonstrates the errors and omissions. Vision has not defended or denied the systemic errors and omissions or violations of margin rules and gross negligence in calculations, thereby waiving their defense.

303   Further in violation of CFTC 1.11.(d) the disqualified *Vision Risk Group*, had insufficient electronic platforms for derivative risk, with systems that were later shown to be materially deficient in handling all strikes in options transactions, and violated numerous exchange rule in margin calculation including CME Span 980, 982, 930, 901, 984. These activities made their risk services, professionally negligent. Plaintiffs documented non-compliance margin errors of 200% of account value. [29] They were not even authorized  (being expelled as an FCM) to carry out duties on behalf of an FCM. Therefore not possessing the authorities of registration permitted as a requisite to even perform those functions. Vision Risk Group and its associated persons were no longer permitted to be an FCM. They could not hide behind a risk group, to continue to act as a silent FCM continuing to operate as an FCM would.

304   The entire risk program was unlawful, replete with errors and omissions, violated exchange compliance margin rules, on materially deficient platforms and it was fraudulently concealed, omitted from disclosure on the RMP and on CFTC 1.11 rendering the services unlawful.

305   The reason why qualifications and disclosures and compliance with CFTC regs and CEA for margining are so important, is that unregistered, unlawful participation in the risk group can cause significant harm and manipulation in the ability of transactions. As a simple example, it is illegal for an electrician to wire building under the building code in NYC unless they possess the requisite electrical licenses. If an unlicensed and illegal worker, subsequently, performs shoddy electrical wiring causes the building to catch fire there is significant harm and damage to the tenants.

---

[28] *CFTC 1.11(d) Risk management unit. As part of the Risk Management Program, each* <u>futures commission merchant</u> *shall establish and maintain a risk management unit with sufficient authority; qualified personnel; and financial, operational, and other resources to carry out the risk management program established pursuant to this section.*
[29] Vision have not denied or defended any of the margin calculations errors in their MTD thereby waiving their defenses.

Page 61

306   In this case the services were not qualified and not fit to be registered on the CFTC Reg 1.11. NFA's approval and failure to enforce numerous compliance laws to permit illegal, unqualified service providers, that had been disbarred for causing significant customer harm, posed a significant threat to traders, and in Plaintiffs case, the caused direct and proximate harm and damage.

9.(iii) 1.55 - NFA intentional violated CFTC 1.55 to conceal disclosure from CTAs and traders

307   Because the conduct was illegal, Defendants knew and intended to not enforce or comply with other compliance laws, including NFA 2-26/CFTC 1.55 and other mandatory disclosure laws to protect customers and CTA's. Defendants knew that if a CTA trader or customer found out that by virtue of opening account at ADMIS, the disbarred *Vision Risk Group*, would be acquiring access to their trade secrets, purloining or depleting their profits with unauthorized fees and other unlawful conduct such as extending margin and credit from an expelled unregistered risk group – they would simply have not opened their accounts or if they found out they would close their accounts.

308   The CFTC has also recognized the importance of the risk management services and conduct of FCM is material in the decision of a trader to entrust funds to an FCM. The CEA provides specific protections to customers and CTA's opening commodities futures accounts. The CEA was enacted to contravene these fraudulent acts. One of those protections that NFA has a ministerial and non-discretionary duty to enforce are those under NFA 2-26/CFTC Reg 1.55.

309   Under Reg 1.55, all FCM's and IB's are required to disclose to customer and traders prior to opening accounts, details of their risk management program expanding upon anything that would be misleading to entrust funds to an FCM. CFTC1.55 includes mandatory disclosure laws to provide to traders and customers, that required both the IB and FCM (meaning the *Vision brokers* and ADMIS) had non-discretionary duties to disclose all aspects of their risk program to CTA's prior to opening accounts. **CFTC Reg 1.55 (k) (11)** provides that the futures commission merchant shall provide material information that includes a summary of the futures commission merchant's <u>current risk practices, controls and procedures</u>; and **CFTC Reg. 1.55 (l)** provides that in addition to the foregoing, each futures commission merchant shall adopt policies and procedures reasonably designed to ensure that advertising and solicitation activities <u>by each such futures commission merchant and any introducing brokers associated with such futures commission merchant are not misleading to its FCM Customers</u> in connection with their decision to entrust funds to and otherwise do business with such futures commission merchant.

Page 62

310   Further protecting CTA's  and Plaintiffs from these market abuses, **CFTC Reg 1.55 (i)** requires disclosure to the CTA of all information about the business and operations of the FCM, (which would include the G&F Agreements and risk service arrangement) <u>that is necessary for full and fair disclosure…expanding upon such information as necessary to keep such disclosure from being</u> misleading, <u>whether through omission or otherwise</u>. Therefore Plaintiffs had an express right to know. Instead NFA conspired with Defendants to harm market participants like Plaintiffs and professional CTA's to keep these illegal arrangements not disclosed. [30]

311   Under NFA 2-26 has a mandatory non-discretionary duty to enforce those laws under CFTC Reg 1.55 to provide the necessary protections to CTA's and Plaintiffs who had a right to make an informed decision prior to entrusting funds, assets, property and monies to the FCM.

312   However Defendants and all Conspirators, NFA, Kadlec, Boshnack, Rothman, ADMIS and Felag, knew and intended, willfully, with scienter and fraudulent intent to keep the orally-agreed so-called risk services confidential and not provide the CTA's and customers the right to opt out. Because Defendants knew that *Vision Risk Group* was disbarred, and not permitted to be performing any so-called risk services  the conduct was illegal. Defendants had to partake in the fraud to not disclose the "arrangements" , as disclosing the arrangement would reveal the illegal operation, NFA therefore knowingly and intentionally partook in the fraudulent concealment. (*See* Section 12 below)

313   Further, Defendants also knew that the rogue risk services agreement did not comply with other material and mandatory provisions of the Commission rules under CFTC Reg 1.11-1.15 and were not approved under the participation and registration rules was being concealed in the RMP and all public disclosures. (See Supra)

314  Accordingly, because NFA failed to enforce the disclosures, likewise it knowingly and intentionally failed to enforce NFA 2-29, prohibiting the deceiving sales and solicitations by both ADMIS and the Vision brokers, to fraudulently conceal the Visions rogue participation. Because NFA failed to enforce NFA 2-29 Plaintiffs have incurred significant damage and harm as identified herein.

---

[30]  **CFTC Regulations 1.55 Part (i)** provides that  no futures commission merchant may enter into a customer account agreement or first accept funds from a customer, unless the futures commission merchant discloses to the customer all information about the futures commission merchant, <u>including its business, operations, risk profile, and affiliates, that would be material to the customer's decision to entrust such funds to and otherwise do business with the futures commission merchant and that is otherwise necessary for full and fair disclosure</u>. In connection with the disclosure of such information, the futures commission merchant shall provide material information about the topics described in paragraph (k) of this section, <u>expanding upon such information as necessary to keep such disclosure from being misleading, whether through omission or otherwise.</u>

Page 63

315   In addition, because the regulations and registration expressly forbade *Vision Risk Group* to step into the shows of an FCM, an extend margin on parties accounts, NFA could not disclose this arrangement to customer and traders, and therefore for fraudulent and illegal purpose they knowingly participated in the fraud to conceal the activities from the lawful disclosure required to protect traders under CFTC 1.55. NFA was required to enforce. (NFA 2-26/CFTC 1.11(b), 1.55)

316   NFA knew, that HRF, Felag, Boshnack and Rothman were acting in a manner not permitted by their expelled registration status – now only as an IB – to extend margin, credit and guarantee customer accounts without their consent and receive "trailing fees and commissions" and with scienter intended to conceal the foregoing from CTA's and customers.

317   Defendants therefore conspired with their Co-Conspirators to willfully and intentionally not enforce the mandatory and non-discretionary disclosure laws to CTA's and customers and to keep the oral risk services agreement fraudulently concealed from traders, and the withdrawal of fees concealed, so that the CTA's, customers and traders would not find out. To perpetuate the fraud so as not to deter customers from opening accounts at account opening – NFA knew and for fraudulent intent and illegal purpose, and at a minimum, participated in express violation of CFTC Reg 1.55 and other laws, NFA 2-26, NFA 2-29 and NFA 2-2, NFA2-3 ad NFA2-4to conceal the arrangements.

318   And so the "oral" arrangements were born, and effective November 1, 2014 the deals went into play. As a result, Plaintiffs would never have opened any accounts at ADMIS and have suffered substantial harm and damages accordingly.

## SECTION 10 - NFA Engages in Unfair Market Competition

### 10.(i)  - Statutory duty to protect registered traders

319   NFA has a special duty to protect its traders and CTA members. They are registered paying members, who paid hard-earned money and fees to the sole futures regulator to protect their interests, and advance their careers as <u>competitive</u> traders. NFA's specifically mandate under 7 USC 1 is to protect "innovation".. and to encourage fair market competition.

320   CTA's are arguably the primary innovators in the industry. Without CTA's there would be no new ideas of how to create profitable trading vehicles and to attract capital into the futures markets. Without attractive and competitive CTA trading programs, investors are not enticed to participate or invest capital into futures – especially the sanctity of newcomers.

Page 64

321   NFA has also has a special duty and a statutory obligation to ensure that one set of traders doesn't abide by a different non-uniform set of market participation rules than another.

322   NFA therefore has a special duty and a mandatory obligation to its registered CTA's to protect fair market participation in the unauthorized fees and rates charged to CTA's trading programs (noting CFTC 33.7 CFTC 1.55 and NFA 2-4, 9005 make it mandatory to disclose fees charged to CTA programs) and to ensure the confidentiality of their CTA trading strategies (noting the NFA acknowledge in NFA 2-4 9061 that that CTA' transaction records are trade secrets).

323   But the illegal Vision deal provided a wanton non-uniform set of market participation rules, that shifted the playing field in favor of Boshnack's new businesses – his HRHC CTA Referral business – and his soon to be formed Vision Investment Advisor a directly competing CTA, and intentionally harmed and depleted the profitability and success of his competing CTA's, many of whom were start-up CTA's just entering the business. This transfer of competitive advantage is expressly prohibited that NFA had a duty to protect.

324   The unfair competition worked in three (3) specific ways. One, Boshnack as described above could suppress the trading profits of his competitors at will – illegally adding unauthorized fees at any time – as high as 18% a year, any time a competing CTA, started to demonstrate profitable returns, and purloin and steal funds from the trading profits – also prohibited under NFA 2-3; [31] (2) Boshnack and HRHC unlawfully without the CTA's knowing, would acquire the real-time inner workings of all his competitors' CTA trade secrets and transaction records, to study, scrutinize and gain an unfair advantage, and then front run, replicate, modify, incorporate and use for profit their programs. He could also use, profit from and incorporate them into his own strategies – Boshnack and Kadlec were planning for them to register as competing CTA's and (3) a material part of the deal, was that Boshnack and HRHC, having discretionary authority on his competitors accounts could manipulate margin on their accounts and cause them to play outside of the exchange mandate rules of CME Span, forcing them to take losses. This again was illegal.

325   NFA and Kadlec knowingly failed to implement any safeguards or conflicts of interest in protecting CTA's from this illegal activity, instead knowingly participating in the fraud to transfer

---

[31] Plaintiffs have documented that midway through trading once their CTA program was priving to be profitable on April 25, 217, suddenly new unauthorized fees were added without consent on May 2, 2017 and monies stolen from the account in exces of $1235  to surpress trading profits by 3.4% every 45 days – or 18% a year. Defendants Vision do not

Page 65

the competitive advantage of start-up CTA's who fell victim to the scheme to benefit HRHC, Boshnack, VIA, and associates who were providing security "financing" to the future industry.

326  Further NFA failed to enforce the CEA, implement any safeguard or protections to CTA's, to ensure compliance with exchange rules in HRHC's rogue margin activity.

327  This in turn created direct pecuniary in unfair competition to create more favorable rules for the HRHC – while knowingly and intentionally depleting the competitive advantage of  new start-up CTA's. As a direct and proximate cause, Plaintiffs as CTA's have been substantially harmed.

10.(ii) NFA Fails to Enforce Compliance Laws in Unfair Margin Activity

328  Having approved the rogue oral-arrangement for Boshnack and *Vision Risk Group*, to act as defacto FCM risk managers, NFA then violated the fair market participation rules by permitting Boshnack and HRHC to have direct control on their competitors' margin. This again created a non-uniform playing field where CTA's who rely upon a uniform set of margining require the same set of CME Span rules applied to all traders equally.

329  CTA's and traders rely upon the equality of margin rules called "SPAN" among all market participants to create a levelized playing field of transactions. The mandatory rules of the CME and CFTC require, that all market participants that use leverage margin, are prescribed only with the rules, laws, regulations of the Act, and the Commission. It is unlawful, for an NFA member to charge or prescribe margin  in a manner unauthorized by the rules. 7 U.S.C. Code 2 (c) (v) (IV)[32]

330  Defendants  directly permitted Boshnack and HRHC to secure an unfair market advantage, by permitting them to use (and not disclose) an arbitrary and proprietary system called "*Margin Allowances*". Not only was their proprietary margin system illegal, it also circumvented the NFA requirements under which FCM's are supposed to collect margin calls. Further, under CFTC 1.55, 1.56(b)(3) and other regs, any margin system other than SPAN had to be disclosed – it was not.

331  All futures market participants  that engage in transactions of futures[33], in order for the market participation rules are "fair" and "equal" amongst between players, must abide by the same Margin rules of the CME under Span. Those rules are non-discretionary, and are governed without limitation

---

[32] It shall be unlawful for any futures commission merchant to, directly or indirectly, extend or maintain credit to or for, or collect margin from any customer on any security futures product unless such activities comply with the regulations prescribed pursuant to section 7(c)(2)(B) of the Securities Exchange Act of 1934 [15 U.S.C. 78g(c)(2)(B)]
[33] As defined under the CEA 1.(d) definition of futures includes futures and options.

Page 66

by CME 930, 980, 982, 984A, 901 The <u>non-discretionary</u> rules related to margining of futures accounts is also codified in the rules of the exchange CME defined by a methodology called SPAN.

332   The SPAN Margin Rules are non-discretionary, and any application of rules that deviate from CME Span are required to be disclosed to customers and CTA's prior to the account being opened. (NFA 2-26/CFTC 1.55/CFTC 33.7).

333   The reasons why the margin rules are so important, is that professional traders (CTA's) that compete for performance track records, the CEA requires that every one play by the same fair-play rules. Like the Deflategate scandal, where Brady's deflated football was alleged to be underweight to give a slight competitive advantage or in any a competitive sport, the rules of the game have to be applied fairly. In the commodities trading world, that fair uniform playing field is hard coded by the exchange to be calculated by CME SPAN  to prevent someone's margin being less or more expensive than an others.  If an FCM is to use a methodology other than SPAN it is a <u>mandatory rule</u> that it is disclosed to customers or traders prior to opening the account. (See CFTC 33.7, CFTC 1.11, 1.55)

334   For example, if all competitive traders are purchasing Apple Stock at $100 and the margin rules require that to purchase the stock, they must post margin of $30 – those are the fair market rules that everyone pays the same margin. If one market participant is then being required to post $90 or $150 of margin instead of $30, that makes their profitability a third or a fifth of their competitors which is a material consideration in how to choose an FCM. That is why under CFTC it is mandatory for an FCM and IB to disclose its margin requirements under CFTC Reg 1.55 so that CTA's can make an informed choice. If a CTA was to be charged $150 (instead of the CME Span) of $30, the ADMIS and Lazzara were required to fully disclose that upfront ***prior*** to opening the account.

335   By illegally outsourcing margin activity to Boshnack, Rothman and Felag, and NFA and Kadlec, knowingly, fraudulently and illegally permitted *Vision Risk Group*, with directly competing CTA activities, to <u>manipulate margin</u> outside of the CME Span rules, this in turn caused significant damages and shortfalls in their competing CTA's ability to transact in accordance with the rules.

336   By causing their competitor CTA's to play by a different set of market rules, which Boshnack and the Vision Risk Group dubbed  "*Margin Allowances*" [34] he could force his competitors to suffer

---

[34] There is no documentation or permission under the CEA for margin to be allocated in an ad-hoc arbitrary manner called Margin Allowances. Margin Allowances are something illegal that have no basis for calculation. In their Motion to Dismiss, Vision had not disputed their use of Margin Allowances, therefore waiving their defense. Vision were caught using an arbitrary system and inflating margin allowances of over $134,000 on a $25,000 account and this use of a non-disclosed proprietary margin system called Margin

Page 67

drawdown and losses unfairly create an advantage on how much margin and credit is on their accounts without compliance with the rules, and continue to bolster his own CTA referral services and his own CTA ambitions for Vision Investment Advisors, as a competing CTA.

337   The "*Margin Allowance*" system used is not in compliance with CME Span, is an arbitrary and ad-hoc system where Boshnack, Rothman, Felag, HRHC, HRF can "penalize" traders at their whim, without compliance with the CME Rules.  The "*Margin Allowance*" system set up by rogue bad-faith perpetrators Boshnack and Rothman, granted license to print and extend credit at will, cover-up and condone gross negligence and systemic errors and omissions in their risk management systems, with no rules, no documentation, no compliance and at-whim, add and subtract margin trading capabilities of his CTA's. As stated supra, HRHC did not have registration as an FCM to even conduct this activity, and there is no dispute on the systemic errors and omissions that were documented.

338   NFA was also obligated to enforce what it has codified an NFA Margin Handbook ( **See Exhibit 11).** This sets forth the rules and regulations that all NFA Members are required to comply with as part of enforcement of NFA Rules – as well as the compliance rules and laws. Without limitation Chapter 2 in the Margin Handbook sets forth the specific SPAN Rules that are mandatory to be complied with in calculation of margin. Chapter 4 Pg. 19 states A margin call will be considered current only to the extent that it represents a *bona fide* attempt to obtain funds.  Noting the also the obligation of the FCM and IB to collect funds and make a *bona fide* attempt  to, collect or call for margin on day trades. [35] Issuance of Margin Calls. Chapter 4, Pg. 12  also set forth clear requirements, that Firms may, but are not required to, collect or call for margin on day trades.

339   This discretionary authority on day-trading or intraday margin was material to the rogue and illegal activity conducted by the *Vision Risk Group*, because there is FCM discretion on the margin required (or not required) for day-trading. Plaintiffs for instance were instructed that ADMIS did not require "intraday margin" to be collected and it could transact up to a limit of $134,000.  The intraday trading window, then provided a window for Boshnack to inflate or deflate (like Deflategate) the

---

Allowances is illegal. Any proprietary margin system that deviates from CME Span is required to be disclosed to traders prior to selecting an FCM, and Margin Allowances were not disclosed in violation of CFTC Reg 33.7 and CFTC 1.55

[35] **NFA Margin Handbook Pg. 12** -  FCMs are required to make a bona fide attempt to collect required margin. (b) Firms must issue calls for margin that would bring an account up to the minimum initial margin requirement (1) when margin equity in an account initially falls below the minimum maintenance margin requirement and (2) subsequently when margin equity plus existing margin calls in an account is less than the minimum maintenance margin requirement. Thus, outstanding margin calls are treated similarly to margin equity in determining whether an incremental margin call is required. Required margin calls shall be made within one business day after the occurrence of the event giving rise to the call. FCMs are required to keep written records of all margin calls, whether made in writing or by telephone.

Page 68

amount of trading in his competitors account without abiding by the rules. Plaintiff documented illegal methods of *Margin Allowances*, not disclosed that artificially permitting intra-day trading of $134,000 and at whim, were removed by Boshnack, to cause significant and substantial damage to his competitor CTA's accounts.

340   NFA also failed to enforce the margin rules, for ADMIS and brokers to make any bona-fide attempt to collect margin, instead, since the outsourcing operation was illegal, the *Vision Risk Group* also, did not attempt to collect margin from customers.  This violated CFTC 1.56(b)(3).

341   Instead, Boshanck, unsupervised, would arbitrarily inflate or deflate margin, all such activities impermissible as neither HRF, Felag, Boshnack or Rothman were registered as an FCM and were not permitted to manipulate CTA's trading activity without their consent. In Plaintiffs case, Plaintiffs were never issued a margin call. Instead, the entire system of "*Margin Allowances*" permitted Boshnack to create an unlevel playing field – to make it prohibitive for his competition to execute and lock them out of their account, which caused substantial losses.

342   NFA and Kadlec's failure to enforce the margin rules, allowed the disbarred, rogue and unqualified Vision Risk Group to have the ability to extend credit or remove margin on traders accounts (without issuing a margin call) and was also an express violation of the exchange rules and expressly rules of conduct under the CEA. (See Supra)

343   This in turn, knowingly engaged in unfair trade and unfair competition.  NFA and Kadlec also violated and failed to enforce the rules, by not requiring <u>disclosing</u> the proprietary Margin Allowance system, prior to opening the account. CFTC 1.55(k) is explicit that ADMIS were required to disclose to CTA's their proprietary margin system, and all methods of risk calculation that deviate from SPAN. They did not. Instead they outsourced margin calculation to disbarred players and outsourced discretionary authority on when to add or remove margin using an adhoc system of Margin Allowances – which is illegal. No disclosures were provided..

344   NFA and Kadlec also failed to enforce, basic rules of participation in the exchange and in ADMIS FCM customer agreement, which without limitation it is expressly forbidden for FCM to outsource discretionary authority on the margin to third parties, it is expressly forbidden for the FCM to implement a margining policy that violates Exchange Rules, and it is expressly forbidden for the FCM (and/or its brokers) to not disclose those margining policies to customers prior to the account opening and  under CFTC 1.11 all elements of the RMP must be disclosed to the CFTC.

Page 69

345   Instead, the illegal, non-compliant risk services agreement also violated the non-discretionary and mandatory rules of the CEA and exchange rules, CME Rule 930, 980, 984, 982,  CFTC 1.11-1.15.  CFTC 1.55 and breach of CME rules, that was a condition of participating in the exchange.

346   As part of the unregulated risk services arrangement *Vision Risk Group*, were unlawfully (and without CTA's knowledge, consent or authorization) granted discretionary authority to manipulate their competitors CTA's <u>intraday</u> account margin, and overcharge their competitors margin of over the $30 required under the rules, and make up ad-hoc and arbitrary numbers such as $90 or $150 to cause significant unfair play in their competitors accounts. This conduct violates CEA. (See 7 USC.2(iv)(c))

347   Further, granting authorization to competitors, persons with directly competing interests, the discretionary authority and ability, who were not licensed to do so, to add/remove and extend credit and add margin on traders account was illegal. It was a primary violation of the CEA.

348   Boshnack and Vision in their anti-trust conduct engaged in deliberate unfair competition, and used this unregulated outsourcing of risk to create an even playing field to harm their CTA competitors, to deploy an unfair and un-levelized margin requirement called "*Margin Allowances*" on its competitors CTA's accounts, and cause significant financial losses in their account and unfair market participation.

349   NFA and Kadlec's conduct, was a willful violation of the exchange rules, expressly prohibited under the CEA, that gave Boshnack and HRHC, with directly competing interests in a CTA referral business, the ability to engage in direct market manipulation of the margin requirement on their competitors account, and direct tampering of margin to restrict fair market transactions.

10.(iii) Trade Secrets - NFA engaged in  unfair market participation in dissemination of trade secrets

350   Defendants also directly engaged in unfair market competition, by authorizing the dissemination of CTA's trading strategies to other NFA Members to their competitors without their consent. The dissemination of CTA trading accounts is also a violation of Federal law, and NFA's own non-discretionary Rules 2-4 9061. Under this rule NFA and Kadlec, acknowledged that a CTA's transaction history is a trade secret, and  knew they needed the written consent before disclosure to other NFA members.

351   As incorporated by reference in Vision 20-CV-3871 FAC ¶234-¶235, the real-time trade secret acquisition of a CTA's timing, execution, volumes, prices, strikes, triggers, and markets, especially

Page 70

in a trading strategy, which not only directly competes with HRHC trading affiliates and Vision Investment Advisors, is the highest level of trade secret misappropriation for traders. It allows its competitors, to misappropriate not just the transactions,  but the exact details, timing and execution. The foregoing Conspirators, not just improperly acquired access to the transaction history, but in willful, wanton, and malicious intent to dissect and acquire their competitors advantage, statements, were given a real-time access of trade secret misappropriation.

352   NFA's fundamental purpose under the CEA is  to "promote innovation" and "fair competition" in permitting traders to engage in fair market participation under a uniform  set of rules. the case of "fair competition .. of market participants" and violation in compliance with the Act. **36**

353   Defendants knew this access was not permitted, and violated Federal laws, and unfairly depleted a CTA's competitive advantage and instead, knowingly permitted it to transpire, thereby intentionally transferring the innovation and competing idea of CTA's to HRHC,  Boshnack, VIA and his affiliates "competitive" and in anti-trust and direct violation of the CEA 7 USC 1 – to promote fair competition.

354   Since the trade secrets, trading strategies, and other proprietary information were disseminated to and utilized in Stamford, Connecticut, and other branch offices across the U.S., their actions violated the Defend Trade Secrets Act which provides for a federal, private, civil cause of action for trade-secret misappropriation in which "[a]n owner of a trade secret that is misappropriated may bring a civil action, if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. §§ 1831 *et seq*.  It also constitutes a predicate act for a RICO violation.

355   Each and every dissemination of a traders transaction records across interstate lines (as included here in Exhibit 9) was an illegal act by NFA and Kadlec and those compliance officers who were involved and approved it, which commenced in or around November 2014 and continues to present date.  Each and every unlawful charging of fees, and withdrawal of CTA's funds and property and theft from their account was also illegal – and transferred, also formed  a pattern of RICO activity which commenced in or around November 2014 and continues to present date. Exhibit 23 attached, is a detailed list of unlawful predicate acts that occurred on Plaintiffs account.

---

36 **7 U.S. C. 1, § 5** states the CEA's purpose is **to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation** and **fair competition** among boards of trade, other markets and **market participants**.

Page 71

356   The unlawful "arrangement" did not just contravene the CEA, it also violated Federal and State laws including the DTSA. HRHC their other its owners, employees, and affiliates now had acquired by fraudulent concealment access to their competitor CTA's (including Plaintiffs') confidential and financial trading data on a real-time basis, to study and monitor its trading patterns in direct violation of the Commodities Exchange Act and Defend Trade Secrets Act Across interstate lines.

357   Defendants willfully and for fraudulent and illegal purpose, had motivation to participate in the scheme, as HRHC, Rothman and Boshnack, were "bankers" to the illegal scheme, and  knowingly transferring the competitive advantage of start-up CTA's to HRHC, Rothman and Boshnack, their funding and credit lines were more secure. This conduct secured an unfair commercial benefit to Boshnack and HRHC, using start-up competing CTA's as collateral damage to be victims of the scheme, to knowingly and intentional deplete their economic trade secrets advantage, to propagate an unfair monopoly and control to Boshnack, HRHC and VIA whom they relied on for "banking".

358   Defendants knowingly, willfully and for fraudulent and illegal purpose, (and at a minimum gross negligence) failed to enforce the NFA compliance violations for NFA Members Felag and HRHC owners, affiliates to obtain a CTA's trading records without their consent and permission; violated and failed to enforce, NFA2-4 9061, and to abide by Federal Laws, under the Defend Trade Secrets Act. As a result, Plaintiffs have been significantly damaged as indicated in Section 25 herein.

### *SECTION 11 - NFA's CONDUCT WAS  ILLEGAL*

359     After agreeing to Boshnack and HRHC's new terms to set up a an "orally- arranged" risk services agreement, that would be shielded from the compliance laws and disclosures as described in Section 9 and 10 supra, NFA then proceeded with the unlawful registration of Boshnack and Rothman, to allow these known bad actors, once again become "registered" market participants.

360   On paper, their registration capacity was now solely as IB's, rendering any of their participation for undocumented risk-services on behalf of an FCM prohibited.

361   On or around November 28, 2014, listed on BASIC, both Robert Boshnack and Howard Rothman obtained their re-registration as Associated Persons, solely in an IB capacity with HRF.

362   In spite of the extraordinary warning signs of bad faith, dishonest, and bad faith conduct (see Attachment 1), NFA failed to conduct any further due diligence or fitness testing on Boshnack, Rothman or their new affiliates, on whether they would continue to pose a threat to other market participants thereby in bad faith failing to enforce and violating NFA Bylaws 301(a)-(e).

Page 72

363   In their reregistration on November 28, 2014, it was with full knowledge in allowing the undocumented, oral-risk-service arrangements were to proceed and therefore NFA's re-registration was bad faith, for unlawful for improper purpose and prohibited. The conduct was not just a failure to enforce or comply with the rules but expressly violated the lawful conduct of the CEA for improper purpose. NFA knew that HRHC, Boshnack, Rothman would engage in acts that knowingly violated exchange rules, and these activities would not be disclosed or consented to by traders, that were outside of the permissible duties of an IB, and as stated in Section 9 and 10, and would directly cause an unfair market place competition.

364   The Commodities Exchange Act does not just impose an obligation on NFA to just enforce the rules, regulations, bylaws and other requirements, it also has specific rules, that if violated, define specified conduct that is expressly deemed <u>unlawful.</u>   (7 U.S.C.§13 and 7 U.S.C.§ 6). For example, without limitation conduct that is deemed unlawful in the commodities futures markets, prohibits purloining and stealing monies from a traders account in anywhere over $100.  (*See* 7 U.S.C § 13(a)))

365   NFA's mandate only permits them to operate with <u>legal and proper purpose</u>, governed by strict rules of compliance under the CEA and CFTC order. NFA is only permitted to collect fees and revenues and permit market participation from <u>legal activity</u>.

366   Plaintiff allegations of wrongdoing are not just failure to enforce as negligence or gross negligence, but that Defendants, knowingly engaged in conduct that the CEA itself prescribes as illegal. CEA rules make it illegal to set up any group of commodities futures trading accounts, that would be exempt from various disclosure and consent laws and operate outside of margin rules.

11.(i) NFA's participation to withdraw monies without consent was unlawful

367   The arrangement, as described supra, involved customers, and CTA's paying Vision on a "trailing fees and commissions" basis, without consent and disclosure However to be legal, it is <u>mandatory </u>those fees and commissions are disclosed to customers and CTA's prior to opening the accounts, and consent is granted. (See NFA 2-26, NFA2-29, CFTC 1.55, 1.57 and 33.7 NFA2-4 9005)

368   Defendants knowledge and participation in the withdrawal of monies from customers and CTA's accounts, without their consent and purloin profits is further defined as illegal under the Commodities Exchange Act. (*See  7 U.S. Code § 13(a)* making it unlawful for example, for any person to steal, purloin any money or property having a value in excess of $100, or accruing to such customer

Page 73

as a result of trades or contracts in the business of such person) [37]. No consent was granted by Plaintiffs or customers for this activity.

369    Therefore without seeking the consent and disclosing the "trailing fees and commission" to customers and CTA's, starting in November 2014 and until present date, Defendants knowingly participated in illegal conduct, including by way of their multiple audits to rubber stamp, the bulk withdrawals of monies from traders' accounts, which converted the money, property and assets in their accounts for payments to Boshnack and his affiliates.

370    The Defendants' approval of Boshnack and his affiliates market participation was also illegal as defined by numerous other statutes of the Commission..

371    Other monies were also stolen from Plaintiffs' accounts (*See* **Exhibit 9**), racking up almost daily unauthorized  fees. Each withdrawal of money for Boshnack each of which was approved and audited by Defendants constituted approval of illegal withdrawals from Plaintiffs account, amounts which exceeded $1000. [38] 7 U.S.C 13(a) makes it a felony to steal any amount over $100.

372    The total amounts stolen to pay Boshnack and his affiliates exceeded $1,000. Under New York State law, if the value of the property or services stolen exceeds $1,000.. the offense is grand larceny in the fourth degree, a class E felony under New York law. (N.Y. Penal Law § 155.30.)

373    The total amount of unauthorized monies being withdrawn or purloined without customers' knowledge, consent and authorization from the scheme, is estimated to exceed $10 million a year, and now exceeds a total of $60 million. The fees to Vision are not being consented or disclosed to customers and Defendants are knowingly participating in the scheme to not disclose. (See Supra).

374    The illegal activities to purloin monies also depleted Plaintiffs' CTA performance by 3.4% over 45 days (18% a year) and caused significant reconciliation issues and only after the purloining of monies from greater than $1,000. Vision have not disputed in their MTD the purloining of fees and

---

[37] 17 USC 13 (a) It shall be a felony .. for (1) Any person registered or required to be registered under this chapter, or any employee or agent thereof, to embezzle, steal, purloin, or with criminal intent convert to such person's use or to the use of another, any money, securities, or property having a value in excess of $100, which was received by such person or any employee or agent thereof to margin, guarantee, or secure the trades or contracts of any customer or accruing to such customer as a result of such trades or contracts or which otherwise was received from any customer, client, or pool participant in connection with the business of such person. The word "value" as used in this paragraph means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

  17 USC 13  (a) It shall be a felony .. for (5) Any person willfully to violate any other provision of this chapter, or any rule or regulation thereunder, the violation of which is made unlawful or the observance of which is required under the terms of this chapter

[38] Vision Defendants and Villa in their MTD, do not deny or defend the unauthorized withdrawals of over $1000, or trade processing fees and transaction fees, or depletion of CTA performance by 3.4% , thereby waiving their defense.

Page 74

overcharges. As a result, Plaintiffs account entered into transaction issues and exchange-violations margin computations from *Vision Risk Group*, to eventually purge Plaintiffs transactional ability.

375   It is also <u>unlawful</u> for Defendants to allow the Conspirators to treat Plaintiffs' (or customers') monies in any manner other money as not belonging to the customer. 7.U.S.Code  §  6d (a)(2).[39] This too is expressly defined under the CEA as unlawful conduct.

376   Defendants didn't just participate in unlawful conduct, they violate their own rules in unauthorized withdrawal of monies, NFA 2-3 and NFA 2-4 9005, where they had, themselves, deemed it a compliance violation to not disclose fees prior to an account violation, stating any type of "deceit" is a compliance violation.

377   Moreover the CEA is also clear on what conduct constitutes unlawful. Defendants conduct, to <u>willfully</u> violate NFA 2-3, NFA 2-4 9005, CFTC 1.55, CFTC 33.7 and all other laws and ¶**Violations** cited hereunder also constitutes unlawful conduct under 7 U.S.C. 13(a)(5).[40]

378   Each and every willful and intentional violation of the rules that the NFA, Kadlec, Wahls and Kiela participated in, including but not limited to CFTC 1.11-1.14, CFTC 1.55, CFTC 1.57, CFTC 33.7, NFA 2-29, NFA 2-26, NFA 2-4 (and all its interpretive notices), including NFA 2-4 9091 prohibiting the disclosure of trade secrets of CTAs was also unlawful under 7 U.S.C. 13(a)(5)..

379   As alleged herein, the intentional purpose of the scheme, was essentially an unregulated slush fund, of the assets, funds and property of subprime *Vision brokers* accounts from which the Conspirators, could finance their activities, and withdraw unauthorized fees and unlawfully convert the trading strategies, deplete CTA performance, purloin trading profits, to pay the interest of Boshnack's and HRHC's credit.  In addition, this in turn this gave HRHC and affiliates an unfair competitive advantage for their competing CTA referral business.

11.(ii) NFA's registration and failure to disclose risk services was unlawful

380   Further, NFA's illegal conduct, expressly violated the registration laws of the CEA, which they are required to enforce which market participants are permitted to perform which market functions.

---

[39] 7.U.S.Code § 6d (a)(2)  Futures commission merchant registration requirements; duties of merchants in handling customer receipts. It shall be unlawful for any person to be a futures commission merchant unless (2) such person shall, whether a member or nonmember of a contract market or derivatives transaction execution facility, treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer.

[40] 7.U.S.C. 13.(a)(5) – making it unlawful for any person to willfully violate any other provision of this chapter, or any rule or regulation thereunder, the violation of which is made unlawful or the observance of which is required under the terms of this chapter

Page 75

381  It is black-letter law therefore under the CEA, that only an FCM, (and not an IB) can extend and maintain margin and credit, and guarantee trades on behalf of a customer. *See* NFA 2-26 / 17 CFR 1.57 (c) and 7 USC 2 (c.)(v)(IV) and which prohibited Vision, its owners, affiliates and employees from directly or indirectly extending, or maintaining credit to or for, or collecting margin on Kumaran's account. It also prohibited them from having discretion on Kumaran's account, as well as power of attorney to handle margin calls.[41] Yet Boshnack, Rothman, HRF and Felag were registered only as IB's.

382  Since Boshnack, Felag, Rothman, Vision and affiliates had been permanently expelled as an FCM, it was unlawful for them to be associated with an FCM, or acting as a business unit or division of an FCM and their status disqualified. Their association "behind-the-scenes" of ADMIS to continue providing functions solely and exclusively for FCM's was illegal. (See 7 U.S. Code § 6k (1), (5)).[42]

383  It is also unlawful for an FCM to extend margin or credit that is not in compliance with the laws of the Commission and CME Span Margin.  Since *Vision Risk Group* were permanently disqualified it was unlawful for them to be handling margin, and using unorthodox "*Margin Allowances*" and debilitating CTA's margin outside of CME Span Rules, and they were disqualified from acting in a margin capacity.. Defendants authorization and signature on documents that approved the activities

---

[41] CFTC Reg 1.57 (c) An introducing broker may not accept any money, securities or property (or extend credit in lieu thereof) to margin, guarantee or secure any trades or contracts of customers, or any money, securities or property accruing as a result of such trades or contracts:

[42] 7 U.S. Code § 6k (1) – unlawful to be associated (1)  It shall be unlawful for any person to be associated with a futures commission merchant as a partner, officer, or employee, or to be associated with an introducing broker as a partner, officer, employee, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation or acceptance of customers' orders (other than in a clerical capacity) or (ii) the supervision of any person or persons so engaged, unless such person is registered with the Commission under this chapter as an associated person of such futures commission merchant or of such introducing broker and such registration shall not have expired, been suspended (and the period of suspension has not expired), or been revoked. It shall be unlawful for a futures commission merchant or introducing broker to permit such a person to become or remain associated with the futures commission merchant or introducing broker in any such capacity if such futures commission merchant or introducing broker knew or should have known that such person was not so registered or that such registration had expired, been suspended (and the period of suspension has not expired), or been revoked. Any individual who is registered as a floor broker, futures commission merchant, or introducing broker (and such registration is not suspended or revoked) need not also register under this paragraph.

7 U.S. Code § 6k (5)  It shall be unlawful for any registrant to permit a person to become or remain an associated person of such registrant, if the registrant knew or should have known of facts regarding such associated person that are set forth as statutory disqualifications in section 12a(2) of this title, unless such registrant has notified the Commission of such facts and the Commission has determined that such person should be registered or temporarily licensed.

Page 76

expressly did not comply with the regulations and were illegal. *See*  7 U.S. Code § 2 (c)(v) (IV); 15 U.S. Code § 78g - (2) (A) (B).[43]

384   Any registration under the Act of an FCM must also comply with 7.U.S.Code § 6d(a)(1) and (2) -  making it unlawful for Boshnack, Rothman, Felag, and HRF – without registration, who were expelled – to continue to act on behalf of ADMIS, without disclosing their activities, and without the proper registration as an FCM.   Market participants, permanently revoked from ever handling customer moneys or extending margin  as FCM's, and only registered now as an IB, were expressly prohibited from guaranteeing and extending margin on Plaintiffs' accounts.   The CEA deems this activity <u>unlawful.</u> [44]  NFA's approval of Vision Risk Groups' margin activities, which were not disclosed to the CFTC were therefore also unlawful.

385   Further concealing *Vision Risk Groups'* margin activities and its true role as a hidden FCM within ADMIS, performing a same duties it did before as Vision Financial Markets, was an unlawful act on its registration to be granted status as an IB.

386   Defendants' conduct was also unlawful, to authorize the owners, employees and Associated Persons, of a permanently disbarred *Vision Risk Group*, who were deemed permanently unfit and not qualified to operate as an FCM, to then step into the shoes of another FCM, as a risk group, hide behind them, and perform essentially the same services, extending margin and credit for customers, and receiving trailing fees and commission on customers – which are <u>only permissible</u> as registrants that are FCM's, in violation of the CEA. The registration of Boshnack, Felag, Rothman, HRF and HRHC violated the registration requirements and disclosures of Act.

---

[43]**7 U.S. Code § 2 - Jurisdiction of Commission;  (c.) (v) . (IV)** <u>It shall be unlawful for any futures commission merchant to, directly or indirectly, extend or maintain credit to or for, or collect margin from any customer on any security futures product unless such activities comply with the regulations prescribed pursuant to section 7(c)(2)(B) of the Securities Exchange Act of 1934</u> **[15 U.S.C. 78(c)(2)(B)]**
 **15 U.S. Code § 78g - (2) Margin regulations (A)**  Compliance with margin rules required: It shall be unlawful for any broker, dealer, or **member of a national securities exchange** to, **directly or indirectly, extend or maintain credit to or for, or collect margin from any customer on, any security futures product unless such activities comply with the regulations.**
**15 U.S. Code § 78g - (2) Margin Regulations (B)**  requires that the margin requirements for a security future product be consistent with the margin requirements for comparable option contracts traded on any exchange registered pursuant to section 78f(a) of this title ; and (II) initial and maintenance margin levels for a security **future product not be lower than the lowest level of margin**, exclusive of premium, required for any comparable option contract traded on any exchange registered pursuant to section 78f(a) of this title, other than an option on a security future;

[44]  7.U.S.Code § 6d (a)(1)Futures commission merchant registration requirements; duties of merchants in handling customer receipts. It shall be unlawful for any <u>person</u> to be a <u>futures commission merchant</u> unless— **(1)  such person shall have registered, under this chapter, with the Commission as such futures commission merchant and such registration shall not have expired nor been suspended nor revoked;** and7.U.S.Code § 6d (a)(2)  Futures commission merchant registration requirements; duties of merchants in handling customer receipts. **It shall be unlawful for any person to be a futures commission merchant unless (2) such person shall, whether a member or nonmember of a contract market or derivatives transaction execution facility, treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer.**

Page 77

387   Since the *Vision Risk Group*, were disbarred, expelled an only registered as an IB, their activities were also illegal under their title of registration participants as IB's and also fraudulently concealed and omitted on their applications to CFTC.   Therefore their registration was also unlawful.

388   FCM's  and IB's also have strict requirements for the operations of the risk management group, as well as mandatory disclosures to customers about their risk management policies (CFTC 1.55). The risk management qualifications are also without limitation set forth in CFTC 1.11-1.14, and CME 982, 980, 932, 930, 984 as well as rights to collect margin are also carefully defined.

389   The conduct to have third parties, convey margin calls or have discretionary authority on margin call was also illegal. NFA Margin Handbook and NFA Financial Handbook Section 7, mandated that Lazzara and ADMIS, issue margin calls directly to customers, and not to Robert Boshnack, an arrangement which to a material failure to enforce exchange compliance laws in Performance Bond margin and failure to issue margin calls under CME 980, CME 982, 930, 984, 901

11.(iii) NFA's re-registration was unlawful as defined under the CEA

390   Also the CEA defines as illegal making known omissions on their registration application. NFA, Kadlec, and the Conspirators, knowingly and willfully made false statements, omitted material facts, on both VIA and HRF and their associated persons registration applications, and did not disclose on their registration that a material part of their market participation activities would be to handle margin and continue to operate a risk management group, outsourced, accessing their competitor CTA's and customers' confidential business records (without consent), and performing "margin" handling, extending credit on behalf of customers" and other functions they were expelled and disbarred for.

391   The conduct was further illegal, since in order to grant registration to the Vision team, as an IB, they were required by law, to disclose these activities on their registration applications to act, (on paper), solely as an IB.   Failure to disclose these material facts, constitute a willful and knowing breach of the CEA, and their application for renewed membership was therefore unlawful and contained material fraudulent omissions and fraud, deceit and trickery, rendering their renewed registration void and illegal. *See* 7 USC 13 (a)(3) and (4) [45]

---

[45] 17 USC 13(a)(3) Unlawful – False and misleading in registration Any person knowingly to make, or cause to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement required under this chapter, or by any registered entity or registered futures association in connection with an application for membership or participation therein or to become associated with a member thereof, which statement was false or misleading with respect to any material fact, or knowingly to omit any material fact required to be stated therein or necessary to make the statements therein not misleading.

Page 78

392   In other words, hiding behind the name ADMIS, Boshnack and his affiliates, continued to operate as a shadow FCM, extending margin and credit for customers, and collecting trailing fees and commissions on a per trade basis from their accounts, although they were expressly not permitted as a registrant to act ever again as an FCM. The *Vision Risk Group*, essentially the same personnel and the same offices, staff, computers and negligence, continued to act as the FCM-in-fact, the de-facto FCM, fraudulently concealed from customers and traders, CTA's opening accounts at ADMIS.

393   Defendants violated 7 USC 13 (a)(3)(4)(5) by not disclosing in their application for registrations as both IB, and also VIA's application for registration as a CTA, the "oral-arrangement". In not disclosing these material facts, the registration applications willfully and knowingly concealed the material conflicts of interest, that Boshnack and its owners, employees and affiliates, market participation would involve (i) full transparency into all the confidential and proprietary trading accounts and business data and trade secrets, of the customers (including their competitor CTA"s), without the consent, knowledge or authorization of the CTA; (ii) the discretionary authority and ability to add and extend credit, in his discretion, to traders accounts, and/or determine the risk threshold on traders accounts (without customer authorization); (iii) the ability to place traders and/or liquidate accounts (without customer authorization); (iv) the discretionary authority to add or remove buying power, or extend margin (without customer authorization); and; (v) to take other actions he deemed fit, in their sole discretion, on the Vision broker traders accounts(without customer authorization) – essentially operating behind the scenes as an FCM.

394   Defendants willful failure to disclose these material facts, constitute a willful and knowing breach of the CEA, and their application for renewed membership was therefore unlawful and contained material fraudulent omissions and fraud, deceit and trickery, rendering their renewed registration void and illegal. *See* 7 USC 13 (a)(3) and (4) [46]

---

17 USC 13(a)(4) Any person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, swap data repository, or futures association designated or registered under this chapter acting in furtherance of its official duties under this chapter.

[46] 17 USC 13(a)(3) Unlawful – False and misleading in registration Any person knowingly to make, or cause to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement required under this chapter, or by any registered entity or registered futures association in connection with an application for membership or participation therein or to become associated with a member thereof, which statement was false or misleading with respect to any material fact, or knowingly to omit any material fact required to be stated therein or necessary to make the statements therein not misleading.

17 USC 13(a)(4) Any person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, swap data repository, or futures association designated or registered under this chapter acting in furtherance of its official duties under this chapter.

Page 79

395   NFA and Kadlec also violated the registration requirement of their own Bylaws 301(a)-(e.) and failed to conduct any due diligence, or failed to do a thorough fitness examination on the Vision Risk Group to determine if they would pose an ongoing threat to customers, specifically in light of the fact that they had been permanently disqualified them as "unfit" to be an FCM. This also is in the registration of Vision Investment Advisors. NFA's and Kadlec's violation of the registration requirements, was for illegal, fraudulent and improper purpose as stated herein and violated 7 USC 13(a).

396   As stated supra, when NFA, without order from the Commission, granted the registration in November 2014 of Boshanck, Rothman, Felag and HRF as IB's, NFA and Kadlec, had full knowledge that as a condition of their registration, they would continue to operate *Vision Risk Group*, behind the scenes, as an FCM. As indicated above, NFA and Kadlec, knowingly and intentionally failed to disclose these activities under CFTC 1.11-1.14 thereby willfully not complying with the express laws to disclose the activities on the RMP. Defendants and Co-Conspirators then willfully did not comply with CFTC 1.55 to make mandatory disclosures of the activities to CTA's and customers – which NFA and Kadlec also intentionally did not do. To intentionally violate CFTC 1.55 and CFTC 1.11 also is unlawful under 7 USC 13(5) (*See* Section 9 Supra).  Such conduct constitutes fraud.

11.(iv) NFA's and Kadlec's participation to disseminate trade secrets was unlawful

397   Finally the acts to disseminate CTA's trade secrets across interstate lines to their competitors was also illegal not just under the laws of the CEA, but also under Federal and State laws. The disclosure of trade secrets and the dissemination of traders and CTA's trade secrets to other NFA members, especially and including those with directly  competing activities is prohibited under NFA's own rules. Any willful violation of NFA 2-4 9061 is also unlawful under 7 USC 13(5).

398   All of the foregoing activities were <u>without the consent, knowledge or authorization of the customer or CTA, expressly violated the CEA,</u>  and were intentionally <u>not </u>to be disclosed to customers and CTA's, and none of these actions were with the customers, traders or CTA's authorization. They were all fraudulently concealed, so that the disbarred Vision Risk Group could hide their true market participation.

399   Boshnack and his affiliates an market participation to acquire his competitors trade secrets for use in interstate commerce without their authorization was also unlawful and protected under 18 U.S.C 1831 el seq, making it unlawful to without authorization, using deception to obtain that

Page 80

information..   and <u>without authorization</u> .. copy, download, upload, transmit, deliver, send, communicate or convey such information.. or otherwise obtain or convert such information.

400   Plaintiffs never authorized dissemination of its trade secrets for the economic benefit of Boshnack et al and such dissemination has caused significant harm and injury to the owner. [47]

401   Defendants conduct to  disseminate CTA's trade secrets, was not just illegal under the 7 USC 13 (a), but also under Federal and State laws, 18 U.S.C. 1831 for upholding economic advantage to professional traders and CTA's, who derive substantial economic advantage for keeping those trade secrets confidential and under no circumstances be disclosed to their competitors. Each act of dissemination also serves as a predicate pattern of unlawful activity under the IRCO 1962(c). statutes.

402   NFA's and Defendants conduct was illegal, enshrouded in fraud, improper and was not for any proper regulatory purpose, that exceeds their mandatory and statutory obligations.

403   Defendants motives were also for illegal and for improper purpose and knowingly and intentionally to participate in create an unlawful subset of accounts – that would operate outside of the purview of the Commission and also knowingly, fraudulent and wantonly concealing the activity that from market participants and traders that fell into the fraudulent scheme – so as to perpetuate the fraud.

### *SECTION 12 -   NFA'S CONDUCT WAS FRAUDULENT*

404   NFA conduct also perpetuated fraudulent conduct and by participating with Conspirators to not disclose and deceive traders, they also violated the anti-fraud provisions 7 USC 6(b) which makes it unlawful (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; and (C)  willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person;

---

[47] 18 U.S. Code § 1832. Theft of trade secrets  (a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly— (1) _steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information; (2) _without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information; (3) _receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

Page 81

405  NFA rules also enforce high standards of ethical conduct and morals in the dealings between members, and required that no NFA 2-2 (a) Cheat, defraud or deceive, or attempt to cheat, defraud or deceive, any commodity futures or swap customer or counterparty; and NFA 2-4 (a) Members and Associates shall observe high standards of commercial honor and just and equitable principles of trade in the conduct of their commodity futures business and swaps business.

406  However, in this scheme, it was known and intended, that Vision brokers, (including Lazzara) and ADMIS, would knowingly and fraudulently conceal, and deceive CTA's (including Plaintiffs).

407  NFA's key role in the scheme and to perpetuate the fraud, was to knowingly and intentionally not enforce the compliance anti-fraud, disclosure and consent laws, so that the Vision brokers and ADMIS, could skirt their compliance obligations, and continue to rake in unauthorized fees and commissions to pay off the credit lines, and perpetuate the hundreds of millions of credit lines .

408  If not for NFA's participation in the fraud to conceal the *Vision Risk Group,* to conceal the "trailing fees and commission", to conceal the dissemination of trade secret, to conceal the margin activity which violated CME Span, and the other tortious conduct, such as purloining profits from CTA accounts, the scheme could not have continued.

409  Starting November 2014 and until present date, and up to when Plaintiffs opened their accounts in January 2017, Defendants knowingly and overtly acted, by failing to enforce the compliance laws, and not updating their disclosures on their websites and NFA Basic (See Section 16 below), and permitted the fraud and deceit to continue, permitting ADMIS and the Vision brokers, to not seek consents from customers and CTA's, and not disclose the behind-the-scenes activities.

410  Therefore as a direct and proximate result of Defendants acts to conceal the fraud, and their own fraudulent omissions and statements on its websites, and NFA BASIC, and failure to enforce the fraud laws on its Conspirators, Plaintiffs suffered direct and proximate harm

411  Defendants participation in this scheme, and all conduct alleged herein was both illegal and constituted fraudulent activity.

412  Plaintiffs and other customers, not just before, but even during the life of its trading accounts, were deceived, lied to, mislead, and made numerous false statements related to their risk and margining on their futures transactions, which directly contravene the market participation rules of the CEA (See 20-CV-3871, Vision ¶240-¶282)

Page 82

413   If these "arrangements" were so legal  and above board – why all the secrecy? Why not just explain who was managing risk and how they were doing it – as they are required to do under CFTC 1.55 But the communications were deliberately deceiving and violated 7 USC 6(b), and the NFA knew and permitted such deceiving and fraudulent concealment, in communications to registered CTA's inquiring about risks on their programs. (See FAC Vision ¶240-¶282)

414   Boshnack et al, instead, were operating a rogue, FCM risk group, outside of their permanently revoked registration capacity, to extend margin, place individual guarantees and credit lines on customers, withdraw trailing commission and fees, all without customers' knowledge and consent as well as access their confidential trading accounts, (including their competitors' CTA records), and deploying unfair margin  as discussed in Section 11. The activity was illegal, and therefore all Defendants and Conspirators, worked together to keep the activities fraudulently concealed, of substantial harm and economic damages to Plaintiffs.

415   Under Section 22 of the CEA, a registered futures association and its compliance officers who aid and abets in fraudulent conduct, are also, liable to the traders who are directly harmed by the conduct.

### *SECTION 13 - THE SCHEME TAKES HOLD, NFA PARTAKES IN FRAUD*

416   Starting in November 2014, Defendants NFA and Kadlec, together with the Conspirators had agreed upon the three (3) agreements that would govern their arrangement going forward. The Settlement Agreement, upon which NFA were paid $1.5 Million dollars to permit Boshnack and Rothman to restructure their business to be owned by HRHC and remain in the business, a Guarantee and Fee Agreement dated August 31, 2014 (ECF31), and on November 1, 2014, and to ink the deal for Boshnack, Rothman and HRHC to wear the risk of guarantee the brokers, and orally arranged risk services agreement, that as discussed supra, was impermissible..

417   As the Vision brokers, began their transfer on or around November 1, 2014 they were sent a "welcome packet" by ADMIS, that disclosed to them that John Felag and HRF would still remain their risk contact. Therefore all *Vision brokers* including Lazzara had material and actual knowledge that risk management services were being provided by High Ridge, a fact that needed to be disclosed to customers and CTA's under CFTC 1.55(k)-(i) See Supra.

418   It was the express statutory duty of NFA to enforce that all participation agreements by Boshnack and his team after being disbarred complied with the CEA. NFA were required by law, to

Page 83

conduct mandatory audits and supervision on the conduct of participation starting November 1, 2014 and going forward,  on a frequent basis.

419   However, the opposite occurred. To perpetuate the activities not going detected,

420   In order to perpetuate the fraud and illegal activities on a continuing basis, NFA needed at least two compliance officers who would operate the scheme on behalf of the NFA, and remain responsible to rubber-stamp audits and authorize the conduct of the Conspirators.

421   NFA has publicly disclosed that its audits are typically handled by at least two persons, one field-level auditor and a more senior level supervisor who remains at NFA offices and oversees the audit.[48] Unlike their usual pattern of assigning random or interchanging auditors NFA, specifically appointed mostly one auditor, Defendant Nicole Wahls, to be the dedicated field auditor on High Ridge and its affiliates and associated persons, including the *Vision Risk Group* activities after the entity was permanently disbarred.

422   Wahls was hired to the NFA in or around June 2011 and within only three years, she became responsible for the entire audits of the transfer and reregistration of a disbarred entity Vision, Boshnack, Rothman, Felag and its new entities High Ridge, who had 172 CFTC Reparations cases brought against them. NFA, did not substitute or replace Wahls, from being the field auditor on all of Boshnack, Rothman, Felag and High Ridge audits, starting from November 2014 when the oral risk services arrangements were approved. Wahls may have also been the auditor prior during Vision's FCM existence starting from or around 2012, so she was familiar with Visions' affairs and the bulk transfer of accounts to ADMIS.

423   After the Peregrine debacle, in which customers lost over $200 million due to fraud that missed by the NFA, scrutiny went into the NFA audit process. Independent investigations of NFA's audits (hereto attached and incorporated by reference ECF29, Exhibit 5) noted that auditors with very little experience were quickly promoted to positions of senior responsibility. Employees with less than four-six weeks experience begin their first onsite audits and many were given significant responsibilities including in records, registration and financial testing during their first year or early in their career at NFA.

---

[48] *See ECF29 Exhibit 5 Pg.18,22*

Page 84

424   External review of the NFA audit process, therein revealed that NFA auditors are frequently promoted to field supervisor within two years from the time the first join NFA right of college and few of them promoted to "senior manager" only one year later. (*See* ECF 29 Exhibit 5, *Pg.* 26-27)[49]

425   Several auditors indicated that the lack of experience resulted in a "check the box" mentality, with others admitting, the NFA audits were "essentially a paper exercise"  (ECF 29, Pg 27-28) [50]

426   In 2009 NFA implemented an enhanced risk management program to identify high-risk Member firms admitting they "rank the Members" based on the their risk profile; and includes reference to investigations, audits, registration records, arbitration filings and disciplinary history. Factors auditors are required to consider are, for instance, number of investigative matters and the number of customer complaint, including for instance prior expulsion. (*See* ECF 29-5, Pg17 , Pg D-2)[51]

427   Under normal circumstances, given Boshnack, Rothman, Felag and Vision's serious disciplinary track record, NFA by its own admission of its audit procedures ordinarily, would have flagged High Ridge as a "high-risk" member firm, and Wahls was required to give heightened scrutiny in its risk-based audit approach, on which it bases history of disciplinary actions, customer complaints, number of investigative matters.

428   However, upon information and belief, instead of "investigative" audits, or ones designed to look at the unique specifics of the deals, such as the G&F Agreements, Wahls, followed the "check-the-box" audits on the NFA's generic modules for IB's that were just "general" audits. These general

---

[49] EC29.5 Pg 26-27 - An auditor on the 2009 audit of PFG (who began working at NFA in January 2007) began his first audit four or five weeks after he started with NFA.143 Several others auditors similarly reported beginning their first audits after between four and six weeks of being at NFA although the audit team also included supervisors who were reviewing their work product.144 The investigation further revealed that the manner in which the audits were structured gave significant responsibility to junior auditors within the first year (or early in their career) at NFA. NFA employees who had just graduated from college were hired in the position of staff auditor I. This position was responsible for conducting modules such as net capital, cash activity, records and registration, and conducting financial testing.145 While they worked on teams with more experienced auditors, the investigation found that some of the auditors who supervised the staff auditors were relatively inexperienced themselves. We found that some NFA auditors were promoted to the position of field supervisor146 within two years from the time they joined NFA right out of college.147 A few of these auditors were then promoted to senior manager only one year later.

[50] Several auditors indicated that the lack of experience resulted in a "check the box" mentality, particularly, when utilizing the modules. One stated explicitly that NFA needed more people "who can look beyond the audit module as just a checklist." Another acknowledged that staff level auditors often "really don't know the big picture" and there were times where the supervisor or manager was "not as helpful as they could be." (Pg-27) A third auditor said, "I think when you are only hiring people directly out of college and the only thing people know is what they're trained on, you're definitely limited." Another former auditor said the focus when she was at the NFA was on "minutia" and the audits were "essentially a paper exercise." (ECF 29, Pg 27-28)

[51] ECF 29.5 - Pg. 17 While conducting its audits, NFA auditors utilize a risk-based audit approach based on various factors including the number of accounts; number of Associated Persons ("AP") and background of personnel; lack [or frequency] of an audit; the number of investigative matters (i.e., customer complaints); promotional materials used; amount of funds under management; and the types of investments.7

Page 85

audits, for instance, do not have modules catered towards the types of customized oral and "banking" arrangements that NFA had agreed to.

429   NFA's "general" audits are supposed to follow about 18 Pre-Set modules.(See ECF 29.5 Pg C-2).   None of which were changed to reflect the bespoke G&F Agreement, the legalities and compliance thereof, or the undocumented oral risk services agreements.

### 13.(i) Wahls starts audits

430   But given NFA's knowledge and awareness of the rogue and impermissible participation – the relatively new Wahls with only a few year's experience, failed to implement any rigor in their audits, specifically in disclosures, consents, compliance with the G&F Agreements, margin, and affiliates, as well as the mandatory disclosure laws for customers and traders to consent.

431   In each and every audit starting around November 1, 2014, NFA and Wahls, fully knowing about the illegal conduct alleged, with  negligence, gross negligence, and with fraudulent and illegal conduct above, failed to enforce the compliance laws. NFA and Wahls signature on the audits was material to perpetuating the scheme. It gave the Conspirators a green-light to continue to not disclose, to perpetuate the compliance violations and to willfully not seek the customers and traders consent in the unlawful activity above, and perpetuate the activity.

432   Wahls, was instrumental in signing the documents that approved and authorized the rogue risk services agreements (which violated CFTC 1.11) and not once in her audits did Wahls enforce disclosure on the RMP, or investigate or enforce disclosures to the customer and traders, or that traders, for instance had knowledge or agreed to the "trailing fees and commission" or knew about the rogue risk services as is mandatory under NFA 2-26 (*See* Supra Section 9 and 10)

433   Further Wahls did not enforce the mandatory requirement that CTA's transaction records could not be disclosed without their written authorization. (NFA2-4, Int 9065)

434   During the multiple audits conducted between November 1, 2014 and January 30, 2017,  Wahls and NFA signed documents approving the orally-arrangement risk services (that were illegally not disclosed in the RMP under CFTC 1.11) and with fraudulent and illegal purpose, intentionally failed to enforce without limitation CFTC1.11, 1.55 & 1.57 that required disclosure to the traders.

435   With full knowledge, that *Vision Risk Group* were even not permitted to be acting as an FCM, an had been expelled for mishandling  customer funds, Wahls, Kadlec and NFA continued to approve and "rubber stamp" the "rogue" risk services, that they knew had been disclosed or approved by the

Page 86

Commission and violated the registration participation. Vision in their MTD has admitted there were multiple audits approving the conduct.

436   Despite knowing the risk services were impermissible and needed to be documented under RMP. NFA, Kadlec and Wahls, then willfully failed to enforce or audit the Margin compliance laws or enforce that the services that were being performed in fact complied with exchange rules, or the sharing of trade secrets of CTA's had received the CTA's consent as required under NFA 2-4 9061.

437   Despite the extraordinary past disciplinary conduct and negligence in *Vision Risk Group* to handle customer moneys and extraordinary losses they caused to be disbarred, NFA and Wahls failed to audit or enforce that any of the so-called risk services were being conducted in compliance with NFA's own Margin Handbook or Margin audit procedures. NFA has dedicated audit modules called "Margin" which are designed to enforce that margin is being calculated in accordance with SPAN, and the margin calls and procedures by the exchange are being made. (See ECF 29.5, Pg. C-2).[52]

438   NFA knew the materially concealed risk services, could cause substantial harm to CTA's accounts, that Vision were deemed unfit to handle margin with their license revoked, but Wahls failed to enforce compliance in the so called "Margin Allowances" that were being used to perilously manipulate their account, and were replete with errors and omissions.

439   Without limitation NFA's and Wahls willful and intentional failure to audit and enforce CFTC Reg 1.11 and the failure to require and enforce the material disclosure of High Ridge Future risk services to traders as required under CFTC 1.55, their quality, accuracy, and compliance with the non-discretionary margin rules, CME 980, 930, 982, 984, 901 and as well as disclosures of CFTC 1.55, 1.57 and CFTC 33.7 which posed significant threat to customers was gross negligence, given *Vision Risk Groups'* prior expulsion from the industry and customer losses of over $2.1 million dollar.

440   Customers, traders and Plaintiff had statutory rights to these disclosures prior to opening their accounts, NFA's bad faith failure to enforce these rules caused Plaintiff significant damages and harm as documented in Section 25 herein.

---

[52] **Margins, ECF 29,5 Pg. C-2 -**The CFTC and SEC have set minimum initial and maintenance margin levels for securities futures at 20% of the current market value of the positions. "Current market value" means the daily settlement price of the security future. The Margins module tests firm's margin systems to ensure proper capital charges are taken and procedures to ensure margin calls are made in a timely fashion. Auditors ensure that the firm's margin requirements are at least as high as Standard Portfolio Analysis of Risk Performance ("SPAN") requirements, margin calls are being made daily, proper firm procedures for under margined accounts exist, and that the firm is collecting the appropriate deposits for foreign currency and options

Page 87

441   NFA and Wahl's approval of illegal outsourced risk services, (not order or approved under Reg 1.11) with unqualified personnel, resulted in grossly negligent and unqualified services, material errors and omissions, and exchange rule violations, materially deficient electronic platforms, and other express violations of NFA's own Margin Handbook, with errors of upwards of 500% of account value, and violating all mandatory margin provisions of the CEA posing a significant threat to customers. It also permitted an illegal Margin Allowance. (*See* Vision FAC. ¶275)

442   Defendants had a mandatory non-discretionary duty to enforce the FCM's rules of the CEA, NFA and CFTC and the CFTC Regs 1.11, 1.55, 1.57 and other laws of the exchange, and under NFA 2-26 to implement a risk management program, with qualified personnel and properly disclosed to the regulator and customers and traders. (Not shrouded in fraud and secrecy). Those exchange rules included were but not limited to compliance with the intraday margin requirements of performance bond, CME 980, 930, 982, 984, 901 as well as the requirements to have electronic platforms capable of monitoring risk and markets on an intra-day basis.

443   NFA Auditors are required prior to audit to take a comprehensive review of all factors, in an audit. Therefore Wahls knew of the G&F Agreements, and their particular compliance requirements. It was Wahls and her supervisors job to enforce all the ¶Violations, and do the necessary due diligence on all the laws that were being violated NFA and Wahls failure to enforce these laws, has caused direct and proximate harm to Plaintiffs.

444   In each and every audit between November 2014 until she resigned in 2020, Wahls, together with the oversight of Kadlec and NFA, also failed to enforce or audit compliance in the Modules called "Affiliates" or in the dissemination of CTA trade secrets to its competitors, and HRHC' numerous CTA Referral affiliates or prop trading arms. Defendants did not conduct any compliance on protecting CTA's trading strategies, and failed to audit once the use and disclosure of their trade secrets in affiliates HRHC or VIA.  Instead, knowing it was expressly prohibited to disclose CTA's transactions and trading accounts to Vision Risk Group, without their written authorization, and with a statutory obligation to protect CTA's trade secrets,  Defendants, flagrantly and intentionally wantonly violated their own rules, because disseminating trade secrets was needed to perpetuate the illegal and fraudulent scheme – with a gross disregard for CTA's rights.

445   Defendants continued to sign documents authorizing the dissemination of CTA"s transaction records, without their knowledge and consent, to other NFA Members, including the disbarred Vision

Page 88

Risk Group, knowingly and intentionally violated NFA 2-4, 9061. The conduct was negligence, gross negligence and for illegal and fraudulent purpose.

446  These failures have caused direct and proximate harm to Plaintiffs in NFA's wrongful and illegal authorization of conduct impermissible under the rules of fair market competition.

447  Wahls was part of the compliance team for NFA, together with NFA and had a non-discretionary and statutory duty to enforce compliance laws with NFA rules and CEA with Vision, its owners, employees and affiliates.

448  ADMIS has admitted that Wahls was also "routinely familiar" with the "bulk transfer" of accounts from VFM, including the G&F Agreements, and the mandatory disclosures and consents from customers, traders and CTA's. Wahls therefore had a statutory obligation to protect "new" customers and "new" traders and CTA's, including Plaintiffs. Wahls was entrusted to enforce Compliance with the laws, rules, regulations and compliance therein.

449  In each and every audit, NFA and Wahls <u>knew</u> that the customer and traders, especially the "new" customers and "new" traders, including Plaintiffs, (who had opened accounts with *Vision brokers* <u>after</u> November 2014 and therefore had no knowledge of Vision after they were disbarred), had <u>not</u> received the mandatory disclosures and/or consented to the "trailing fees and commission", yet Wahls approved the bulk transfer of monies from their accounts to compensate Boshnack for his credit lines, without their knowledge, consent or authorization. Vision in their MTD have admitted that NFA had full knowledge of the conduct.

450  NFA and Wahls also knew that new customers and new CTA's had their confidential and trade secrets and accounts disseminated to Vision and their directly competing CTA Referral business and VIA (without their knowledge, consent and approval, specifically NFA 2-4 9061). But again they knowingly, willfully violated their own rules, on a repeated basis.

451  Yet in willful in deliberate violation of NFA 2-4 9001, CFTC 33.7, CFTC 1.55 and numerous other compliance laws ¶**Violations**, NFA, Kiela and Wahls (with knowledge of Kadlec), "rubber-stamped" the audits, performed "check-the-box" audits, to intentionally violate the compliance laws and permitted HRF, Boshnack, Rothman, Felag and Vision to withdraw the bulk transfers of monies, improperly acquire their competitors CTA's trading strategies, implement rogue margin activities, not comply with CME Span, penalize their competitor traders with unauthorized fees midway through

Page 89

trading, and continue a non-disclosed rogue operation that exceeded their registration abilities, and created an unfair market competition by harm CTA's and misappropriating their accounts.

452   Conspirators have stated that Wahls was a key person, who's signatures on audits proved NFA's knowledge and complicit approval of the illegal conduct, was "routinely familiar" with the operations of Vision affiliates, since Visions' reregistration in September 2014, and intended to call Wahls as a key "defense" witness for the allegations therein. Therefore Wahls role to rubber stamp the audits was a material part in facilitating the illegalities which caused serious harm, destruction and damages to other CTA's.

453   It was a necessary part to effectuate the scheme NFA, Kadlec, and a few chosen auditors and compliance officers, Wahls and Kiela who were parties to the scheme to defraud and not enforce the mandatory disclosure and non-discretionary consent laws required to be gotten from the customer and traders. NFA, Wahls, Kiela's and Kadlec's role in overseeing the fraud and failure to obtain the customer and CTA's consent was material part of the scheme to pay for the Boshnack Guarantees.

454   During each and every audit conducted between November 2014 until January 2017, Defendants knew and intended that customer and traders were not to be given disclosures, and knew and intended to fraudulently conceal the rogue services, misappropriation, thereby with intention, participating in the fraud.

455   As a direct and proximate result of Defendants, willful and intentional failure to enforce the compliance laws, Plaintiffs would not have been fraudulently induced into opening an account at ADMIS, and have suffered substantial damages and harm thereunder.

13.(ii) ADMIS audits

456   In addition NFA is required to audit FCM's such as ADMIS every 15 months, (*See* ECF 29.5)). Therefore between August 31, 2014 when the G&F Agreement was signed and January 2017 when Plaintiffs opened its account, NFA was also required to audit and enforce the compliance laws on ADMIS and conducted audits at least twice. It is unknown the names of the auditors.

457   In each audit, NFA its compliance officers who oversaw the audits, and Kadlec (acting in a dual role) willfully and intentionally, in the same manner as above, for fraudulent and illegal purpose, failed to enforce the disclosure laws and consents from CTA's and customers, and other laws as described in detailed herein, including withdrawal of fees, and fraudulent sales, solicitations and promotions to induce customers to open accounts at ADMIS, while hiding Vision. See ¶**Violations**

Page 90

458   Of note in the G&F Agreement, ADMIS in Section ¶2.5, had agreed to be responsible for NFA 2-29 and sales and promotional activities that did not mislead or deceive customers and traders opening accounts at ADMIS after November 2014. But NFA, Kadlec and its compliance officers, wilfully and intentionally to perpetuate the scheme, during the period November 1, 2014 until present date failed to enforce these compliance laws listed below ¶**Violations**)

459   As a result of the wilful and bad faith failure, Plaintiffs have incurred substantial economic harm and damage described in Section 25 herein.

### 13.(iii) IB Audits

460   Likewise introducing brokers, IB's, including *Vision brokers* are required by statute to incur NFA audits every three (3) years.

461   Examinations are a delegated <u>non-discretionary</u> function by the CFTA to be performed by NFA in its function as DSRO to ascertain members' compliance with CFTC reg 17 CFR 1.52(c).  CFTC's delegated authority for over three (3) years, since their transfer from Vision. Therefore NFA had also violated the non-discretionary 17 CFR 1.52(c). (iv) (B) in failing to enact their compliance and examination audit to supervise Vision IB's, thereby also causing direct harm to Plaintiffs.

462   At the time of Lazzara audit, since the G&F Agreements were in place in 2014,  NFA had failed to conduct one minimum audit on Lazzara and was not in compliance with its obligations to enforce compliance laws and protect customers and to protect the CTA from harm, including Plaintiffs.

463   Kiela was the second compliance officer fully aware of and knowledgeable of the scheme, who audited Trey Lazzara and upon belief other *Vision broker* audits. It is not known if Kiela was also the supervisor on Nicole Wahls audits. Kiela was one of the two compliance auditors who were instrumental in not enforcing the laws, to protect customers, traders, CTA's and Plaintiffs.

### 13.(iv) Collective audit Violations

464   NFA, Kiela, Wahls, Kadlec and other compliance officers involved in the foregoing multiple audits, between November 1, 2014 and until present date, knowingly and with both negligence and gross negligence, as well as for fraudulent and illegal purpose, willfully  failed to enforce the Commodities Exchange Act, NFA and CFTC Compliance Laws to perpetuate the scheme, including but not limited to the following <u>non-discretionary</u> rules, herein after called "**Violations**";

   (i)  NFA 2-26 including CFTC 1.11, CFTC 1.55, CFTC 1.57, and CFTC 33.7 – non-discretionary rules - which required Lazzara and ADMIS, disclose customers, *all* its risk management policies and procedures, *prior* to opening the account; (CFTC 1.55 (k) ..disclosures about risk policies prior to a customer entrusting funds to an FCM were prerequisite and CFTC 1.55.(l)

Page 91

    .. expanding upon such information as necessary to keep such disclosure from being misleading whether through omission or otherwise, CFTC 1.55.(i).. business, operations, risk profile, and affiliates, that would be material to the customer's decision to entrust such funds to and otherwise do business with the futures commission merchant and that is otherwise necessary for full and fair disclosure...;

(ii) NFA 2-4 Int Not 9061 makes it a non-discretionary and mandatory NFA Compliance violation for NFA Members Felag, HRC, and Vision owners, affiliates to obtain or seek to obtain a CTA's trading records and trade secrets without their permission;.

(iii) NFA 2-4 Int Not 9005 and NFA Rule 2-26 / CFTC Part 33.(7) which has a non-discretionary mandatory requirement that Lazzara and ADMIS disclose all the costs and fees, transaction fees and trade processing fees (being deducted from Plaintiffs accounts and reducing Kumaran's CTA record to pay Vision) prior to the account being open, and that any arrangement that is likely to deceive customers is a violation of NFA Requirement;

(iv) NFA 2-3 which has a non-discretionary, mandatory requirement that prohibited Vision to share, directly or indirectly, in the profits or losses accruing from commodity interest trading in any account of a customer carried by the Member, or another Member, unless the customer's prior written authorization is therefore obtained;

(v) NFA 2-14 which has a non-discretionary and mandatory requirement that prohibited all NFA Members who fail to comply with any NFA requirement to be subject to disciplinary action or responsibility action or both

(vi) NFA 2-2 which makes it a non-discretionary mandatory NFA Compliance Rule violation to in any manner deceive, cheat or defraud another NFA member or commodities futures customer; In addition NFA is prohibited to aid and abet in fraud and knowingly engage in fraud, which expressly prohibits the unlawful violation of the anti-fraud provisions of the CEA 7 USC 6(b)(2); NFA's failed to enforce and aided-and-abetted in violation of NFA 2-2 and NFA 7 USC 6(b)(2);

(vii) NFA 2-29 which prohibits the fraudulent sales and telephonic sales and marketing communications by ADMIS, and a network of Vision IB's, including Lazzara; and NFA Bylaw 801 which prohibited solicitations from unregistered AP's Julie Villa. NFA 2-29(a)(1) also prohibits conduct that operates as a fraud or deceit; and solicitation to open futures accounts that conceal material facts. It also prohibits solicitations by unregistered AP's;

(viii) 15 USC 78(g), 1.56(b)(3), NFA Margin Handbook and NFA Financial Handbook Section 7, which are non-discretionary and mandated that Lazzara and ADMIS, issue margin calls directly to customers, and not to Boshnack and Rothman an arrangement which to a material failure to enforce exchange compliance laws in Performance Bond margin and failure to issue margin calls under CME 980, CME 930, CME 982, and making it unlawful for Robert Boshnack and Howard Rothman, an arrangement which to a material failure to enforce exchange compliance laws in Performance Bond margin and failure to issue margin calls under CME 980, CME 982.

(ix) NFA 2-26 / 17 CFR 1.57 and 7 USC 2 (c.)(v)(IV), CFTC 1.11 and 7 U.S. C.§ 2 (c)(v) .(IV) 15 U.S. Code § 78g - (2) (A),(2) (B), NFA 2-26  17 CFR § 1.57 (c.), 17 CFR § 1.55 Part (k); and which prohibited strangers, Vision, its owners, affiliates and employees from directly or indirectly extending, or maintaining credit to or for, or collecting margin on Kumaran's account. It also prohibited them from having discretion on Plaintiff's account, as well as power of attorney to handle margin calls;

(x) 7 USC 2 (c.)(v)(IV), CFTC 1.11 and 7 U.S. C.§ 2 (c)(v) .(IV) 15 U.S. Code § 78g - (2) (A),(2) (B using an unorthodox and unregulated method of "Margin Allowances" which is prohibited by the exchange, not documents, violates CME Span, and is required to be disclosed to traders;

Page 92

(xi) CEA privacy laws, CFTC Privacy laws, 17 CFR 160 unlawful and unauthorized dissemination of customers and CTA's personal financial data, social security numbers, net worth, financial balances, names, addresses, emails, telephone numbers and other personal and confidential information in violation of CEA; NFA are obligated to abide by mandatory CEA requirements to maintain privacy of customer information. NFA's failed to enforce or aiding-and-abetting in violation of CEA Privacy Laws;

(xii) CEA. 7 U.S.C. § 6b (2).  NFA has a non-discretionary obligation to enforce the claims of fraud and aiding and abetting in fraud. Plaintiffs' fraud and aiding and abetting fraud claims under CEA § 4b, 7 U.S.C. § 6b, absolute immunity for claims that invoke fraud under the Commodities Exchange Act and exchanges can be held accountable for breaching their statutory duties to enforce their own rules..... by futures traders who can prove injury from these violations

(xiii) Other laws, rules, regulations and bylaws listed in this Complaint including 7 USC 13 and 7 USC 6 which determines unlawful conduct as described in Section 11 and 12 above,

465   Defendants failure to enforce the rules in this action was bad faith. Bad faith for the failure to enforce non-discretionary rules (rules that are a statutory and mandatory requirement) under the exchange rules of Commission or rules of the NFA, are considered bad faith if NFA failure was met by the standard of mere negligence.

466   Defendants conduct above and violation of the non-discretionary rules, at a minimum rose to the standard of negligence and in many cases was gross negligence. Gross negligence invoked a lack of standard of care, that fell far beyond and outside the duties of reasonable care, and constituted a wanton, reckless and willful disregard of customers, traders, and Plaintiffs' property, assets, funds and proprietary information.

467   All the non-discretionary laws and **Violations** herein under Section 22, Defendants willfully and with knowledge, failed to enforce the rules, regulations, bylaws, required under the CEA,  with both the minimum standard of negligence as well as gross negligence. However, Plaintiffs have also alleged Defendants actions went far beyond negligence and as alleged herein also were additional for illegal and fraudulent purpose and ulterior motive, for which they have no immunity.  (See Section 11, 12, NFA's conduct was illegal and fraudulent).

468   The illegal and fraudulent conduct, for which Defendants have no immunity, has and continues to cause ongoing unfair competitive advantage to HRCH and VIA, and included the shuttering of Boshnacks' competitors CTA, and NRCM's business, and as itemized in the damages Section 25 herein, for which State Law claims are preserved. In all cases, Defendants conduct was bad faith and caused direct and proximate harm to Plaintiffs as outlined herein, including losses in Plaintiffs accounts and other overcharges and fees.

Page 93

13.(v) Wahls 2019 Audit continues to propagate harm

469  . Since the conduct had been occurring since November 2014, in what is believed to Wahls' fourth or fifth audit it was learned that on or around January 15, 2019 until February 9, 2019 Wahls and NFA conducted another "general" audit of HRF, Boshnack, Rothman, Felag and their affiliates. (At the time Wahls name was not identified and referred to as Jane Doe 2). Plaintiffs uncovered these facts on or around April 6, 2019, which alerted Plaintiffs to the conflicts of interest in NFA.

470  By the time of Wahls 2019 audit NFA, had already received written complaints in 2017 and 2018, from Kumaran and NRCM as a CTA's, including allegations of fraud, failure to disclose, misappropriation of funds, illegal margin activity and improper dissemination of trade secrets and other **Violations**. But as alleged above, NFA already knew the conduct was continuing and was in fact a material part of enacting the scheme.

471  Plaintiffs have subsequently learned, that even after its CTA complaints, logged reporting fraud and non-disclosure, NFA and Wahls continued to take no action to enforce the compliance laws, thereby perpetuating the scheme. Plaintiffs have alleged that while moved into Arbitration, Defendants intended that in the Arbitration, no further consequence could come of Plaintiffs legitimate compliance violations, and Defendants had no intention of enforcing the compliance laws, rules and regulations that were its statutory obligation, and no intention of stopping the scheme which up this date had generated an estimated to be up to a billion dollars of illicit fees.

472  On or around April 6, 2019, Plaintiff learned specifically that Wahls, NFA and other supervisors also conducted an onsite audit and compliance examination of HRF during the period after Plaintiffs' complaints were logged in 2017 and 2018, which took place on or around January 15 2019 until around February 7 2019 in Connecticut. It was at this time, that Plaintiffs first learned of NFA's complicit awareness and participation in  the scheme, as well as conflicts of interest.

473  As part of Wahls pre-audit work, NFA, Wahls and Kiela were required to review customer complaints as well as the firm's log of complaints, arbitration records and in its internal databases, as well as apply its "red flags" protocols when traders are reporting fraudulent activity. NFA audits and internal systems, are supposed to be designed to alert staff of suspicious activity and "red flags" when customers report fraud. (*See* ECF 29.5 Pg D-2) By the time of the 2019 audit Plaintiffs had documented significant breaches, including in emails listing the Violations.

Page 94

474   In or around September 2017 Plaintiffs had logged complaints both to the NFA Hotline, as well as to other compliance officers, and in arbitration filings, documenting that unauthorized fees were purloined from its account, and CTA's records were disseminated without consent, and other gross negligence, errors and omission in the margin calculations – as well as violations of privacy data. The complaints were specific, that in breach of the G&F Agreements that NFA were required to enforce, no consents or disclosures were being sought by ADMIS, Vision brokers or HRF.

475   At no time did NFA contact Plaintiffs to investigate or respond to Plaintiffs complaints. NFA knew that Plaintiffs were registered NFA Members as CTA's, that they had a special duty and statutory duty to protect and enforce the rules.

476   Since Plaintiffs had specifically reported "*fraud*" and "*non-disclosure*" on known perpetrators, Boshnack, Rothman, according to NFA's own training manuals and Fraud Auditing presentations, this would have triggered "red flags". Reports show NFA auditors were required to use a heightened set of audits – and NFA auditors are trained in manuals that include "Fraud Auditing for NFA Staff, Participant Guide, Page on Red Flag, Fraud Auditing,. Fraud Auditing presentation." Among other specific fraud training manuals, the Fraud Auditing presentation identifies the main elements of fraud, such as "a misrepresentation of a fact," and "intent to deceive." (*See* ECF 29.5 Pg.29)

477   However, despite the on-paper presentations to supposedly train auditors in fraud, independent investigations into NFA's failed audits also documented that auditors recalled giving a "brown-bag" lunch presentation after Madoff and others recalled informal meetings where either Madoff or MF Global  were discussed, but they noted that there were no changes to any modules as a result of the lessons learned from those scandals. (*See* ECF 29.5 Pg. 33)

478   NFA had documented over 172 CFTC Reparations cases against Boshnack, Rothman and Vision, who were expelled, majority of which cited predatory conduct against other members and customers, including  "*misrepresentation*", "*non-disclosure*" and "*unauthorized trading*" – and other misconduct. (See Att. 1)  Defendants had a statutory obligation and a special duty to ensure that conduct that invokes fraud, misrepresentation and non-disclosure, did not occur, to protect its new registered members, CTA's and traders including Plaintiffs, to stop disbarred affiliates Boshnack, Rothman and their affiliates from being a threat to others, in the re-registration of expelled members

479   But now again in 2017 and 2018 were more documented complaints, and arbitration, citing "misrepresentation", fraud" and failure to disclose and grant consents, by the same perpetrators,

Page 95

480  Defendants, instead of enforcing the compliance laws, with willful and illegal intent, instead, proceeded to cover-up and continue the actions, as this time, they were parties to the scheme, reliant on the Boshnack's funding and perpetuating the scheme for other unlawfuly and fraudulent purpose.

481  By this time, it is estimated that Boshnack, Rothman and HRHC's guarantees had secured potentially as high as a billion dollars of futures revenues, through unauthorized fees and the Conspirators and Defendants had already agreed that the Class-D *Vision brokers* accounts would serve as collateral damage, from which monies would be purloined, trading strategies disseminated, and the monies to pay for the credit lines.

482  Defendants therefore had no intention of enforcing its laws, regulations, rules. bylaws and duties. Plaintiffs complaints were being sung to deaf ears. Further because Vision Risk Group's activities were illegal (See Section 11 and 12 supra), Defendants at this stage could not enforce their own rules, without admission of culpability and liability for their own wrongdoing.

483  While Plaintiffs were tucked away, in an NFA-controlled, Arbitration proceeding, and now with full knowledge of harm and damages, calling out the rogue risk management activities and non-disclosure to CTA's, and complaints from its members, NFA instead blatantly continued to propagate the scheme, reliant that its non-appealable, unregulated and unsupervised, NFA Arbitration forum, with a broad reaching blanket gag-order on Plaintiff and deny its rights to a fair hearing, where they could instead propagate an outcome favorable to ADMIS and Conspirators.

484  NFA and Wahls blatantly continued her audits in 2019 – making no changes, and willfully ignoring the allegations of fraud and non-disclosures, and errors and omissions, and violations of margin activity, and continuing to cover-up and engage in the billion dollars scheme – that disenfranchised dozens of CTA's and customers, to an unfair market playing field that violated the exchange rules, and benefitted a few-insiders and Conspirators, who were "bankers" to the industry.

485  Wahls 2019 audit was material, as NFA's and Wahls' signatures on the audit conducted between on or around January 15,  2019 and February 7, 2019 were identified by ADMIS, as documentary proof that NFA were parties to the scheme, had actual and direct knowledge of and approved the illegal conduct, including authorizing failure to disclose and seek consents from customers and CTA's, as well as the unlawful Margin Allowances and illicit errors and omissions in risk, and dissemination of CTA's trading strategies to its competitors, were being used as "defense" to the activities which clearly violated the NFA Rules (See ¶**Violations**).

Page 96

486   Conspirators could not allege however that the CFTC or CME had any knowledge or approved the conduct – and neither could they – as all parties were concealing the activities in the RMP and on CFTC 1.11 and CFTC 1.55.  In fact the CFTC and CME have stated the opposite – they did not approve and had no knowledge that CTA's trading accounts were being disseminated to High Ridge.

487   As stated in Section 9-12 supra, NFA's knew that Vision Risk Group's market participation as a behind-the-scenes defacto risk group, after being statutory disqualified as an FCM was prohibited, so NFA with Conspirators, intended to keep the risk services "oral" and intentionally violated CFTC Reg 1.11 and Reg. 155 to not disclose the activities. As stated in Section 11, under 7 USC 13(1)-(5) these actions were unlawful – including knowingly not disclosing the activities to CTA's

488   Plaintiffs complaints also documented the rogue risk services that were replete with errors and omission, and Margin calculation violations, and exchange violations in CME Span. Not once did NFA intended to enforce these laws, deliberately and continuing to give HRHC and its CTA referral services an unfair market competition to create an unlawful and un-levelized playing field.

489   During the 2019 audit, on or around February 7, 2019 Wahl's submitted further compliance examination questions to Vision affiliates, that requested they answer questions that relate  "*how they handle margin calls and risk management on behalf of ADMIS customers and CTA's*". This question, directly evidences that Defendants were fully aware that ADMIS had materially outsourced and delegated authority on its material risk management and material margin activities to Vision.

490   On or around February 7,  2019,  Wahls  and NFA again therefore signed her name on documents showing NFA's approval of the rogue, undisclosed, impermissible risk services, and in response to the question on how they handled margin calls and risk management on behalf of ADMIS customers that ADMIS had delegated John Felag and Vision affiliates were authorized, to:

> (i)   place trades on behalf of ADMIS customers and CTA's account - <u>without the customers and CTA's knowledge, authorization and consent</u>;
>
> (ii) liquidate ADMIS customers' and CTA's account - <u>without the customers and CTA's knowledge, authorization and consent</u>;
>
> (iii) add buying power, extend or add credit to a ADMIS customer and  CTA's confidential account, <u>without the customers and CTA's knowledge, authorization and consent</u>; and/or
>
> (iv) take other actions in their sole discretion, related to margin activity, <u>without the customers and CTA's</u> <u>knowledge, authorization and consent</u>;

Page 97

491   As stated in Section 9 and Section 11, no such risk services were permissible under the CEA, as the *Vision Risk Group* were expelled from participating as an FCM, and performing margin related functions. Any bona-fide risk services had to be disclosed to the CFTC under Reg 1.11 and in all cases had to be disclosed to the customers Reg.1.55. It was not, Plaintiffs never consented to this arrangement.

492   Further the grant of power of attorney to permit Vision affiliates and Felag to liquidate a customer's account, or place trades on behalf of a customer, or extend credit to a customer, can only be granted with the customers' written authorization and consent. Wahls had actual and constructive knowledge that Plaintiffs never granted any such power of attorney or authorization.  Neither had the other customers or CTA's who had no knowledge that ADMIS were engaged in this outsourcing of margin activity, and wantonly violating their rights  and obligations under the CEA.

493   Documents now in NFA's possession showed actual and constructive evidence that the rogue risk management operation, was being handled by unqualified personnel, with gross negligence, was replete with errors and omissions,  violated exchange margin rules, in breach of the Commodities Exchange Act, CFTC, NFA Rules.

494   Wahls, NFA, Kiela did not investigate once under the Margin audit module whether any of *Vision Risk Group's* margin activity was in compliance with SPAN or exchange rules, or whether they had materially deficient or capable electronic platforms, or their now reported illegal activities of using Margin Allowances of other activities were posing a threat to customers – even though they now had documented evidence from Plaintiffs CTA that the rogue-risk service were in violation of numerous compliance laws CME 980, 930, 982, 984 and 901 and not disclosed on CFTC Reg 1.11-1.14, 1.55, 1.57. Defendants in their usual manner, just "checked the box" on a routine general audit.

495   Her signature on this audit and over actions to perpetuate the fraud, were with full knowledge of the unlawful conduct, as Plaintiffs had complained in writing to the NFA, that no disclosures or consents were being granted by CTA's in violation of NFA Rules. Defendants conduct in 2019 audit, was now with full knowledge no consents were given by CTA's and that the Conspirators were not making disclosures under NFA 2-26/Reg 1.55, and had logged complaints. However, because NFA already knew the activity was not legal – or disclosed on CFTC reports, they intentionally failed to enforce .This was a material and intentional failure to enforce the compliance laws.

Page 98

496   The foregoing authorizations are an express violation of the Commodities Exchange Act, and multiple compliance rules under the CFTC and NFA Rules

497   Yet Wahls and NFA, intentionally failed to enforce CEA 7 U.S. Code § 2  and 15 U.S.C. 78g(c)(2)(B)[53] that prohibits Felag and Vision affiliates extending credit and violating exchange margin rules. Defendants had constructive knowledge that the risk procedures violated CME exchange rules, as documented in emails and failed to comply with the laws.

498   The fraudulent concealment and decision to outsource the handling of margin calls, and risk management services to the unqualified management team of the employees of the disbarred team at Vision was material. Even more paramount was Vision's blemished management team had previously caused over $2million dollars of losses to futures customers and resulted in their entity being effectively disbarred. They had a long track record of serious disciplinary actions, that CTA's did not want to do business with. This made disclosure even more paramount and material.

499   Additionally the *Vision Risk Group* were permanently disbarred and revoked to act as FCM and the statutory obligations do not permit unauthorized persons to extend margin or act on behalf of an FCM once their registration is permanently revoked (*See above* Section 9 – Section 12).

500   Finally, in 2019, NFA and Wahls  failed to audit or do due diligence on the acquisition and use of CTA's competing trade secrets, and failed to once enforce any segregation of duties, protections on CTA's, or conflicts of interest, as well as Vision Investment Advisors.

501   Despite the recorded complaints of CTA's transactions being disclosed, and NFA's knowledge of VIA's competing options strategies, NFA and Wahls in 2019 specifically did not once audit or compare once the transaction records strategies of Kumaran versus those of VIA.  NFA did not conduct one audit to ensure the VIA's trading strategies did not encroach on the rights of Plaintiffs or other CTA's – thereby failing to prevent Rothman, Boshnack, unlawful use of Plaintiff strategies incorporated and used in their own and front-running them in options trading.

502   At the time of the 2019 audit, Defendants also knew that Vision Investment Advisors, a CTA had been registered effective March 2018 and were engaged in direct competition. Defendants willfully and purposefully failed to uphold NFA 2-4 9061. Instead they caused continuing harm to

---

[53] 15 U.S. Code § 78g - (2) Margin regulations (A) Compliance with margin rules required: It shall be unlawful for any broker, dealer, or member of a national securities exchange to, **directly or indirectly, extend or maintain credit to or for, or collect margin from any customer on, any security futures product unless such activities comply with the regulations.**

Page 99

Plaintiffs to allow Boshnack, Rothman, Felag, HRF and HRHC who were violating anti-trust laws and harming free market competition to improperly scrutinize and unlawfully obtain all their competitors CTA's trade secrets.

503   Wahls and NFA failed to audit the Affiliates, knowing that Vision Investment Advisors, now a competing CTA, were acquiring, using and profiting another CTA"s records, that it was obtained during the scheme, continued and has further caused direct and proximate harm not to redress the conduct. NFA did not conduct one audit on the misappropriation of CTA's transaction records, including Plaintiffs to audit or abscond the unlawful misappropriation.

504   NFA, not only initiated the scheme, they failed to take any actions to stop the scheme, remedy the scheme, and then knowingly and intentionally permitted VIA, to engage in direct competition, and continue to front-run CTA's in direct competition. Therefore NFA's ongoing actions, continue to cause direct and proximate harm to Plaintiffs.

505   Further NFA continued to and failed to enforce any other compliance laws that effectuate unfair competition in the scheme. And knew that HRHC and its affiliates, had vested interests in CTA's.

506   NFA and Wahls weren't there to enforce the laws, they were there to enable the conduct to continue, to intentionally benefit a "select group of market participants" and "insiders" who were bankers to the business and were intentionally transferring and depleting the competitive advantage of CTA's to further the unlawful conduct.

507   NFA continue to take no action to investigate or stop that conduct of unfair competition, continuing to willfully procure an unfair benefit to HRHC CTA's referral and VIA, by disseminating the CTA's trade secrets, and permitting them to engage in unlawful activities to suppress their CTA performance, and manipulate their margin to case them losses, which continues to cause direct and proximate harm to Plaintiffs to this date.

### SECTION 14 - SERVICE PROVIDER ARRANGEMENT WAS VOID UNDER LAW, UNNCESSARY,  ILLEGAL  AND IMPERMISSIBLE UNDER THE CFTC AND CEA RULES

508   The final part of the scheme, was for ADMIS and Kadlec, on behalf of Conspirators, to intentionally use a deceptive and unenforceable privacy policy, that contains multiple ambiguous and contradictory terms, to try to contract their way around the Commodities Exchange Act.

509   It is impermissible to execute contracts, that violate the law and thereby contract away Conspirators  obligations under the CEA. NFA and Defendants intended to try to us the word "service provider" to contract around the CEA. This is nonsensical. An NFA member can't call themselves a

Page 100

"service provider" and then not be obligated to abide by the NFA Rules and commodities exchange act. The participants in this scheme, and the contracting parties, were NFA Members, registrants and subject to the express laws, rules, registration, and regulations of the Commodities Exchange Act, that NFA was obligated to enforce.

510   NFA knew and engaged in approvals that NFA Members, and registrants, could call themselves "service providers" and then nullify their NFA and regulatory obligations, and then act illegality. That is impermissible. NFA registered Boshnack, Rothman Felag, and HRF only as IB's (not FCM's) and any participation had to comply with the rules and laws of the CEA and Act as well as the strict compliance laws not to perpetrate a fraud and harm other members. A person can't provide FCM functions as a service provider. The risk services were unlawful and prohibited under the Act.[54]

511   And regardless of whether they were legal or illegal, or pink or blue, they had to be disclosed. CFTC 1.55, CTA's and Plaintiffs had a statutory right to know and NFA had a non-discretionary duty to enforce the disclosures were made to CTA's. (See e.g. CFTC Reg 1.55.(k)(l)(i) all risk procedures to be disclosed expanding upon any information to prevent it from being misleading by omission or otherwise). These were expelled members further heightening the right to know. The conduct was akin to hiring serial pedophiles, recently released, to hide behind the curtain to operate a day-care.

512   Calling them service providers doesn't condone their conduct as reregistered NFA members or permit them to act outside their registration authority and illegally extend margin on accounts.

513   Their registration to act in the capacity as an FCM ever again was permanently revoked. They can't call themselves service providers, and then provide FCM functions without a registration.

514   And the reason it was necessary to conceal the perpetrators, is that they were expelled and disbarred, and the so-called services they were providing were expressly prohibited and illegal under the laws of the CEA. (See Section 11) Any illegal and impermissible that violates the laws of the CEA and market participation renders the customer agreement and Privacy Policy void-under law and null.

515   Conspirators Kadlec and NFA however, willfully intended the Privacy Policy to serve as a "loophole" under which they wanted to get around the compliance laws. This argument also fails for multiple other reasons as stated herein, because the perpetrators were registered NFA members, and therefore can't void their compliance obligations to dress themselves up as service providers.

---

[54] Plaintiffs incorporate by reference herein ADMIS related case FAC ¶113-¶138 on other arguments why the Privacy Policy was unenforceable and void under law.

Page 101

516   Further the contracts themselves did not permit the conduct. The Privacy Policy had overarching terms that were of protection and beneficial to the trader and customer, that ADMIS would protect the sanctity of their data, transaction records and confidential information. (Incorporated herein in the Privacy Policy, Vision 20-CV-03873 ECF 37.1, 37.2, 37.3). Without limitation that language includes wording that ADMIS are "committed to <u>safeguarding</u> customer information from loss, misuse, unauthorized disclosure and alteration"[55]

517   The Privacy Policy further defined clearly that the transactions and trading history made by Customer were included in the definition of non-public personal information. "Companies" also obtain and retain non-public (personal) information about you resulting from <u>transactions involving your financial investments</u>. This includes your <u>account balances, funding</u> and <u>transaction history</u>. ADMIS's Privacy Policy further represented that Customer would be provided written notice of any changes, and that "This privacy policy may change from time to time and <u>you will receive written notification of any such changes.</u>" Plaintiffs received no such notification of any changes.

518   It contained overt representations on which created reliance on Plaintiffs and customers using over-the-top and binding language that also laid out explicit protections that the "Companies" <u>take very seriously their responsibilities</u> to keep your personal information private. The "Companies" <u>will not disclose</u> non-public personal information about our customers except <u>as required and permitted by law</u> and except under the circumstances described above; and that the "Companies" will not disclose any of your personal information to unaffiliated third parties, <u>unless specifically authorized by you in writing to do so</u>. The confidentiality and conditions of this agreement will continue to be maintained <u>even when you cease to do business with the "Companies."</u> "

519   Therefore the overarching theme and dominant language in the Privacy Policy was that Plaintiffs would have to " authorize in writing" any third party disclosures and that ADMIS takes very seriously their responsibility and that they will not disclose the information, and that ADMIS <u>would comply with the law</u>. To the extent there are conflicting provisions or terms or ambiguities in the agreements those ambiguities are construed against the drafter and in favor of Plaintiffs.

---

[55] See P.P Pg. 1, ADM Investor Services ("ADMIS") and its affiliated introducing broker that introduced your account to ADMIS, (hereafter jointly called the "Companies") are committed  protecting the privacy, accuracy and reliability of any personal information you choose to provide. The "Companies" are further committed to safeguarding such information from loss, misuse, unauthorized access, disclosure and alteration. This privacy policy statement is provided to you on behalf of the "Companies" and addresses the "Companies" data collection, use and disclosure practices.

Page 102

520   Moreover the overriding terms of the ADMIS Customer Agreement in Section 11, made expressly clear that any transactions or matters related to the ADMIS account had to be in compliance with all rules and regulations of the  CME, NFA, CFTC and the CEA. [56]

521   Other conflicting language in the ADMIS Customer Agreement is that ADMIS would make decisions and handle risk management in its sole discretion (See Customer Agreement ¶1, ¶9, ¶26,.. the word "sole discretion" appears four times in the ADMIS customer agreement)

522   Plaintiffs relied in these representations in agreeing to open accounts. Therefore under law, no so-called service provider agreement could be in violation with or conflict with the rules of the CEA. Without limitation Reg 1.11 required the services to be included to the CFTC. (*See* **¶Violations**)

523   Any ambiguities, illegalities, conflicting language in the agreements, or illegal conduct that does not comply with the CEA, renders the contracts unenforceable and void under law, or certainly construed in Plaintiffs favor and against ADMIS.

524   Further under Federal laws, both the FCM and IB were required to give Plaintiffs the opportunity and right to "opt-out" of disclosures. *See* 17 CFR § 160.30, 17 CFR § 160.4, 17 CFR § 160.4 (f), 15 US Code § 6802,  15 U.S. Code § 6803, 15 U.S. Code § 6803 (c)

525   Defendants intended to use the little loophole language, to pretend that adequate disclosures had been made and to 'rubberstamp' their audits, and thus violate the numerous compliance laws and commit the **Violations** herein.

526   This also fails also because no such language authorizes monies to be withdrawn or purloined from CTA's accounts to pay for any bona-fide service provider. The Privacy Policy, also does not contemplate or grant permissions that Plaintiffs had to "pay" for ADMIS's service providers.

527   The intent of the language is for routine providers – to reboot a server – fix an accounting form – not give competitors fully disclosed access to a CTA"s trading strategies, and then purloin their profits to pay for it. In no circumstance did the Privacy Policy, again, allow ADMIS and NFA, to contract their way around the Commodities Exchange Act, and purloin funds and steal moneys from customers and Plaintiffs accounts to pay for these rogue services, which were impermissible under the laws of the CEA. This also was an intended part of the scheme.

---

[56] All transactions by ADMIS on Customer's behalf shall be subject to the applicable constitution, rules, regulations, customs, usages, rulings, and interpretations of the exchanges or markets on which such transactions are executed by ADMIS or its agents for Customer's account (such as the Chicago Mercantile Exchange and its affiliated clearing house, the National Futures Association and to all applicable governmental acts and statutes such as the Commodity Exchange Act or the Commodity Futures Trading Commission Act of 1974) and to rules and regulations made thereunder.

Page 103

528   The language "except as necessary" to service your account also fails to contract around the CEA. Plaintiffs have alleged, in detail that the services were not necessary, were improperly performed, violated exchange rules, were replete with errors and omission, conducted with gross negligence, performed by unqualified persons, on materially deficient electronic platforms, were prohibited, and without the necessary registration and license to do so. The fact ADMIS could open Plaintiffs account through an alternative IB, and not need the service providers, demonstrates the agreements were not necessary.

529   But to the extent they were "necessary' they were "material" and therefore had to be disclosed. Therefore under all circumstance under CFTC Reg 1.55 and CFTC Reg 1.11 which NFA has a statutory obligation to enforce the disclosures are materials. Conspirators can't have it both ways, and call the services "necessary' and then not disclose them as "material". But NFA, Kadlec and Conspirators could not disclose them, as described in detail in Section 9-12, and they had to be oral-arrangements, as the participants were expelled and prohibited from providing such services outside their registration capacity. Therefore all Defendants, including Conspirators knowingly, and intentionally and with unlawful purpose concealed the arrangements and made sure they are "oral" . This illegal and fraudulent conduct is prohibited (See Section 9-12)

## *SECTION 15 -  MAIL, WIRE AND TRADE SECRET FRAUD RACKETEERING ACTIVITY*

530   Defendant Kadlec, in his private and commercial capacity as CEO of ADMIS, and also using his role on the NFA Board, to propagate and "rubber-stamp" and push through the fraud, played a key role, together with using the NFA to not enforce their rules, to direct and organize a scheme that derived hundreds of millions of dollars of unauthorized revenue to the Defendants, Conspirators, and ADMIS, and caused significant harm, destruction and damages to Plaintiffs and other Victims of the scheme herein.

531   As described herein, the illegal dissemination of trade secrets, withdrawal of moneys from customer and CTA's accounts (including Plaintiffs), the charging of unauthorized "trailing fees" on a per transaction basis from customer accounts, depletion of CTA competitive performance records by competitors, the unlawful sales and telephonic solicitations by Vision brokers to customers and traders while concealing the G&F Agreements, and concealing the non-compliant, oral-rogue risk management services (fraudulently concealed from the CFTC under Reg 1.11-1.14 and not permitted under the registration conditions of disbarred *Vision Risk Group)*, all authorized and approved by

Page 104

Kadlec and Defendants, were not necessary, were unlawful, were fraudulently concealed, were not authorized by or disclosed to the trader as required under the CEA, were fraudulently paid for and knowingly, violated the Commodities Exchange Act, the Commission rules of the CFTC, the Defend Trade Secrets Act, and other laws, with scienter and deceit,

532   The objective of the scheme to defraud customers and CTA's including Plaintiff, which started in or around August 28, 2014 and has continued and occurred in a continuous pattern until present date, was illegal, outside of the proper regulatory activity, involved tortious actions including misappropriation of customer money, and dissemination of trade secrets for interstate commerce, and for the improper benefit of Conspirators including Tom Kadlec (and his private interests as CEO of ADMIS), and all Conspirators, who, achieved an illegal stream of unauthorized revenue from a unregulated pool of trading accounts.

533   The illegal conduct permitted allowed disbarred market participants, Boshnack, Rothman, Felag and its new entities, who were prohibited from operating as an FCM, to hide behinds the scenes of another FCM, and act outside of the permitted duties of an IB, to extend margin, credit and guarantee customer accounts, in exchange for hundreds of millions of dollars of financial benefits, In exchange for the concrete benefits, NFA and Defendants herein, willfully overtly, and substantially assisted the fraud, by not enforcing the CEA, and permitted the Boshnack defendants, to gain unauthorized access to their competitors accounts, disseminate and misappropriate their trade secrets and gain an unfair competitive advantage, and collect unauthorized overcharges and fees, disguised in overcharges such as trade processing fees and transaction fees to which the Vision and its beneficiaries were not entitled to,, and other illegal conduct described herein.

534   The purpose and objective of the scheme, was to perpetuate an unregulated dark pool of customer and trader accounts, of former *Vision brokers*, that were not subject to the same market participation rules or laws of the Commodities Exchange Act.  The purpose of the scheme was to intentionally circumvent the rules, and treat the pool, as an unregulated slush fund of trading accounts from which monies could be purloined, and trading strategies disseminated without consent or knowledge, as Boshnack, Rothman and HRHC had become a "financiers" of the futures industry, on what is estimated to be over hundreds of millions of dollars of futures revenue.

535   Kadlec and Defendants role in the scheme was to knowingly violated the CEA, to intentionally not enforce the compliance laws, in order to gain illicit unlawfully compensation from the Victims

Page 105

(including Plaintiffs) futures accounts, and the monies would be stolen for the unlawful purpose to compensate disbarred owners Boshnack, and Rothman, in exchange for them securing hundreds of guarantee and credit line to secure the clearing arrangements of about one hundred Vision brokers, that were impacted when Vision Financial was disbarred in 2014.

536   The scheme additionally was in direct violation of the unfair competition and unfair market place laws, and was designed to create an unfair competitive trading advantage to HRHC and its trading affiliates, and deplete and willfully disadvantage to ADMIS traders' accounts that are CTA's, and misappropriate traders information for use and profit, in direct competition with the activities of Vision, causing significantly damaged customers and trader's confidential accounts.

537   The schemes operation, facilitated by, Kadlec and by and through Defendants was conducted by rubber-stamping multiple audits that started in or around November 2014, and knowingly, intentionally, willfully and wantonly failing to enforce numerous NFA Rules, Commodities Exchange Act rules, and CFTC rules, and permitting illegal and unlawful activity to continue. Defendants facilitated the scheme to avoid the CEA rules by setting up an undocumented, "oral" rogue risk management services "arrangement", for which no legitimate or legally binding contract existed, that was concealed from disclosure required under the CFTC Reg 1.11 and would not be disclosed to CTA's and traders (including Plaintiffs) under CFTC Reg 1.55.

538   Defendants approval of Vision Risk Group's services were not permitted under the registration as an IB, were not necessary and were not lawfully rendered, violated exchange rules, were grossly negligent, were replete with errors and omissions, were performed by unqualified personnel, on materially deficient platforms, were fraudulently concealed, and required the unlawful dissemination of trade secrets across interstate lines,  the unlawful overcharging of trade processing and transaction fees, all of which were not authorized by or disclosed to the customer as required under the CEA, were fraudulently billed, and were billed at excessive and unreasonable amounts, deliberately causing depletion of CTA's performance record and dissemination of CTA's trade secrets to competitors,.

539   This objective necessarily required the fraudulent disguise and inclusion of overcharges, fees, trade processing fees and transaction fees, to be deducted in cash payments from Plaintiff's accounts, to be paid across interstate wires to Vision defendants; and the fraudulent disguise and dissemination of customers and CTA's and Plaintiffs' competitive trade secrets and trading strategies in violation of 18 USC 1831 across interstate wires to Vision defendants, and to generate significant profits and an

Page 106

unfair market competition advantage of Vision, and derive and unfair use and profit of its competitors trading strategies, which Vision trading arms have and continue to use and profit from today in direct competition.

540   Incorporated herein by reference in **Exhibit 9**, Plaintiffs documented hundreds of line items of unauthorized withdrawals of monies across interstate lines, instigated by Kadlec as well as hundreds of lines items of dissemination of trade secrets across interstate lines, each counting as a predicate act under RICO while Plaintiffs accounts were opened in January 2017 – June 2017.

541    The conduct started in or around November 2014 and continues to date and therefore poses an open-ended continuity of activity. Vision in their MTD have admitted the conduct continues in the market place today.

542   All documents, communications, emails, letters, correspondence, transaction records, trade secrets, trading strategies and unauthorized fees and access in connection with the illegal, impermissible, unnecessary, unqualified, risk services, and illegal extension of margin and credit on traders accounts (without registrations), and improper quantification of margin in violation of exchange margin rules,  and the fraudulent concealment and misrepresentation thereof, , throughout this pleading traveled through interstate wires ,emails, telephonic communications or mail and were delivered to, acquired from or received by Plaintiff including in the Southern District of New York.

543   Every fraudulent communication, electronic computerized statement, and unauthorized fees and statements, dissemination of trade secrets, and unauthorized conduct on a daily basis, as well as in each and every audit starting in November 2014 by Defendants for which there were multiple audits[57], detailed herein including the signature on rubber-stamp audits that approved illegal activity,  and every single statements sent electronically to Plaintiffs (of which there are hundreds), concealment of Vision's unauthorized access to Plaintiff's CTA trading records and account, and unauthorized purloining and withdrawal of profits and fees from customers and CTA"s account as included in **Exhibit 9**, involved at least two (2) use of the interstate mails or wire communications.\

544   It was foreseeable to Kadlec and  Defendants (including by way of their fraudulent and illegal rubber stamping of audit) that Conspirators making false representations and omissions to Plaintiffs would trigger reliance by Plaintiffs on the false statements and concealments in furtherance of the scheme to defraud, including actually disclosing its trade secrets, sharing its CTA account, opening,

---

[57] Vision MTD admits also the existence of multiple audits, which invokes more than (2).

Page 107

maintaining and transferring funds, capital, assets, and property including intellectual property to ADMIS, to fall victim to the scheme to illegally generate billions of futures industry revenue – at the expense of small CTA's and start-ups who were victims of the scheme

545   Every unauthorized fee and deduction at issue, as outlined in **Exhibit 9**, and every improper dissemination, acquisition, use and profits of its competitors trade secrets, as also described in this Complaint, and every false representation and knowing omissions to fraudulently conceal the unauthorized rogue risk operation by disbarred Boshnack and Rothman, every concealment by Defendants and Kadlec when Plaintiffs inquired about the Enterprise, every fraudulent sales and solicitation where Plaintiffs were induced to rely on the Defendants' false statements, were transferred, uploaded, downloaded, input, copied, accessed, monitored, reviewed, acquired, accessed, tampered with, deducted from Plaintiff's commodities futures trading accounts using interstate mail and wire communications, and were each a separate and individual act of misappropriation and unauthorized charges.

546   The fraudulent scheme detailed herein generated thousands of individual deductions and fees taken out of futures customer's accounts across interstate bank wires, and generated thousands of instances of where Defendants and their conspirators, unlawfully accessed, transferred, downloaded, copied, accessed, misappropriated, and acquired their competitors transaction records, financial information and trade secrets, across interstate lines for use and profit.

547   As detailed herein, Kadlec and Defendants fraudulently concealed and disguised Vision Defendants' unauthorized access to customers and CTA's accounts and  fraudulently concealed and disguised these overcharges and fees, and using fraudulent communication, material misstatements, and omissions, that were submitted to Plaintiffs via interstate wires, email or telephonic communications related to each Plaintiff, customer or CTA discussed in this Complaint.

548   It was within the ordinary course of business for Kadlec, Defendants with their Conspirators to fraudulently conceal, misrepresent and improperly acquire their competitor CTA's trade secrets fraudulently conceal and mispresent trade processing and transaction fees to overcharge fees, from Victims and Plaintiffs confidential accounts through interstate wires and mail and unlawfully deplete CTA's performance records in unfair competition.

549   Moreover, the business of fraudulently gaining unauthorized electronic access to customer and CTA's financial accounts and trading records, seeking unauthorized fees and payments, and gaining

Page 108

an unfair competitive advantage by acquiring their competitor CTA's trading and risk management strategies, and providing unnecessary and unqualified services, impermissible by the CEA, by ADMIS and each of the Vision Defendants and the LCI Defendants at issue herein is regularly conducted by to which each Vision defendant is not entitled and is achieved through the use of fraudulent communications sent via intestate wires and mail. In other words, discrete fraudulent misrepresentations, improper acquisition, use and profit from their competitors' CTA's trading accounts, fraudulent concealment of fees, deducting trade processing and transaction fees without customer's authorization, are instances of mail and wire fraud are a regular way of doing business for each of the defendants.

550   The Defendants at the direction and with the knowledge and participation of Kadlec,  have perpetuated by over action a continuous pattern and continue to improperly and illegally conduct permitted Vision acquire their confidential trade secrets; overcharge fees, collect and deduct cash payments, fraudulently seeking unauthorized fees and payments, and gaining an unfair competitive advantage by acquiring their competitor CTA's trading and risk management strategies, and harm Plaintiffs and other similarly situated .customers and CTA's.

551   Thus, Kadlec and Defendants commission of wire fraud and misappropriation of trade secrets continues.

552   As Kadlec and other Defendants named in the conspiracy agreed that they would use (and, in fact, did use) the e-mails, telephonic calls over interstate wires, and false statements over the computerized logins, and other emailed statements, in furtherance of their scheme to defraud Plaintiffs, including but not limited to theft of trade secrets, to distribute, disseminate, access, acquire, use and profit from their trade secrets and confidential trading accounts, deducting, stealing and purloin unlawful fees not permissible under the CEA, permitting disbarred members (who's registrations were permanently revoked to act as an FCM), to perform unnecessary, unqualified services that are not permissible without disclosures, under the CEA,  and permitting direct/directly engaging in unfair competition, and engaging in market place fraud to have one set of traders abide by a different set of rules and margin these defendants committed mail fraud, as defined in 18U.S.C. § 1341.

553   As Kadlec and other Defendants and Conspirators (including their agents, employees) agreed that they would use (and, in fact, did use) emails, telephonic calls over interstate wires, and false

Page 109

statements over the computerized logins, and other emailed statements, over interstate wires in furtherance of their scheme to defraud Plaintiffs, to illegally propagate the scheme, violate the CEA, securities laws and federal laws, and to illegally and unlawfully disseminate, distribute, access, acquire, use and profit from their trade secrets and confidential trading accounts in interstate commerce,, and deduct unlawful fees not permissible under the CEA, charging fees by receiving payment for and performing unnecessary and unqualified services that are not permissible under the CEA, these Defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

554   Plaintiffs reasonably relied on the fraudulent representations and omissions, received from Defendants listed in detail above, and have suffered significant damage and harm as alleged herein.

555   As the Kadlec and Conspirators agreed to pursue the same criminal objective (namely, mail and wire fraud, and theft of trade secrets), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Plaintiffs' damages.

## *SECTION 16 - NFA FALSE STATEMENTS*

556   Prior to granting registration to Felag, Rothman and Boshnack, NFA publicly stated on June 20, 2014 that prior to registration "*If High Ridge applies for membership, NFA will conduct a thorough fitness examination*." (*See* Attachment 2). These statements were materially false when made.

557   On October 18, 2019  NFA admitted in response to subpoenas issued on them that it has no documents related to a fitness examination related to its ongoing "risk services" or the compliance of its margin activities, or the fitness of risk management group cause significant harm to customers.

558   NFA did not conduct any fitness examination on John Felag or High Ridge Futures Risk Group (which was identical to *Vision's Risk Group)*. NFA did not audit or conduct any fitness examination review on their compliance with mandatory exchange rules, whether their technological and electronic platforms were material deficient, or whether their risk policies and procedures were in compliance with the Commodities Exchange Act.

559   NFA has knowingly and materially failed to update these public statements rendering them false and misleading.

560   After November 1, 2014 once NFA registered High Ridge solely as an IB,  NFA had material knowledge and fully authorized an "oral-service-provider" agreement that violates numerous compliance laws herein and this prohibited under the CEA (See Section 11). Therefore the ongoing

Page 110

publication that NFA has done a thorough fitness examination which continues to be published is materially false and misleading.

561   NFA to facilitate customers and CTA's not finding out that ADMIS was distributing customer and CTA accounts to Vision, substantially and directly omitted any reference or link to the arrangement on NFA's Basic Website, so any Customer, CTA or Member, inquiring about ADMIS or the *Vision brokers* had no knowledge or history of the relationship and transfer of customer accounts to Vision affiliates, owners and employees.

562   On June 20, 2014, NFA also has and continues to make public statements that mislead and misrepresent the customer and traders about High Ridge. Their disclosures states "*If High Ridge applies for membership, NFA will conduct a thorough fitness examination. If the firm becomes registered, NFA will ensure that any <u>customer</u> who inquires about High Ridge through NFA's BASIC system will be provided with information about all of Vision's disciplinary actions*." (*See* Att 5, Pg.2)

563   NFA's Basic system is a public website portal that allows customers and the public to look at the history, disciplinary conduct and other pertinent information about each NFA Member, including those that are affiliates or majority owners of entities, prior to selecting a choice of introducing broker or FCM or CTA or other business partner or for any research purpose. https://www.nfa.futures.org/basicnet/

564   Plaintiffs relied upon and used the NFA Basic system prior to opening accounts with both Trey Lazzara (who was not listed as Trey but Gerard), and also ADM Investor Services. Neither ADMIS nor Lazzara show as affiliated or materially associated in any way shape or form with High Ridge Futures. Therefore reliant on the public disclosures made by NFA, which is has control of what to publish, Plaintiffs were also reliant upon the limited information and concealments.

565   NFA  knew that it was material for "customers" of High Ridge to have access through NFA Basic about all of Vision's disciplinary actions. There statements on June 20, 2014 make clear the importance that customers and traders have a right to full disclosures prior to doing business with a disciplined or disbarred NFA Member. However in November 1, 2014 after NFA and Kadlec approved the behind-the-scenes oral risk services, they made no further updates to their announcements, and also took overt actions, to not include a reference in NFA Basic, that showed that Vision brokers, or customers opening account through ADMIS, would in fact become customers and doing business with High Ridge.

Page 111

566   This materially denied customers (including Plaintiffs) the right to have information about Visions' disciplinary action, which by NFA's own admission in June 2014, was material to a customers' decision to do business with High Ridge. By not updating the necessary links in NFA Basic, and not providing customers o Vision brokers, access to material information about High Ridge, (that High Ridge were in fact guarantors on their account). NFA, took overt actions to participate and conceal the misconduct, thereby aiding and abetting in the fraudulent concealment.

567   NFA had a statutory duty (especially to its members) not to engage in any conduct that is misleading or that could deceive.

568   Therefore the material Guarantee and Fee Agreements, the oral risk services agreements and the relationship between the Vision brokers, High Ridge and ADMIS, being reliant upon and contingent on customers, traders and Plaintiffs doing business with High Ridge were concealed. Therefore NFA's public statements and including its disclosures in BASIC were designed to mislead customers to doing business with Vision brokers, without full and fair disclosures of all parties they would be doing business with. Any scheme, device or artifact to mislead is unlawful. 7 USC 13(4).

569   NFA purposefully did not update NFA  Basic or its public disclosures, as alleged herein in Section 9-12, they knew that customers and traders ,including Plaintiffs would rightfully not have chosen to open accounts with Vision brokers. Therefore NFA acted with scienter and intent to conceal that accounts opened by Vision brokers, would become "customers" of High Ridge, purposefully denying customers, traders and Plaintiffs the right to inquire about Vision's disciplinary actions.

570   NFA has a statutory duty to update its website to notify the public that *Vision brokers* were being guaranteed by High Ridge and a statutory duty to disclose in NFA Basic, that anyone becoming a customer of a *Vision broker*, would thereby become a defacto customer of High Ridge, and thus have a right to all information about Vision's disciplinary actions, prior to make the decision to entrust funds to the IB or the FCM. This disclosure is upheld by NFA's own compliance laws NFA 2-2, NFA 2-4, NFA 2-29 and NFA 2-26 as well as the express anti-fraud provisions of the 7 USC 6(b).

571   NFA's false statements, that were never updated, and NFA Basic that was never updated, also contributed to overt actions to aid and abet, conceal and propagate the fraud.

572   Plaintiff reasonably relied on the completeness and thoroughness of the information on NFA Basis when selecting Trey Lazzara and ADMIS, (which contained material omissions as to whom Plaintiff would actually be doing business with) and NFA has acknowledged information about High

Page 112

Ridge's past disciplinary action as Vision is material. Such omissions were fraudulent, with the intent to deceive and induce reliance. Plaintiffs have been substantially harmed and damaged by not having access to the disclosures and the opportunity to review this information prior to opening its account.

### *B – PRESENT FACTS TO PLAINTIFFS CASE*

### *SECTION 17 – HOW PLAINTIFF SUCCUMB TO FRAUD*

573   In or around July 2016 Plaintiff Kumaran passed the Series 3 test – the requisite licensing to become a Commodities Trading Advisor "CTA". Plaintiff was therefore well aware of NFA Rules and compliance laws, and was in the process of becoming registered as a CTA. Plaintiff Kumaran has an extensive background in risk management services and software, having previously since 1993 run a boutique risk consulting business in NYC, which was in 2018 awarded a Top 10 for enterprise risk software. Plaintiffs professional experience includes over two decades of rigorous risk audits and compliance for several large firms and energy companies, serving as Risk Manager for Niagara Mohawk Energy Marketing in Syracuse, NY,  with a long background of experience from Wall Street.

574   Starting a CTA requires substantial upfront capital and risk from the CTA. Plaintiffs and their friends and family invested substantial monies in formation capital, sweat equity capital and IP capital in the formation of the hedge funds under the brand name Nefertiti, and they would never have selected to do busines. The hedge funds owning the equity and capital are Nefertiti Asset Management, LLC which now holds the registration of Kumaran individually as CTA and CPO and the performance record of the STORM trading program is owned by Kumaran.

575   Plaintiff Kumaran, as stated supra, also invested substantial monies, time and effort to develop highly complex mathematical algorithms and options trading strategies, that would give it a competitive advantage in the commodities options trading markets as a CTA. Significant effort and hard-to-come-by expertise went into the research and development of the models, and handling of risk in options trading – that for one, Conspirator Vision had not been able to come up with themselves, and had in fact been disbarred for, in exactly the same type of options trading. Plaintiff brought a unique mathematical and risk management background to the competitive edge and its trade secrets as described above derive substantial economic advantage to its CTA;, which it had a right to keep confidential and out of the hands of its competitors.

576   Plaintiff had a business model to raise substantial assets for Nefertiti, and develop its track records in a small prop-trading account. The business valuation and forecast of Nefertiti over a ten

Page 113

year proforma was over tens of millions which led to a sizable investment of capital from Plaintiff individually, and friends and family to launch the competitive CTA and CPO. Usually the first two years of a CTA,  require home-grown moneys as until the track records proves out, it is difficult to raise outside monies. Therefore the track record at NRCM and ADMIS was critical to launching the business and Plaintiffs were particular on the type of FCM it was doing business with as well as the qualifications and capabilities in risk management, disclosures, risks, costs, and fees and partners involved in the account. Plaintiffs planned to open the account with relatively small capital (less than $100,000) and overtime scale it up to a significantly large number.

577   At no time, would Plaintiffs ever have selected to do business with High Ridge or Vision.

578   Plaintiffs considerations were also reputational. As professional CTA's, with a long term 10 year business model, they did not want to be affiliated with disbarred or sub-performance individuals who had hundreds and hundreds of reparations cases filed against them for unsanitary conduct.

579   The goodwill and reputation of a CTA is also important and being associated with an entity like Vision, would and has caused significant reputational damage to Plaintiffs. (*See* Attachment 1)

580   In or around December 2016 while Plaintiff (individually) was in the process of trading various pilot tests for its equities trading programs, an unregistered futures broker called Julie Villa, used telephonic communications only to unlawfully and without registration, solicit Plaintiff to open a futures account. Villa referred Plaintiffs to her former employer Trey Lazzara, and made no mention during the telephone calls of her past relationship as an AP of Lazzara Consulting and her knowledge of Vision.

581   In or around December 16, 2016, Plaintiff Kumaran first spoke to Lazzara, and specifically advised him about her extensive risk management services and software background, that she ran a boutique risk consulting services company, and that she was registering as a CTA, and intended to form various hedge funds for competitive trading in commodities futures options strategies. Lazzara knew that both Plaintiff's provision of services as a professional risk vendor and options trader were in direct competition with HRHC CTA Referral service, and the risk services of HRF.

582   Unknown to Kumaran, Lazzara was one of the former *Vision brokers*, involved in the scheme. Lazzara materially, intentionally fraudulently concealed from Plaintiffs the long-standing arrangements between High Ridge, ADMIS and disbarred owners of Vision.

Page 114

583   Lazzara, at all times fraudulently concealing that his IB was guaranteed by HRF, "immediately" referred the account to ADMIS and didn't offer Kumaran any other options, boasting about ADMIS' status as a large FCM and all its public literature. (Plaintiff incorporates herein ADMIS FAC Exhibit 5 on the fraudulent and deceptive ADMIS literature. Plaintiff relied upon public disclosures of ADMIS, Lazzara and the NFA Basic Website when its' made its selection of FCM and IB.

584   Lazzara also stated commissions were "low" and only $1.50 again at all times knowingly and fraudulently concealing at all times the trailing fees and commissions, and "trade processing fees" and "transaction fees" that would be added on Day 2 and paid to Vision affiliates as part of the scheme (*See* Supra Section 8)  Lazzara instead, intentionally and with fraud and deceit, violated the mandatory compliance disclosures to not disclose the fees. (NFA 2-3, NFA 2-4 9005, CFTC 33.7, CFTC 1.57)

585   Because of Kumaran's extensive professional background in risk, as well as her ownership of advanced risk management software Kumaran asked detailed questions on the risk management policies and procedures at ADMIS for handling commodities options. Kumaran specifically sought confirmation on any proprietary margin system, and that ADMIS has sufficient electronic platforms, and that options were margined only in accordance with CME Span. In accordance with CFTC Reg 1.55(i)(k)(l), Lazzara, the Vision broker, and ADMIS were obligated to disclosed ADMIS' risk procedures, all its outsourcing to Vision, as well as its margin systems, methods of Margin Allowances "expanding on any information to prevent the solicitation from being misleading". (*See* Section 9.(iii) supra)

586   Instead Lazzara stated ADMIS only uses "CME Span" and intentionally fraudulently concealed the material outsourcing of risk management to the disbarred risk group of VFM. Later on September 29, 2017, (after the account was closed) Lazzara admitted that ADMIS has "risk procedures" that required him to get approvals from unaffiliated from the disbarred risk group of Vision. Under CFTC 1.55(k)(l)(i) those disclosure were material, and were required to be made before the account was open. With willful intention to deceive they were not made, and Plaintiffs were induced into reliance that to open the account. Plaintiffs would never have done business with ADMIS or opened the accounts if they had known the true identity of the disbarred risk group.

587   Falling hook, line and sinker for the fraud, Plaintiffs were fraudulently induced into opening the accounts at ADMIS, opening some of the account documentation in NRCM's name and other's in Kumaran's individual name. Mistakenly, Kumaran genuinely believed the accounts were a sole-

Page 115

proprietor account, and thereby signed numerous of the account forms with the customer name in her individual name. Lazzara, in his sloppy procedures never corrected the forms.

588  Just days after opening the account, the unauthorized fees started following the operating playbook of the scheme. (See Vision FAC ¶197-¶330)

589  Kumaran challenged and disputed the fees, but Lazzara, using the tradecraft response, stated that "the account was not set up correctly" and on Day 2, misrepresented the new fees were exchange clearing costs. (This also deters the switching costs to close the account which is why transaction fees are added on the second day). This information was materially false and untruthful when made, and intended to deceive and Lazzara intentionally failed to disclose that monies were being diverted to pay HRF. This constitutes fraud and unlawful conduct.(7 USC 13(1))

590  Almost immediately after the account was opened Plaintiffs, detected grossly negligent errors and omission occurring in what it believed was ADMIS' risk group. (See Vision FAC ¶XX-¶XX). Plaintiffs started to dispute the calculations, pointing out the risk services were being conducted replete with documented errors (which were screenshot) and the calculations violated CME margin rules. (*See* Vision 238-¶283).[58]

591  When challenged on the repeated errors and omissions, Lazzara continued a pattern of deceit in phone calls and emails, at all times fraudulently omitting, his true dialog was with the John Felag, the former risk manager of the disbarred Vision Financial Markets, in Stamford, CT who's license and registration had been permanently revoked to participate against as an FCM.

592  Lazzara deceptive conduct, went as far as making false statements in emails that he was speaking to a "risk guy at ADMIS, and he worked with "a division of ADMIS that handled managed futures" at all times misleading and deceiving Plaintiffs that his communications were solely with ADMIS to rectify the now errors and omissions. He also misstated that the "risk group" were fixing bugs in systems, and margin errors were resolved. and "risk would extend credit on account.". But extending margin on Plaintiffs account was being done by HRF and Vision, a participation dty that they were expressly disbarred from and prohibited from performing on behalf of an FCM.

593  Instead, the margin errors were not resolved, and eventually Lazzara admitted the so-called risk group were using decades old technologies, materially deficient electronic platforms, that were

---

[58] Vision have not disputed the errors or that the calculations violated margin rules in their MTD, thereby waiving their defenses.

Page 116

incapable of handling commodities options, lacked the ability to perform intraday calculations, and were missing even the most basic form of CME compliance in handling all options risk, strikes, prices and could not calculate CME Span Margin. These material deficiencies were also a violation of compliance laws and Conspirators lack of technologies to manage risks needed to be disclosed.

594   Continuing to conceal it was in fact the disbarred *Vision Risk Group* performing the disastrous risk function, Lazzara continued his charade to tell Plaintiffs the problems were temporary, ADMIS IT guys were working on patches, and if Plaintiff switched from trading in Heating Oil to Crude Oil the system issue would resolve. However these facts were materially untrue when stated, no patches were programmed and the material errors and omissions persisted without cure.

595   At no time did Lazzara dispute the risk group errors, and all times acknowledging that Kumaran's risk systems were correct and the "risk group" was operating materially deficient technologies from the eighties that did not even have the ability to pull up all option strikes, and making errors in the tens of thousands of dollars. These gross negligence and (See Vision ¶260-¶273)

596   Plaintiff despite the mayhem and documented errors was proving out its strategies without issue, and as a CTA posting competitive returns of 12% over 60 days in crude oil buy or around April 24, 2017. There had been no margin calls.

597   Despite Kumaran's repeated questions and documented evidence of screenshots replete with errors and omissions, violating exchange rules, and scores of risk management errors that violated CME 930, 980 and CME 982, Lazzara persisted in the fraud, at all times concealing it was Vision's grossly negligent and unqualified risk team, who were behind the scenes impostering the risk management program.  The errors were upwards of 200% of  account value, violating the CEA.

598   Suddenly tampering in the account began. On April 25, 2017 the mysterious Villa, who claims she was working from her home in Hawaii suddenly undertook a customer facing role for Lazzara, now claiming she was in the futures industry – as an undocumented worker.

599   Almost immediately thereafter starting on or around May 2, 2017 more unauthorized fees, designed to thwart the performance of Kumaran as a CTA were specifically added to Plaintiffs options account. These fees were never consented. The funds were purloined from Kumaran causing significant damage, depleting profits by over 3.4% every 45 days. Over $1,260 was removed. This conduct is illegal. (See 7 USC 13)

116

Page 117

600   In further malfeasance, wrongdoing, without Kumaran's knowledge and consent, Boshnack and Rothman, and the Vision Risk Group, were tampering with, interfering with, violating exchange rules, and in gross negligence and errors and omissions, misstating margin by over $134,000 on a $25,000 account and using unreasonable, non-exchange complaint procedure to inflate Kumaran's account – with detrimental effects. Lazzara and ADMIS never issued a margin call violating the CEA.   This activity was also illegal. This resulted in a significant drawdown, in the only account that monies were being purloined from

601   On or around May 24, 2017 Plaintiff threatened to bring NFA action against Lazzara because of the errors. On or around May 25, 2017,  HRHC and its owners and employees  took overt actions to "close" Plaintiffs CTA' account, while pretending it was "ADMIS".

602   Upon belief, Boshnack and Felag had unlawfully manipulated credit without consent or authorization, causing material harm and sabotage to a competitor Kumaran's CTA account. On or around June 25, 217 Plaintiffs spoke to ADMIS and they stated they had no knowledge of them closing their account and attempted to reopen it through the NY office. Plaintiffs were still unaware of the illegal activities of HRHC, Boshnack, Felag and others.

603   At all times, including on May 15, 2017 and May 16, 2017, using interstate wires and mail communications, Lazzara persisted in the fraud, deceit and misrepresentation, to conceal Vision affiliates access and their grossly negligent, deliberate and material meddling in its competitor CTA's account, which was expressly forbidden under exchange rules, and instead fraudulently misrepresented that ADMIS had authorized an intraday credit line. The information was false.

604   On or around May 17, 2017  and again on June 16, 2017 Kumaran in New York, spoke to Dave Glancy in Chicago, IL, at ADMIS risk department. Glancy, also, by fraudulent concealment, intentionally omitted and failed to disclose that Vision affiliates had been outsourced risk.

605   On or around June 25 2017 Kumaran closed the account at ADMIS, citing gross negligence in the risk department and still materially unaware of Vision affiliates access to the account. By no coincidence on or around June 29, 2017  Villa suddenly stopped working for Lazzara during the same 45 days period that Plaintiffs accounts were tampered with.

606   On or around August 20 2017 Kumaran through reconciliation and audit, detected that cash balances in the account ending balances did not tie out, and that unauthorized fees and payments had

Page 118

been made to deplete its CTA performance by about 18% annualized, to deplete its competitive valuation in direct and targeted unfair market competition.

607   On or around September 20, 2017 Kumaran uncovered that unauthorized access had been given to its account to third parties, Vision's owners and affiliates and started to confront Lazzara.

608   On or around September 20, 2017, September 27, 2017 and September 29, 2017 after multiple emails, seeking explanations from her broker Lazzara, how unauthorized third parties Vision affiliates had access its accounts, and demanding to know what their financial interest was in her proprietary trading records as a CTA, Plaintiffs was alerted to the fraud. (**See Exhibit 3**)

609   Lazzara on or around September 27, 2017 tried to blame others " he was following risk management procedures of ADMIS to give confidential emails related to Kumaran's trading account to Vision's affiliates' risk management procedures he had materially concealed at account opening, and were mandatory to be disclosed under NFA Rule 2-26 / CFTC 1.11, 1.55 and 33.7.

610   On or around September 29, 2017 learned and inquired for the first time on NFA Basic who High Ridge really was, and learned about Visions' disciplinary actions. The Conspirators had knowingly and intentionally deceived and concealed their involvement so that Plaintiffs would not inquire about High Ridge prior to opening the accounts, and as a result caused significant harm and damages to Plaintiffs. In addition, behind the scenes, Conspirators were disseminating and granting real-time access to HRHC, Felag, Boshnack and Rothman and their affiliates to scrutinize and improperly acquire Plaintiff trade secrets, risk management and options trades.

611   On or around October 12, 2018 ADMIS,  admitted that it had shared the trading strategies of Kumaran's CTA account with its competitors Vision, its owners, employees and affiliates – in arrangement for them to provide risk management services. The risk management services performed were grossly negligence, by unqualified personnel, replete with errors and omissions, and egregious violations of the CME rules, to use non-compliant margin allowances and other rogue calculations.

612   Kumaran, a registered CTA and NFA Member had not authorized such conduct, and it was fraudulently concealed. Other customers were insinuated as also being victims of the scheme.

## *SECTION 18  - NFA EXECUTES A COVER UP AND WHITE WASH*

613   On or around September 27, 2017 when Plaintiffs first learned that its account had been unlawfully distributed to Vision's affiliates, and illegal withdrawal of funds had occurred from its accounts, as well as breaches of privacy laws, without its consent, it promptly reached out to the NFA

Page 119

hotline, to inquire, what "approvals" existed by NFA, for ADMIS to distribute customer accounts to Vision affiliates. Kumaran noted it was a new CTA, was new to the futures industry, had never heard of Vision, just found out they had a nefarious background with multiple disciplinary actions.

614   On or around September 27, 2017 and September 29, 2017 using telephonic and interstate wires, Kumaran in New York City, communicated with a Ms. Funda Agkok ("Agkok") in the NFA Compliance department. Agkok was sent exact copies of communications dated September 29, 2017 between Kumaran and Lazzara, and therefore Agkok and NFA Compliance had actual, direct and constructive knowledge that Plaintiffs had uncovered the scheme and were raising legitimate complaints that their CTA account was shared with the employees owners of the disbarred Vision, without their knowledge, consent and authorization, in violation of NFA 2-4 9061(*See* **Exhibit 4**)

615   However at the time Plaintiff initiated the call, as described in detail supra, NFA, Kadlec and other compliance staff, already knew of the market place fraud. Unknown to Plaintiff, since September 2014 until the time of the call or around September 2017, Defendants, Kadlec and the Conspirators in the scheme had reaped approximately $10 million dollars a year to support the commodities futures industry, and overcharges of transaction fees, and NFA Fees.

616   Therefore to directly perpetuate and cover-up the fraud, instead of providing assistance, NFA and Agkok intentionally failed to respond to any of the reasonable questions that were posed by Plaintiffs, as registered CTA's despite her duty to enforce compliance laws, including its September 27, 2017 and September 29, 2017 emails which stated in part

> (a) *I am seeking the NFA Rules and other laws that prohibit an IB from failing to respond to a Customer regarding questions on their account (b) I am specifically looking for the NFA Rules, or Commodity Exchange Act Rules, or CFTC Rules or all applicable Financial Institution Rules, that protect a customer's confidential information and trading data records from being disclosed or disseminated to unauthorized third parties (including other brokers, IB's) without the customer's knowledge or consent. And; (c.) I need to find the specific statutes or laws that protect my financial data.*

617   Agkok had access to the NFA internal risk system (See Supra Section 13) and therefore had material actual and substantial knowledge that the G&F Agreements were in place, and that NFA had approved the oral services. NFA knew that customers, especially CTA"s. finding out could expose, significant wrongdoing that implicated illegal conduct from the NFA itself. Instead, of investigating, or answering any of Plaintiffs legitimate questions which NFA had a duty to respond to, Agkok left

Page 120

Plaintiffs completely in the dark. If the risk services were legal – there would be no reason to not provide accurate information. NFA failed to even answer how financial data was not being protected.

618   Agkok however had contacted various other NFA Compliance Officers, upon belief Kiela and Wahls who were routinely familiar with the scheme and instead, and instead of implementing the compliance laws equitably to address Plaintiff concerns, continued actions that would keep the fraud concealed. A material part of not permitting other customers and CTA's to find out was to induce Plaintiffs into NFA-controlled Arbitration.  They were also now on alert that a CTA had uncovered the scheme. Instead of investigating a hotline complaint NFA swiftly instigated a cover-up.

619   Plaintiffs received no answers, no information, no assistance, no guidance as to where it could find information on how such conduct was permitted under NFA Compliance rules. It wasn't. And NFA knew that they would be liable if others found out and dug deeper. These failures were in further violation of NFA's statutory duties to provide equitable treatment, and enforce the numerous laws and Violations,

620   The fraudulent conduct to harm thousands of customers and CTA's had been going on for close to three (3) years and was generating millions of dollars of unauthorized revenue, NFA's ADMIS' board member  and substantial revenue in Membership Dues and transaction fees from allowing all the Vision IB's to partake in the fraud.

621   Intentionally knowing that the conduct violated multiple NFA compliance rules, and in bad faith failing to enforce them, NFA did not contact Plaintiff once for any more information. NFA requested no follow up information from Plaintiff, about the numerous allegations about fraudulent sale and solicitation, unauthorized fees, and dissemination of trade secrets.

622   At the time of Plaintiff's phone-call, upon information and belief NFA was also in breach of its own compliance obligations to audit all the Vision brokers. NFA had *never* conducted an audit of IB Lazzara since Vision was disbarred, had not met the minimum frequency requirements to audit, were in violation of commission delegation.  Upon belief, numerous other Vision brokers had not been audited ***ever*** since the transfer in 2014, if NFA had performed it requisite audits, and had enforced it rules NFA 2-2, NFA 2-3 NFA 2-26, NFA 2-29 to require Vision IBs' and Lazzara to comply with the disclosure laws, Plaintiffs would not have suffered significant harm and damages.

623   As Agkok had intentionally failed to respond to her questions, and failed to enforce rules Kumaran followed up on or around October 19, 2017 and communicated with NFA Compliance

Page 121

Officers Tom Paschen and Jay Bond. LinkedIn profiles states that Bond i a certified fraud examiner for over 10 years and manages and oversees risk-based operational and financial audits of NFA Member Firms to ensure compliance with NFA Rules, CFTC Regulations and industry standards.

624   Bond and Pashcen, NFA Compliance staff, again received constructive documented complaints, that consents were not being granted, that Plaintiffs' (a CTA's) trading account, had been disseminated to Vision, its owners, employees and affiliates, in violation of NFA Rule 2-4, 9061, and the risk management was replete with errors and omissions, violations of the CME rules of posting margin, and other NFA rule violations they had a duty to enforce. NFA therefore knew that the so-called G&F Agreements were being breached, contracts they were supposed to enforce. Kumaran posed specific questions that privacy laws had been violated that third party NFA-Members, disbarred Vision had obtained access to a CTA's trading record without consent.

625   Plaintiffs do not know who Bond and Paschen forwarded their emails to, but their failure to respond was concerning. Since a CTA had now uncovered the scheme and its actions were protecting their own interests than legitimately providing protection to traders who made the hotline complaint. As stated supra, NFA already knew about the dissemination as they had intentionally authorized the scheme back in November 2014, that had gone undetected for three years.

626   Therefore in bad faith, and their duties to NRCM and Kumaran also both paying registered NFA members, NFA again intentionally failed to respond to Plaintiffs' questions and in bad faith intentionally failed to enforce the rules they had a duty to do. NFA knew that any answer would implicate their own liability would be exposed. They therefore vacated compliance duties to respond

627   NFA never followed up with Plaintiff on the unauthorized fees, breaches of privacy and how its CTA strategies had ended up in the hands of its competitors, disbarred Vision, violation they had a duty to enforce, and despite the charred disciplinary record that Vision had, deliberately contradicting the false and misleading narrative and NFA's own public announcements that anyone "doing business with High Ridge, would have access to Vision's background".

628   The CEA is explicit in NFA requirement to adopt "fair market participation rules" and "absolute standards" to promote "competition". Even though Plaintiffs, as "newcomers" and newly registered NFA Members, called the NFA in September 2017, for enforcement of their CTA rights, NFA knowingly failed to enforce any of the compliance laws, rules, regulations and bylaws.

Page 122

## *SECTION 19 - KIELA CONTINUES TO NOT ENFORCE*

629   Unknown to Plaintiffs, instead NFA instigated a cover-up, during the period October 17 2017 until around March 13 2018, NFA compliance officer Kiela, conducted what was to be another rubber-stamp auditof Lazzara. Despite again the heightened "red-flags" where Plaintiffs had documented non-disclosure and failure to seek consent, Kiela did not conduct an "investigative" audit. Instead, following the "check-box" mentality, she only conducted a "general" audit – in wholesale, failing to investigate or dig deeper into any of Plaintiffs serious legitimate complaints.

630   Although the NFA's investigation into Lazzara directly involved and was commenced only after Plaintiffs reported misconduct on a CTA's property and rights, that clearly violated NFA 2-29, NFA2-4, NFA 2-26 and NFA 2-2, and other **Violations**, NFA and Kiela deliberately did not contact Plaintiff once. The audit was not logged as an "Investigative" but only as a routine IB audit.

631   At the time of the so-called audit of Vision broker Lazzara, NFA and Wahls had signed multiple audits, that intentionally, in bad faith, knowingly failed to enforce the non-discretionary compliance laws of disclosures, withdrawal of fees, margin rules, and non-dissemination of proprietary CTA trade data and other regulations and requirements under the CEA (NFA 2-2, NFA 2-3,  NFA 2-4, NFA 2-4 9001, NFA 2-4 9065, NFA 2-37, NFA 2-26, CFTC 1.11, CFTC 1.55. CFTC 33.7 amongst others **Violations**, thereby adopting a different set of standards from one set of NFA participants to the other.

632   Kiela and NFA had no intention of enforcing the compliance laws, and were working with Conspirators to propagate the scheme.

633   They intentionally chose to exclude Plaintiff from participation in any investigation, as that directly implicated NFA's own wrongdoing, thereby obtaining only a one-sided review of the facts, so that, purposefully none of Kumaran's actual allegations could be properly reviewed or considered, and to shield NFA's own complicit-ness and failure to enforce compliance laws and willful participation in the scheme.

634   Further, because NFA were already part of the conduct, tellingly NFA did not conduct an "investigative" audit as would ordinarily be required if someone calls the hotline to report fraud or other deceit and misrepresentation and conducted a general compliance examination of Trey Lazzara. The audit however was not designed to legitimately investigate any of the conduct Kumaran alerted them to, but to cover up, and to conduct an incomplete one-sided investigation and to rubber-stamp, NFA's compliance with its own DSRO frequency requirements.

Page 123

635   NFA did not respond to Plaintiffs concerns to protect its CTA rights or provide Plaintiff with notice of the investigation. NFA also intentionally failed to ask for two-sided explanations of the material allegations of compliance violations, including dozens of jpgs of evidence of margin calculation errors, and fraud and deceit (including multiple misrepresentations and omissions) on Kumaran's account and even though it was a first audit on a Vision broker Lazzara. For example, there were multiple false statements made by Lazzara in email, as well as jpgs of screenshots of mishandled risk management that violated CME Span Margin rules.

636   Further, NFA, intentionally took actions to conceal the investigation from Kumaran and to procure an outcome that did not equally enforce the rights of all. The same allegations occurred in another action against the NFA, Effex where NFA failed to conduct an investigation that properly included evidence from the persons actually harmed.

637   At the time of the audit, NFA and Kiela had actual and constructive knowledge of  Kumaran's call to the NFA compliance line on or around September 27, 2017 and reporting of violations of NFA compliance laws, including but not limited to the dissemination of CTA's trading records, without its permission, authorization and consent to Vision. Since they were also NFA Members, this conduct was in violation of NFA 2-4 Interpretive Notice 9061. NFA were in receipt of the communications from Kumaran including those dated September  29, 2017 to Agkok, (*See* Supra)

638   Not only had Agkok provided Kiela, with the emails and correspondence from September  20, 2017 and September 27, 2019  that Kumaran had the NFA, that Kumaran had supplied during its call to the NFA Compliance, those emails outlined multiple regulatory violations including those of mishandling margin and violations of NFA 2-26/ CFTC 1.11, CFTC 33 and CFTC 1.55. NFA under rule 2-26 are require to enforce those laws. They had actual and constructive knowledge of the fraud.

639   On or around October 17, 2017 Kiela requested from Trey Lazzara, copies of all communications, emails and documents related to Kumaran's account. Therefore again, NFA and Kiela had constructive knowledge of all the fraudulent activities related to the account outlined multiple regulatory violations including those of mishandling margin and violations. (*See* Vision FAC ¶197-¶282 documenting numerous fraudulent and incorrect statements)

640   ~~NFA 2-2-~~ and the antifraud provisions of the 7 USC 6(b) make it unlawful for Lazzara to cheat, deceive or apply any form of misleading statement in the transaction of futures. Yet Lazzara

Page 124

communications were full of misstatements and directly dishonest communications to knowingly conceal the rogue risk operation in Stamford, CT.

641   NFA and Kiela, purposefully and again for fraudulent and illegal purpose, did not enforce the material NFA 2-2 and 7 USC 6(b) antifraud laws, thereby condoning in bad faith the illegal conduct of Lazzara to lie, conceal and cheat Kumaran, even when it was clear from the emails, that Plaintiffs were routinely disputing the accuracy of he risk services, and questioning Lazzara on the risk procedures, and had legitimate concerns that the risk department was full of errors and omissions.

642   Not once did NFA or Kiela investigate the documented errors and omission or the failures of the Vision Risk Group to comply with the Margin Exchange rules.

643   NFA and Kiela's willful and intentional failure to enforce NFA 2-2, and 7 USC 6(b) was bad faith, and for illegal and fraudulent purpose to cover the scheme that they had instigated to fund the activities on the Vision brokers and Plaintiffs' account had already been marked as one of "subprime" accounts – being used as collateral damage to operate outside of the CEA. Therefore their improper purpose was not to enforce compliance laws, but to further propagate the illegal scheme.

644   At the time of NFA examination, screen shots from Lazarra's computer, evidence the NFA had direct, actual and constructive knowledge, that Lazzara's fraudulent conduct had impacted and defrauded dozens if not more of his customers, and CTA's who had no knowledge that their confidential trading accounts had been disseminated to Vision, and who had not approved fees across interstate lines, to fraudulently transfer moneys to Vision affiliates.

645   NFA and Kiela also had material and direct knowledge, that Lazzara, in participation with ADMIS, Vision had gouged, through both Plaintiffs and multiple customer's accounts being defrauded, an estimated excess of $100,000 in authorized fees a year from Lazzara only, from his customers and CTA's in express violation of the Commodities Exchange Act, and NFA Compliance Rules 2-26, which in turn generated substantial revenues and operating fees for the NFA.

646   NFA and Kiela knew customers had not been given the required disclosures or granted consents on this information at account opening in violation of the black-letter law for fee disclosures and sales and promotional requirements required under the CEA and NFA had an affirmative duty to enforce the fraud and compliance laws. (NFA 2-29. NFA 2-26, NFA 2-2).

647   Kiela also failed to investigate any of the sale and solicitations from unregistered AP Villa, and her full-time work, with customer facing activities during the exact same period Plaintiffs account

Page 125

was being depleted with over $1000 in purloined fees between May 2, 2017 and June 25, 2017 – the exact 45 day period Villa was working.

648   These fraudulent financial deductions were also being used to directly pay Robert Boshnack, Howard Rothman and Vision, without the customers and CTA's knowledge, authorization and consent, who were using back-door deals with ADMIS, "credit lines" and "guarantees" to NFA Board Members, which in turn were illicitly propping up the futures industry, funding operative revenues of the NFA, to buy themselves back into the industry after being disbarred.

649   At the time of the audit, NFA and Kiela had actual and constructive knowledge of Plaintiffs call, as registered NFA members and CTA's,  to the NFA compliance line. She also had constructive and actual knowledge of the G&F Agreements, the illegal oral risk services, and Boshnack's. credit lines on the accounts, and the requirements that those agreements operate in compliance with laws for disclosures and consents from customers and CTA's. But with intention , NFA and Kiela, willfully intended to not enforce Compliance laws to allow the fraudulent scheme to continue.

650   Therefore after the audit which was completed between October 17, 2017 and or around February 23 2018, Kiela with actual, direct and constructive knowledge of the foregoing conduct, directly participated in and facilitate perpetuation of the fraud, in bad faith willfully failed to enforce the Commodities Exchange Act, and NFA Compliance Laws and signed her name on the audit to permit the conduct to continue including but not limited to NFA2-29 as listed in the **Violations** supra.

651   Not only did NFA and Kiela perpetuate violation of numerous NFA Compliance Rules the very rules they had a duty to enforce, Kiela failed to abide by multiple Federal laws, that protect the integrity of customers personal financial data, confidential information as well as their proprietary trading records and transaction history.  For example for CTA's, professional traders, who were direct competitors of Vision Investment Advisors, LLC, Felag and Boshnack, another CTA, Federal law prohibits the unauthorized dissemination of a CTA's trade secrets to their competitors, under 18 USC 1831 el seq, across interstate lines under the Defend Trade Secrets Act.

652   NFA and Kiela's conduct infringed the very heart of the Commodities Exchange Act, that the NFA 7U.S.C.1,§5 was enacted to promote "fair market competition" and to protect the interests of market participants, to promote responsible innovation and fair competition among market participants. The purpose of the NFA's Articles of Incorporation Section 1(a) public interest…is The adoption, administration and enforcement as … regarding fair practice and designed to prevent

Page 126

fraudulent and manipulative acts and practices, to promote just and equitable principles of trade and, in general, to protect the public interest" (See also https://www.nfa.futures.org/rulebook/index.aspx)

653   In fact, the report also does not recommend that. Lazzara or LCI disclose to its customers the role that Vision plays with respect to risk management activities, including handling margin matters involving Lazzara's customers' accounts that are cleared through ADMIS. Defendants intended to conceal the activity, as they knew many customers would close their accounts if they found out.

654   By intentionally failing to enact the foregoing compliance laws, the NFA had a duty to enforce, NFA and Kiela directly aided and abetted and provided substantial assistance in perpetuate the fraud on customers and CTA's. Such actions involve material violations of the non-discretionary duties of Commodities Exchange Act, and material, intentional and bad faith failures of the NFA, Kiela to enforce NFA compliance rules to propagate the scheme NFA and ADMIS and Vision.

655   As a result of Defendants bad faith failure to enforce its laws, Kumaran, NRCM continue to have suffered irreparable harm in loss of their confidential and trade secrets, financial losses in their trading accounts, deplete losses in performance records, damages to their good will and other impacts to the their CTA careers, financial losses to their property, livelihoods and investments in the futures industry, as well as other significant damages.

## SECTION 20 - TOM KADLEC FRAUDULENTLY CONCEALS

656   Still unaware even that High Ridge had even obtained its data, or any of the inner workings of the scheme, or the G&F Agreements, on or around April 19, 2018 Plaintiffs attended the CTAExpo (a trade show for CTA's and other market professionals) at the Stewart Hotel in New York City. At the expo, Plaintiffs ran into Tom Kadlec in person, who was also attending the conference.

657   Plaintiff Kumaran spoke directly with Kadlec, and started to inquire directly in person on the handling of its account. Kadlec however stated he was in a hurry to go to a conference call, and stated they would follow up.

658   On or around April 20, 2018 Plaintiff emailed to Kadlec directly, and inquired directly if the parties could speak related to the handling of its account. Plaintiff stated "*I have some serious concerns with how my account was handled.*" At that time Plaintiffs did not have knowledge of the extent of fraud and participation or what Vision was doing. Nor did they know with certainty its account had been disseminated or anything about the existence of risk group, or Boshnack's guarantees. But Kadlec did know and had material knowledge at the time of the communications.

Page 127

659   On April 21, 2018 Kadlec replied to Plaintiff in email and stated "*I will review with ADMIS staff upon my return to the office which will be late next week.*"

660   Kadlec never responded or followed up or replied to Plaintiffs request. Kadlec instead, together with Conspirators, despite his own independent duty, not just as a Board Member of the NFA, but also as CEO of ADMIS, that had statutory and non-discretionary duties as an FCM to disclose the risk services agreement (See CFTC 1.55) and provide a reasonable explanation of the G&F Agreement to Plaintiffs, (NFA 2-29) and other conduct related to the handling of its account.

661   Kadlec, as the CEO of ADMIS, and also an NFA Board Member had superior knowledge and had a duty to his customers and traders, who had entrusted funds to him and his company to disclose all relevant information about his FCM. (*See* CFTC 1.55(k)(l)i) supra). Kadlec due to his position of superiority and influence and control over access to information, that Plaintiffs and other customers and CTA's, had to rely on him, as the source of accurate information Kadlec had a duty to transfer accurate information to Plaintiffs, a duty to be honest, had a duty to communicate accurate information to Plaintiffs.

662   Since Kadlec was a registered NFA Member and Board Member and CEO of ADMIS as a registered FCM (which had a duty to abide by the rules and laws of the CEA), and had superior control over the information, and Plaintiffs placed trust and confidence in the Kadlec and CEO of ADMIS, and an NFA Board Member to be honest, as is mandated under the laws, rules and statutes.

663   At all times Kadlec *knew* of the relationship with Vision Defendants and its directly competing HRHC CTA Referral program, *knew* that Plaintiffs account would be and had been disseminated to its competitors HRHC Defendants, *knew* that risk management services had been outsourced by members not registered or qualified to provide such services, and *knew* that additional unauthorized fees would be deducted from Plaintiff's CTA track record to pay HRF – yet he persisted in willfully, wantonly and intentionally continuing to deceive, engage in the concealment and omit material facts, with wanton disregard for Plaintiffs' rights.

664   Kadlec, knowingly, intentionally and fraudulently omitted to disclose all information about the *Vision Risk Group*, or Boshnack's individual guarantees, the trailing fees and commissions, the withdrawals from Plaintiffs accounts, and as a CTA the dissemination of its trading strategies, transaction history and trade secrets to its competitors.

127

Page 128

665   Kadlec's omissions at the time of April 19 2018, and April 20, 2018  in direct communications, also were with the purpose of inducing Plaintiffs into Arbitration, as Kadlec knew that NFA were had approved the scheme, and that Plaintiffs were considering arbitration. Kadlec as NFA Board Member had a duty to disclose the conflicts in interest in NFA Arbitration – and his omissions to Kumaran personally, were to continue to propagate the fraud and cover up, and further induce into an NFA controlled Arbitration.

### *SECTION 21  - TOM KADLEC, CEO OF ADMIS, IS APPOINTED ONTO NFA BOARD AND MEMBERSHIP COMMITTEE – UNFAIR COMPETITION*

666   Instead Kadlec, on the Membership Committee together with NFA, approved the registration of Boshnack and Rothman, to become direct competitors as CTA's.  Any registration of Boshnack and Rothman to become market participants as CTA's given they  AP's of an expelled Vision Financial Markets, required an order by the CFTC or  a ruling by the Membership Committee that they did not pose a threat to other members.

667   On or around March 13, 2018, Kadlec and NFA instead approved Boshnack and Rothman to start yet another registrant called Vision Investment Advisors, LLC ("VIA") to compete directly as a CTA, and directly with Plaintiffs, despite the unlawful acquisition of dozens of his CTA's and customers trade secrets. This direct violates the heart of the CEA to stem unfair competition and promote innovation.

668   On the application for registration NFA and Kadlec, knowingly made false statements and omissions, that Boshnack and Rothman had unlawfully and improperly access and acquired hundreds of its competitors CTA's strategies, without their knowledge and consent  (including Plaintiffs) and also failed to make the material disclosures tat behind the scenes Boshnack and Rothman were providing  orally-approved risk services for ADMIS, which granted them back-door access to thousands of customer accounts, and put them in a directly conflicting position.

669   Further as stated supra, their grant of services for ADMIS, was expressly prohibited by the CFTC as their registration to extend margin, and guarantee accounts was forbidden since they were irrevocable expelled. Their application was unlawful as it failed to make true disclosure on the unfair competition of HRHC CTA Referral and the unlawful acquisition of its competitors trade secrets, and put them in a directly competitive advantage. Their improper acquisition of CTA trade secrets is expressly prohibited under the NFA Rules, and also under Federal law (See Supra Section 10)

Page 129

670   At all times through the life of Plaintiffs' account Boshnack and Rothman played directly supervisory roles, were actively involved in accessing the accounts, engaging in direct phone calls with Vision broker Lazzara overseeing the account and handling margin activities. Further they had discretionary authority on the account.

671   Defendants violated 7 USC 13 (a)(3)(4)(5) by not disclosing in their application for registrations as both IB, and also VIA's application for registration as a CTA, the "oral-arrangement" that granted him unauthorized by the CTA or customer, access to their accounts, (See Section 10(iii),11(iii) supra)

672   Despite the conflicts of interest, Kadlec did not recuse himself from any decision to rule on the Membership Committee  under NFA Bylaw 301(e)(i) and neither the NFA nor Kadlec did any due diligence or investigation to protect his other CTA's. Instead he, Defendants  were motivated to provide an unfair competition to HRHC CTA Referral, and VIA, and provide more favorable circumstances, as they relied on HRHC's profitability for their banking arrangements.

673   Therefore to continue their fraudulent and illegal scheme, by which Boshnack was "financing" hundreds of millions of dollars of credit, NFA and Kadlec, knowingly and intentionally failed to enforce and violated the registration provision of the CEA, including but not limited to Bylaws 301(e.) and CFTC, and engage in direct unfair competition after depleting the profitability of its competitors.

674   NFA and Kadlec, as they knew they had engaged in direct competition, to transfer the competitive trade secrets of CTA's and Plaintiffs to VIA,  failed to audit any of the trading strategies of CTA's who's trade Boshnack, Rothman and VIA had improperly acquired over and  for fraudulent and improper purpose, failed to abide by the registration requirements of NFA Bylaw 301 (a)- (e) Since the CFTC did not order Boshnack's registration as a CTA, the registration was in bad faith, fraudulent, illegal and caused significant harm to other CTA's.

675   Further VIA, by unlawfully acquiring its competitors trade secrets, now were using, in interstate commerce, together with the personal benefit of Kadlec for profit and gain, CTA programs that incorporate and mirrored those of its CTA's it had harmed. VIA's options strategies were substantially similar to those of Plaintiffs' options trading strategies, and were only created and replicated after Boshnack and Rothman had studied, replicated, copied and improperly utilized the trading algorithms therein, and now to front-run Plaintiffs' CTA program, in 2018

676   After unlawfully acquiring Plaintiffs options account, VIA then launched a directly similar program  in direct competition The STORM program is a unique options strategy that applies in multi-

Page 130

commodities including but not limited to S&P options, in direct competition to the S&P options programs offered by the new Vision Investment Advisors, LLC ("VIA"), also a CTA. The program mirrors strikes, volumes, prices, execution and risk management that was unlawfully acquired from Plaintiffs. Conspirators only conceived and launched their program in 2018, after being given unlawful backdoor access to study, replicate, Plaintiffs proprietary account, and then just eight months later in 2017, launched a directly similar program, that mirrors the strategy. Conspirators were then allowed to front run Plaintiffs CTA using identical strategies that could not have been learned or created without gleaning from Plaintiffs' trading account.

677   Incorporated by reference herein is Vision FAC ¶126-¶141 related to the replication and use and profit of misappropriated trading strategies and unfair competition, for use in interstate commerce and Kadlec and NFA directly engaged in unfair competition and misappropriation of trade secrets. In unlawfully registering VIA, Boshnack, and NFA and Kadlec, knowingly and intentionally violated NFA 2-4 9061 to notify CTA's that their trading records had been disseminated to a competing CTA.

678   Their acts of misappropriation and unfair competition are incorporated herein by reference from 20-CV-3871 ADMIS FAC ¶2-4. NFA, Kadlec and ADMIS engaged in directly anti-competitive behavior to procure an unfair competitive advantage to HRHC, Boshnack and his affiliates and associates. This also is a willful violation of the CEA and the laws and rules of the NFA.

679   NFA and Kadlec fraudulently and for illegal purpose violating the registration requirements failed to audit any of the CTA's and Vision Investment Advisors to ensure no threat or unfair competition had occurred. Failed to notify CTA's of the violation of NFA-2-4 9061 and enforce that rule and fail to enforce the CEA to uphold high standards of market integrity and protect CTA's from harm. NFA and Kadlec's conduct also violated 17 USC 13(a)(3) which makes it unlawful to omit any material fact stated in their registration[59]  - and NFA and Kadlec, knew Boshnack, Rothman were illegal acting as a risk management arm of ADMIS, without the FCM license to do so, thereby unlawfully acquiring dozens of their competitors trade secrets.

---

[59] 17 USC 13(a)(3) Unlawful – False and misleading in registration Any person knowingly to make, or cause to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement required under this chapter, or by any registered entity or registered futures association in connection with an application for membership or participation therein or to become associated with a member thereof, which statement was false or misleading with respect to any material fact, or knowingly to omit any material fact required to be stated therein or necessary to make the statements therein not misleading.

Page 131

680   NFA Kadlec, violated the registration requirements in materially failing to disclose to the CFTC, Boshnack, Felag, Rothman and VIA's and their affiliates wrongful access to CTA"s accounts without their consent, and violations of CFTC Reg 1.11 and Reg 1.55 rendering their registration unlawful and NFA's failure to enforce these rules, fraudulent, illegal, for improper purpose and bad faith.

681   NFA also failed to update and correct its public statements, which it knew were false, that it would conduct a "thorough fitness examination" prior to permitting the reregistration of Boshnack and Rothman – this time as CTA's. No fitness examinations were conducted and they were then permitted to misappropriate their competitors trade secrets and operate new affiliates using illegal "oral arrangements" that the NFA was party to – in illegal violation of the CEA

### SECTION 22 -  AFZAL INDUCED TO ARBITRATION

682   On or around March 14, 2018 unaware of any of the activities of NFA and Kiela and not having received any follow up from the NFA about its September 2017 phone calls, Kumaran from New York, called the NFA again to inquire about the compliance violations. On or around March 15, 2018, via teleconference in New York City, Kumaran spoke again to NFA compliance staff Sebastian Waliczek and Muhammad Afzal located in New York City, NY.

683   During the call, Kumaran specifically inquired from Afzal what approvals NFA had granted to permit a CTA's transaction records to be distributed, without consent to other NFA Members, and the disbarred Vision team, without CTA's consent specifically that violated NFA 2-4 9061.

684   Afzal and Waliczek had superior knowledge and direct knowledge at the time of the phone call of the scheme, including that (a) NFA had *approved* the G&F Agreements for Boshnack to individually guarantee Plaintiffs account, and that (b) NFA had approved the illegal outsourcing of risk management to *Vision Risk Group* in violation of CFTC Reg 1.11 which was not being disclosed as is mandatory to CTA's under NFA 2-26/Reg 1.55 as required. Afzal and Waliczek knew NFA had approved the illicit risk agreement, which unlawfully permitted Vision Risk Group (as expelled and unqualified to act as an FCM) to access Plaintiffs CTA transaction records in violation of the rules, and act outside of their registration capacity as a disbarred FCM.

685   Instead, during the call on March 15, 2018, speaker Afzal in New York, fraudulently concealed the information and stated on the phone that "the case had been closed" without explanation. He said the information was in an NFA computer system related to Plaintiffs call but refused to explain any

Page 132

information about why the matter had been closed. Plaintiffs as registered CTA and NFA Members had a right to know why their data and rights under NFA rules were being violated.

686   NFA and Afzal were in a position of superiority and influence over Plaintiff, since Plaintiff did not have direct access to the information about the risk authorization and trailing fees (which are black letter law and mandatory to be disclosed under NFA 2-3, NFA 2-4, NFA 2-26/CFTC 1.55, 33.7, NFA 2-29), and NFA and Afzal had superior control over the information and Kumaran and NRCM placed trust, confidence and reliance on NFA to be honest.

687   Instead of enforcing the NFA rules, however Afzal had full knowledge of Kiela's audit that continued to endorse the illegal and  fraudulent conduct to not disclose Visions' ongoing illegal market participation and NFA's priority to cover it up. Afzal appeared in the call more concerned on how Plaintiffs had found out, and what information Plaintiffs had to show that NFA had participated in the scheme. In the phone call, Afzal requested specific information, including "emails" from Plaintiffs  on how Plaintiffs knew the NFA had approved the conduct.

688   On or around March 16, 2018,  in accordance with Afzal's request, and reliant and trusting that the NFA was enforcing the duties and compliance laws, Plaintiffs sent to Afzal the email where Vision broker Lazzara, admitted that the NFA had approved the relationship. (**Exhibit 12** is a true and accurate copy of the email that Plaintiffs sent to Afzal)

689   However, at that time, unknown to Plaintiffs, NFA, Afzal and Waliczek, already had direct and substantial knowledge of NFA's authorization to disseminate accounts and in fact knew further, that Kiela's so-called audit, had further endorsed the illegal conduct – and were furthering NFA's own illegal participation in the conduct to cover-up and conceal the information from CTA's and Plaintiffs. Instead of enforcing the rules, NFA, Afzal, Waliczek, directly partook in the fraud, to conceal and cover up the illegal activities, and continued to fraudulently conceal that this long-standing arrangement was being intentionally being used to harm CTAs.

690   On or around March 25 2018, Plaintiffs sent further documentation to Afzal and other NFA Compliance officers, that showed direct evidence of violations, including but not limited to facts that (a) Plaintiff, a registered CTA, had its confidential and trade secret information transaction history, sent to Vision without its knowledge consent and authorization in violation of NFA 2-4  9061 and; (b) Kumaran, without disclosure, consent and permission, was charged unauthorized fees that were being deducted to compensate Vision in violation of NFA 2-26. Afzal was also provided in advance

Page 133

a document of a list of about thirty pages of NFA Rules violations that Kumaran would allege against ADMIS and Vision affiliates, which were not being enforced.

691   NFA and Afzal again had direct and actual knowledge of the complaint, and Plaintiffs concerns and **Violations**. At no time did Afzal state there was a mistake or Plaintiff had not interpreted the laws incorrectly.

692   Instead NFA and Afzal had material knowledge about the activities of Kiela, Wahls and NFA's authorization to defraud other market participants, and knowingly and intentionally omitted to disclose, cover-up the activities, and concealed the information from Kumaran, and stated the matter was closed – failing to elaborate. NFA at all times had a statutory duty to enforce its compliance laws, and had a special duty to protect its CTA's and registered members. (See Article I – a primary purpose of the NFA was to protect customer and traders).

693   NFA and Afzal also had a statutory duty to disclose to Plaintiff about the G&F Agreements and the oral risk services, and any arrangements that impacted Plaintiffs accounts and why they were being concealed, and also to initiate a Business Conduct Complaint and enforce disciplinary action against any violation of the NFA Rules. Instead they did not. They willfully chose to not enforce.

694   For example NFA 2-4 9005 makes clear that any intent to deceive and not disclose fees, shall subject the member to disciplinary action. But not such disciplinary action ensued as it was pre-determined that NFA and Afzal were intentionally not enforcing their rules.

695   After seeing the numerous **Violations**, listed in the exhibit, on or around March 25, 2018, using telephonic communications from New York to Plaintiffs in her offices in NYC, Afzal stated that NFA does not investigate compliance complaints unless NFA receives Arbitration Fees, and NFA would need payment of $9,500 before looking into the material violations discussed. NFA's requests to be "paid to investigate" legitimate compliance complaints violates the NFA's mandate and statutory obligations and the CEA.

696   NFA intended to use the NFA Arbitration forum as a ruse, to restrict Plaintiffs from further asserting its rights, and therefore, used the information received, which could incriminate or point out illegalities at the NFA's own conduct to take over the action to induce Plaintiffs into an NFA controlled arbitration, where they could ensure an unfavorable outcome, restrict access to documents and produce procedural bias to the Co-Defendants.

Page 134

697   Afzal also stated that once complaints are filed at the NFA Arbitration, he would then be able to access them, because Arbitration complaint were also sent to NFA Compliance for review, and that only after a Plaintiff paid its fees to the NFA Arbitration does the Compliance review it.

698   These statements were material false when made, and both falsely represented NFA's statutory obligations to conduct, and were made for the sole purpose to induce reliance by Plaintiffs to comment an NFA Arbitration, to cover up the illegal and fraudulent participation of NFA themselves.

699   Afzals statements were false when made as NFA and its compliance staff had no intention of enforcing the compliance laws and it is also unlawful for a regulator to demand "pay-for-play".

700   No-one at the NFA had responded once to Plaintiffs' legitimate questions on how it was possible for the employees and owners of the disbarred Vision, to be accessing its confidential trading account of another CTA, without its permission, as specifically prohibited under the rules.

701   At the time of the communications, NFA Compliance Staff Agkok, Bond, Pashcen, Afzal had full knowledge of the NFA'a approval of the *Vision Risk Group* unlawfully operating as an unregistered division of the FCM, and deliberately took actions to conceal information. Afazal and others, knowingly and intentionally concealed, about Kiela's audit, failed to respond to and answer legitimate questions and emails, (as to which rules protect CTA's confidential information), or that NFA already knew and approved that CTA transaction data was being disseminated and fees withdrawn, and by knowingly and willfully omitting and concealing material facts, including their own signatures on the audits and approvals of the risk services and  G&F Agreements that violate numerous laws, induced Kumaran into a biased and evidently partial proceeding.

702   Plaintiffs continued to place special trust and reliance on the NFA, as they were certified and registered NFA member and reasonably relied, based on the "on-paper" compliance laws and rules of the CEA that NFA would uphold those rules and fair market participation.

703   Prior to selecting the NFA Arbitration Forum, could not have uncovered the fraud upon due diligence, prior to initiating the Claim. Therefore the fraud was (1) not discoverable upon the exercise of due diligence prior to the arbitration; (2) materially related to an issue in the arbitration; and (3) established by clear and convincing evidence[60].

---

[60] 9 U.S.C.A. § 10(a)(1).

Page 135

704   In fact Afzal went as far as to demand more money for the NFA, and stated that the only way NFA would investigate a "compliance complaint" is after Kumaran paid $9,500 to the NFA Arbitration department. Since at the time Kumaran had no knowledge of the NFA's complicit involvement, Plaintiffs reasonably relied on Afzuls's representations, and reasonably believed and trusted the NFA would genuinely uphold the rules.

705   Instead Plaintiffs were deceived and had no knowledge that NFA were fully complicit in the scheme and were induced to bring the Arbitration at the NFA, (as opposed to any other forum) because they were deliberately misled, that the NFA would only look into and enforce compliance violations if it brought the NFA Arbitration, and paid money to the NFA..

## SECTION 23 – NFA ARBITRATION VIOLATES DUE PROCESS RIGHTS

706   Reliant on the fraudulent representations and omissions by Afzal and NFA, on or around May 22 2018 Kumaran and Plaintiffs wired $9,500 to the NFA Arbitration department, and paid the fees Afzal stated were requisite to NFA enforcing compliance violations. It is also a violation of its statutory duties to require "payments" from traders to investigate compliance violations.

707   On or around June 8, 2018 Kumaran electronically filed its final complaint (after being granted two tolling extensions, with the initial notice of intent filing made on March 6, 2018, initial filing on April 9, 2018, tolling extension until May 8, 2018  (in part due to mail correspondence not received and no emailed notification), notice for fees to be paid by June 8, 2018 and second tolling extension until June 8, 2018) with the NFA Arbitration department.

708   In accordance with NFA rules the filing date related to notice of intent of March 6, 2018. The Complaint cited multiple violations of the Commodities Exchange Act, and the scheme by ADMIS, Vision and numerous Vision IB's, to defraud customers and CTA's.

709   NFA archaic Arbitration proceedings only accept "paper filings" and claim they keep no electronic records of arbitrations, or electronic storage requiring Plaintiff to physical mail over eleven copies of hard copies of Complaints and Exhibits, of additional cost and burden.

710    At the time Plaintiffs had no idea that NFA was a participant in the fraud and had knowledge of any of the alleged conduct. If it had known it would have selected an alternate forum.

711   NFA is required to provide a unbiased, fair, and neutral forum for arbitration for resolution of customer and member disputes.[61] NFA's bylaws, rules and regulation that is given by Article III(c)

---

[61] *See* NFA s Article II, Article III, NFA Bylaw 1506, and NFA Bylaw 801, & CEA 7 USC 21(b)

Page 136

are also governed under Section 22 in the obligations of the NFA to enforce "fair" and "equitable" procedures. Any Arbitration has to comply with the Federal Arbitration Act, 9 USC 1 el seq.

712   Under those rules and code of ethics of FAA, NFA must make the requisite disclosures both as administrators and to the arbitrators, of any all conflicts of interests and their involvement in the scheme. ADMIS had later made clear that Wahls and Kiela were to be called as "defense witnesses" to defend ADMIS's conduct. Under the Code of Arbitration guidelines, NFA were therefore required to disclose their knowledge and appearance as defense witness to avoid the perception of bias.

713   The FAA mandates that Plaintiffs have access to a neutral and unbiased forum, without any perception of bias. Any relationship involving the alleged conduct between NFA, ADMIS and Vision Defendants needed to be disclosed both to Plaintiffs and to the Arbitration so any conflicts of interest addressed. But NFA knowingly did not make the necessary and mandatory disclosures under the FAA, related to its own evident partiality and liability in the conduct and instead hurled forward to manipulate a proceeding, without equity in the due process to Plaintiffs in any of the procedures.

714   For instance, the FAA requires Plaintiffs are also entitled to a fair, expeditious and equitable resolution of its rights. But NFA for instance took multiple overt actions to deny Plaintiffs a "fair" and "equitable" resolution. They took over 275 days to appoint an Arbitration Panel, (close to 9 months), they permitted and acted with Conspirators, to violate NFA's own Arbitration Rules including 7(a)(2) procuring delays of over 523 days to produce the G&F Agreements, which by NFA's own rules were supposed to exchange on October 15, 2018 – instead they acted with Conspirators to conceal documents and withheld for another 365 days until October 2019. The extraordinary bad faith conduct, continued to ensure the concealment of documents, evidence, motions, exhibits, going as far as to conceal filings from the Panel, obstruct subpoeans, require over $12,000 by wired to NFA Board Members witnesses who had incriminating information about the NFA and take over procedural aspects from the Panel, including permitting only 24 hours for Plaintiffs to respond to motions and denying transcripts. And at all times, exerting lenience and inequitable scheduling  (for example 17 day) response times to ADMIS.

715   Incorporated herein by reference ECF1 ¶125-¶260 is an outline of the extraordinary lack of due process in the NFA Arbitration. At one point NFA claimed (without ruling by any Panel) that Plaintiffs could not be reimbursed legal fees, despite its statutory rights under Federal law to do so, thereby deterring any legal counsel from participating.

Page 137

716   On or around February 26, 2019 (over eight months into the proceeding), Plaintiffs learned through discussion of discovery documents, that ADMIS intended to produce documents, including signed audits by Wahls and Kiela, that demonstrated that NFA was fully aware of the conduct and that NFA itself, had participated in the scheme with ADMIS, to disseminate customer and CTA's confidential trading accounts to Vision, and that NFA was itself liable for the conduct.

717   Plaintiffs learned there was a direct conflict of interest in the NFA Arbitration Forum administering the proceeding.

718   Plaintiff also learned that the documents demonstrated NFA's, Wahls and Kiela's complicit conduct in the scheme and material failures to enforce NFA compliance laws and above mentioned **Violations**. Kumaran learned for the first time that NFA employees Wahls and Kiela would be called as defense witnesses in the NFA controlled Arbitration forum and became aware that NFA were liable, jointly and severally as a party and defendant in the case and there was a conflict of interest.

719   Promptly, on or around March 1 2019, Plaintiffs sent a Non-Public Information request to the NFA to request all public and non-public documents related to the registration of Vision affiliates. NFA therefore became aware, that Plaintiffs were seeking documents that exposed their direct and substantial assistance in the fraud. **( *See ECF1* Exhibit 5)**  Despite the request and NFA's requirement to comply with the Federal Arbitration Act, Plaintiff received no such non-public documents. Plaintiff only received public registrations which answered none of Plaintiff material requests in Items 1-10.

720   On or around April 6, 2019, in further discussion of discovery items, Plaintiffs also learned for the first time that for four years NFA employee and compliance officer Wahls had been a material part of the scheme, acting in conspiracy with ADMIS and Vision to not enforce NFA compliance laws, and to permit dissemination of the customer accounts. and that ADMIS intended to call Wahls as a "defense" witness. (*See* Section 13 supra).

721   On or around April 9, 2019 Plaintiff documented in letter to NFA, that Plaintiffs had been made aware of a material conflict of interest, and notified NFA Arbitration staff, that (a) ADMIS was producing documents to implicate NFA was liable for its own rule violations, and there was material conflict in the NFA role in the proceeding and its own liability under 7 USC 25; (b) subpoenas needed to be issued against Wahls, under NFA Rule 701(c) for its own employees participation in the scheme, and (c) issues had been raised about NFA had violated its own rules and Bylaws, related to the re-registration of Boshnack and Rothman

Page 138

722   However despite repeated and numerous requests, as outline in ECF1¶125-¶260, NFA failed to cooperate and provide the documents that Plaintiffs sought related to disclosures of NFA's material involvement in the scheme rendering their ability to administer any arbitration biased or non-neutral. (*See* ECF1, Exhibits 5, 10 and 11) Instead of administering a fair and neutral process, NFA instead subject Plaintiffs to numerous procedural abnormalities and prejudices, overstepping their arbitral powers as administers to act as Arbitrators,

723   In all, the proceeding was slated to make it procedurally impossible for Plaintiffs to pursue it rights in equity to a fair due process, frequently given less than 24 hours to respond to motions, while Defendants were given 10 days, and other outlandish, unsupervised conduct, with material information was being concealed from the Panel.  After close to 18 months of delays, and over four Motions to Compel being willfully delayed, to "hide" the arrangements, Plaintiffs had started to demand subpoenas on the production of documents of the so-called risk services agreement.

724   Once again in defiance of Panel Order and with no consequence from the NFA in an NFA-controlled Arbitration, Defendants materially refused to and failed to provide any documents or evidence of a risk-services agreement, further supporting the entire conduct was "oral" and undocumented – supporting that their conduct was impermissible. (See Section 9, 11). To this date NFA, and Conspirators have worked together to hide and conceal the risk services arrangements.

725   The timeline of violations of due process and other arbitration abnormalities is included by reference in ECF 1 ¶125-¶260

726   On or around September 24, 2019, ADMIS also to attempted to squash subpoenas, and stated they intended *to request NFA's employees be called to testify at a hearing"* as defense witnesses, in an NFA Arbitration. [62] ADMIS's admissions exemplified the material conflict of NFA employees defending ADMIS, further supporting the allegations of NFA knowledge and complicit participation in the fraud NFA continued to abuse the bias in the NFA controlling the NFA Arbitration Forum, where their own wrongdoing was being enjoined in the liability.

727   On September 25 2019, ADMIS filed more unauthorized communications with NFA legal staff, Mr. Brockway, exemplifying the collusion between NFA and ADMIS, and trying to block more

---

[62] *ADMIS email dated September 25, 2019 - As previously stated, the issue which is obviously triggering Claimant's information requests appears to largely be Ms. Kumaran's disbelief that the NFA was aware of the bulk transfer of customer accounts from Vison to ADMIS, and the involvement of High Ridge Futures with those accounts going forward following that transfer.  Accordingly, Respondents will shortly be asking the Panel to request that an NFA employee possessing the relevant knowledge appear at the hearing to provide that information.*

—

Page 139

subpoenas in an NFA Arbitration, revealing the concerted effort to hide information from Plaintiffs "***It is critical that Mr. Brockway be made aware of our very serious concerns with regard to releasing the information sought by Kumaran****.*" The information would directly show NFA's participation to defraud hundreds of ADMIS customers and CTA's, in unfair market competition.

728   On or around October 14, 2019 Plaintiffs filed a response again citing material conflicts of interest in NFA's administration of the proceeding, (See **ECF1, Exhibit 10**). The Panel accepted the motion and gave the NFA until October 21, 2019 to respond or oppose the conflicts of interest. In a material failure to ensure the proceeding has fundamental fairness and protect Plaintiffs as CTA's due process rights, NFA failed to offer a response or respond to Panel's orders. NFA failed to file a response to Kumaran's opposition and response brief, and notably did not oppose the material conflicts of interest and allegations of fraud, corruption and bias in the NFA Arbitration, as was requested by the Panel.

729   If Kumaran's arguments and allegations of wrongdoing and violations of the CEA, notably by Wahls and Kiela raised in the October 14, 2019 memo were frivolous and unfounded, NFA were afforded an opportunity and had an legal obligation, to respond – and to provide information to support its neutrality in administering the Arbitration.  Instead NFA did not respond. NFA failed to offer one factual piece of evidence in contradiction, failed to provide one legal argument to its defense, and intentionally, in bad faith, chose not to respond, in violation of its own duties of impartiality and neutrality, and obligations to not condone bias, under the Federal Arbitration Act.

730   On or around October 31 2019 the Panel signed an order for a *first subpoena* to be issued directly to the NFA in an NFA Arbitration Forum, as ADMIS. The Order was served upon the NFA on November 1 2019. (*See* **ECF1, Exhibit 11**). However, NFA continued to object and refused to produce voluntarily, as required under the FAA, all documents asserting its conflict of interest.

731   On or around November 1, 2019, in that Order, the Panel acknowledged the allegations against the NFA and review of Kumaran's October 14, 2019, motion related  to conflicts of interest in the NFA Arbitration Forum, which NFA failed to oppose or file a response to on October 21, 2019. The Panel ruled  "*We have no jurisdiction over that matter. The Panel would entertain a  request by Claimant at this time to stay these arbitration proceedings (or if it wishes to withdraw the claims with or without prejudice) while it seeks relief against the NFA in the proper forum.*"

Page 140

732    On or around November 4,  2019 the Panel ordered in part a *second subpoena* on the NFA in an NFA Arbitration Forum, for the NFA to produce documents, that required production of documents related specifically to Defendants Wahls and Kiela, NFA Compliance Officers, who were also to serve as witnesses and their participation in the violations of the Commodities Exchange Act, failure to enforce NFA rules and disseminate customers, and Kumaran's confidential trading account to Vision. (*See ECF1,* **Exhibit 12**)

733    Despite Plaintiffs multiple requests to stay the proceeding on November 5, 2019 and November 8, 2019 and seeking clarification, again violation its obligations under 7 USC 21(k) NFA did not respond timely to communications, and it is unclear of NFA withheld timely those communications from the Panel.

734    In a final attempt to prevent due process, again due process under fair and equitable procedures, NFA denied Kumaran the right to appear at oral argument, and object to an overly broad, blanket Gag-Order designed to cover-up and conceal the scheme. The Order and Kumaran's opposition were never permitted for oral argument. (See **ECF30**)

735    After 523 days ADMIS produced only one material document. It was heavily redacted, redacting everything related to disseminating customer accounts. It is filed under seal. (*See* **ECF31**)

736    On or around November 18, 2019,  the granted the stay of the proceeding before the NFA Arbitration, pending action this Court against NFA, while it seeks relief against the NFA in the proper forum, effective November 13, 2019 until November 13, 2020. (**See ECF1 Exhibit 14).**

737    On or around November 12, 2020, Plaintiffs moved to extend the stay pending resolution of the proceedings in SDNY. On November 13, 2020 Plaintiffs were notified that two of the Arbitrators recused themselves from the proceedings and that the Panel's Chairperson and other Arbitrator had resigned.  A substantially brand new Panel with no familiarity with the case was appointed December 14, 2020.

738    On or around December 1, 2020 all Vision Defendants and Lazzara Defendants consented to the jurisdiction of SDNY and there is no arbitration or arbitrability dispute between the parties. Likewise NFA and Plaintiffs have consented to the jurisdiction of this Court. The only remaining sole issue of arbitrability remaining is by and between ADMIS and NRCM (and that issue is in related case). Plaintiffs object to any continuation of NFA-controlled arbitration.  Because all of the parties

Page 141

(20-CV-03871, 20-CV03668) have consented to the jurisdiction of the Court, the motion for injunctive relief is moot. Plaintiffs will assert SDNY jurisdiction for the *one* remaining party ADMIS.

739   On or around December 11, 2020 Plaintiff filed another opposition to request disclosures by the Panel are made on NFA's conflict of interest in the proceeding. The motion was "hidden" from the new Panel. No conflicts of interest or disclosure were made.

740   NFA is obligated Section 22 of the CEA, and 7 USC 21(k) and Article III( c).to provide members are "fair" and "equitable" hearing that complies with the Federal Arbitration Act. ("FAA", 9 USC 1 el seq, requires that any arbitration conducted must disclosure any information that would lead a reasonable person to believe there is a perception of bias.  NFA's actions are in violation of the Federal Arbitration Act, and delegated and statutory authority responsibilities.

741   This action ensues.

### *SECTION 24 -   NFA had a Special Duty to its NFA Members and Registered CTA's*

742   Plaintiffs were and are undoubtedly both members of the NFA. This means that NFA also had a special duty to enforce the rules equally among market participants. **Both** Plaintiff Kumaran individually, and Plaintiff NRCM, paid the requisite "membership fees" are were registered members of the CFTC and NFA. NFA, gladly accepted and accepts the individual Membership Fee from Kumaran as a CTA, accepted its fingerprints, and also listed Kumaran, individually, with three aliases Samantha Siva, Samantha Kumaran, and Samantha Siva Kumaran.

743   As a member, NFA had a special rule to enforce the rules, in an equal and unbiased way across all members, and not just deploy a special set of rules, for "insiders" or "long-standers" – or an old-boys network - or those that "paid them extra fees" or who pay an extra $1.5million to buy their way back into the business.

744   The NFA Rules are non-discretionary, and required by law, statute and Congress to encourage innovation, allow new players to enter the market as CTA's, and not be forced to play by a different set of exchange rules, that unlawfully permit those that pay extra fess to the NFA, or a "bankers" to engage in anti-trust anti-competitive behavior, engage in unfair competition, and have a different and more favorable set of rules. NFA has an obligation to all its members, not those lining its pockets with extra fees or providing "banking" arrangements.

745   NFA had no statutory authority to give preferential treatment on the compliance laws, or take payments-in-kind to violate the rules against other CTA's and traders.  NFA request to require $9,500

Page 142

to enforce compliance laws, to protect CTA's, and its past conduct to charge $1,500,000 as Settlement in exchange for which it allowed Boshnack, Rothman and other bad actors, to remain registered - however violating their registration requirements to be permanently expelled to handle customer money as an FCM – involve illegal and fraudulent conduct. (See Section 11)

746   In exchange for hundreds of millions of dollars of credit lines and "banking" – NFA and its conspirators knowingly violated the market participation laws.  This "pay-for-play" is symptomatic of significant corruption and bias, where a regulator, can accept money in exchange for violating or enforcing the rules and laws. NFA's wanton and willful failure to enforce the laws, (as it still relies on the funding of Boshnack, and allows the fraud to continue to date) has and continues to cause significant damages to Plaintiffs (causing NRCM to be dissolved)

747   Kumaran, individually and NRCM (now dissolved), relied on the NFA Membership Rules, and the NFA's statutory responsibility to uphold and enforce its rules, regulations, bylaws, compliance laws and mandatory obligations to enforce under the CEA.

748   Reliant on the NFA's duties thereunder, Kumaran as a CTA, entrusted its business asserts, intellectual property and trade secrets, with the intent to start a competitive hedge fund and to participate as a CTA and CPO. Therefore Kumaran, invested substantial money, capital, time, property, resources to became a Series 3, register as a CTA, and to start a new business under the brand name Nefertiti.

749   NFA instead of encouraging new members and innovation, outside money and expertise to enter the business, simply viewed their registration as expendable, and collateral damage for the Boshnack credit lines, and while they gladly and gleefully accepted membership and  registration fees they failed to uphold their end of the bargain which is to protect and enforce the market participation rules.

750   By accepting and registering Kumaran and NRCM as NFA members, NFA also had a special duty to Plaintiffs as CTA's and to ensure protection of their assets and property. These rules that NFA has a special duty to enforce included but not limited to NFA2-2, NFA 2-3, NFA 2-4 9061 and all other Violations listed herein, and also to prohibit other members from obtaining its trading records.

751   NFA also had a special duty, when Plaintiff phoned the NFA during September 2017 – May 2018 to disclose their material knowledge of the arrangements with High Ridge and ADMIS. If the risk services arrangement was legitimate, NFA had a statutory duty to disclose it, under NFA 2-25/ CFTC 155 and CFTC 1.11 to disclose it to Plaintiffs when requested. However Plaintiffs alleged the

Page 143

entire arrangement, was illegal, was not approved by the Commission, was not permissible for Vision Risk Group to act on behalf of an FCM after being permanently expelled, so NFA took substantial, overt actions to cover up the fraud, aid and abet the fraud, conceal the activities and thus causing substantial and irreparable harm to Plaintiffs.

752   Under NFA Articles of Incorporation, its purpose is under Article III Public Interest (a) the adoption, administration and enforcement as to the following persons of requirements regarding fair practice and designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade and, in general, to protect the public interest. None of that conduct was observed here.

753   NFA under statute is the enforcement  in Article III also has a mandatory requirement under Section III (e) to provide "Protection of Customers," including both Kumaran and NRCM both members, and they are required to implement the fundamental purpose under Section 1 to promote the improvement of business conditions, and to undertake the enforcement and regulation of persons.[63] Without limitation NFA's enforcement requirements include NFA 2-4 9005 requiring Members to disclose all the costs and fees to traders prior to opening an account, noting specifically that "Any such arrangement which is intended to or is likely to deceive customers is a violation of NFA Requirements and will subject the Member to disciplinary action." NFA has a mandatory obligation to enforce disciplinary action on non-disclosed fees.

754   For persons that are registered members of the NFA sets forward a list of rules, regulations and bylaws, publicly available on its website, https://www.nfa.futures.org/rulebook/index.aspx of all rules and compliance laws that it is required to enforce in a non-discretionary manner. Kumaran and NRCM relied upon the enforcement of those rules, in both entrusting its property, asserts, trading strategies, CTA's career, money and business to become a member of the NFA.

755   Amongst many of the non-discretionary rules that NFA must abide by that are relevant to this Complaint are (a) NFA 2-3  No Member or Associate shall share, directly or indirectly, in the profits or losses accruing from commodity interest trading in any account of a customer carried by the

---

[63] **Section 1: Fundamental Purposes** Subject to the limitations in Section 2 of this Article, the fundamental purposes of NFA are to promote the improvement of business conditions and the common business interests of persons engaged in commodity futures and swaps or related activity by (i) undertaking the regulation of persons that are members of NFA (hereinafter "Members") as set forth in this Article; (ii) relieving the Commission from the substantial burden of direct regulation in such matters; and (iii) providing such regulatory services to such markets as the Board may from time to time approve. Actions of NFA to effectuate these purposes may include:

Page 144

Member, or another Member, unless the customer's prior written authorization is therefore obtained.

(b) NFA 2-4 9065   Compliance Rule 2-4 prohibits Members and Associates from <u>knowingly</u> <u>obtaining</u> or seeking to <u>obtain another Member's or Associate's confidential information or trade</u> <u>secrets without that person's permission</u>. It also prohibits Members and Associates from knowingly or recklessly <u>misusing confidential information or trade secrets in their possession and also prohibits</u> <u>obtaining or attempting to obtain information disclosing a CTA's historical trading positions without</u> <u>the CTA's permission</u>.   The CEA's purpose is to encourage and <u>promote innovation</u> and fair competition among market participants  7 U.S. Code Chapter 1, § 5, and the dissemination of traders transactions records to competitors is prohibited under the CEA.[64]

756   Most importantly NFA has a non-discretion duty to enforce compliance under  NFA2-26 which complies with Commission ordered regulations of disclosures of the risk management services program (CFTC Reg 1.55, CFTC Reg 1.11, Reg 33.7 etc). The Commission by regulation required that ADMIS and Lazzara disclose all aspects of the risk management program of the commission to <u>ensure that advertising and solicitation activities by each such futures commission merchant and any</u> <u>introducing brokers associated with such futures commission merchant are not misleading to its FCM</u> <u>Customers in connection with their decision to entrust funds to and otherwise do business with such</u> FCM. (See 1.55(I, 1.55(k)(11),1.55(l))

757   NFA mandatory compliance requirements also include the anti-fraud provisions for members, NFA 2-2 making it unlawful for any member to cheat, deceive or defraud another member, and also the hierarchy provision in the CEA 7 U.S. Code § 6b, which also prohibits margin related activity by fraud, and applies to the NFA's own conduct – to not aid and abet in fraud. Section 22 of the CEA, permits private rights of action against NFA and its compliance officers who also aid and abet and engage or partake in fraudulent conduct under 7 U.S.Code § 6b

758   NFA recognized the importance of disclosing Visions' past background to customers in June 2014, as they made public announcements on June 20, 2014 (See att4) stating as follows "*If the firm becomes registered, NFA will ensure that any customer who inquires about High Ridge through NFA's BASIC system will be provided with information about all of Vision's disciplinary actions.*" NFA recognized the importance of customers learning about and having disclosures of Visions

---

[64] See 7 USC Code 1 to **and to promote responsible innovation** and **fair competition** among boards of trade, other markets and **market participants**.

Page 145

extensive disciplinary actions at the time it made the announcement prior to Boshnack, Felag, Rothman being registered.

759   But NFA failed to uphold any of its end-of-the-bargain in protecting Kumaran and NRCM, as registered CTA's, and enforcing the rules, regulations, bylaws and requirements under the CEA, to protect Plaintiffs from the very fraudulent and deceitful conduct alleged herein which is prohibited under NFA's mandate and statutory obligation.

760   The 2nd Circuit has pointed out that the private remedy was designed to reflect "a balance that does not insulate [exchange'] officials from answering serious questions posed by injured traders." (735 F.2d at 677)  The Court commented  that "[t]o do otherwise would drastically curtail the private right of action deemed essential to the regulatory framework adopted by Congress." Id

### *SECTION 25  - DAMAGES*

761   As a direct and proximate result of the unlawful and fraudulent conduct Defendants, Kadlec and their Conspirators have wrongfully profited from its fraudulent conduct, and been unjustly enriched, and that by reason of the foregoing, the Plaintiffs have been damaged, suffered irreparable harm and been injured in their livelihoods, financial assets, economic advantages, business and property.

762   As a result of the foregoing conduct alleged herein, Plaintiff Kumaran as the sole owner of the trade secrets, and the STORM trading program, has suffered damages that includes without limitation, irreparable and significant harm in loss of their confidential and trade secrets, STORM (including its transaction history and trade data) to its competitors, as well as loss of all profits earned by the competitors, and reasonable royalties that should have been paid to a CTA for access to their competitive trade secrets, in amounts to be proven at trial.

763   In addition Plaintiffs have suffered, economic interference, financial losses in their trading accounts, depletion and reduction, and losses in CTA's performance records estimated to be not less than 18% a year, damages to their good will and other impacts to the her CTA and CPO career, reductions to the financial trading account balances, financial losses to their property, and significant increased legal and compliance costs to its CTA business, and other costs and fees associated with its membership. in amounts to be proven at trial.

764   Plaintiff Kumaran, individually as a risk management service and software developer, has suffered losses by Kadlec (in his private interest) misuse of Kumaran's competitive risk management trade secrets, uniquely developed and designed over twenty years, which Kumaran is the sole owner

Page 146

and inventor, by improperly misuse of the account  as a testing and debugging facility, to benchmark and test and misappropriate Kumaran's risk management systems, and use of Z-Live to document, monitor, quantify, and debug their materially deficient electronic platforms, and errors and omissions as demonstrated in related case during the period January 2017 until June 2017, without compensations Kumaran was not compensated for its use of its software, for use by Kadlec and ADMIS as a testing and debugging facility and ADMIS has been unjustly enrichment in the benchmarking, debugging and testing services performed for Z-Live, Kadlec and ADMIS use of Kumaran's uncompensated risk services, operated outside of the parameters of any provision of any agreement for Plaintiff to provide such testing, debugging and IP services, and ADMIS' distribution of that proprietary and trade secret analysis to its competitors, HRF who provide, directly competing risk consulting services, for which Plaintiff Kumaran, as the sole owner of the IP and risk software, received no compensation or license fees, in amounts to be proven at trial.

765   In addition, Plaintiff Kumaran, as the sole owner of the rights, title and interest to the trade secrets and the STORM Trading Program, (which includes its transaction history and trade executions) and has suffered substantial "consequential damages" in it valuation and license to the CTA and CPO, has suffered net present value loss, in its rights and ownership interests of the trade secrets, its rights of capital,  by the unlawful misappropriation by Vision and Kadlec and Defendants of its hedge fund, and its performance record and abilities to raise capital, interruptions and interference in their business operations, delays to their commercial livelihoods and investments in the futures industry.

766   Plaintiffs have suffered additional damages, by Defendants and Kadlec's direct participation in the scheme to procure an unlawful and unjust advantage to its competitors, and VIA's improper, acquisition and  "front running" of its trading program, for use in direct competition. Plaintiffs have also suffered damages in the  interference in their hedge funds and commodities options trading pools, increased costs of business, delays and interference into its operations, loss of opportunity costs,  as well as other significant damages including Kumaran's loss in present value and futures profits into the STORM Fund LP.

767   Plaintiffs accordingly seek disgorgement of all unjust enrichment by its competitors Kadlec, ADMIS, HRF, HRHC, VIA, Boshnack, Rothman, in amounts to be proven at trial but estimated to be not less than $1million dollars. Kumaran is the sole owner of these claims in and to the fund and

Page 147

its trading programs, and NRCM never had, or never contemplated to have any rights, title, ownership interest in the STORM Trading Program or the STORM Fund, LP.

768   Plaintiff as successor in interest to the claim of NRCM, and signer individually on some of the agreements individually   (NRCM now dissolved) have also collectively suffered damages and financial harm in unauthorized fees and deductions, actual and realized losses in their trading accounts, estimated to exceed $75,000 in overcharges, drawdown losses, MTM errors, and other software charges, as a result of the tortious interference by Vision, and the tampering with Plaintiffs account being concealed to pay Vision its owners, employees and affiliates.

769   Defendant, Kadlec and Conspirators have wrongfully profited from the fraudulent conduct, and been unjustly enriched, and that by reason of the foregoing, Plaintiff has been damaged, suffered irreparable harm and been injured in their livelihoods, financial assets, economic advantages, business and property.

770   Plaintiff Kumaran, individually, as a CTA, and sole owner of the STORM Trading Program, has also been harmed by the depletion of fair market competition, by the unlawful access to their trading strategies by competitors Vision its owners, employees and affiliates. The wrongful conduct and misappropriation of Plaintiffs' trade secrets alleged herein will continue unless enjoined and restrained by this Court, and is causing and will continue to case great and irreparable injury to Plaintiff's livelihoods and business, and is causing and has caused Vision its owners, employees and affiliates to have improper advantages, positions, and rights in the marketplace to Plaintiffs' detriment.

771   Absent injunctive relief, further disclosure and use of Plaintiffs' trade secrets by Conspirators, Kadlec and Vision its owners, employees and affiliates, as well as ongoing depletion of performance records, and deduction of fees, continues to irreparably harm to Plaintiffs confidential futures trading accounts. The unlawful and unauthorized fees are ongoing and accumulating, causing ongoing financial damages and losses, depletion to account value and losses from Plaintiffs' accounts.

772   Furthermore, the far reaching pattern of fraudulent conduct by Defendants, Kadlec, and their Conspirators  evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

Page 148

### *CAUSES OF ACTION*
### *COUNT 1 – VIOLATION OF THE NON-DISCRETIONARY RULES OF THE COMMODITIES EXCHANGE ACT   (SECTION 22)*
### **Against all Defendants**

773   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

774   Pursuant to Section 22 of the CEA, 7 U.S.C. § 25(b)(2)-(4), a registered futures association and its compliance officers and directors and board members, that fail to enforce any bylaw, rule, regulation, or resolution that it is required to enforce that is required under 7 U.S.C. § 21 shall be liable for actual damages sustained by a person resulting from such failure to enforce or enforcement of such bylaw, rule, regulation, or resolution. In accordance with § 25(b (4), Plaintiffs allege that the conduct in Count 1 was in  bad faith, was negligent and/or grossly negligent, for improper purpose, ulterior motive and was fraudulent and illegal for which no immunity is granted.

775   Courts have interpreted the term "bad faith" as referring to "negligence" when applied to a commodity exchange's failure to enforce its own rules that are non-discretionary. *Bosco v. Serhant*, 836 F.2d 271, 278-79 (7th Cir. 1987). See, for example, *Jordan v. New York Mercantile Exchange*, 571 F. Supp. 1530, 1540 (S.D.N.Y. 1983)-"Where an exchange knows or should know of wrongful market conduct that it is empowered and required to control, a nondiscretionary duty to take some action arises, and the failure to satisfy that duty constitutes conduct amounting to a bad-faith exercise of the exchange's statutory responsibilities."

776   Defendants, over the consistent period starting in or around September 2014, and over a continuous pattern of over six (6) years, individually and jointly have intentionally and in bad faith, knowingly, fraudulently and for improper purpose failed to enforce, and violated the CEA, numerous NFA and CFTC  compliance rules and regulations that they had a non-discretionary duty to enforce, and as a result, have caused significant damages and harm to Plaintiffs.

777   The non-discretionary rules, regulations and laws that the NFA knowingly, wilfully, wantonly and intentionally failed to enforce are included by reference in paragraphs ¶ **Violations**, include but are not limited to:

i.  Test NFA 2-26 including CFTC 1.11, CFTC 1.55, CFTC 1.57, and CFTC 33.7 – non-discretionary rules - which required Lazzara and ADMIS, disclose customers, *all* its risk management policies and procedures, *prior* to opening the account; (CFTC 1.55 (k) ..disclosures about risk policies prior to a customer entrusting funds to an FCM were prerequisite and CFTC 1.55.(l) .. expanding upon such information as necessary to keep such

Page 149

disclosure from being misleading whether through omission or otherwise, CFTC 1.55.(i).. business, operations, risk profile, and affiliates, that would be material to the customer's decision to entrust such funds to and otherwise do business with the futures commission merchant and that is otherwise necessary for full and fair disclosure...;

ii.   NFA 2-4 Int Not 9061 makes it a non-discretionary and mandatory NFA Compliance violation for NFA Members Felag, HRC, and Vision owners, affiliates to obtain or seek to obtain a CTA's trading records and trade secrets without their permission;.

iii.   NFA 2-4 Int Not 9005 and NFA Rule 2-26 / CFTC Part 33.(7) which has a non-discretionary mandatory requirement that Lazzara and ADMIS disclose all the costs and fees, transaction fees and trade processing fees (being deducted from Plaintiffs accounts and reducing Kumaran's CTA record to pay Vision) prior to the account being open, and that any arrangement that is likely to deceive customers is a violation of NFA Requirement;

iv.   NFA 2-3 which has a non-discretionary, mandatory requirement that prohibited Vision to share, directly or indirectly, in the profits or losses accruing from commodity interest trading in any account of a customer carried by the Member, or another Member, unless the customer's prior written authorization is therefore obtained;

v.   NFA 2-14 which has a non-discretionary and mandatory requirement that prohibited all NFA Members who fail to comply with any NFA requirement to be subject to disciplinary action or responsibility action or both

vi.   NFA 2-2 which makes it a non-discretionary mandatory NFA Compliance Rule violation to in any manner deceive, cheat or defraud another NFA member or commodities futures customer; In addition NFA is prohibited to aid and abet in fraud and knowingly engage in fraud, which expressly prohibits the unlawful violation of the anti-fraud provisions of the CEA 7 USC 6(b)(2); NFA's failed to enforce and aided-and-abetted in violation of NFA 2-2 and NFA 7 USC 6(b)(2);

vii.   NFA 2-29 which prohibits the fraudulent sales and telephonic sales and marketing communications by ADMIS, and a network of Vision IB's, including Lazzara; and NFA Bylaw 801 which prohibited solicitations from unregistered AP's Julie Villa. NFA 2-29(a)(1) also prohibits conduct that operates as a fraud or deceit; and solicitation to open futures accounts that conceal material facts. It also prohibits solicitations by unregistered AP's;

viii.   15 USC 78(g), NFA Margin Handbook and NFA Financial Handbook Section 7, which are non-discretionary and mandated that Lazzara and ADMIS, issue margin calls directly to customers, and not to Boshnack and Rothman an arrangement which to a material failure to enforce exchange compliance laws in Performance Bond margin and failure to issue margin calls under CME 980, CME 930, CME 982, and making it unlawful for Robert Boshnack and Howard Rothman, an arrangement which to a material failure to enforce exchange compliance laws in Performance Bond margin and failure to issue margin calls under CME 980, CME 982.

ix.   NFA 2-26 / 17 CFR 1.57 and 7 USC 2 (c.)(v)(IV), CFTC 1.11 and 7 U.S. C.§ 2 (c)(v) .(IV) 15 U.S. Code § 78g - (2) (A),(2) (B),  NFA 2-26  17 CFR § 1.57 (c.), 17 CFR § 1.55 Part (k); and which prohibited strangers, Vision, its owners, affiliates and employees from directly  or indirectly extending, or maintaining credit to or for, or collecting margin on Kumaran's account. It also prohibited them from having discretion on Plaintiff's account, as well as power of attorney to handle margin calls;

x.   7 USC 2 (c.)(v)(IV), CFTC 1.11 and 7 U.S. C.§ 2 (c)(v) .(IV) 15 U.S. Code § 78g - (2) (A),(2) (B using an unorthodox and unregulated method of "Margin Allowances" which is prohibited by the exchange, not documents, violates CME Span, and is required to be disclosed to traders;

Page 150

xi.   CEA privacy laws, CFTC Privacy laws, 17 CFR 160 unlawful and unauthorized dissemination of customers and CTA's personal financial data, social security numbers, net worth, financial balances, names, addresses, emails, telephone numbers and other personal and confidential information in violation of CEA; NFA are obligated to abide by mandatory CEA requirements to maintain privacy of customer information. NFA's failed to enforce or aiding-and-abetting in violation of CEA Privacy Laws;

xii.   CEA. 7 U.S.C. § 6b (2).  NFA has a non-discretionary obligation to enforce the claims of fraud and aiding and abetting in fraud. Plaintiffs' fraud and aiding and abetting fraud claims under CEA § 4b, 7 U.S.C. § 6b, absolute immunity for claims that invoke fraud under the Commodities Exchange Act and exchanges can be held accountable for breaching their statutory duties to enforce their own rules..... by futures traders who can prove injury from these violations

xiii.   Other laws, rules, regulations and bylaws listed in this Complaint including 7 USC 13 and 7 USC 6 which determines unlawful conduct as described in Section 11 and 12 above

778   The fraudulent and illegal scheme was wanton willful and with scienter, and intended to harm a sub-group of start-up CTA"s, and customers that opened accounts through *Vision brokers*, under which Defendants, knowingly, and for fraudulent and illegal purpose, failed to enforce the protections granted to CTA's under CEA, and instead used their commodities futures account, as an unregulated dark pool of account that operated outside of the laws of the CEA, and failed to apply a uniform set of market participation rules.

779   Defendants knowingly and in bad faith, with negligence, gross negligence and for fraudulent and illegal purpose, failed to enforce the non-discretionary disclosure laws and consents required from customers and traders for Vision to access their accounts, and allowed disbarred members to purloin funds, deplete CTA profits and misappropriate trading data and trade secrets(NFA 2-2, NFA2-3, NFA 2-4, NFA, 2-14, NFA 2-26, NFA2-29 and CFTC Reg1.11-1.14, CFTC 1.55, CFTC 33.7)

780   Therefore NFA had an statutory and ministerial obligation to enforce the following disclosures and consents, and had a duty to ensure fair market competition and maintain the secrecy of Plaintiffs' CTA trade secrets, and prohibit their dissemination to other NFA member, and competitors Boshnack, Rothman, Felag, HRF and VIA without Plaintiffs' consent.

781   Under the fraudulent scheme, Defendants since November 2014, knowingly, willfully, wantonly and with intent to deceive, participated in the scheme with ADMIS, Vision and Vision brokers to permit unlawful participation (See Section 11) prohibited under the exchange rules, which resulted in direct unfair market competition (See Section 10) and caused substantial harm and damages to start-up and new CTA's, including Plaintiffs' CTA, in violation of the CEA.

Page 151

782   Defendants participation in the scheme directly made overt actions of fraud and concealment, and knowingly made omissions to substantially propagate the direct market place fraud, deceit and concealment. The conduct of fraud is expressly directly prohibited under 7 U.S.C. § 6b (2), which NFA had a statutory duty to enforce.

783   Defendants had an affirmative, non-discretionary and statutory duty to enforce the CEA, enforce compliance NFA bylaws, rules, regulations and other requirements of the Commission, and to protect Plaintiffs with equal rights of protection and enforcement of the foregoing **Violations**.

784   As a result of NFA bad faith failure to abide by it duties, and failure to enforce the CEA, and NFA Rules and other laws. Plaintiffs have direct and proximate damages, suffered irreparable harm in loss of their confidential and trade secrets, financial losses in their trading accounts, other financial losses in fees, costs and charges associated with these accounts, depleted performance in their CTA track records, damages to their good will and other impacts to the their CTA careers, financial losses to their property, livelihoods and investments in the futures industry, as well as other significant damages, in accordance with Section 25 - Damages.

785   The fraudulent scheme generates illegal and unauthorized revenue of over hundreds of millions of dollars for Conspirators at the knowing expense and harm to small customers, CTA's and Plaintiffs, directly causes unfair competition and stems to the heart of NFA's duties under the CEA. 7 USC 1

786   Defendants, and Conspirators jointly and severally, have wrongfully profited from their conduct and have caused Plaintiffs damages and irreparable harm, as well as irreparable loss of its competitive advantage and loss of trade secrets to Vision, its owners, employees and affiliates. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Section 25 and repeated herein.

787   Defendants conduct was with moral turpitude and wanton disregard for the rights of others, was for fraudulent and illegal purpose, as stated supra in Section 11 and repeated herein.

788   Defendants conduct was intentional, fraudulent, illegal, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

*COUNT 2 – VIOLATION OF THE DISCRETIONARY RULES OF THE  COMMODITIES EXCHANGE ACT  (SECTION 22)*

**Against all Defendants**

789   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

Page 152

790   Pursuant to Section 22 of the CEA, 7 U.S.C. § 25(b)(2)-(4), a registered futures association and its compliance officers and directors and board members, that fail to enforce any bylaw, rule, regulation, or resolution that it is required to enforce that is required under 7 U.S.C. § 21 shall be liable for actual damages sustained by a person resulting from such failure to enforce or enforcement of such bylaw, rule, regulation, or resolution. In accordance with § 25(b (4), Plaintiffs allege that the conduct in Count 2 was in bad faith, was for improper purpose, ulterior motive and was fraudulent and illegal for which no immunity is granted.

791   Plaintiffs bring Count 2 for NFA and Kadlec, bad faith violation of the <u>discretionary</u> rules of the CEA including but not limited to the unlawful re-registration of Robert Boshnack, Howard Rothman, John Felag, High Ridge Futures and Vision Investment Advisors and their affiliates to remain market participants and registrants, after being expelled (*See* Section 11)

792   NFA's violated without limitation NFA Bylaw 301(a)-(e) and 7 USC § 21(b),. with the knowing and fraudulent intent that thereafter, they would continue to operate as FCM's without a registration, continue to violate market participation rules, and perpetrate a fraud and other illegal actions, causing substantial they would operate and conduct business, in violation of their registration status of IBs'.

793   In fact, pursuant to NFA Bylaw 301 (e), given their disqualification, NFA could only permit Vision affiliates and persons to remain registered as an NFA Associate Member if the CFTC directed it to do so or upon a finding by NFA's Membership Committee that *Vision Risk Group*'s and affiliates ongoing participation did not cause him to pose a threat to Members, Associates or customers.

794   However, the CFTC did not order NFA to maintain Boshnack, Rothman, Felag, HRF and VIA's registration and its Membership Committee never investigated his activities to determine if he posed a threat to commit additional fraudulent acts. As stated supra, NFA failed to conduct any due diligence on the Felag, HRF its compliance with laws and rules, and margin requirements, in its outsourced risk services, and failed to disclose them on mandatory disclosures CFTC Reg 1.11-Reg.1.14.

795   Pursuant to the CEA, the lawful registration requirements of the CFTC,  under 7 USC 21(b) any registration required full disclosure of the Vision defendants true roles as "risk service providers" acting on behalf of ADMIS to extend margin, guarantee accounts, and outside of their capacities as IB's and continuing to act as defacto RCM. (See Section 9-11). NFA went further to knowingly conceal their participation in the mandatory disclosure on CFTC 1.11 documents. Failure to disclose these material facts, constitute a willful and knowing breach of the CEA, and their application for

Page 153

renewed membership was therefore unlawful and contained material fraudulent omissions and fraud, deceit and trickery, rendering their renewed registration void and illegal. *See* 7 USC 13 (a)(3) (4) [65]

796   NFA participated in and knowingly and willfully made false statements, omitted material facts, on both VIA and HRF and their associated persons registration applications, and did not disclose on their registration that a material part of their market participation activities would be to handle margin and continue to operate a risk management group, outsourced, accessing their competitor CTA's and customers' confidential business records (without consent), and performing "margin" handling, extending credit on behalf of customers" and other functions they were expelled and disbarred for.

797   The conduct was further illegal, since in order to grant registration to the Vision team, as an IB, they were required by law, to disclose these activities on their registration applications which granted them rights <u>solely as an IB,</u> In other words, hiding behind the name ADMIS, Boshnack and his affiliates, continued to operate as a shadow FCM, extending margin and credit for customers, and collecting trailing fees and commissions on a per trade basis from their accounts, although they were expressly not permitted as a registrant to act ever again as an FCM. The *Vision Risk Group*, essentially the same personnel and the same offices, staff, computers and negligence, continued to act as the FCM-in-fact, the de-facto FCM, fraudulently concealed from customers and traders, CTA's opening accounts at ADMIS. Defendants violated 7 USC 13 (a)(3)(4)(5) by not disclosing in their application for registrations as for HRF and VIA application for registration as a CTA, the "oral-arrangement".

798   Accordingly Defendants knowingly, and with fraudulent intent and purpose, knowingly made omissions and false statements on the registration documents so as to perpetuate the fraudulent and illegal scheme, and also concealed their knowledge of the other as well as the other **Violations.** Accordingly in granting registration of Boshnack, Rothman, Felag, High Ridge Futures, and Vision Investment Advisors, NFA and Kadlec, knew and intended to violate both the non-discretionary and discretionary rules of the CEA, including NFA Bylaw 301(a)-(e) to permit re-registration.

---

[65] 17 USC 13(a)(3) Unlawful – False and misleading in registration Any person knowingly to make, or cause to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement required under this chapter, or by any registered entity or registered futures association in connection with an application for membership or participation therein or to become associated with a member thereof, which statement was false or misleading with respect to any material fact, or knowingly to omit any material fact required to be stated therein or necessary to make the statements therein not misleading.

17 USC 13(a)(4) Any <u>person</u> willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a <u>registered entity</u>, <u>board of trade</u>, <u>swap data repository</u>, or futures association designated or registered under this chapter acting in furtherance of its official duties under this chapter.

Page 154

799   Defendants NFA and Defendant Kadlec, who is simultaneously on the Board and Membership Committee, and acting with private interests for ADMIS,  also took direct bad faith actions and with full knowledge other CEA laws had been been violated, (See **Violations**) also failed to disclose the Violations and instead took over actions to conceal and approve the registration of Vision Investment Advisors, while violating the anti-trust and unfair competition rules at the heart of the CEA.

800   The foregoing actions in Count II were done in bad faith, for fraudulent and illegal purpose, and to perpetuate a fraudulent scheme that does not comply with the CEA.

801   This  cause of action also applies to any other rules, regulations, bylaws, and requirements that NFA failed to enforce, that are determined to have been discretionary, and not included in Count 1.

802   As a result of NFA bad faith failure to abide by it duties, and failure to enforce the CEA, and NFA rules, regulations and other laws. Plaintiffs have suffered direct and proximate damages, suffered irreparable harm in loss of their confidential and trade secrets, financial losses in their trading accounts, other financial losses in fees, costs and charges associated with these accounts, depleted performance in their CTA track records, damages to their good will and other impacts to the their CTA careers, financial losses to their property, livelihoods and investments in the futures industry, as well as other significant damages, in accordance with Section 25 - Damages.

803   The fraudulent scheme generates illegal and unauthorized revenue of over hundreds of millions of dollars for Conspirators at the knowing expense and harm to small customers, CTA's and Plaintiffs, directly causes unfair competition and stems to the heart of NFA's duties under the CEA. 7 USC 1

804   Defendants, and Conspirators jointly and severally, have wrongfully profited from their conduct and have caused Plaintiffs damages and irreparable harm, as well as irreparable loss of its competitive advantage and loss of trade secrets to Vision, its owners, employees and affiliates. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Section 25 and repeated herein.

805   Defendants conduct was with moral turpitude and wanton disregard for the rights of others, was for fraudulent and illegal purpose, as stated supra in Section 11 and repeated herein.

806   Defendants conduct was intentional, fraudulent, illegal, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

*COUNT 3 – FRAUD*
Under New York State Law and Common Law
Against Defendant NFA and Defendant Kadlec (in private capacity)

Page 155

807   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

808   Jurisdiction for this claims also lies under Section 22 of the CEA, and the anti-fraud provisions of the 7 USC 6(b). Section 7 USC § 6(b) an 6(e) of the Commodities Exchange Act, prohibits Defendants, themselves, from participating in, and knowingly engaging in any scheme making it unlawful to employ any device, scheme, or artifice to defraud or to willfully defraud or willfully to deceive or attempt to deceive the other person by any means whatsoever.

809   State law claims are not preempted by the CEA and in accordance with October 6, 2020 Order ECF33 and October 23, 2020 ECF34, Plaintiffs brings its claims under New York State law and common law. Claims against Kadlec are brought in his private and commercial capacity.

810   Further Plaintiffs allege the conduct in Count 3 is fraudulent and illegal and outside of the permitted regulatory conduct as explained in Section 11 was for unlawful and improper purpose. Since the conduct is deemed illegal and fraudulent under both  7 USC § 13(a)(1)(4) and (5) and other Federal and State law Statutes (see Section 11)  <u>which makes it illegal to disseminate or steal a private parties' trade secrets and</u> was conducted for no legal or proper purpose, Defendants have no immunity

811   As alleged above, Defendants had actual, direct and constructive knowledge of the fraud and fraudulent scheme as fully alleged above.

812   Defendants and its compliance officers, agents, servants, employees had an affirmative duty to abide by their own compliance rules, regulations and requirements including the anti-fraud provisions and laws of the NFA and CFTC, and to not themselves partake in fraudulent conduct prohibited 7 U.S.C. 6(b) and other laws by the CEA.

813   NFA and Kadlec (as CEO of ADMIS and also on NFA Board) had superior knowledge and possessed material information that Plaintiffs were entitled to know and also had a duty to disclose prior to and during the accounts being opened. NFA and Kadlec by omissions, knowingly and intentional concealed the material arrangements with Vision and their access to Plaintiffs account.

814   NFA also had a statutory duty to its Members to ensure that its public website disclosure and NFA Basic, disclosed that Vision brokers were guaranteed by High Ridge, and that customers had access to information about Visons' disciplinary actions prior to opening the accounts.

815   NFA had a statutory duty not to engage or promote fraudulent conduct and to enforce that sales and promotions were not fraudulent, that CTA's were not deceived by solicitation from Vision

Page 156

brokers and ADMIS, and that NFA members did not engaged in fraudulent conduct as governed by 7 USC 6(b). Instead NFA directly participated in the fraud, permitted and allowed unlawful conduct for *Vision brokers* and ADMIS to conceal their arrangements with High Ridge and have caused Plaintiffs substantial harm and damages as outlined herein and in Section 25.

816   Plaintiff reasonable relied on the statements that contained omissions, and the conduct of Kadlec and NFA, who had statutory obligations not to engage or promote fraudulent conduct, and thus was induced by reliance to open accounts at ADMIS.

817   Further NFA and Kadlec had duties disclose information being requested about Plaintiffs account, that NFA had superior knowledge of the facts, and a duty to protect all its NFA members. NFA had a statutory duty to abide by their own disclosure laws. NFA also had a duty to disclose all its conflicts of interest related to the Federal Arbitration Act. NFA also had a duty to not mislead, deceive or make misrepresentations to Plaintiffs and not omit material facts, expanding upon anything so as not to mislead.

818   As alleged herein  in Section 18 and Section 22,  Defendant NFA through various employee and compliance officers speaking on March 25, 2018 made fraudulent misrepresentations that "if Plaintiffs paid $9,500 to the NFA they would investigate Compliance violations."

819   During the period September 27, 2017 until around March 26, 2018 from its offices in New York, Plaintiffs spoke or communicated with NFA and several other compliance officers, Agkok, Bond, Paschen, Afzal, Wazichek and others, each named and mentioned herein. In each case, Plaintiffs directly requested compliance material related to the Violations, and NFA's approval for HRF to access its proprietary trading account.

820   In each communication listed above, NFA and each of its officers, knowingly and with intent fraudulently concealed the agreements it had approved, intentionally fraudulently omitted and failed to disclose material facts, that are statutory obligations to disclose, without limitation under CFTC 1.55 on the risk providers and policies at ADMIS, and the withdrawal of fees and knowingly concealed and omitted material information from Plaintiffs, so as to both propagate the scheme.

821   Defendants concealments were purposeful and for fraudulent and illegal purpose, and violated 7 USC 6(b)  as Plaintiffs, both registered NFA members had a right to know this information, and NFA has a statutory obligation to not conceal information related to its own approvals of the conduct.

Page 157

822   As a result of Defendant's omissions, Plaintiffs continue to and have suffered harm and damages as outlined herein in Section 25, including being fraudulently induced into   an NFA-controlled Arbitration, and damage to NRCM causing it to be dissolved, and other damages herein.

823   On or around April 19, 2018 Plaintiffs also spoke with Defendant Kadlec (in both his private capacity as CEO of ADMIS and NFA Board Member), in person at a CTA Expo in New York City and via email communications.

824   Kadlec had superior knowledge of the scheme, and also his registration of Vision Investment Advisors in direct competition with Plaintiffs after misappropriation of their trading account. Kadlec, as a key orchestrator of the scheme dating back to November 2014 was in a position of superiority in his role as CEO of ADMIS, and the unlawful sales and solicitations of Plaintiffs accounts.

825   Kadlec also had statutory duties to Plaintiffs, as a registered CTA and NFA Member, to disclose, (including when asked) all material information related to its account, including under CFTC 1.55 the risk policies and procedures and its material outsourcing to High Ridge. Kadlec, knowingly and for fraudulent intent and purpose continued to conceal and make omissions to Plaintiffs.

826   Plaintiff reasonably relied on statements (which contained omissions) and acted upon false and incomplete information and have been substantially harmed accordingly.

827   Defendant NFA has also engaged in fraudulent misrepresentations in its NFA public statements on its June 20, 2014 regarding its supposed "thorough fitness examinations of High Ridge Futures" prior to granting them registrations, and also incomplete representations, that customers would be ensnarled into the High Ridge Futures would have "access to information about Visions prior disciplinary actions".

828   Defendants representations were false or required disclosure of additional facts to render the information furnished not misleading as described in Section 12 and Section 16. Specifically and without limitation of NFA's obligations and material disclosure requirements, Defendants, are obligated to enforce and abide by the disclosure requirements under the CEA.

829    Defendant NFA during the period August 31, 2014 until present date made and continues to make fraudulent omissions on its NFA Basic Website upon which Plaintiffs reviewed on Trey Lazzara and ADMIS prior to opening its accounts which made no mention of Vision or High Ridge Futures, despite Plaintiffs becoming "customers" of High Ridge by virtue of opening accounts.

Page 158

830  Defendant NFA and Kadlec, knew of the material omissions, had authorized the illicit risk service arrangements, and G&F Agreements, that disbarred owners Boshnack and Rothman had placed individual guarantees on its account and its trading strategies were being disseminated in exchange, and that Plaintiffs would become "customers" of High Ridge or subject to the unqualified, illegal risk services arrangements that were unlawfully not disclosed.

831  Because the outsourcing of FCM services to a disbarred entity Vision was illegal, with purpose and scienter to conceal, NFA maintained its fraudulent statements on its NFA website and NFA Basic system, so that "customers" of High Ridge would not in fact find out about Vision's past disciplinary actions, and not have the option to opt-out of the illegal arrangements, thereby being fraudulently induced into opening accounts and transaction in the futures industry.

832  Plaintiffs were thereby intentionally deprived of its rights to learn about High Ridge and Visions' past disciplinary actions prior to opening its accounts, which by law, it is entitled to all material information including risk disclosures.

833  Defendant NFA and Kadlec also made fraudulent omissions in all communications in knowingly not seeking or being granted consent to access and acquire their competitor CTA's trade secrets, and in the propagation of deceit to conceal their involvement in the account. Further, without limitation Defendants are obligated under NFA Rule 2-4 9061 to not disseminate CTA"s confidential and trade secret records, which states expressly that it is a NFA Compliance violation for NFA Members Vision owners, employees, affiliates to obtain a CTA's trading records without their permission; and to abide by Federal Laws, the Defend Trade Secrets Act and New York law.

834  The misrepresentations, fraudulent concealments and omissions, were intentionally made by Defendants, in furtherance of their scheme to defraud Plaintiffs expressly prohibited under fair market place laws and other market place misconduct to create an unfair advantage to Defendants.

835  Defendants misrepresentations and omissions were known to be false and were made for the purpose of fraudulently inducing Plaintiffs to open and maintain accounts, entrust funds, property and business to ADMIS, which in turn depleted fair market competition and economic advantage of customers and CTA's, and Plaintiffs, as alleged herein.

836  The misrepresentations and omissions of fact made by the Defendants,  include, but are not limited to, those material misrepresentations discussed in detail and exemplified herein.

Page 159

837   The scheme to defraud perpetrated by Defendants and its co-conspirators, was dependent upon a succession of material misrepresentations of fact, fraudulently concealments and omissions, by Defendants, as outlined herein.

838   The fraudulent concealment and omissions, were illegal (as explained in Section 11, and also and unlawful as defined under 7 USC 13(b) of the CEA, and is deemed fraud under 7 USC 6(b)) and material and directly impacted Plaintiffs as CTA's, and violate the material obligations of disclosure of the NFA rules and in express violation of the CEA, the other Federal and State laws.

839   The conduct also constitutes fraud under Common Law and New York law. The purpose of fraudulently scheme involved propagation and furtherance of unlawful conduct by way of,

     a.     unlawfully distributed customer and CTA' confidential trading secrets and futures accounts to Vision, who then set up a competing CTA, in direct unfair market competitions in violation of Federal law, privacy laws, and the Defend Trade Secrets Act;

     b.     unlawfully overcharged customers and CTA"s fees between 0.30 cents and $6.00 for compensation to unauthorized third parties and Vision amounting to over $10 million dollars a year, without the customers consent;

     c.     unlawfully permitted Vision to tamper with, extend and manipulate margin controls, liquidate accounts, place trades for customers, and engage in other manipulation of their competitors accounts in direct unfair market competition [66];

     d.     improperly acquired their competitors trade secrets, for use, profit, gain, engage in economic sabotage and direct unfair competition;

     e.     other misconduct alleged herein,

so that Defendant and its co-conspirators, can fraudulently secure illegal business that violates the CEA, for their illegal profit, gain and financial benefit;

840   Plaintiffs reasonably relied upon such material misrepresentations, fraudulent concealments and omissions to their detriment in (i) agreeing to open accounts and maintain accounts and transferring valuable money, property, assets, confidential information and  trade secrets to Kadlec and ADMIS therein as CTA's, (ii) becoming and paying to become registered NFA members as CTA's and (iii) then being fraudulently induced into a NFA Arbitration.

841   As a direct and proximate result of the Defendants' fraudulent representations, acts, and omissions, Plaintiffs have been damaged in its business and property as described herein. Defendants by engaging in illegal and fraudulent conduct, have wrongfully gained, profited, received concrete benefits, from their willful, knowing participation fraud, with wanton disregard for their customers and CTA's rights, and have caused Plaintiffs substantial damages and irreparable harm.

---

[66] CFTC 1.11 and 7 U.S. C.§ 2 (c)(v) .(IV) 15 U.S. C§ 78g (2) (A)(B), NFA 2-26 17CFR§1.57 (c.) §1.55 Part (k);

Page 160

842   Defendants, and Conspirators jointly and severally, have wrongfully profited from their conduct and have caused Plaintiffs damages and irreparable harm, as well as irreparable loss of its competitive advantage and loss of trade secrets to Vision, its owners, employees and affiliates. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Section 25 and repeated herein.

843   Defendants conduct was with moral turpitude and wanton disregard for the rights of others, was for fraudulent and illegal purpose, as stated supra in Section 11 and repeated herein.

844   Defendants conduct was intentional, fraudulent, illegal, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### *COUNT 4 – AIDING AND ABETTING IN FRAUD*
Under New York Law, and under 7 USC 6(b) and Section 22 of the CEA
Against all Defendants

845   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

846   Defendants, individually and collectively, had actual, direct and constructive knowledge of the fraud and fraudulent scheme as fully alleged above.

847   Defendants had an affirmative and statutory duty to enforce the CEA, enforce rules and laws, and enforce compliance NFA bylaws, rules, regulations and requirements including the anti-fraud provisions. Defendants in bad faith, willfully failed to enforce the CEA, NFA rules and bylaws, and Federal laws and therefore provided substantial assistance in aiding and abetting in the fraud, as listed supra.

848   Defendants as stated herein each took direct and overt actions and provided substantial assistance in the furtherance of the fraudulent scheme. Those acts included rubber-stamping audits that they knew did not comply with the regulations, and permitting Conspirators to make and continue fraudulent statements and omissions as described herein.

849   Defendants motives as set forth in detail herein were for fraudulent and illegal purpose as described in Section 5-12.

850   In addition Defendants also propagated fraud and deceit in not updating its public disclosures, and in communications from its own Compliance officers and permitting Conspirators to engage fraudulent sales and solicitations under NFA 2-29, not making requisite disclosures under Reg 1.11 to the Commission,  making fraudulent concealments under CFTC Reg 1.55 and other laws for

Page 161

disclosures of fees, and permitting Vision brokers including Lazzara to intentional mislead and make false representations to Plaintiffs. At all times Defendants took over actions and provided substantial assistance in allowing the fraudulent conduct  to proceed and not enforcing the compliance laws.

851   As a result of the foregoing actions and concealments, and as a direct and proximate result of the Defendants' fraudulent representations, acts, and omissions, and aiding and abetting in fraud, violation of the anti-fraud provisions of the CEA, including but not limited to 7 USC 6(b) and direct participation in the scheme Plaintiffs have suffered harm and damages herein.

852    Plaintiffs have been damaged in its business and property as described herein. Defendants and Conspirators by engaging in illegal and fraudulent conduct, have wrongfully gained, profited, received concrete benefits, from their willful, knowing participation fraud, with wanton disregard for their customers and CTA's rights, and have caused Plaintiffs substantial damages and irreparable harm.

853   Defendants, and Conspirators jointly and severally, have wrongfully profited from their conduct received illegal and concrete benefits from their aiding and abetting in fraud, and took substantive actions to enable the fraud to perpetuate and have caused Plaintiffs substantial damages and irreparable harm, as well as irreparable loss of its competitive advantage and loss of trade secrets to Vision, its owners, employees and affiliates. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Section 25 and repeated herein.

854   Defendants conduct was with moral turpitude and wanton disregard for the rights of others, was for fraudulent and illegal purpose, as stated supra and repeated herein.

855   Defendants conduct was intentional, fraudulent, illegal, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT 5  - MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT  ("DTSA")

**Against Defendant Tom Kadlec (acting in private & commercial interests as CEO of ADMIS)**

856   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein;

857   Defendant Kadlec acted at all times in his personal and private interests,  to procure commercial benefit on himself and his entity ADMIS using fraudulent and unlawful means, and misusing his role on the NFA Board, Kadlec is not subject to any exemptions under 18 USC 1833.  This claim is brought

Page 162

against Defendant Kadlec, individually, acting with private interests as CEO of ADMIS, for whom no immunity is granted.

858  Plaintiffs transaction records, trading strategies and risk management strategies constitute competitive commercially sensitive information, including trade details, formulae, compilations, programs, methods, techniques, or processes, that give them an economic advantage, are trade secrets and are (1) non-public information; (2) protected by reasonable measures; and (3) and which derive independent economic value, actual or potential, from not being known to other persons, who can obtain economic value from its disclosure or use. of the information.

859  Plaintiffs trade secrets, include without limitation its trading strategies and risk management strategies and constitute competitive commercially sensitive information, including trade details, transaction history, trading records,  trading executions, strategies, timing, formulae, compilations, methods, techniques, or processes, that give them an economic advantage and that derive independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secrets' disclosure.

860  Plaintiffs have maintained this information in confidence and it is not generally known to other persons or the public who could obtain economic value from the disclosure or use of such information. Plaintiff derive substantial economic advantage over their competitors who do not know how to use it and who do not have access to it.

861  Plaintiffs took and takes reasonable measures to maintain the secrecy of its trade secrets. Such measures include, but were not limited to: (1) limited access to confidential information; (2) requiring third-parties to execute strict non-disclosure agreements before being allowed to access the information; and (3) requiring passwords for access to such information.

862  A substantial investment of time, money, cost, development over a long period of time, was invested by Plaintiffs to develop the trading strategies, risk management strategies that gives Plaintiffs a valuable, unique competitive advantage to compete as a trader in the commodities futures industry and a  risk management professional. Kumaran also invested substantial capital, money and time to register as a CTA, and start commodities hedge funds under the name Nefertiti, from which is could derive substantial economic advantage as an entrepreneur and small business owner in NYC.

863  Kadlec willfully, wantonly, for significant private interest and gain, misappropriated Plaintiffs' valuable and proprietary trade secrets for use and profit by Plaintiffs competitors, and his own

Page 163

economic self-interest and gain,  by deliberate actions which include but not limited to: (i) improper dissemination and acquisition of Plaintiff's trade secrets using improper means that include fraud, misrepresentation, and fraudulent omission, and deceit, fraudulent inducement of a CTA futures account, fraudulent concealment of Vision's access to CTA's strategies; (ii) violations of his mandatory obligations of confidentiality and duties of secrecy under the CEA, fraudulent sales and telephone solicitations,   (iii) the willful and wanton, breach of his statutory duties, CEA, NFA Rules, CFTC Rules, compliance duties and Federal laws and confidential relationship and obligations of to maintain the secrecy and restrictive covenants of a CTA's trading strategies, communications with the FCM, and transaction records, trade secrets; (iv) ongoing use and profit in direct unfair competition and his role in the approval of registration to compete with Vision Investment Advisors, and use of Plaintiffs trade secrets, in which he benefits from,  and all Conspirators own economic benefit for illegal purposes without the express or implied consent of Plaintiffs; all in violation of the Defend Trade Secrets Act  "DTSA" for use in interstate commerce.

864   Kadlec, with his  Co-conspirators, for fraudulent and illegal purpose, willfully, wantonly and maliciously intended to and knowingly stole and, without authorization, acquired, disseminated, disclosed, copied, downloaded, uploaded, replicated, transmitted, delivered, communicated, conveyed, referred to, obtained guidance from, Plaintiffs' trade secrets and disseminated trade secrets to its competitors, for use, referral, and tortious conduct, for competing trade activities, in their affiliates, and unlawfully profited from, in unfair competition,.

865   Kadlec and his Co-conspirators acquired, used or disclosed Plaintiffs trade secrets, knowing that they have been stolen, obtained, or converted without Plaintiff's authorization. Kadlec and Co-conspirators intentionally engaged in these acts to benefit his own self-interests, and Co-Conspirators ADMIS and Vision and LCI Defendants with the knowledge or intent that these acts would injure Plaintiffs.

866   Kadlec and Conspirators have wrongfully profited from their misappropriation and have caused Plaintiffs substantial damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in Section X supra and repeated herein and also in irreparable loss of their confidential and trade secrets to their competitors, Vision, and affiliates Vision Investment Advisors, in Stamford CT, depletion of their competitive advantage, and unlawful reduction in their performance track record.

Page 164

867   The wrongful conduct and misappropriation of Plaintiff's trade secrets alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Plaintiff's livelihoods and business, and is causing Kadlec and Co-Conspirators to have improper advantages, positions, and rights in the marketplace to Plaintiffs' detriment. Absent injunctive relief, further disclosure and use of Plaintiff's trade secrets by Kadlec and Co-Conspirators would irreparably harm to Plaintiffs.

868   Kadlec's conduct was with moral turpitude and wanton disregard for the rights of others as stated supra and repeated herein.

869   Kadlec's conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

*COUNT 6  - MISAPPROPRIATION OF TRADE SECRETS*
**UNDER NEW YORK STATE LAW**
Against all Defendants

870   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein;

871   State law claims are not preempted by the CEA and in accordance with October 6, 2020 Order ECF33 and October 23, 2020 ECF34, Plaintiffs brings its claims under New York State law and common law.  Further Plaintiffs alleged the conduct is illegal, fraudulent  and outside of the proper regulatory actions, and was done for unlawful and improper purpose.

872   Since the conduct is deemed illegal and fraudulent under both  7 USC 13 and other Federal and State law Statutes such as 18 USC 1831 el. Seq which makes it <u>illegal</u> to disseminate or steal a private parties' trade secrets and was conducted for no legal or proper purpose, Defendants have no immunity.

873   Plaintiffs transaction records, trading strategies and risk management strategies constitute competitive commercially sensitive information, including trade details, formulae, compilations, programs, methods, techniques, or processes, that give them an economic advantage, are trade secrets and are (1) non-public information; (2) protected by reasonable measures; and (3) and which derive independent economic value, actual or potential, from not being known to other persons, who can obtain economic value from its disclosure or use. of the information.

874   Plaintiffs have maintained this information in confidence and it is not generally known to other persons or the public who could obtain economic value from the disclosure or use of such information.

Page 165

Plaintiff derive substantial economic advantage over their competitors who do not know how to use it and who do not have access to it.

875   Plaintiffs trade secrets, include without limitation its trading strategies and risk management strategies and constitute competitive commercially sensitive information, including trade details, transaction history, trading records,  trading executions, strategies, timing, formulae, compilations, methods, techniques, or processes, that give them an economic advantage and that derive independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secrets' disclosure. Under New York law a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it". [67]

876   The NFA Rules specifically recognizes a CTA's transactions records, and trading strategies as a trade secret, and that the trading strategies, and performance records of a traders and CTA fall under the definition of "trade secret".  The definition of trade secret under New York law, is also defined under the Restatement of Torts, for which Plaintiffs have met all six factors.

877   Plaintiffs took reasonable measures to maintain the secrecy of its trade secrets. Such measures include, but were not limited to: (1) limited access to confidential information; (2) requiring third-parties to execute strict non-disclosure agreements before being allowed to access the information; and (3) requiring passwords for access to such information.

878   A substantial investment of time, money, cost, development over a long period of time, was invested by Plaintiffs to develop the trading strategies, risk management strategies that gives Plaintiffs a valuable, unique competitive advantage to compete as a trader in the commodities futures industry and a  risk management professional. Kumaran also invested substantial capital, money and time to register as a CTA, and start commodities hedge funds under the name Nefertiti, from which is could derive substantial economic advantage as an entrepreneur and small business owner in NYC.

879   Defendants acted with illegal and fraudulent purpose, outside of their statutory authority, and for improper purpose, for which no immunity is granted. Defendants directly acted with the intent and purpose of  unfair competition, knowingly and intending to partake in the fraudulent

---

[67]  See *Ashland Mgt. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 [1993], quoting Restatement of Torts § 757, comment b.

Page 166

dissemination of Plaintiffs CTA's and other start-up traders' trade secrets would be improperly disseminated to their competitors, in furtherance of their illegal scheme.

880   In furtherance of the fraudulent scheme, Defendants acted with willful, wanton disregard for the CTA's and Plaintiffs rights and improperly, and knowingly without authorization, converted their trade secrets for the benefits and use and profit of their competitors, and illegally and for improperly purpose, transferred, authorized dissemination of trade secrets to competitors, to perpetuate a fraud, that benefits a select group of competitors, in exchange for billions of dollars of futures revenue, that could not be secured, without the illegal dissemination of CTA's trade secrets.

881   By the unlawful dissemination, acquisition and use of CTA trade secrets, they knowingly and intentionally conferred an unfair competition benefit on Boshnack, Rothman, HRHC, HRF and Felag, in exchange for the illegal concrete benefits. Defendants also procured the trade secrets using fraud and misrepresentation as describe hereunder including permitting the *Vision broker* and ADMIS to engaged in fraudulent concealment of the Vision members access to CAA accounts.

882   Defendants knew the conduct was illegal, and fraudulent, but continued to perpetuate the scheme without regard for the property and trade secret rights of the traders and Plaintiffs.

883   Defendants willfully, wantonly, and acting illegally, fraudulently and for improper purpose, violated statutory duties, to obtain trade secrets by fraud, and to then intentionally misappropriate and disseminate their trade secrets to their competitors (for which they had no authority to do) and to use Plaintiffs trade secrets in a scheme of unfair competition, in consideration for billions of dollars of benefits, thereby intentionally diluting their competitive advantage for the benefit of their competitors,

884   Defendants also unlawfully engaged in un-registered and improper market activity and market participation and knowingly engaged in unlawful conduct, to use Plaintiffs' accounts and unlawfully use Plaintiffs' trade secrets, as a form of payment-in-kind compensation, to pay for fraudulent and unlawful activities, to procure an unfair competitive advantage on HRHC and its owners and affiliates. Defendants therefore used Plaintiffs trade secrets, by knowingly participating in conduct to unlawfully disseminate Plaintiffs CTA trading strategies and transaction records to their competitors at HRHC,  for use in direct unfair competition without their  consent.

885   Defendants engaged in unauthorized, fraudulent activities, and intentionally misappropriated trade secrets by deliberate actions which include but not limited to: (1) improper acquisition of

Page 167

Plaintiff's trade secrets using misrepresentation and fraud, including by intentional fraudulent sales and solicitations, fraudulent inducement of futures trading account, fraudulent concealment of Vision's access to CTA's strategies; violations of their obligations of protections to CTA's, confidentiality and duties of secrecy and other conduct alleged herein; (2) Defendants willful and wanton, disclosure and dissemination of trade secrets, in breach of their duties of secrecy and statutory obligations, compliance duties and Federal and State laws and confidential relationship and obligations of to maintain the secrecy and restrictive covenants of a CTA's trading strategies, , and transaction records, trade secrets and privacy laws; (3) and knowingly and intentionally participating in a scheme with Vision Investment Advisors for their ongoing use and profit with Conspirators, in direct unfair competition and the approval of registration to compete with Vision Investment Advisors.

886  Defendants and their Co-conspirators, for fraudulent and illegal purpose, willfully, wantonly and maliciously intended to and knowingly stole and, without authorization, acquired, disseminated, disclosed, copied, downloaded, uploaded, replicated, transmitted, delivered, communicated, conveyed, referred to, obtained guidance from, Plaintiffs' trade secrets and disseminated trade secrets to its competitors, for use, referral, and tortious conduct, for competing trade activities, in their affiliates, and unlawfully profited from, in unfair competition.

887  Defendants and their Co-conspirators acquired, used or disclosed Plaintiffs trade secrets, knowing that they have been stolen, obtained, or converted without Plaintiff's authorization. Defendants and Co-conspirators intentionally engaged in these acts for fraudulent and improper purpose and for commercial unfair benefit of Co-Conspirators ADMIS and Vision and LCI Defendants with the knowledge or intent that these acts would injure Plaintiffs.

888  All Defendants and their Conspirators acted with fraudulent and illegal purposes outside of their regulatory and statutory authorities, and not in accordance with any proper or legal regulatory functions with disbarred members acting outside of their registration, for which they have no immunity.

889  Defendants and Conspirators have wrongfully benefitted together from their misappropriation and fraudulent and illegal conduct and have caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in Section X supra and repeated herein and also in irreparable loss of their confidential and trade secrets to their competitors, Vision,

Page 168

and affiliates Vision Investment Advisors, in Stamford CT, depletion of their competitive advantage, and unlawful reduction in their performance track record.

890   The wrongful conduct and misappropriation of Plaintiff's trade secrets alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Plaintiff's livelihoods and business, and is causing Co-Conspirators to have improper advantages, positions, and rights in the marketplace to Plaintiffs' detriment. Absent injunctive relief, further disclosure and use of Plaintiff's trade secrets by Kadlec and Co-Conspirators would irreparably harm to Plaintiffs.

891   Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra and repeated herein.

892   Defendant's conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

*COUNT 7 – CONVERSION*
**UNDER NEW YORK STATE LAW**
Against all Defendants

893   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

894   State law claims are not preempted by the CEA and in accordance with October 6, 2020 Order ECF33 and October 23, 2020 ECF34, Plaintiffs brings its claims under New York State law and common law. Claims against Kadlec are brought in his private and commercial capacity.

895   Further Plaintiffs allege the conduct in Count 7 is fraudulent and illegal and outside of the permitted regulatory conduct as explained in Section 11 was for unlawful and improper purpose.

896   Defendants intentionally and willfully improperly converted Plaintiffs' property, assets, monies, funds, trading rights, intellectual property, trades secrets, profitability, and trading advantage for use and profit for Co-Conspirators and Vision Defendants, and for unlawful and improper purpose, by engaging in a scheme of fraud and misrepresentation.

897   NFA, Kadlec, Wahls, Kiela intentionally and substantially interfered with Plaintiffs rights to its property, assets, intellectual property, trading rights, trade secrets, profitability and funds, by, illegally authorizing the purloining and withdrawal of unlawfully charging fees, and withdrawing taking the funds in express violation of the Commodities Exchange Act. Their conversion included without limitation the misappropriation of funds for Conspirators unlawful use and illegal "arrangements"

Page 169

with disbarred Vision and its owners and affiliates. Defendants also intentionally and wantonly converted the trading strategies of Plaintiffs, depleted the trading profitability of Plaintiff's CTA and the STORM, as it converted its trading assets and profits to unlawfully pay Vision. New York courts have defined ''conversion'' as the unauthorized assumption and exercise of another's ownership rights in property to the exclusion of the proper owner's rights.[68] Conversion has also been defined as ''any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with that person's rights in the property.''[69]

898  Plaintiff did not consent in any manner to NFA, Wahls, Kiela and Kadlec's taking and conversion of its monies, funds, assets, property, and/or property rights at issue to give to HRHC, its owners or affiliates, or any other Co-Conspirator.

899  Despite repeated complaints by Plaintiffs, Defendants continued the conversion,  persisted in and continued to deny Plaintiffs' rights to their property and continued to act in a manner inconsistent with their own statutes to protect Plaintiffs confidential property, assets, funds, monies, property and trade secrets Defendants permitted ongoing use and conversion of Plaintiff property for use in unfair competition by its competitor VIA. In the case of Defendant Kadlec continued to deplete more funds, monies and theft, including on May 2nd, 2017,  conferring Plaintiffs trading funds for its own use to pay and compensate Vision  and Co-Conspirators.

900  Plaintiffs have sent cease and desist after the closing of its account after it learned of the dissemination. Defendants have failed to cease and desist, and Conspirators, including HRHC and Vision Investment Advisors, Kadlec and ADMIS, still have and are using and profiting from Plaintiff's property, and have incorporated it into competing trading and risk management programs with direct competition – for the taking of Plaintiff property in direct competition through Vision Investment Advisors, HRHC and its affiliates, owners and employees.

901  Plaintiffs at no time consented to the taking of its funds, property, trade secrets, intellectual property and assets. NFA, Wahls, Kiela and Kadlec, for illegal and improper purpose, wrongfully exerted dominion over Plaintiffs property denying Plaintiffs its rights and to therefore and without that persons consent or authorization and inconsistent with Plaintiffs.

---

[68] *See* Vigilant Ins. Co. of Am. v. Housing Auth. of City of El Paso, 87 N.Y.2d 36, 660 N.E.2d 1121, 637 N.Y.S.2d 342 (1995); Kranz v. Town of Tusten, 236 A.D.2d 675, 653 N.Y.S.2d 194 (3d Dep't 1997).
[69] *See* 23 N.Y. Jur. 2d, Conversion § 1 (2001), citing Meyer v. Price, 250 N.Y. 370, 165 N.E. 814 (1929). t

Page 170

902   Defendants Wahls, Kiela, NFA and Kadlec, fraudulently intended to convert Plaintiffs monies, funds asserts, property and trade secrets, and to use them as "payment in kind" for the illegal scheme, and at all times acted without the authorization of Plaintiffs thereby depriving Plaintiffs of hits property.

903   Defendants and Conspirators have wrongfully profited and conferred illegal benefit from their fraudulent conduct and have caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in Section 25 supra  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra and repeated herein.

904   Defendant's conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT 8 – AIDING AND ABETTING IN CONVERSION AND MISAPPROPRIATION OF TRADE SECRETS
### UNDER NEW YORK STATE LAW
Against All Defendants

905   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

906   Plaintiffs also plead aiding and abetting in conversion and misappropriation. State law claims are not preempted by the CEA and in accordance with October 6, 2020 Order ECF33 and October 23, 2020 ECF34, Plaintiffs brings its claims under New York State law and common law. Claims against Kadlec are brought in his private and commercial capacity.

907   Further Plaintiffs allege the conduct in Count 8 is fraudulent and illegal and outside of the permitted regulatory conduct as explained in Section 11 was for unlawful and improper purpose.

908   For the reasons included by reference Counts 6 and 7,  Plaintiffs' confidential information and trade secrets, assets funds, monies ,property and other information were misappropriated by conspirators ADMIS, Vision, Vision brokers, and Kadlec across interstate lines to Vision, its owners, employees, and affiliates in Stamford, CT.

909  Defendants had direct, actual and constructive knowledge of the conversion and misappropriation, as evidenced at length in this Complaint.

910  Defendants as stated herein each took direct and overt actions and provided substantial assistance in the furtherance of the fraudulent scheme. Those acts included rubber-stamping audits

Page 171

that they knew did not comply with the regulations, and permitting Conspirators to make and continue fraudulent statements and omissions as described herein.

911   Defendants motives as set forth in detail herein were for fraudulent and illegal purpose as described in Section 5-12.

912   Defendants had an affirmative duty to enforce the numerous compliance laws, and **Violations** including but not limited to NFA 2-4 9061 to enforce rules and laws the prohibit a CTA's trading record being supplied to another NFA member without their permission and NFA 2-3 and NFA 2-26 to obtain consents from CTA's prior to converting monies and funds from their accounts.

913   Defendants knowingly assisted in registering competitors VIA, after misappropriating Plaintiffs and other CTA's competitive trading strategies in direct unfair market competition, for use, profit and gain, in violation of the CEA, and Federal and State laws.

914   In addition Defendants also propagated fraud and deceit in not updating its public disclosures, and in communications from its own Compliance officers and permitting Conspirators to engage fraudulent sales and solicitations under NFA 2-29, not making requisite disclosures under Reg 1.11 to the Commission,  making fraudulent concealments under CFTC Reg 1.55 and other laws for disclosures of fees, and permitting Vision brokers including Lazzara to intentional mislead and make false representations to Plaintiffs. At all times Defendants took over actions and provided substantial assistance in allowing the fraudulent conduct  to proceed and not enforcing the compliance laws.

915   As a result of the foregoing actions and concealments, and as a direct and proximate result of the Defendants' fraudulent representations, acts, and omissions, and aiding and abetting in fraud, violation of the anti-fraud provisions of the CEA, including but not limited to 7 USC 6(b) and direct participation in the scheme Plaintiffs have suffered harm and damages herein.

916   Defendants and Conspirators, jointly and severally, have wrongfully profited and conferred illegal benefit from their fraudulent conduct of aiding and abetting in conversion and misappropriation and have caused Plaintiffs damages and irreparable harm. As a result of Defendants bad faith failure to abide by it duties, and failure to enforce the CEA, and aiding and abetting in misappropriation, Kumaran and other customers and CTA's have suffered irreparable harm in loss of their confidential and trade secrets, to their competitors, as well as other significant damages;

Page 172

917   As a result Plaintiffs have been damaged in accordance with the Damages in Section 25 supra and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra and repeated herein.

918   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### *COUNT 9 - INTERFERENCE WITH ECONOMIC ADVANTAGE*
### UNDER NEW YORK STATE LAW
Against All Defendants

919   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

920   State law claims are not preempted by the CEA and in accordance with October 6, 2020 Order ECF33 and October 23, 2020 ECF34, Plaintiffs brings its claims under New York State law and common law. Claims against Kadlec are brought in his private and commercial capacity.

921   Further Plaintiffs allege the conduct in Count 9 is fraudulent and illegal and outside of the permitted regulatory conduct as explained in Section 11 was for unlawful and improper purpose.

922   As alleged clearly throughout Defendants engaged in fraudulent and illegal conduct that violates the express provisions of the CEA, and constitutes torts and unlawful behavior. (See e.g. Section 11 and 12). As a result of the illegal and fraudulent behavior, Defendants interfered with prospective economic advantage and commercial viability of Plaintiffs CTA's.

923    Plaintiffs as CTA's had a reasonable expectation of deriving income from acting as a CTA and forming a commodities hedge fund with competitive options strategies throughout the world and/or careers as CTA's, including solicitations of capital with prospective customers for its hedge funds.

924   Its CTA programs gave it a unique competitive advantage which Defendants for illegal and fraudulent purposes disseminated to its competitors HRHC, and VIA, for their use and profit in interstate commerce.

925   Defendants were aware that Plaintiffs had a reasonable expectation of deriving income from acting as a CTA and forming a commodities hedge fund with competitive options strategies throughout the world.

926   Defendants unlawful actions and other torts herein have prevented, and obstructed and otherwise irreparable harmed Plaintiff CTA's and Kumaran from fully maximizing its economic advantage as a CTA;

172

Page 173

927  Defendants and Conspirators, jointly and severally, have wrongfully profited and conferred illegal benefit from their interference in economic advantage, and have caused Plaintiff damages and irreparable harm as a result of Defendants interference with Plaintiff CTA and Kumaran's economic advantage; As a result Plaintiffs have been damaged in accordance with the Damages in Section 25 supra  and repeated herein.

928  Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra and repeated herein.

929  Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT 10  - CIVIL CONSPIRACY
#### UNDER NEW YORK LAW
##### Against All Defendants

930  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

931  State law claims are not preempted by the CEA and in accordance with October 6, 2020 Order ECF33 and October 23, 2020 ECF34, Plaintiffs brings its claims under New York State law and common law. Claims against Kadlec are brought in his private and commercial capacity.

932  Further Plaintiffs allege the conduct in Count 10 is fraudulent and illegal and outside of the permitted regulatory conduct as explained in Section 11 was for unlawful and improper purpose.

933  Defendants entered into an association of fact and agreement to not enforce compliance laws, and engaged in acts of fraudulent and illegal conduct as set forth herein, including in Section 9-12. in conspiracy with Kadlec, ADMIS, Vision employees, owners and affiliates, and Vision IB's were beneficiaries of the arrangements -  to defraud Plaintiff and dozens of customers and CTA's opening accounts at ADMIS engage in intentional violations of the CEA and Federal and State Laws.

934  The civil conspiracy in fraudulent and illegal conduct included an arrangement to (a) distribute customer and CTA' and Plaintiffs confidential trading secrets and futures accounts to Vision; (b) purloin funds and trading profits, and overcharge fees between 0.30 cents and $6.00 for compensation to Boshnack and other third parties from Plaintiffs and other victims; and (c) other misconduct and fraud alleged herein, so that Defendants, through improper means, and using fraudulent inducement, could pay the interest and make compensations-in-kind for the financial credit lines and guarantees

Page 174

from disbarred Vision's owners and support the futures industry; and operate an enterprise that violates the CEA, for their illegal profit, gain and financial benefit; ("Agreement to Defraud").

935   Defendants NFA, Wahls, Kiela and Kadlec provided intentional and overt acts to propagate the Agreement to Defraud, including intentionally not enforcing the rules and regulations, rubber-stamping multiple audits that they knew propagated fraud and deceit, permitting Conspirators to make fraudulent solicitation and obscure black-letter law disclosures about fees, risk management and at all times engaged in fraudulent conduct to permit dissemination of CTA's proprietary trade secrets to a disbarred *Vision Risk Group*.

936   A lynchpin of the fraud and civil conspiracy was to misappropriate assets, monies, funds, property and funds including the trading strategies of start-up CTA's transfer it to its competitors, for use and profit in interstate commerce. The Conspirators used artifice, misrepresentation, trickery, deception and fraudulent intent to convert money, property and funds from the Vision broker accounts, (which included Plaintiffs CTA account) without their knowledge and consent to pay for their illegal non-compliant arrangements with disbarred Vision, all of which was fraudulently concealed from CTA's and Plaintiffs, and fraudulently paid for by purloining funds from CTA's and Plaintiffs.

937   Defendants, individually and jointly, intentionally acted in furtherance of their Agreement to Defraud, by, among other things, coordinating: (i) rubber-stamping compliance audits without enforcement of the disclosure and consent laws and other Violations listed herein; (ii) engaging in material concealments and false representations in public and solicitation documents, such as the disclosure documents, email solicitations, corporate brochures, websites, customer forms; (iii) fraudulently concealing the alleged risk procedures from customers, in express violation of the disclosures under the CFTC Rules. (iv) secretively and without traders consent, distributing access to their trading accounts, (v) knowingly and intentionally engaging in a consistent pattern of bad faith, dishonesty and deceit when customers, including Plaintiff question the irregular conduct to conceal the fraud, and (vi) conspiring with and engaging at least two compliance officers at the NFA,  who acted in concert with the scheme, to willfully, knowingly, and intentionally not enforced the compliance laws in bad faith, to permit the scheme to go undetected; (vi) and other conduct alleged herein; in the Agreement to Defraud.

938   Defendants intentionally performed the actions set forth in the paragraphs  above.

Page 175

939   Defendants, individually and jointly acted in furtherance of their Agreement to Defraud,  by, among other things, coordinating: (i) failing to audit Vision IB's in accordance with the minimum frequency requirements ; (ii) covering up and failure to enforce NFA compliance laws, as stated in Paragraphs 262-263 and otherwise above; and (iii) using the NFA Arbitration Forum, to cover-up fraud, and not enforce fair, expeditious and equitable procedures and justice, but a mechanism where the NFA could control, impede, obstruct and prejudice Plaintiff's rights, and procure an outcome to protect NFA and its conspirators, in the Agreement to Not Enforce.

940   As  a result of Defendants repeated and unlawful actions Plaintiffs have been significantly harmed and damages as alleged herein

941   Defendants and Conspirators, jointly and severally, have wrongfully profited and conferred illegal benefit from civil conspiracy and have caused Plaintiff damages and irreparable harm as a result of Defendants interference with Plaintiff CTA and Kumaran's economic advantage; As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages in Section 25 supra and repeated herein.

942   Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra and repeated herein.

943   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### *COUNT 11– CIVIL RICO – USC § 1962(c).*
Against Defendant Kadlec
(in his private and commercial capacity as CEO of ADMIS)

944   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

945   This claim is brought against Defendant Kadlec, individually, acting with private interests as CEO of ADMIS, for whom no immunity is granted.

946    Over a pattern of continuous conduct commencing in or around September 2014 until present date, Defendant Kadlec, each individually playing a role, engaged in a scheme with ADM Investors Services, Vision's owners, employees and affiliates and a network of Vision brokers, and key insiders at the National Futures Association, and the NFA, formed an association-in-fact enterprise (the "Enterprise"), in exchange for illegal financial benefits to Defendants, using predicate acts of wire

Page 176

fraud, mail fraud and fraud to steal, illegally misappropriate and use Plaintiffs trade secrets under 18 USC 1831,  and purloin and steal monies from Plaintiffs accounts, and engage in illegal overcharging of fees, and money laundering to defraud new commodities futures customers and CTA, for their illegal profit, gain and financial benefit in a pool of unregulated accounts, that were not subject to compliance under the CEA.

947  At all times relevant herein, the Enterprise engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

948  The scheme involves using interstate wire and mail communications, and fraudulent and deceptive sales and solicitations, and repeated fraudulent communications after the accounts are opened,  to fraudulently induce new customers, CTA's start-ups including Plaintiffs, to open  and maintain commodities futures trading accounts at ADMIS, whereby, in violation of the law, while materially concealed, that unqualified persons who were formerly associated with permanently disbarred FCM called, Vision, its owners, affiliates, employees would (a) gain fully disclosed access to their accounts and trade secrets in violation of 18 USC 1831; (b) would unlawfully deduct, withdraw and steal cash payments, disguised as trade processing or transaction fees, out of their accounts across interstate lines to make personal compensations to Boshnack and procure special rates (See G&F Agreements, ECF31);  (c) would engage in unlawful margin activity to suppress the profitability of their competitors CTA accounts outside of exchange rules and (d) would be used, with the direct actions of Tom Kadlec, to approve registration, in direct competition by Vision Investment Advisors, and High Ridge Holding Corporation, who run a CTA referral program, to front run and compete with the CTA proprietary trading programs, in unfair competition, after improper acquisition of Plaintiffs and CTA's trade secrets.

949  The repeated and continuous pattern of fraudulent communications by Lazzara and ADMIS, are incorporated by reference in **Exhibit 9,** and Vision FAC ¶186-¶330

950  In furtherance of the Enterprise, the Co-Conspirators intended to and knowingly stole and, without Plaintiff's authorization, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Plaintiffs  trade secrets. The co-conspirators also received, acquired, or possessed Plaintiffs trade secrets, knowing that they had been stolen, obtained,

Page 177

or converted without Plaintiffs authorization in violation of 18 USC 1831 el seq.. Each predicate act of misappropriation counts as a pattern if RICO activity

951  The Co-Conspirators intentionally engaged in these acts to benefit Defendants and Co-Conspirators, with the knowledge or intent that these acts would injure Plaintiffs.  The Defendants each agreed to further, facilitate, support, and operate the Enterprise. As such, the Defendants conspired to violate 18 U.S.C. § 1962(c)

952  Each of the Conspirators and Defendant Kadlec individually and jointly permitted the Enterprise to operate, by their direct participation in the scheme to intentionally fail to enforce the CEA and NFA rules that prohibit the conduct, as alleged in the Paragraphs above and otherwise herein.

953  Defendant Kadlec directly acquired financial benefit from the scheme. The predicate RICO acts set forth herein were carried out on a continued basis for more than a five year period, were related and similar and were committed as part of the ongoing scheme of Defendants and Conspirators one or more of the *Vision brokers* to fraudulently induce accounts to ADMIS and then unlawfully disseminate CTA's strategies to Boshnack and his enterprises, and unlawfully deduct cash and transfer it to Boshnack and his enterprises, if not stopped, such acts will continue into the future

954  As admitted in the Vision Motion to Dismiss, this pattern of activity poses a specific threat of repetition extending indefinitely into the future, and continues to harm to the present day;

955  The Defendants fraudulently to collect unauthorized fees and deductions, estimated to be more than $50 million dollars over five years, in violation of the Defend Trade Secrets Act, the Commodities Exchange Act, Federal and State law, and the CEA and transfer those funds, under false pretenses, and without the customer and CTA's knowledge and approval to Vision, its owners, affiliates and employees.

956  The scheme therefore also underpins unlawfully money laundering Plaintiffs cash from its customers futures accounts, across interstate commerce, which directly depleted the profits of their accounts and the performance record of their trading activities, as well as stole the trading strategies. Defendants knew that the transaction involved such proceeds would be wired across interstate to Vision owners and affiliates and made persistent and repeated attempts to fraudulently conceal. Vision IB and ADMIS, enabled by Defendants, intended to promote the carrying on of the specified unlawful activity and knew the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds -  namely Rothman and Boshnack.

Page 178

957   Plaintiffs have been damaged as a direct and proximate result of a violation of the Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961-1968) ("RICO") and by reason of this conspiratorial conduct whereas Plaintiffs have been induced to open accounts at ADMIS, and unwittingly contribute and disclose trades secrets, assets, capital, property, goodwill, and irreparable loss of competitive trade secrets to Vision as a result of Defendants' unlawful conduct described herein.

958   By virtue of this violation of 18 U.S.C. § 1962(c.)(d), Defendants have wrongfully profited from their civil conspiracy and have caused Plaintiffs damages and irreparable harm. Defendants are jointly and severally liable to Plaintiffs and Plaintiffs are entitled to recover from each three times the damages sustained, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

959   Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra and repeated herein.

960   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT 12 – CIVIL RICO -  U.S.C. § 1962(d)
Against Defendant Kadlec
(in his private and commercial capacity as CEO of ADMIS)

961   Plaintiffs repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

962   This claims is brought against Defendant Kadlec, individually, acting with private interests as CEO of ADMIS, for whom no immunity is granted. To the extent illegal and fraudulent conduct is judicially ruled upon by the Court, Plaintiffs will amend this cause of action, to include Defendants NFA, Wahls and Kiela, as no immunity is granted under this exception.

963   The Co-Conspirators have intentionally conspired and agreed to directly and indirectly participate in the affairs of the Enterprise through a pattern of racketeering activities in violation of 18 U.S.C § 1832, as described in Count 11

Page 179

964   The Co-Conspirators knew that their actions constituted a pattern of racketeering activities and agreed to those actions in furtherance of, and for the benefit of the Enterprise, as described in Count 11. A list of transactions is incorporated in related case Exhibit 9.

965   The actions of the Co-Conspirators constitute a conspiracy to violate 18 U.S.C § 1962(c), in violation of 18 U.S.C § 1962(d).

966   As a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(d) by the Co-Conspirators, Plaintiffs have suffered economic damages throughout the world, but not limited to, injuries in the Southern District of New York; in an amount to be proven at trial.

967   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Plaintiffs have been damaged in accordance with the Damages supra in Paragraph Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein

968   The aforementioned acts of the Co-Conspirators were done willfully, with malice toward Plaintiffs and wanton disregard for their rights, entitling Plaintiffs to treble damages, attorneys' fees, and costs.

969   Defendants are jointly and severally liable to Plaintiff and Plaintiff is entitled to recover from each three times the damages sustained, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

970   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT 13 – VIOLATIONS OF SECTION 22 of the CEA
### FAILURE TO ENFORCE RULE 21(b)(10) and Article III(C)  of "fair" and "equitable" procedures under the FEDERAL ARBITRATION ACTION, 9 USC 1 el seq.

Against Defendant NFA

971   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

972   Plaintiffs Kumaran and NRCM, at the time of the events, were both registered commodities trading advisors ("CTA's) and had paid in full their membership dues to the NFA. Plaintiffs are entitled to fair and equitable protections under the CEA, and NFA's obligations to promote "innovation" and a uniform set of rules. Kumaran individually remains a  registered member as a

Page 180

CTA and NRCM was dissolved as a result of significant harm and damage caused herein. Kumaran's membership dues have been paid in full.

973   NFA gladly accepted over the period 2016-2020 over \$3,500 in membership fees on behalf of Kumaran individually and its Nefertiti entities, entitling them to duties and protections of NFA Members. NFA has a statutory and ministerial obligation to enforce those rules.

974   Congress granted a private right of action to traders and CTA under 7 USC 25(b)-(d) against a registered futures association who in bad faith fails to enforce its rules, regulations (ADD). Amongst those rules under 7 U.S.C. 21 (b) (10) and NFA's Articles of Incorporation III(c)[70] NFA has a statutory and obligation to Jurisdiction over this claim is governed by Section 22 of the CEA, giving Plaintiffs a private right of action for NFA's failure to enforce rules, regulations, under 7 USC 21 (b) and Article III(c) and its fraudulent and illegal conduct for which its conduct was bad faith.

975   NFA had a special duty to its paying registered members, under 7 USC 21(b)  to as well as to enforce its own NFA bylaws, rules, regulations and requirements. NFA had a statutory duty to protect its members, the rules of the association are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, in general, to protect the public interest,

976   NFA's Arbitration under 7 USC 21 (b)(10) and Article III(c) are governed by under the Federal Arbitration Act, 9 U.S.C. 1 *el seq* are also subject to the due process requirements of the Fifth and Fourteenth Amendment to the Unites States Constitution in connection with the foregoing delegated authorities. [71]

977   Under the CEA Section 22, as an important criteria of the mandatory obligations to members, as listed in  NFA's bylaws, rules, and regulations under the laws it is mandatory to enforce 7 USC 25(b) it is obligated to Article III (c) to adopt and administer a <u>fair and equitable</u> procedure through arbitration or otherwise for resolution of claims and grievances between Members. Since Member have no ability to it has no obligation to settle or resolve grievances between Non-Members such as

---

[70] **Article III (c) Arbitration.** The adoption and administration of a fair and equitable procedure through arbitration or otherwise for the voluntary settlement of customers' claims or grievances against Members described in paragraph (a) above, their employees, and Associates, in accordance with Section 17(b)(10) of the Act, or claims or grievances of such Members or Associates against customers, or claims or grievances between or among such Members or Associates: *Provided, however*, no such procedure shall apply to the settlement of a claim or grievance where the parties, by valid and binding agreement, have committed themselves to the resolution of such claim or grievance in a forum other than NFA, or where parties having claims or grievances between or among themselves are required by Contract Market rules to submit the controversy to the settlement procedures of such Contract Market.

[71] The Fifth Amendment provides: "[N]or shall any person . . . be deprived of life, liberty, or property, without due process of law[.]" and Fourteenth Amendment provides: "Nor deny to any person within its jurisdiction the equal protection of the laws.

Page 181

High Ridge Holding Company, the private trading arms of Boshnack Family, LLC, Rothman Family, Julie Villa or numerous unregistered Vision affiliates.

978   NFA is required to provide a <u>unbiased, fair, and neutral forum</u> for arbitration for resolution of customer and member disputes.[72] NFA's bylaws, rules and regulation that is given by Article III(c) are also governed under Section 22 in the obligations of the NFA to enforce "fair" and "equitable" procedures. Plaintiffs, as traders, and as paying Members, are reliant on the NFA's neutrality and lack of bias, to enforce the rules, as required by statue in an unbiased manner, also in accordance with Federal law. Any failure to enforce Article III to not provide paying members and traders of the NFA, rights to a "fair", "expeditious" and "equitable" procedures, where the Co-Defendants are entitled to deference, is a violation of traders due process rights and violation of Section 22, for NFA's failure to enforce its rules and regulations under Artible III, giving rights for a private right of action.

979   As alleged herein, NFA and Kadlec, had full knowledge of the fraudulent scheme including the G&F Agreements, and the sham, non-compliant, oral risk services arrangements, concealed from the CFTC, the illegal purloining of monies from CTA's accounts, the illegal dissemination of trade secrets to competitors Boshnack, and HRHC who ran a CTA referral service, and Kadlec, also on the NFA Board, had directly approved Vision Investment Advisors registration in March 2018, after the unlawful dissemination of Plaintiffs trade secrets, across interstate lines, for use in direct competition as a CTA. The scheme was illegal and fraudulent, and no immunity is granted.

980   On or around March 21, 2018, NFA compliance staff fraudulently represented that if Plaintiffs paid $9,500 to the NFA to initiate an arbitration exclusively under the NFA, only then would NFA investigate a compliance investigation. At the time of the statements, NFA and its staff already had material knowledge of the illegal scheme, G&F Agreements and fraud herein.

981   Plaintiffs reasonably relied on the statements of Afzal and other material statutory omissions of NFA (See Supra) and paid the money to the NFA on or around May 22, 2018, also reliant on its supposed "neutrality" to provide a fair, neutral and unbiased forum. NFA fraudulently and intentionally concealed its knowledge and signatures of the fraud.

982   In accordance with the statutory obligations of disclosures under the FAA, and the Commercial Code of Ethics of Arbitration, NFA violated 7 USC 21(b)(1) and Article III(C), and NFA intentionally failed to make the required disclosure to Plaintiffs, as administrators and witnesses in the Arbitration,

---

[72] *See* NFA s Article II, Article III, NFA Bylaw 1506, and NFA Bylaw 801, & CEA 7 USC 21(b)

Page 182

of their role with ADMIS, and Kadlec, Boshnack and Rothman in the fraudulent scheme, so that the dispute could be adjudicated in a "fair" and "neutral" forum. The Code of Ethics Canons I and II mandate that A. The concealment was intentional to violate Plaintiff due process rights.

983   Defendant NFA failed to provide Kumaran, and NRCM, due process of the law, failed to provide equal protection of the NFA rules, and repeatedly, arbitrarily, and as part of a fraudulent and illegal scheme with Boshnack, Rothman, Kadlec, ADMIS and other insider market participants, in order to prejudice Plaintiffs' rights, and procure procedural advantage to its NFA Board Member Kadlec,  obstructed delayed, repeatedly failed to enforce or varied its rules, processes and procedures. NFA's conduct was willful, wanton and bad faith to cover up the fraudulent and illegal scheme.

984   Among other things, such conduct included failing to enforce NFA rules on discovery  for 523 days, failing to appoint a Panel for 275 days, failing to failing to enforce **four** Motions to Compel for over 13 months to produce contracts exposing the fraud, withholding exhibits form the Panel, concealing dockets, cancelling conferences, denying Plaintiffs rights to receive oral transcripts, setting forward arbitrary procedures to prejudice Plaintiffs, provided 30 days notice to ADMIS of oral argument but only 2 days to Kumaran, provided NFA legal staff 14 days to oppose subpoenas, and Plaintiffs only 6 hours delaying subpoenas to the Panel by weeks, maintaining ex-parte communications with ADMIS, leaking information to ADMIS, overriding Federal statutes for the claims for legal fees, failing to enforce NFA 2-5, attempting to extort over ten thousand dollars in exchange for adverse testimony from NFA whistleblowers on corruption failing to enforce NFA Rule 7(a)(2), 7(h), granting favorable extensions to NFA Board Members, concealing information from the Panel, and failing to provide any transparency, dockets, documentation or records, including services of process.

985   NFA through their biased, evidently partial conduct and materially failed to abide by the FAA violated Kumaran's due process rights, and failed to enforce impartiality to the Arbitration.

986   NFA subject Plaintiffs to arbitrary and ad-hoc procedures, violated the Code of Arbitration Ethics,. failed to disclose their material conflicts of interests and vested financial interest in the guarantees of Boshnack and Rothman, (generating hundreds of millions of dollars to the industry), willfully failed to disclose their own compliance officers Wahls and Kiela had authorized illegal dissemination of trade secrets and purloining of Plaintiffs CTA profits, and failed to disclose material facts that a reasonable person would consider bias and evident partiality, including their own

Page 183

compliance officers being called as "witnesses" to defend the illegal scheme, exceed their powers and their statutory duties, willfully set forth unreasonable schedules that were intended to harass Plaintiffs or not permit them fair and equal opportunity to protect their rights , obstructed material evidence, withheld motions and exhibits from the Panel, acted outside of their jurisdictional authority to rule on motions, acted with secrecy, lack of transparency, inside dealing, routinely flouted their rules, failed to enforce laws, concealed documents, and violated their own Arbitration rules under the Federal Arbitration Act, in an unsupervised forum that was tantamount to abuse and harassment, to interfere in Kumaran's and NRCM's rights to property and liberty and rights to make a living. The illegalities were used for self-interest to cover up the fraud and illegalities of NFA's own conduct, in what they intended to be a "closed-door", gag-ordered proceeding where they could procure a biased and unfavorable outcome to Plaintiffs in order to continue their fraudulent scheme.

987   NFA, Kadlec and ADMIS, acting together and in conspiracy, deliberate and fraudulent conceal without limitation the G&F Agreements for 523 days, and fraudulently and intentionally violated judicial Panel Orders and NFA Member arbitration Rules, to – do this date- conceal the illegal, orally approved  "risk services" that Boshnack and Rothman, were acting outside of their registration authority, to extend margin on credit, - the same conduct they had been disbarred for. Because it was illegal, NFA knowingly participated to intentionally cause over 18 months delays, and cause irreparable harm and obstructions, to willfully cause NRCM to be dissolved.

988   In violation of the due process clause, NFA has failed to adopt rules, provisions or procedures that address NFA's own conflict of interest or liability in the proceeding, or that  provides any due process protections to prevent or redress the type of injury Plaintiffs have suffered. As alleged herein, NFA does not provide sufficient safeguards to prevent unconstitutional conduct. NFA Arbitration has failed to stay current and falls far below acceptable standards such as FINRA, CPR or AAA, and has failed to provide a remedy for members who are impacted by NFA's own wrongdoing under 7 USC 25 NFA's Arbitration program has been unsupervised by the CFTC since 2008 and subject to other complaints for due process without redress. (ECF1 Exhibit 1 Pg10)

989   Plaintiff's due process rights and equal rights to the law were violated. NFA were not neutral, had a direct pecuniary interest in the outcome, and violated due process to cover up their participation in fraud and caused Plaintiff damages and irreparable harm.

Page 184

990   Under the CEA, the CFTC in Exhibit 1 has identified 31 delegated and statutory authorities to Defendant NFA including but not limited to enforcing a <u>fair, equitable, and expeditious hearing</u> under the Federal Arbitration Act, and enforcing compliance laws. NFA

991   CFTC has previously received other hotline complaints related to the NFA arbitration and disciplinary programs. "*NFA arbitrations are not appealable to the Commission or to federal or state courts. As NFA does not publish its arbitration decisions, it is apparent that NFA arbitration decisions are not subject to evaluation and comment by other. CFTC documented the need for periodic oversight of NFA's arbitration program, in order to ensure that arbitrators are qualified and unbiased, and that complaining customers, as well as NFA members (and their employees), <u>receive all due process required</u>*" (Exhibit 1, Pg.10)

992   NFA was well aware of the lack of oversight on its Arbitration program by the Commission, and during the time of the events in this Complaint, no such oversight was conducted. NFA abused it power and authority to breach Article III(c), and it rights of due process to Plaintiffs, both registered traders and members, instigating "unfair" and "inequitable" and illegal procedures as part of the scheme to cover up and conceal their own violations of the Act.

993   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## *PRAYER FOR RELIEF*

WHEREFORE, Plaintiffs pray for relief that this Court render a judgment against Defendants, jointly and severally, as follows:

a.    Damages in accordance with Section 22 of the CEA, as permitted thereunder, including disgorgement of all fees and monies illegally obtained by NFA from the fraudulent scheme;

b.    Damages in the amount of all reimbursement of all MTM financial losses and reductions of economic advantage, for all commodities trading accounts involved in the scheme

c.    Damages in the form of disgorgement of all profits gained by each Defendants from the fraudulent conduct, the accounts fraudulently induced hereunder and the misappropriation of trade secrets, Plaintiffs' trade secrets fraudulently induced hereunder;

d.    Damages for the misappropriation of trade secrets, restitution, unjust enrichment, and disgorgement of profits, from Defendants, its agents, servants, employees and introducing brokers, resulting from the fraudulent scheme, and including misappropriation of Plaintiff's trade secrets;

184

Page 185

e.    Damages in the form of royalties, and costs and development costs, and other lost profits of Plaintiffs' from the scheme and fraudulent activity;

f.    Damages calculated as by loss of property,  assets, livelihood and liberty, including loss of businesses, lost opportunities, loss of CTA revenue, and intellectual property, in an amount to be determined at trial;

g.    Damages in the amount of all reimbursement of all financial losses and reductions of economic advantage, for all commodities trading accounts involved in the scheme;

h.    Damages in the form of loss of capital, loss of income, loss of economic advantage, interruptions to business, costs of development, economic interruption, economic interference, disruption and delays, royalties, irreparable losses for trade secrets in an amount to be determined at trial;

i.    Disgorgement of all fees and profits unlawfully gained from the activity;

j.    Entry of an order that restrains and preliminarily enjoins, and a Final Order that permanently enjoins, Defendants and their agents, servants, employees, introducing brokers, service providers, attorneys, and all persons acting in active concert or participation with them, from the unauthorized acquisition, disclosure, use, duplication, or distribution of the Plaintiffs' trade secrets;

k.    Exemplary damages including  but  not  limited to all special, indirect, punitive, consequential or other damages as permitted by Federal Law, State Law, and Statute;

l.    Treble damages against Defendant Kadlec as provided in 18 U.S.C. §§ 1964(c) and 1964(d);

m.    Attorney Fees, Costs and Expenses of this action as permitted under Federal Law, State law and Statute;

n.    Post and Pre Judgment Interest;

o.    All other relief, remedies and rights available in law and equity as this Honorable Court shall determine deems just and proper;


PLAINTIFF DEMANDS TRIAL BY JURY


This Pleading is signed and filed electronically on January  14, 2020

Page 186


Electronically Signed

//SSK//                                    //BMA//

Samantha S . Kumaran                       Brian August, Esq
Pro Se Plaintiff                           AugustLawNYC
                                           100 Willoughby Street 9E
                                           Brooklyn, NY 11201
                                           (917) 664-4465
                                           bmaugust61@gmail.com
                                           www.augustlawnyc.com

                                           *Attorney for NRCM*