# EXHIBIT A

**SAMPLE PARAGRAPHS**

**REFERRING TO GUARANTEES AND REDACTED PROVISIONS**

¶167 - The G&F Agreement, to preserve these relationships, permitted Boshnack and his newly created affiliates to provide "*sales and marketing services*" – with such sales and marketing services only permissible if they are in full compliance of the CEA. The G&F Agreement only permitted them to provide a limited scope of services to refer business to ADMIS. The G&F Agreements *did not contemplate or approve in any manner the provision of risk management services* or any other form of services. (See G&F, ECF31¶2). (**ECF31, ¶2.1, ¶2.2**)

¶168 - Therefore, notably the G&F Agreement did not contain any provisions that provided for risk management services. The only services permitted under Section 2.1 and **Section 2.2 of the G&F** are "*sales and marketing*" – in compliance with the laws.

¶149 **The terms of the G&F Agreement permitted Rothman (individually), Boshnack (individually) and HRF (owned by HRHC) to guarantee the accounts of hundred or more** *Vision brokers* that were transferred to ADMIS. The ownership of HRHC was material. NFA also knew that HRHC ran a directly competing CTA referral basis that would be in direct competition with the many of the new CTA's that subsequently opened accounts.[1]

¶173 - But as clearly pled in related Complaint 20-CV-3873 ADMIS, (Incorporated by reference herein in related case ADMIS 20-CV-3873 **ECF15 Exhibit 5 and other Exhibits 1-4**) ADMIS and Kadlec, however made no changes to their promotional and marketing literature, and knowingly and intentionally failed to disclose to any new customer and new traders, any of the information, about their material affiliation with Vision. There was no inclusion about material **individual guarantees on their traders accounts or the ability to deduct trailing fees and commissions**. This information was material, as traders, would not have agreed to open accounts.

---

[1] (See Att2, NFA acknowledging on Pg.3 ¶7, that significant revenue comes from Vision CTA referral business, and in Vision FAC Exhibit 11, by virtue of restructuring HRHC maintained ownership of the CTA referral business).

Page 3

¶187 - But the Conspirators **were heavily reliant on the several hundred million dollars of credit lines and Guarantees from Boshnack**[2]. Without the subprime **customers paying for the Boshnack credit lines, the scheme would never have worked**, So the parties never intended, to seek their consent.

¶225,   NFA and Kadlec's bad faith failure was directly harmful to "innovation" and "fair market competition" and CTA's. Professional traders, CTA's and Plaintiffs had a non-discretionary, statutory right to know *prior* to opening the account … (ii) **that the credit and guarantees on the account was being sourced from disbarred owners** of a prior FCM that was kicked out of the industry for dishonorable conduct and disciplinary violations; (iii) **the parties of interest of their account were direct competitors and ran a directly competing HRHC CTA referral services**; and (iv) as was later negotiated all their proprietary trading strategies **would individual credit lines to compensate Boshnack personally for his credit lines and all their proprietary trading strategies would be disclosed to a competing CTA referral** service by Boshnack under later their own directly competing CTA Vision Investment Advisors.

¶231 -   It was carefully and purposely planned that the only way to make up that shortfall and pay the guarantees was through the unknown and unauthorized payments from unwitting customers, traders and start-ups including new CTA's (including Plaintiffs') who would not be able to opt-out. The conduct to conceal HRHC, **Boshnack and Rothman's involvement** was a clear antitrust and competitive fraud, with CTA's a specific class of victim who were harmed.

¶237 - Since it was determined that **Boshnack would be providing the funds to guarantee of *Vision Brokers,*** subject to compliance with disclosures the former Associated Persons of the disbarred Vision then began their reregistration into the NFA as market participants, this time expressly limited to the role of an Introducing Broker ("IB").

¶239 - Any role out of the G&F Agreements, as stated in Section ¶1 was "contingent on" HRF (owned by HRHC) being able to register as IB's. In other words, in a   *tail-wagging the dog scenario*, **the**

---

[2] Boshnack includes by reference Boshnack, Rothman and HRHC but for simplification is replaced now with Boshnack

**registration of these participants was <u>a necessity</u> in order for the Guarantees to go into effect, and hundreds of subprime brokers to remain in the business.** (See ECF31, ¶1)

¶263 - Boshnack, Rothman, Felag and his HRHC affiliates, with a deadline looming for a deal on by November 1, 2014 as inked in the G&F Agreements (see ECF31, ¶1) then negotiated, that **in order for them to continue their Guarantees, negotiated an "orally-arranged" risk service provider that would unlawfully, and behind-the-scenes, provide them**

    (i)   full transparency into all the confidential and proprietary trading accounts, business data, transaction records and trade secrets of customers (including their competitor CTA"s);

    (ii)  the discretionary authority and ability to add and extend credit, in their discretion, to traders accounts, and/or determine the risk threshold on traders accounts since he was wearing the risk on the account;

    (iii) the ability to place traders and/or liquidate accounts to minimize their risk;

    (iv) the discretionary authority to add or remove buying power, or extend margin and;

    (v)  to take other actions he deemed fit, in his sole discretion, on the *Vision broker* traders accounts.

¶416 - Starting in November 2014, Defendants NFA and Kadlec, together with the Conspirators had agreed upon the three (3) agreements that would govern their arrangement going forward. The Settlement Agreement, upon which NFA were paid $1.5 Million dollars to permit Boshnack and Rothman to restructure their business to be owned by HRHC and remain in the business, a Guarantee and Fee Agreement dated August 31, 2014 (ECF31), and on November 1, 2014, and to ink the deal for **Boshnack, Rothman** and HRHC **to wear the risk of guarantee the brokers, and orally arranged risk services agreement, that as discussed supra, was impermissible..**

¶246 - As stated **supra, the acquisition of subprime *Vision brokers* contributes to about one hundred and forty five (145) of the three hundred (300) ADMIS's Introducing Broker business and generated hundreds of millions of dollars of commission revenue on a risk free basis. ADMIS an**d Kadlec were also materially reliant on the source of funds from Boshnack to acquire approximately 1/3

of their business, estimated to be over $100 million of gross revenue a year, and over a billion dollars of transactions to the futures industry.[3]

¶247 - In addition upon information and belief, because their capital was supporting substantial trading clearing business, upon information and belief, HRCH, **Boshnack and Rothman individually,** also contributed to ADMIS's mandatory CME capital **to guarantee the futures business** in the clearing to the exchange. One of the FCM rules of participation is that all FCM's have to post additional guarantees to the CME to secure the defaults and trading liquidity of the markets. In addition, upon belief,  as an additional deal sweetener, Boshnack, Rothman and HRHC, offered to and did agree to post additional margin, on behalf of ADMIS for their depository contributions to the CME for exchange liquidity.

¶250,  As the final deal terms of Boshnacks' or HRHC's funding role was ironed out, underscored in the consideration was that now HRHC was wearing tremendous risk and exposure in their **guarantees on thousands of brokers and hundreds of *Vision brokers* accounts, and the indemnification thereof,** it was determined, that the result of any business decision made by ADMIS on extending credit would or could result in substantial unauthorized drawdowns or risks to Boshnack or HRHC or his team.

¶126, Ordinarily when a company secures credit, capitalization or funding (such as Softbank provided funding or credit to WeWork it is the responsibility of receiver (in this case ADMIS) to pay the interest or repayment of the funds. Boshnack et al's source of funding was not for free and clearly Boshnack and his affiliates wanted to be paid handsomely for providing credit and guarantees to ADMIS.

 ¶142 - NFA, also knew that without executing guarantee, a significant dent and loss of potential review of subprime Vision brokers, and who did not have collateral to participate in the futures markets Because ADMIS, and NFA, would not secure the credit, NFA were reliant on the guarantees an credit lines of Bohsnack and Rothman the parties agreed to a new set of agreements.

---

[3] As stated supra, according to NFA's disclosures  in 2010 alone generated shy of $50 million dollars of commissions within 6 months which would now be paid to ADMIS.

¶148 - In or around August 28, 2014, in accordance with the above, ADMIS, agreed to accept a "bulk transfer" of *all* customers and *Vision brokers* to now clear through ADMIS.  The agreement was memorialized in a Guarantee and Fee Agreement ("G&F Agreement", incorporated herein by reference previously filed under seal - *ECF31*)) dated also August 28, 2014, by and between ADMIS, Kadlec, Boshnack, Rothman, and HRF (owned by HRHC) .

¶149 - **The terms of the G&F Agreement permitted Rothman (individually), Boshnack (individually)** and HRF (owned by HRHC) **to guarantee the accounts of hundred or more *Vision brokers* that were transferred to ADMIS.** The ownership of HRHC was material. NFA also knew that HRHC ran a directly competing CTA referral basis that would be in direct competition with the many of the new CTA's that subsequently opened accounts.[4]

¶150 - Any agreement approved by the NFA had to be in compliance with the Commodities Exchange Act, and the NFA were obligated to enforce the rules, regulations, bylaws under the G&F Agreement, to ensure fair market competition, fair and equitable market participation. That agreement also is expressly required to comply with the laws, rules and regulatory requirements of the Act.

¶151 - NFA had approved now two agreements that permitted disbarred members to remain participants, both of which NFA, is required to enforce their own compliance. *First,* the Settlement Agreement date June 20, 2014, for which they procured financial benefit of $1.5 million dollars, and also a *second,* Guarantee and Fee Agreement signed on or around August 28, 2014 between ADMIS, Boshnack, Rothman and HRF (owned by HRHC) that permitted the "bulk transfer" of former Vision customers to ADMIS.

¶684 ..  NFA had *approved* the G&F Agreements for **Boshnack to individually guarantee Plaintiffs account**, and that (b) NFA had approved the illegal outsourcing of risk management to *Vision Risk Group* in violation of CFTC Reg 1.11 which was not being disclosed as is mandatory to CTA's under NFA 2-26/Reg 1.55 as required… which unlawfully permitted Vision Risk Group (as expelled and

---

[4] (See Att2, NFA acknowledging on Pg.3 ¶7, that significant revenue comes from Vision CTA referral business, and in Vision FAC Exhibit 11, by virtue of restructuring HRHC maintained ownership of the CTA referral business).

unqualified to act as an FCM) to access Plaintiffs CTA transaction records in violation of the rules, and act outside of their registration capacity as a disbarred FCM.

¶830 -  Defendant NFA and Kadlec, knew of the material omissions, had authorized the illicit risk service arrangements, and G&F Agreements, **that disbarred owners Boshnack and Rothman had placed individual guarantees on its account and its trading strategies were being disseminated in exchange,** and that Plaintiffs would become "customers" of High Ridge or subject to the unqualified, illegal risk services arrangements that were unlawfully not disclosed.

¶934 -  The civil conspiracy in fraudulent and illegal conduct included an arrangement to (a) distribute customer and CTA' and Plaintiffs confidential trading secrets and futures accounts to Vision; (b) purloin funds and trading profits, and overcharge fees between 0.30 cents and $6.00 for compensation to Boshnack and other third parties from Plaintiffs and other victims; and (c) other misconduct and fraud alleged herein, so that **Defendants, through improper means, and using fraudulent inducement, could pay the interest and make compensations-in-kind for the financial credit lines and guarantees from disbarred Vision's owners** and support the futures industry; and operate an enterprise that violates the CEA, for their illegal profit, gain and financial benefit; ("Agreement to Defraud").

¶986  - NFA .. failed to disclose their material conflicts of interests and vested **financial interest in the guarantees of Boshnack and Rothman, (generating hundreds of millions of dollars to the industry),** willfully failed to disclose their own compliance officers

¶658 -  NFA .. failed to disclose their material conflicts of interests and **vested financial interest in the guarantees of Boshnack and Rothman, (generating hundreds of millions of dollars to the industry).**

¶664  -  Kadlec, knowingly, intentionally and fraudulently omitted to disclose all information about the *Vision Risk Group*, **or Boshnack's individual guarantees, the trailing fees and commissions, the withdrawals from Plaintiffs accounts, and as a CTA the dissemination of its trading strategies**, transaction history and trade secrets to its competitors.

¶830 - Defendant NFA and Kadlec, knew of the material omissions, had authorized the illicit risk service arrangements, and G&F Agreements, that disbarred owners **Boshnack and Rothman had placed individual guarantees on its account and its trading strategies were being disseminated in exchange,** and that Plaintiffs would become "customers" of High Ridge or subject to the unqualified, illegal risk services arrangements that were unlawfully not disclosed.

¶934 - … Defendants, through improper means, and using fraudulent inducement, could pay the interest and make compensations-in-kind for the **financial credit lines and guarantees from disbarred Vision's owners** and support the futures industry; and operate an enterprise that violates the CEA, for their illegal profit, gain and financial benefit; ("Agreement to Defraud").

¶986 - NFA .. failed to disclose their material conflicts of interests and vested **financial interest in the guarantees of Boshnack and Rothman, (generating hundreds of millions of dollars to the industry)**

¶114  - During the period June 20, 2014 until on or around August 30 2014 after ADMIS agreed to transfer the former clearing business of Vision, ADMIS upon information and belief conducted its own due diligence and went through **carefully all the former *Vision brokers*, and the ones they would agree to guarantee.** Those brokers would be Guaranteed at ADMIS.

¶116 - Consistent with statements made by other ADMIS IB's, under ADMIS policies, an introducing broker (IB) who wishes to clear through ADMIS, is required to post additional funds which are greater than the exchange minimums. Upon information and belief,  the subprime remaining **<u>100 or so *Vision brokers*, who did not qualify to be guaranteed - did not have those additional funds.</u>** (*See* Att. 8 ¶23).

¶117 -  Therefore the *first* problem, was that in order for those Vision brokers to be included in the transfer to ADMIS, **<u>someone had to agree to the additional funds to secure those credit lines and guarantees in ¶23 of the IB agreement.</u>**

¶118 - As learned later in the agreements produced, negotiations resulted in that ADMIS <u>would not</u> provide the credit to secure the creditworthiness of the former *Vision brokers*. Neither did the parent company ADM agree to acquire the credit risk of the *Vision brokers* despite the fact that the transfer of

business and would generate hundreds of millions of dollars of commissions. This was testimony to the lack of creditworthiness.

¶119 -  Because ADMIS had already determined that it did not deem them credit worthy, ADMIS then materially refused, as part of the transfer of business to obtain, fund and provide the guarantee to secure the creditworthiness of the former Vision IB's these Vision brokers were "subprime" or a Class D debt, **ADMIS would not also guarantee the former subprime *Vision broker* unless another counterparty would.**

¶120 ADMIS instead, wanted a risk-free credit line from the subprime former *Vision brokers* to clear. Therefore, in what appears to have been closed-door negotiations and settlement, **it was agreed that in exchange for millions of dollars of credit lines, and securing their ability to be re-registered in the futures business,** Boshnack and Rothman, and their new entity High Ridge Holding Corporation agreed to provide guarantees and credit behind the brokers – and remain in the futures business.

¶121  In other words, NFA knew that there could be a billion dollar default, or exit from the business of many brokers and/or their customers, **unless they solved the problem of finding a source of credit guarantee on the brokers.** Thousands of customers that cleared through the Vision brokers, also could not clear directly through ADMIS and had to be opened through an IB, so **they needed the guarantees.**

¶122 - Upon belief, many of those former brokers, including, Lazzara were also indebted to Vision for the referral, and many IB's and brokers who's account had been opened through the now disbarred FCM Vision**, had an obligation to pay trailing fees and commission to Boshnack. Therefore Lazzara, and the other Vision IB's also owed Boshnack  and Rothman a part of their business.**

¶123 - Therefore, as part of the "bulk-transfer" agreement, since ADMIS as a material part of the deal would not provide credit, that ADMIS, NFA, Kadlec, Boshnack, Felag, Rothman and Vision, negotiated, and enacted in the agreements, that in addition to the $1.5 million direct and pecuniary financial benefit

Page 10

to the NFA of the Settlement, **Boshnack, Rothman would both personally and individually, and their new affiliates owned by HRHC, guarantee the credit worthiness of the approximately 100 Vision Brokers – estimated to be in the amount of up to an estimated $100 million. This is no small amount.**

¶149, - The terms of the G&F Agreement **permitted Rothman (individually), Boshnack (individually) and HRF (owned by HRHC) to guarantee the accounts of hundred or more _Vision brokers_ that were transferred to ADMIS**. The ownership of HRHC was material. NFA also knew that HRHC ran a directly competing CTA referral basis that would be in direct competition with the many of the new CTA's that subsequently opened accounts.[5]

¶252 –   Therefore a new and material **part of the finalization of Boshnack and his affiliates role, was to require and renegotiate that if he was to wear the risk, credit, and guarantee the default of thousands of customers and traders of the Vision brokers, he needed to "be involved" and directly monitor the risks on the account.** These terms had not been negotiated or agreed to in the G&F Agreements.

---

[5] (See Att2, NFA acknowledging on Pg.3 ¶7, that significant revenue comes from Vision CTA referral business, and in Vision FAC Exhibit 11, by virtue of restructuring HRHC maintained ownership of the CTA referral business).