UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Samantha Siva Kumaran, et al.,

Plaintiffs,

-against-

National Futures Association, et al.

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   9/16/2021

1:20-cv-03668 (GHW) (SDA)

**REPORT AND RECOMMENDATION**

STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.

TO THE HONORABLE GREGORY H. WOODS, UNITED STATES DISTRICT JUDGE:

## INTRODUCTION

Before the Court are motions by Defendants National Futures Association ("NFA"), Nicole Wahls ("Wahls") and Vilia Sutkus-Kiela ("Sutkus-Kiela") (together with the NFA, the "NFA Defendants") and Defendant Tom Kadlec ("Kadlec") (collectively, the "Defendants") to dismiss the First Amended Complaint ("FAC") in this action pursuant to Federal Rule of Civil Procedure 12(b)(6). (NFA Defs.' Mot. to Dismiss, ECF No. 73; Kadlec Mot. to Dismiss, ECF No. 76.) For the reasons set forth below, I respectfully recommend that Defendants' motions be GRANTED.

## BACKGROUND

Since the FAC relates to commodities futures trading and asserts claims under the Commodity Exchange Act ("CEA") against the NFA, some background regarding such trading, the CEA and the NFA is instructive.

I.    **Commodities Futures Trading And The Role Of The NFA**

"A commodity futures contract is a contract to buy (or sell) a standard quantity of a particular commodity at a specified price and time in the future*." Troyer v. Nat'l Futures Ass'n,*

290 F. Supp. 3d 874, 880 (N.D. Ind. 2018) ("*Troyer II*") (quoting *Commodity Futures Trading Comm'n v. Risk Cap. Trading Grp., Inc.*, 452 F. Supp. 2d 1229, 1235 (N.D. Ga. 2006)). "Trading occurs in the contract, not in the commodity, and takes place on the futures exchange, a market meticulously defined and governed by the CEA." *Prestwick Cap. Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 649 (7th Cir. 2013) (internal quotation marks omitted) (citing *Chi. Mercantile Exch. v. S.E.C.*, 888 F.2d 537, 542 (7th Cir. 1989)).

"Enacted in 1936, the CEA regulates transactions unique to the futures industry and forbids fraudulent conduct in connection with these activities." *Prestwick*, 727 F.3d at 649. "The [CEA] is a 'remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived.'" *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 239 (S.D.N.Y. 2019) (quoting *Loginovskaya v. Batratchenko*, 764 F.3d 266, 270 (2d Cir. 2014)). "When futures trading expanded in the 1970s, Congress overhauled the CEA in order to institute a more comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Prestwick*, 727 F.3d at 649 (internal quotation marks and alterations omitted) (citing *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 836 (1986)); *see also Sam Wong & Son, Inc. v. N.Y. Mercantile Exch.*, 735 F.2d 653, 661 (2d Cir. 1984). "Congress contemporaneously created the Commodity Futures Trading Commission ('CFTC'), the regulatory agency charged with administering the CEA and promulgating any rules necessary to implement its new structure." *Prestwick*, 727 F.3d at 650.

"Central to the [CEA's] regulatory scheme are its registration requirements, which have been hailed as 'the kingpin in this statutory machinery, giving the [CFTC] the information about

participants in commodity trading which it so vitally requires to carry out its other statutory functions of monitoring and enforcing the [CEA].'" *Ping He (Hai Nam) Co. Ltd. v. NonFerrous Metals (U.S.A.) Inc.*, 22 F. Supp. 2d 94, 102-03 (S.D.N.Y. 1998), *opinion vacated in part on other grounds on reconsideration*, 187 F.R.D. 121 (S.D.N.Y. 1999) (quoting *CFTC v. British American Commodity Options Corp.,* 560 F.2d 135, 139-40 (2d Cir. 1977)). "The registration requirements ensure that persons dealing in commodities meet certain minimum financial and fitness requirements, and enable the CFTC to monitor the trading activities of market members." *Id*.

The NFA is a private corporation registered as a futures association under the CEA and functions as a self-regulatory organization ("SRO") for the futures industry under the oversight of the CFTC. *See Prestwick*, 727 F.3d at 651; *Troyer II*, 290 F. Supp. 3d at 881; *see also* 7 U.S.C. § 21(j) (discussing requirements for registered futures associations). "As the sole CFTC-approved registered futures association under the CEA since September 1981, the NFA is charged with processing registrations for[,]" *inter alia*, Futures Commission Merchants ("FCMs"),[1] Commodity Trading Advisors ("CTAs"),  Introducing Brokers ("IBs")  and relevant associated persons ("APs"). *See Troyer v. Nat'l Futures Ass'n*, 981 F.3d 612, 613 (7th Cir. 2020) ("*Troyer IV*"); see also 17 C.F.R. § 3.4 (CFTC regulation delegating registration duties to the NFA).

"Subject to limited exceptions, entities and accompanying APs registered with the CFTC in these enumerated capacities are both required to be NFA Members (or Associate Members) and are subjected to NFA requirements." *Troyer IV*, 981 F.3d at 613 (quotation marks omitted). "The purpose of the NFA is to assure high standards of business conduct by its [m]embers and to

---

[1] An FCM is an individual or organization that solicits and accepts orders to buy or sell futures contracts and accepts money from (or extends credit to) customers in connection with such orders. *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 175 (2d Cir. 2013); *see also* 7 U.S.C. § 1a(28).

protect the public interest." *Troyer II*, 290 F. Supp. 3d at 881. "The NFA performs screening to determine fitness to become and remain a member of the NFA, establishes and enforces certain rules and standards, audits and investigates members, and conducts arbitration in futures disputes." *Id*. (internal citation and alterations omitted).

## II.    **Plaintiffs' Factual Allegations**[2]

### A.    **History Of NFA Action Against Vision**

Vision Financial Markets, LLC ("Vision") became an NFA Member in 1988 and registered as a FCM in 1990. (FAC, ECF No. 57, ¶ 88); *see also* NFA BASIC Database (hereinafter "BASIC").[3]) Vision was owned by Robert Boshnack and Howard Rothman, who were registered with the NFA as principals and APs of Vision. (*See, e.g.*, FAC ¶ 535; *see also* BASIC.) John Felag was the risk manager for Vision and was registered with the NFA as an AP of Vision. (FAC ¶¶ 94, 591; *see also* BASIC.)

On May 18, 2011, the NFA's Business Conduct Committee ("BCC") issued a Complaint against Vision,[4] Rothman and another principal of Vision, alleging that they failed to supervise five of the firm's IBs, all of which had been the subject of NFA Complaints alleging sales practice

---

[2] For purposes of Defendants' motions, the Court accepts, as it must, Plaintiffs' allegations as true and draws all reasonable inferences in their favor. *See City of Providence v. BATS Glob. Mkts., Inc.*, 878 F.3d 36, 50 (2d Cir. 2017).

[3] According to the NFA website, BASIC is a free tool that NFA Members and investors can use to research the background of derivatives industry professionals. *See* National Futures Association, BASIC Search, https://www.nfa.futures.org/BasicNet/ (last visited Sept. 15, 2021); *see also* FAC ¶ 563 (describing NFA's BASIC database). The Court takes judicial notice of the information contained in the BASIC database.

[4] This was the fourth Complaint that the BCC had initiated against Vision. (*See* 2011 BCC Complaint. FAC Ex. 3, ECF No. 57-3, ¶ 4 (noting three prior Complaints in 1993, 1996 and 2000 that were resolved through settlement).)

abuses, in violation of NFA Compliance Rule 2-9(a).[5] (FAC ¶ 63; 2011 BCC Compl.) Vision settled

the 2011 case. (*See* 2013 BCC Compl., FAC, Ex. 2, ECF No. 57-2, ¶ 6 (discussing prior settlements).)

On September 11, 2013, the BCC issued another Complaint against Vision, along with two

APs, alleging violations of NFA Rules 2-4, 2-6 and 2-9(a) related to Ace Investment Strategists LLC,

a CTA recommended by Vision to its customers.[6] (FAC ¶ 89; 2013 BCC Compl.) The 2013 BCC

Complaint noted that "a substantial part of Vision's business involve[d] recommending [CTAs] to

its customers." (2013 BCC Compl. ¶ 7.) On June 20, 2014, the NFA accepted an offer of settlement

from Vision, and the other respondents, in which Vision agreed to pay a $1.5 million fine to the

NFA; to withdraw from NFA membership within six months; and to pay approximately $2.053

million in restitution to customers. (FAC ¶¶ 62 (2d), 81 (2d) 90;[7] June 20, 2014 NFA News Release,

FAC Ex. 4, ECF No. 57-4, at 2; *In re Vision Financial Markets LLC*, NFA Case No. 13-BCC-018 (N.F.A.

---

[5] NFA Rule 2-9(a) requires each FCM Member to "diligently supervise its employees and agents in the conduct of their commodity interest activities for or on behalf of the Member." *See* NFA Rulebook, Rule 2-9(a), https://www.nfa.futures.org/rulebook/index.aspx (last visited Sept. 15, 2021) (hereinafter "NFA Rulebook").

[6] NFA Rule 2-4 states that "Members and Associates shall observe high standards of commercial honor and just and equitable principles of trade in the conduct of their commodity futures business and swaps business." *See* NFA Rulebook, Rule 2-4. NFA Rule 2-6 states that "[n]o person who has been expelled or suspended or is subject to a similar sanction by NFA in a proceeding brought pursuant to Part 3 of NFA's Compliance Rules that temporarily or permanently prohibits the person from NFA membership or affiliation in any capacity with an NFA Member shall hold himself out as a Member in good standing of NFA, or as affiliated with a Member, as the case may be, during the period the sanction is in effect" and that no FCM, IB, or CTA Member or Associate "shall permit such a person to maintain any affiliation with it or perform any activities for, on behalf of or in connection with its commodity interest business regardless of whether such affiliation or activities require registration or NFA Membership during the period the sanction is in effect unless authorized by the Business Conduct Committee, Hearing Committee or the Appeals Committee." *See* NFA Rulebook, Rule 2-6.

[7] Paragraph numbers 60 through 90 are used twice in the FAC. The Court cites to the second of each numbered paragraph as FAC ¶ X (2d), with "X" denoting the paragraph number.

June 20, 2014) (hereinafter "June 2014 NFA Decision").[8] Vision further agreed that, in the event that it was to reapply for NFA membership, the 2013 BCC Complaint and resulting decision could be used by NFA as the sole basis for denying its application. (*See* June 2014 NFA Decision at 3.)

The NFA's news release regarding the settlement noted that Vision's owners, Boshnack and Rothman, were not named in the 2013 BCC Complaint and had announced their intention to start a new FCM called High Ridge Futures LLC ("High Ridge").[9] (June 20, 2014 NFA News Release.) The news release stated that, if High Ridge applied for membership, the NFA would conduct a thorough fitness examination and, if High Ridge became registered, the NFA would ensure that any customer who inquired about High Ridge through the BASIC system would be provided with information about all of Vision's disciplinary actions. (*See id.*; *see also* FAC ¶ 556.) Plaintiffs allege that between June 20, 2014 and on or around August 15, 2014, the NFA determined that Boshnack, Rothman and the so-called "Vision Risk Group,"[10] were not qualified to register as FCMs and "permanently denied" registration of Boshnack, Rothman, Felag or any of their new alter-ego entities [*i.e.*, High Ridge] to act or participate as an [FCM]." (FAC ¶ 90 (2d); *see also* FAC ¶ 105.)

---

[8] The June 2014 NFA Decision is available in BASIC. Although Plaintiffs do not attach a copy of the NFA's decision accepting Vision's offer of settlement, they frequently refer to the settlement in the FAC (*see, e.g.*, FAC ¶¶ 17, 25, 81 (2d)) and, thus I consider the NFA's decision to be incorporated by reference. *See N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y.*, 850 F.3d 79, 86 (2d Cir. 2017) ("We consider the facts alleged in the complaint, documents attached to it or incorporated by reference, and matters subject to judicial notice.").

[9] According to Plaintiffs, High Ridge is owned and controlled by High Ridge Holding Corporation, of which Vision became a subsidiary. (FAC ¶¶ 69 (2d), 82 (2d), 98, 101.)

[10] Plaintiffs do not define Vision Risk Group, but they appear to be referring to the individuals who had performed risk management functions at Vision, including Felag, the former Vision risk manager. (*See, e.g.*, FAC ¶ 94.)

B.     <u>Agreements Between High Ridge And ADMIS And The Alleged Scheme</u>

Plaintiffs allege that the network of more than one hundred IBs that had worked with Vision lacked adequate creditworthiness or financial capital to clear their commodities futures trades independently and, following Vision's agreement to withdraw its NFA membership, were looking for a new FCM. (FAC ¶¶ 109-11.) On August 28, 2014, ADM Investor Services, Inc. ("ADMIS"),[11] an FCM registered with the NFA, entered into a Guarantee & Fee Agreement ("G&F Agreement") with High Ridge, Boshnack and Rothman, in which ADMIS agreed to accept a "bulk transfer" of customers and IBs who formerly cleared through Vision, including those IBs that had been guaranteed by Vision (the "Vision IBs").[12] (FAC ¶¶ 106, 148; G&F Agreement, ECF No. 58-1, § 2.1(c).) However, Plaintiffs allege that ADMIS would not guarantee all the former Vision IBs because they lacked sufficient lines of credit. (FAC ¶¶ 114-19.) As a result, Plaintiffs allege that Boshnack and Rothman agreed to provide personal guarantees and credit for certain Vision IBs. (FAC ¶¶ 120, 123, 148-49.) In return, Plaintiffs allege that ADMIS would collect "trailing fees and commission[s]" from customers who subsequently opened accounts with ADMIS through those IBs, without the customers' knowledge or consent, and provide those fees to Boshnack and Rothman. (FAC ¶¶ 130-36, 367.) The G&F Agreement also contemplated that High Ridge would register as an IB and enter an IB Agreement with ADMIS, such that ADMIS would provide FCM

---

[11] Kadlec, the President of ADMIS, signed the G&F agreement on its behalf. (*See* G&F Agreement, ECF 58-1.)

[12] IBs that are parties to binding guarantee agreements, in which an FCM guarantees the performance by the IB of the IB's obligations under the CEA, are not required independently to meet net capital requirements. *See Prestwick*, 727 F.3d at 651. Thus, "a guarantee agreement is an alternative means for an IB to satisfy the CFTC's standards of financial responsibility." *Id.* (internal quotation marks and alterations omitted).

services to High Ridge customers in exchange for a share of income. (*See* G&F Agreement § 2.4(a), (b).)

In September 2014, ADMIS announced the agreement to acquire Vision's network of customers and IBs, pending regulatory approval. (FAC ¶ 238; *see also* FAC Ex. 10, ECF No. 57-10.) However, before the registration of High Ridge, Boshnack, Felag and Rothman as IBs was finalized, Plaintiffs allege that Boshnack sought to renegotiate High Ridge's role regarding risk management, which was not addressed by the G&F Agreement, to give Boshnack and his team the ability to monitor the accounts they had agreed to guarantee. (FAC ¶¶ 250-56.) Plaintiffs contend that Boshnack, and others in the Vision Risk Group, were prohibited from performing any services as an FCM and thus their risk management services were unnecessary. (FAC ¶ 258.) However, in an effort to cement the deal and avoid losing the anticipated business from the Vision IBs, Plaintiffs allege that Kadlec, on behalf of ADMIS, entered into an oral risk services agreement with Rothman, Boshnack and Felag, on behalf of High Ridge, wherein High Ridge would become a risk services provider to ADMIS in exchange for access to ADMIS's CTA customer accounts, including transactions records and trading strategies. (FAC ¶¶ 145, 223, 260, 263, 350.) Plaintiffs allege that the G&F Agreement and the oral risk services agreement were part of a scheme to allow Vision/High Ridge to continue to operate as an FCM under the cover of ADMIS, while at the same time accessing information from ADMIS's CTA customers. (*See, e.g.*, FAC ¶¶ 90 (2d), 91-98, 261-62, 392.) On October 17, 2014, High Ridge became an NFA member and registered IB. (FAC ¶ 241; *see also* BASIC.) Shortly thereafter, Boshnack, Felag and Rothman each registered as IBs and APs with High Ridge. (FAC ¶¶ 240-42, 361; *see also* BASIC.) Plaintiffs further allege that the NFA was aware of these agreements and concomitant violations of NFA Rules and

applicable laws, but failed to act to prevent the Vision IBs from exiting the market and to preserve a significant stream of revenue. (FAC ¶ 264.)

### C.  **Plaintiffs' Account With ADMIS**

In or around December 2016, Julie Villa, an unregistered broker, called Kumaran about opening a futures account and referred her to Villa's former employer, Trey Lazzara, a former Vision IB. (FAC ¶¶ 580, 582.) Kumaran spoke with Lazzara on December 16, 2016 and told him about her background and plans to "form various hedge funds for competitive trading in commodities futures options strategies." (FAC ¶ 581.) Lazzara referred Kumaran to ADMIS without, according to Plaintiffs, disclosing any connection between ADMIS and Vision or High Ridge and without providing proper disclosures regarding ADMIS's fees or risk management procedures. (FAC ¶¶ 582-86.) Further, Plaintiffs allege that nothing in the NFA's BASIC database showed that Lazzara or ADMIS were associated with High Ridge and/or Vision. (FAC ¶¶ 564, 572.)

In January 2017, Plaintiffs opened an account with ADMIS.[13] (FAC ¶¶ 456, 540.) Shortly thereafter, Plaintiffs allege that they were charged unauthorized fees and began to notice errors in risk services, including margin errors. (FAC ¶¶ 588-90.) Nevertheless, Plaintiffs allege that the CTA account posted competitive returns as of April 24, 2017. (FAC ¶ 596.) On or around May 2, 2017, Plaintiffs allege that additional unauthorized fees were deducted from their options account to "thwart the performance of Kumaran as a CTA" and resulted in depleting their profits. (FAC ¶ 599.) Plaintiffs also allege that margin errors resulted in a "significant drawdown" on their account. (FAC ¶ 600.) On or around May 25, 2017, Plaintiffs allege that High Ridge, acting through

---

[13] Plaintiffs allege that Kumaran "open[ed] some of the account documentation in NRCM's name and other's [sic] in Kumaran's individual name." (FAC ¶ 587.)

ADMIS, took actions to close their account and, on June 25, 2017, Plaintiffs closed the account. (FAC ¶¶ 600, 603.) In August 2017, Plaintiffs allege that they discovered the unauthorized fees and payments and, on or around September 20, 2017, discovered that unauthorized access to their account had been given to "Vision owners and affiliates." (FAC ¶¶ 606-08.)

      **D.**      **Plaintiffs' Complaints To The NFA And The NFA Arbitration**

In September 2017, Kumaran communicated with an NFA compliance officer, Funda Agkok, seeking information about NFA rules relating to the dissemination of her CTA account information, but received no response. (FAC ¶¶ 613-19, 623.) On or around October 17, 2017, unbeknownst to Plaintiffs, the NFA began a general audit of Lazzara conducted by Defendant Wahls, who had worked as a compliance officer for the NFA since 2011, and Defendant Sutkus-Kiela, a Senior Compliance Officer and Manager. (FAC ¶¶ 37, 39, 421.) On or around October 19, 2017, Kumaran communicated with two other NFA compliance officers, Tom Paschen and Jay Bond, but again received no response or request for additional information from the NFA. (FAC ¶¶ 623-27.) Plaintiffs allege that the audit of Lazzara, which continued until in or around February 2018, failed to investigate their alleged violations and instead willfully failed to enforce NFA Rules and compliance laws to allow the alleged fraudulent scheme to continue. (FAC ¶¶ 629-54.)

On March 6, 2018, Kumaran filed a Notice of Intent to arbitrate with the "NFA arbitration department." (FAC ¶ 707.) Around the same time, on or around March 13, 2018, the NFA, with Kadlec on the NFA membership committee, approved the registration of Vision Investment Advisors ("VIA")—a new CTA owned/operated by Rothman and Boshnack. (FAC ¶ 667; *see also* BASIC.) Plaintiffs allege that VIA unlawfully acquired their trade secrets and used information

obtained from Plaintiffs' account with ADMIS to unfairly compete with them. (*See, e.g.*, FAC ¶¶ 676-78.)

On or around March 15, 2018, Kumaran again contacted the NFA regarding alleged compliance violations. (FAC ¶ 682.) Kumaran spoke to NFA compliance staff members Sebastian Waliczek and Muhammad Afzal, but without providing any explanation, Afzal told Kumaran that her case had been closed. (FAC ¶¶ 683, 685.) Afzal later told Plaintiffs that the NFA did not investigate compliance complaints, except through the NFA's arbitration procedures, which required payment of a fee. (*See* FAC ¶ 695, 697, 704.) On June 8, 2018, Plaintiffs filed their arbitration Complaint alleging multiple violations of the CEA related to "the scheme by ADMIS, Vision and numerous Vision IB[s], to defraud customers and CTA[s]." (FAC ¶ 708.) Between January 15, 2019 and February 9, 2019, Wahls and the NFA conducted another general audit of High Ridge, Boshnack, Rothman, Felag and their affiliates, but according to Plaintiffs did not take any action. (FAC ¶¶ 469, 471.)

## PROCEDURAL HISTORY

Plaintiffs commenced this action on May 11, 2020. (Compl., ECF No. 1.) On July 2, 2020, the Court dismissed the case, *sua sponte*, for failure to state a claim. (Order of Dismissal, ECF No. 13.) On July 20, 2020, Plaintiff Kumaran filed a motion for reconsideration. (Mot. for Recons., ECF No. 17.) On October 6, 2020, this Court entered a Report and Recommendation recommending that District Judge Woods grant the motion for reconsideration in part to grant Plaintiff Kumaran, and Plaintiff NRCM if it appeared through counsel, leave to amend their CEA § 22(b) claim, claims for injunctive relief and state law claims. *Kumaran v. Nat'l Futures Ass'n*, No. 20-CV-03668 (GHW) (SDA), 2020 WL 6264457 (S.D.N.Y. Oct. 6, 2020). I recommended denying Plaintiffs' motion with

respect to their other claims. *See id*. at *4. On October 23, 2020, Judge Woods adopted the Report and Recommendation. *See Kumaran v. Nat'l Futures Association*, No. 20-CV-03668 (GHW) (SDA), 2020 WL 6264001 (S.D.N.Y. Oct. 23, 2020).

On January 15, 2021, Plaintiffs filed the FAC and on March 15, 2021, Defendants filed the motions that are now before the Court. On June 30, 2021, Plaintiffs filed three separate memoranda in opposition and, on July 20, 2021, filed "corrected" versions of these memoranda.[14] (*See* Pls.' CEA Opp. Mem., ECF No. 106; Pls.' Kadlec Opp. Mem., ECF No. 107; Pls.' State Law Opp. Mem., ECF No. 108.) On August 13, 2021, Defendants filed their reply memoranda. (NFA Defs.' Reply Mem., ECF No. 109; Kadlec Reply Mem., ECF No. 110.)

## LEGAL STANDARDS

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible if the complaint contains factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 239 (S.D.N.Y. 2019). The Court "must accept as true all of the factual allegations contained in the complaint[,]" but "[t]hreadbare recitals of the elements of a cause of action, supported by mere

---

[14] The Court cites to the corrected versions of Plaintiffs' memoranda. The Court notes that, in accordance with the Court's Individual Practices, Plaintiffs were entitled to file at most two memoranda (one in opposition to each motion) not to exceed 25 pages in length. Even though Plaintiffs failed to comply with these requirements, because Plaintiff Kumaran is proceeding *pro se* and because I recommend that the Defendants' motions be granted, the Court has considered Plaintiffs' arguments in each of the memoranda.

conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted); *see also Nguyen* 364 F. Supp. 3d at 239 ("The Court need not accept as true, 'legal conclusions, deductions, or opinions couched as factual allegations.'") (quoting *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)). Where, as here, a plaintiff is proceeding *pro se*, the Court must "construe [her] complaint liberally and interpret it to raise the strongest arguments that it suggests." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

Claims of fraud also must satisfy the Federal Rule of Civil Procedure's heightened pleading standard under Rule 9(b). *See Reich v. Lopez*, 38 F. Supp. 3d 436, 445-46 (S.D.N.Y. 2014) (applying Rule 9(b)'s heightened pleading standard to "all claims of fraud—including those under RICO[.]"). To meet this standard, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (internal quotation marks and citations omitted). "Rule 9(b) also dictates that while the circumstances of the fraud must be pleaded with particularity, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* (internal quotation marks omitted).

## DISCUSSION

Plaintiffs assert claims against the NFA Defendants pursuant to CEA § 22(b), 7 U.S.C. § 25,[15] and against Kadlec, in his capacity as CEO of ADMIS.[16] (FAC ¶¶ 773-806, 971-93.) The NFA Defendants, in addition to arguing that the FAC fails to comply with Federal Rules of Civil Procedure 8 and 9(b), argue that Plaintiffs' CEA claims are untimely and fail to state a claim, and that Plaintiffs' state law claims should be dismissed because the NFA Defendants have immunity; the claims are preempted by the CEA; and fail to state a claim for relief. (*See* NFA Defs.' Mem. at 12-20.) Defendant Kadlec argues that he is immune from all non-CEA claims and, in any event, the claims against him should be dismissed for failure to comply with Federal Rules of Civil Procedure 8 and 9(b) and failure to state a claim. (*See* Kadlec Mem. at 6-15.)

I.   **Plaintiffs' CEA Claims Should Be Dismissed**

    A.   **Plaintiffs' CEA Claims Are Time-Barred[17]**

A claim pursuant to the CEA must be brought "not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). Defendants argue that Plaintiffs' CEA claims are time-barred because they discovered their alleged injuries no later than September 2017, more than

---

[15] The CEA is codified at 7 U.S.C. § 1, et seq. "As such, the sections of the CEA do not always correspond numerically to the U.S. Code sections. . . . Section 22 of the CEA corresponds with Section 25 of the Code." *Holladay v. CME Grp.*, No. 11-CV-08226, 2012 WL 5845621, at *4 n.2 (N.D. Ill. Nov. 16, 2012). Section 22(b) pertains to claims against registered entities and their officers, directors, governors, committee members and employees. See 7 U.S.C. § 25(b).

[16] In his memorandum, Kadlec clarifies that he is the President of ADMIS, not the CEO as Plaintiffs allege. (*See* Kadlec Mem. at 2 n.3.)   In any event, the distinction is not relevant for purposes of the instant motions.

[17] "At the motion to dismiss stage, dismissal of a complaint on the grounds that the statute of limitations has expired is appropriate only if the complaint clearly shows the claim is out of time." *S.T.A. Parking Corp. v. Gen. Star Indem. Co.*, No. 19-CV-04250 (GHW), 2019 WL 7115307, at *2 (S.D.N.Y. Dec. 23, 2019).

two years before commencing this action.[18] (NFA Defs.' Mem. at 12; Kadlec Mem. at 9.) Plaintiffs

do not dispute that they uncovered the alleged scheme on or around September 29, 2017 (*see*

FAC ¶ 29), but argue that their claims against the NFA Defendants did not begin to accrue until

February 26, 2019, when they learned about the NFA's participation in the scheme. (Pls.' CEA

Opp. Mem. at 40-41; *see also* FAC ¶ 472). Plaintiffs allege that it was the NFA's failure to act

following the NFA's January 2019 audit that alerted them to the NFA's knowledge and

involvement in the alleged scheme. (FAC ¶¶ 470-72.) In the alternative, Plaintiffs attempt to

invoke the doctrine of equitable estoppel based on fraudulent concealment or apply a six-year

statute of limitations to claims sounding in fraud. (Pls.' CEA Opp. Mem. at 41-44.)

The Second Circuit has held that a CEA claim accrues when a plaintiff discovers her "CEA

injury." *Levy v. BASF Metals Ltd*., 917 F.3d 106, 108 (2d Cir. 2019). "The relevant inquiry . . . is not

whether [the plaintiff] had discovered the identity of the defendants or whether she had

discovered the manipulation scheme she alleges in her complaint . . . [r]ather, the question is

when [the plaintiff] discovered her CEA injury—that is, a loss that was the result of a CEA

violation." *Id*. at 108-09 (citing 7 U.S.C. § 25(a)(1) (providing a cause of action for someone who

suffers "actual damages" "caused by" a CEA violation)).[19] "A plaintiff does not need to know that

---

[18] Although Defendants raise this argument only with respect to Counts 1 and 2, the statute of limitations is the same for all of Plaintiffs' CEA claims.

[19] Plaintiffs argue that the statute of limitations does not accrue until discovery of the injury *and the injurer* (*see* Pls.' CEA Opp. Mem. at 40-41 (emphasis in original)), but the cases they rely upon do not support this point. In *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 150 (2d Cir. 2012), the Second Circuit discussed the accrual rule in the context of RICO claims and cited a Seventh Circuit case that included the language quoted by Plaintiffs, but did not adopt such a rule. *Compare Koch*, 699 F.3d at 150 ("It remains the law in this Circuit that a RICO claim accrues upon the discovery of the injury alone.") *with Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 387 (7th Cir. 2010) ("But RICO requires discovery only of the injury and the injurer."). Moreover, in *Levy*, which postdates *Koch*, the Second Circuit was clear that

his injury is actionable to trigger the statute of limitations – the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *Id*. at 109 (quoting *Cancer Foundation, Inc. v. Cerberus Capital Management, L.P.*, 559 F.3d 671, 674 (7th Cir. 2009)).

As discussed further below, under CEA § 22, the NFA Defendants only can be liable for "actual damages sustained by a person that engaged in any transaction specified in [7 U.S.C. § 25(a)] to the extent of such person's actual losses that resulted from such transaction . . . ." 7 U.S.C. § 25(b)(2). Accordingly, Plaintiffs' CEA injury is limited to losses resulting from qualifying transactions associated with their ADMIS account.  Any such losses were known to Plaintiffs by the time they closed their account on or around June 25, 2017 or, at the latest, on or about August 20, 2017 when Plaintiffs allege that "Kumaran through reconciliation and audit, detected that cash balances in the account ending balances did not tie out, and that unauthorized fees and payments had been made to deplete its CTA performance[.]" (FAC ¶ 606; *see also* FAC ¶¶ 601, 605.) Plaintiffs did not file this action until May 11, 2020, almost two years and nine months after the latest accrual date.[20]

---

accrual does not depend on "whether [the plaintiff] had discovered the identity of the defendants[.]" *Levy*, 917 F.3d at 108.

[20] There is no merit to Plaintiffs' argument that a six-year statute of limitations should apply to Plaintiffs' CEA claims. The case relied upon by Plaintiffs, *Fustok v. Conticommodity Servs., Inc.*, 618 F. Supp. 1076, 1079 (S.D.N.Y. 1985), applied a state-law limitations period because the CEA claims accrued prior to the 1983 amendment to the CEA, in which Congress created an express private right of action with a two-year limitations period. *See id.; see also* 7 U.S.C. § 25(c); *U.S. Commodity Futures Trading Comm'n v. Fin. Robotics, Inc.*, No. CIV. A. H-11-2446, 2013 WL 3280038, at *4 n.1 (S.D. Tex. June 27, 2013) (discussing 1983 CEA amendment).

As for Plaintiffs' equitable tolling argument, even if Court were to find that this was one of the "rare and exceptional circumstance[s]" where the doctrine of equitable estoppel applied,[21] see *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000), it would not save Plaintiffs' claims because they admit that they became aware of the alleged fraudulent scheme in September 2017 and, thus, were aware of the alleged violations during the limitations period. (FAC ¶¶ 609-10; *see also* FAC Ex. 12, ECF No. 57-12 (email from Lazzara stating that "Relationship of High Ridge and ADMIS [had] been approved by NFA[.]"). Thus, their claims still would have accrued by September 2019, well before the date they commenced this action.

For these reasons, I find that Plaintiffs' CEA § 22 claims are time-barred and recommend that they be dismissed on that basis. In addition, as set forth below, I recommend, as a second, independent ground, that Plaintiffs' CEA § 22 claims be dismissed for failure to state a claim.

### B.    Plaintiffs Fail To State A CEA Claim Against The NFA Defendants[22]

"CEA § 22 enumerates the only circumstances under which a private litigant may assert a private right of action for violations of the CEA." *Klein & Co. Futures v. Bd. of Trade of City of New York*, 464 F.3d 255, 259 (2d Cir. 2006). Section 22(b) applies to, *inter alia*, claims against registered

---

[21] "The doctrine of equitable tolling is applied in the court's discretion 'as a matter of fairness' when a plaintiff has been prevented from exercising her rights." *Behrens v. JPMorgan Chase Bank N.A.*, No. 16-CV-05508 (VSB), 2019 WL 1437019, at *6 (S.D.N.Y. Mar. 31, 2019) (quoting *Smith*, 208 F.3d at 17). "In order for equitable tolling to be available on the basis of fraudulent concealment, a plaintiff must prove that (1) the defendant concealed the existence of the unlawful conduct, (2) the plaintiff remained ignorant of the violation until sometime within the statute of limitations, and (3) this continuing ignorance was not the result of a lack of diligence." *Id.* In addition, "[a] claim of fraudulent concealment must be pleaded with particularity, in accordance with the heightened pleading standards of Rule 9(b)." *Id*.

[22] Plaintiffs only were given leave to replead claims against the NFA Defendants based on CEA § 22. *See Kumaran*, 2020 WL 6264001, at *1. Accordingly, to the extent Plaintiffs attempt to assert claims under other sections of the CEA (*see, e.g.*, FAC ¶¶ 364, 366, 404, 568-69, 679 (alleging violations of 7 U.S.C. § 13 and 7 U.S.C. § 6)), the Court does not consider them.

futures associations such as the NFA and their officers, directors and employees. *See* 7 U.S.C. §

25(b).  Section 22(b) of the CEA provides, in relevant part:

> A registered futures association that fails to enforce any bylaw or rule that is
> required under [7 U.S.C. § 21][23] or in enforcing any such bylaw or rule violates this
> chapter or any Commission rule, regulation, or order shall be liable for actual
> damages sustained by a person that engaged in any transaction specified in
> subsection (a) of this section to the extent of such person's actual losses that
> resulted from such transaction and were caused by such failure to enforce or
> enforcement of such bylaw or rule.

7 U.S.C. § 25(b)(2). It also provides in relevant part:

> A person seeking to enforce liability under this section must establish that the . . .
> registered futures association, officer, director, governor, committee member, or
> employee acted in bad faith in failing to take action or in taking such action as was
> taken, and that such failure or action caused the loss.

*Id*. § 25(b)(4).

Plaintiffs assert that the NFA Defendants violated the CEA by failing to enforce various

non-discretionary and discretionary rules, regulations and laws (Counts 1 and 2) and failing to

enforce fair and equitable arbitration procedures (Count 13). (FAC ¶¶ 773-806, 971-93.)

To state a claim under the CEA for failure to enforce, Plaintiffs must establish: (1) that the

NFA Defendants failed to enforce a Bylaw or Rule that [they were] required to enforce; (2) that

Plaintiffs suffered "actual losses[;]" (3) that the losses were caused by such failure to enforce;

and (4) the NFA Defendants acted in bad faith in failing to take action. *See In re Chicago Bd.*

*Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 867 (N.D. Ill.

2020) (citing 7 U.S.C. §§ 25(b)(1)(A), 25(b)(4)).  The NFA Defendants argue that Plaintiffs have not

adequately alleged any of these elements. (NFA Defs.' Mem. at 12-20.)

---

[23] 7 U.S.C. § 21 corresponds to CEA § 17.

18

The FAC, which spans more than one thousand paragraphs over almost 200 pages, includes allegations that the NFA failed to enforce a laundry list of NFA Rules and Bylaws, as well as other laws and regulations. (*See*, *e.g.*, FAC ¶¶ 27, 33, 295 711, 777, 792, 795, 977, 982.) Liberally construing the FAC, the Court can reasonably discern three broad categories of rules that Plaintiffs allege were required by 7 U.S.C. § 21 and that the NFA failed to enforce: (1) NFA Bylaw 301(a)-(e) regarding NFA membership (which implements the requirements of 7 U.S.C. § 21(b)(3)); (2) NFA Compliance Rules 2-2, 2-3, 2-4 and 2-14 regarding fraud, sharing in profits, the "just and equitable principles of trade," and compliance jurisdiction and (3) rules pertaining to arbitration procedures required under 7 U.S.C. § 21(b)(10).[24] (*See, e.g.*, FAC ¶¶ 64, 295, 362, 395, 464, 711, 777, 792.) The Court considers each of these categories in turn.

1. **NFA Bylaw 301**

First, Plaintiffs contend that the NFA failed to enforce Bylaw 301(a)-(e) by allowing individuals and entities that had been associated with Vision, including High Ridge, Boshnack, Rothman and Felag, to register as IBs and/or APs without performing the required diligence and conducting thorough fitness examinations to ensure that they would not pose a threat to customers. (*See, e.g.*, FAC ¶¶ 24, 26, 64 (2d), 65 (2d), 66 (2d), 69 (2d), 71 (2d), 89, 102, 113, 291,

---

[24] To the extent Plaintiffs cite to other rules or regulations, the Court finds that Plaintiffs do not adequately allege that those rules are required under 7 U.S.C. § 21, as is necessary to state a claim under CEA § 22. *See Troyer v. Nat'l Futures Ass'n*, No. 16-CV-00146 (SLC), 2017 WL 2971962, at *10 (N.D. Ind. July 12, 2017) ("*Troyer I*") ("where a bylaw or rule is not required by § 21, there is no private right of action under § 25(b)(2)"). For example, Plaintiffs cite to NFA compliance Rules 2-26 and 2-29, but those rules were not adopted until 1985, after the CFTC approved the NFA's application and, thus, could not have been required for the NFA to become a registered futures association. *Cf. Nicholas v. Saul Stone & Co., LLC*, No. 97-CV-00860, 1998 WL 34111036, at *18 (D.N.J. June 30, 1998) (NFA Rule 2-8(e) adopted after NFA became registered futures association not required under CEA § 17 (7 U.S.C § 21)), *aff'd*, 224 F.3d 179 (3d Cir. 2000); *see also Troyer I* at *10 (CFTC granted NFA registration as registered futures association in 1981 and "inherent in the grant" is determination that NFA's rules satisfied requirements of CEA § 17).

295-98 362, 557-58, 672-74, 792-93, 798; *see also* Pls.' NFA Opp. Mem. at 21.) Bylaw 301(e) states, in relevant part, that "[a] person who is ineligible or disqualified to become or remain a Member or associated with a Member under [Bylaw 301(a) or 301(d)] may nevertheless become or remain a Member or associated with a Member . . . upon a finding by the Membership Committee . . . that the reason for ineligibility does not cause the person to pose a threat to Members, Associates or customers[.]" NFA Rulebook, NFA Bylaw 301(e).

For Bylaw 301(e) to apply, the person seeking to register would have to be "ineligible or disqualified to become or remain a Member" under Bylaw 301(a) or 301(d). Although it is not entirely clear from the FAC which specific section of the Bylaw Plaintiffs contend applies, Plaintiffs appear to rely on Bylaw 301(a)(ii)(E), which limits eligibility of any person who "[h]as associated with the person any other person who is known to, or in the exercise of reasonable care should be known to, the person to be ineligible to become or remain a Member or associated with a Member under [Bylaw 301(a)(ii)(A)-(D),]" which refers to NFA members who have, in some way, been disbarred, suspended or expelled. *See* NFA Bylaw 301(a)(ii)(A)-(E).

In short, Plaintiffs appear to allege that the fact that High Ridge, Rothman, Howard and Felag were associated with Vision, which Plaintiffs repeatedly assert was suspended, expelled and/or disbarred, rendered them ineligible for NFA membership without involvement by the NFA Membership Committee as set forth in Bylaw 301(e). (*See, e.g.*, FAC ¶¶ 295-98, 791, 793.) Plaintiffs' argument crumbles, however, because they have not adequately alleged that Vision was suspended, expelled and/or disbarred from the NFA. Documents referenced in the FAC show that Vision withdrew its membership. (*See* June 2014 NFA Decision at 2.) Accordingly, the Court finds that Plaintiffs fail to state a claim based on the alleged failed to enforce Bylaw 301(a)-(e).

*Cf. Troyer v. Nat'l Futures Ass'n*, No. 16-CV-00146 (SLC), 2019 WL 4695524, at *9 (N.D. Ind. Sept. 26, 2019) ("*Troyer III*") (granting summary judgment in NFA's favor because plaintiff could not establish first element of CEA claim based on Bylaw 301 when NFA did not "expel" entity and instead entity withdrew membership), *motion for relief from judgment denied*, 2020 WL 881552 (N.D. Ind. Feb. 24, 2020), *aff'd*, 981 F.3d 612 (7th Cir. 2020).

Plaintiffs' claims that the NFA violated Bylaw 301 by allowing VIA to register as a CTA without first finding that it did not pose a threat to other members (*see* FAC ¶¶ 666-68, 673-74, 681) and by allowing High Ridge effectively to operate as an FCM and perform services that the former members of the Vision Risk Group were "disbarred from performing" (*see* FAC ¶¶ 19, 61 (2d), 66 (2d), 100, 258-61, 297, 392, 792, 795-97), similarly fail because they also rest on Plaintiffs' assertion that Vision was suspended, expelled or disbarred, which Plaintiffs have not plausibly alleged.

### 2.     NFA Compliance Rules

Second, the FAC focuses on the NFA's alleged failure to enforce NFA Compliance Rules. Plaintiffs allege that the NFA failed to enforce Rules 2-2, 2-3, 2-4 and 2-14 by, *inter alia*, allowing Lazzara, ADMIS, High Ridge, Boshnack, Rothman, Felag and others to engage in the alleged scheme and to operate in violation of NFA Rules and CFTC regulations regarding required disclosures, the role of FCMs, the provision of risk management services and the handling of customers' accounts. (*See, e.g.*, FAC ¶¶ 11, 27, 41, 63, 136, 138, 152, 162, 175, 178-79, 229, 264, 268, 306-17, 322, 325, 328, 340, 343, 350, 376, 407, 464, 777.) In addition, Plaintiffs allege that Wahls and Sutkus-Kiela failed to enforce audit procedures, which allowed the allegedly unlawful conduct to continue. (*See, e.g.*, FAC ¶¶ 430-61, 622, 631, 641, 643, 646.)

While it is a close question as to the plausibility of Plaintiffs' allegations that the NFA failed to enforce its compliance rules—as distinct from allegations that other actors independently violated those rules (*see* NFA Defs.' Mem. at 13)—even if Plaintiffs could satisfy the first element, they have not plausibly alleged that they suffered actual losses caused by the failure to enforce.[25] *See In re Chicago Bd. Options Exch.*, 435 F. Supp. 3d at 873-74 (suggestion that exchange's non-enforcement of rules caused damages "too speculative to be plausible"). Accordingly, I recommend that Plaintiffs' CEA claims based on the NFA Defendants' alleged failure to enforce compliance rules be dismissed.

### 3.   Rules Regarding Arbitration Proceedings

Finally, Plaintiffs attempt to assert a claim under CEA § 22 relating the NFA's handling of Kumaran's complaints and the resulting NFA arbitration. Pursuant to 7 U.S.C § 21(b)(10), a registered futures association's rules must "provide a fair, equitable, and expeditious procedure through arbitration or otherwise for the settlement of customers' claims and grievances against any member or employee thereof[.]" 7 U.S.C § 21(b)(10). Accordingly, the NFA established a Code of Arbitration and Member Arbitration Rules which, "like all NFA rules, [were] subject to CFTC approval." *Ikon Glob. Mkts., Inc. v. Commodity Futures Trading Comm'n*, 859 F. Supp. 2d 162, 164 (D.D.C. 2012); *see also id*. at 168 (noting CFTC approval of NFA Code of Arbitration).

Plaintiffs allege that NFA compliance officer Afzal made false statements designed to induce them to initiate an NFA-controlled arbitration so that the NFA could cover-up its "illegal and fraudulent participation" in the alleged scheme. (FAC ¶¶ 698, 701, 705.) Plaintiffs further

---

[25] Because I find that Plaintiffs have failed to adequately allege other elements of a CEA claim, I do not address the parties' arguments regarding the element of bad faith or the appropriate bad faith standard.

allege that the NFA arbitration violated their due process rights. (*See* FAC ¶¶ 706-40.) However, these allegations do not relate to the NFA's arbitration procedures writ large and Plaintiffs do not identify a provision of the NFA Code of Arbitration or a NFA Member Arbitration Rule that the NFA failed to enforce. To the extent Plaintiffs remain dissatisfied with actions taken by the NFA in its arbitral capacity, the Court previously dismissed Plaintiffs' claims under the doctrine of arbitral immunity. *See Kumaran v. Nat'l Futures Ass'n*, No. 20-CV-03668 (GHW), 2020 WL 3630389, at *4 (S.D.N.Y. July 2, 2020), *on reconsideration in part*, 2020 WL 6264001 (S.D.N.Y. Oct. 23, 2020).

Moreover, even if Plaintiffs adequately alleged a rule that the NFA failed to enforce for which the NFA Defendants were not immune, they have not plausibly alleged actual losses caused by the failure to enforce arbitration rules. *See* 7 U.S.C. § 25(b)(2); *see also In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*, No. 19-CV-06002 (LJL), 2021 WL 827190, at *11 (S.D.N.Y. Mar. 4, 2021) (party who did not suffer actual losses resulting from CEA violation had not stated claim for relief). As a logical matter, it is unclear how Plaintiffs could plausibly allege that an actual loss from a qualifying transaction was caused by any failure to enforce an arbitration procedure. In any event, they have not done so here given that the arbitration process occurred well after Plaintiffs closed the account with ADMIS. *Cf. Troyer III*, 2019 WL 4695524, at *17 (rejecting assertion that NFA's failure to enforce Bylaw 301 caused losses sustained prior to alleged failure) (citing *Billhofer v. Flamel Techs., SA*, 663 F. Supp. 2d 288, 297 (S.D.N.Y. 2009) (An "inescapable rule of causality [is] that a cause must precede its effect."); *Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d. Cir. 1984) ("An effect never precedes its cause.")).

For these two independent reasons (*i.e.*, limitations bar and failure to state a claim), I recommend that Plaintiffs' CEA § 22 claims be dismissed.

## II.   Plaintiffs' State Law Claims Against The NFA Defendants Should Be Dismissed

In addition to their CEA claims, Plaintiffs assert claims against the NFA Defendants for fraud (Count 3), aiding and abetting fraud (Count 4), misappropriation of trade secrets (Count 6), conversion (Count 7), aiding and abetting conversion and misappropriation (Count 8), interference with economic advantage (Count 9) and civil conspiracy (Count 10). (FAC ¶¶ 807-55, 870-943.) The NFA Defendants seek to dismiss Plaintiffs' state law claims, arguing they are preempted by the CEA and that the NFA has absolute immunity for claims relating to performance of its regulatory functions. (NFA Defs.' Mem. at 20-22.)

As the Court previously has explained, "[a]n SRO and its officers are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities." *Kumaran*, 2020 WL 3630389, at *3. "This immunity extends both to affirmative acts as well as to an SRO's omissions or failure to act." *Id*. (quoting *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Secs. Dealers, Inc.*, 637 F. 3d 112, 115 (2d Cir. 2011)); *see also DL Cap. Grp, LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 97 (2d Cir. 2005) ("There is no question that an SRO and its officers are entitled to absolute immunity when they are, in effect, 'acting under the aegis' of their regulatory duties.") (citation omitted). However, because the doctrine "is of a rare and exceptional character . . . courts must examine the invocation of absolute immunity on a case by case basis." *Standard Inv. Chartered, Inc.*, 637 F. 3d at 115-16 (citation omitted). In assessing whether an SRO is entitled to immunity, courts look to "the nature of the function performed, not the identity of the actor who performed it." *Id*. at 116.

The Court finds that Plaintiffs' state law claims arise from the NFA Defendants' actions in connection with the discharge of their regulatory responsibilities (s*ee, e.g.*, FAC ¶¶ 813-15, 819-20, 885, 897, 910, 922, 935) and, therefore, I recommend that these claims be dismissed as barred by the doctrine of absolute immunity. *See City of Providence v. Bats Glob. Markets, Inc.*, 878 F.3d 36, 46-47 (2d Cir. 2017) (identifying six contexts in which SROs are entitled to absolute immunity including "general regulatory oversight"); *accord Dexter v. Depository Tr. and Clearing Corp.*, 406 F. Supp. 2d 260, 263 (S.D.N.Y. 2005) ("absolute immunity must be absolute because only such immunity can protect regulatory agencies from the fear of burdensome damage suits that would inhibit the exercise of their independent judgment") (internal citation omitted). Although Plaintiffs allege that the NFA Defendants failed to comply with certain rules and regulations, the "central question" regarding SRO immunity "is not whether the SRO is acting (or not acting) 'consistent with' the laws it is supposed to apply but rather whether the plaintiff's allegations concern the exercise of powers within the bounds of the government functions delegated to it." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 98 (2d Cir. 2007). Otherwise, "the immunity doctrine would be effectively subverted." *Id.*[26]

### III.   Plaintiffs' Claims Against Defendant Kadlec Should Be Dismissed

Plaintiffs also purport to assert claims against Kadlec in his "private and commercial capacity" as CEO of ADMIS,[27] including claims for fraud (Count 3), aiding and abetting fraud (Count 4), violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, (Count

---

[26] Because I recommend dismissing Plaintiffs' state law claims based on immunity, I do not reach the issue of whether Plaintiffs' state law claims are preempted by the CEA.

[27] The Court notes that Plaintiffs have asserted similar claims against ADMIS in a separate lawsuit. *See Kumaran v. ADM Inv. Servs.*, No. 20-CV-03873 (GHW) (SDA), (S.D.N.Y. May 18, 2020).

5), misappropriation of trade secrets (Count 6), conversion (Count 7), aiding and abetting conversion and misappropriation (Count 8), interference with economic advantage (Count 9), civil conspiracy (Count 10), and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Counts 11-12).[28] (FAC ¶¶ 807-970.) I first consider Plaintiffs' federal claims[29] and then turn to Plaintiffs' state law claims against Kadlec.

### A.   DTSA

The DTSA provides a federal cause of action for trade secret misappropriation. *See* 18 U.S.C. § 1836(b)). "To state a claim for trade secret misappropriation under the DTSA a plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, No. 15-CV-00211 (LGS) (SDA), 2020 WL 1442915, at *8 (S.D.N.Y. Jan. 27, 2020), *report and recommendation adopted*, 2020 WL 1435645 (S.D.N.Y. Mar. 24, 2020). "The DTSA defines 'misappropriation' to include 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means' or 'disclosure or use of a trade secret of another without express or implied consent' in specified circumstances." *AUA Priv. Equity Partners, LLC v. Soto*, No. 17-CV-08035 (GHW), 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018) (quoting 18 U.S.C. § 1839(5)). The term "improper means" includes "theft, bribery,

---

[28] To the extent that Plaintiffs assert claims against Kadlec under CEA § 22, those claims are based on Kadlec's role as an NFA Board Member, and, thus, should be dismissed for the same reasons as the same claims against the NFA Defendants.

[29] Although Kadlec argues that Plaintiffs were not granted leave to replead the DTSA and RICO claims (*see* Kadlec Mem. at 9-10), the Court did not construe the original Complaint as asserting claims against Kadlec in his individual capacity and, thus, only dismissed claims as they pertained to Kadlec in his role as an NFA Board Member. *See Kumaran*, 2020 WL 3630389, at *4.

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A).

Plaintiffs contend that their transaction records, trading strategies and risk management strategies are trade secrets and that Kadlec and others misappropriated these trade secrets. (*See, e.g.,* FAC ¶¶ 76, 77, 351.) Kadlec argues that Plaintiffs' trade secret claims should be dismissed because they fail to adequately allege the existence of a trade secret or misappropriation. (Kadlec Mem. at 13-14.) Even assuming arguendo, that Plaintiffs have alleged the existence of a trade secret,[30] Plaintiffs' allegations fail to state a DTSA claim against Kadlec because the FAC contains no facts as to how Kadlec personally improperly acquired, disseminated or used Plaintiffs' trade secrets.[31] (*See, e.g.,* FAC ¶ 350 (alleging generally that "Defendants engaged in unfair market competition by authorizing the dissemination of CTA's trading strategies"); ¶ 350 (concluding that dissemination of traders' transactions records by Kadlec and others was illegal).[32] Thus, the Court finds that Plaintiffs' allegations regarding misappropriation "lack 'factual content that

---

[30] *But see Kumaran v. Northland Energy Trading, LLC,* No. 19-CV-08345 (MKV) (DCF), 2021 WL 797113, at *11 (S.D.N.Y. Feb. 26, 2021) ("Courts have found that similarly general allegations regarding confidential information and processes simply do not give rise to a plausible trade secrets claim.") (internal quotation marks and alterations omitted).

[31] In a letter to the Court dated August 27, 2021, Plaintiffs assert that the Court should disregard Kadlec's argument that Plaintiffs failed to plead Kadlec's acquisition of their trade secrets because it was raised for the first time in reply. (Pls.' 8/27/2021 Letter, ECF No. 111, at 1.) However, contrary to Plaintiffs' assertion, Kadlec also argued that Plaintiffs had not plausibly alleged misappropriation, which includes acquisition, disclosure or use. In any event, Plaintiffs addressed this argument in their opposition, which includes a sub-section on "Acquisition" (*see* Pls.' Kadlec Opp. Mem. at 37-38) and the Court finds that no further briefing is necessary.

[32] Plaintiffs also seek to incorporate by reference allegations in the related cases against Vision and ADMIS. (*See* FAC ¶ 677.) Even considering these allegations, they are insufficient to state a claim against Kadlec. The only allegations regarding conduct by Kadlec pertain to his alleged role, as an NFA Board Member, in approving VIA's registration as a CTA. (*See Kumaran v. Vision Financial Markets*, 20-cv-03871, First Am. Compl., ECF No. 55, ¶ 128.) Even if plausible, claims stemming from Kadlec's role as an NFA Board Member are barred by the doctrine of absolute immunity. *See supra*, Discussion Section II.

allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Cf. Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 674 (S.D.N.Y. 2016) (dismissing trade secret misappropriation claim based on conclusory allegations that defendant conspired to steal trade secrets) (quoting *Iqbal,* 556 U.S. at 678.) Accordingly, I recommend that Plaintiffs' DTSA claim be dismissed.

### B.   RICO

RICO confers a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation" of the statute. 18 U.S.C. § 1964(c). In relevant part, the Act makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). To establish a civil claim under RICO, a plaintiff must allege "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity, as well as injury to business or property as a result of the RICO violation." *Foster v. 2001 Real Estate*, No. 14-CV-09434 (RWS), 2015 WL 7587360, at *3 (S.D.N.Y. Nov. 24, 2015) (citing *Lundy v. Catholic Health Sys. of L.I.*, *Inc.*, 711 F.3d 106, 119 (2d Cir. 2013)). "Racketeering activity" encompasses, among other things, any act indictable for crimes enumerated under 18 U.S.C. § 1961(1)(B), which include, as relevant here, 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1832 (theft of trade secrets).

The elements of a RICO offense must be established as to each individual defendant. *See United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) (focus of § 1962(c) "is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the

members of the enterprise")). In addition, where, as here, "the predicate acts on which a RICO claim is based sound in fraud, those acts must be pleaded in conformity with Rule 9(b)'s heightened pleading standard." *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11-CV-07801 (PAE), 2012 WL 1231775, at *4 (S.D.N.Y. Apr. 12, 2012) (citing *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 292-93 (2d Cir. 2006)). "In addition, close scrutiny of RICO claims based on fraud is merited because virtually every ordinary fraud is carried out in some form by means of mail or wire communication, and thus there is the potential for transforming garden-variety common law actions into federal cases." *Id.* (internal quotation marks omitted); *see also U.S. Fire Ins. Co. v. United Limousine Serv., Inc.,* 303 F. Supp. 2d 432, 443 (S.D.N.Y. 2004) ("courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb").

Plaintiffs allege that Kadlec engaged in mail fraud, wire fraud and misappropriation of trade secrets by "instigat[ing]" withdrawal of unauthorized fees and transmitting Plaintiffs' transaction records and trade secrets to High Ridge on various dates between January 2017 and June 2017.[33] (FAC ¶¶ 530-55, 948, 952; *see also* FAC Ex. 9, ECF No. 57-9;[34] Pls.' Kadlec Opp. Mem. at 19-20.) Kadlec argues that Plaintiffs fail to state a RICO claim because, among other deficiencies, they do not allege that he engaged in even one predicate act, let alone a pattern of racketeering activity. (Kadlec Mem. at 14.) The Court agrees that these and other deficiencies warrant the dismissal of Plaintiffs' RICO claims.

---

[33] To the extent the FAC attempts to base a RICO claim on Kadlec's actions in approving registration of NFA members and approving audits (*see* FAC ¶¶ 537-38), those acts only could have been taken by Kadlec in his role as an NFA Board Member, and thus are barred by the doctrine of absolute immunity. *See supra*, Discussion Section II.

[34] The Court notes that Exhibit 9 is mislabeled Exhibit 6 on the document itself. (*See* FAC Ex. 9 at 1.).

To start, Plaintiffs have not plausibly alleged that Kadlec personally participated in the alleged predicate acts. "The standard for liability in a civil RICO action is no exception to the general rule requiring individual involvement in order to subject a corporate officer to liability, and requires personal involvement by each defendant." *Nat'l Grp. for Commc'ns & Computs., Ltd. v. Lucent Techs. Inc.*, No. 03-CV-06001 (NRB), 2004 WL 2903745, at *3 (S.D.N.Y. Dec. 15, 2004), *as corrected* (Jan. 5, 2005). With respect to both the withdrawal of unauthorized fees and the misappropriation of trade secrets, Plaintiffs' allegations refer to "ADMIS" (s*ee generally* FAC Ex. 9; *see also* FAC ¶ 540, 545-55) and, thus, are insufficient to state a claim against Kadlec. *See Gross v. Waywell*, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009) ("lumping the defendants into collective allegations results in a failure to demonstrate the elements of § 1962(c) with respect to each defendant individually, as required."); *see also Persico*, 832 F.2d at 714 (noting that the focus of § 1962(c) "is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise").[35]

In any event, Plaintiffs' conclusory allegations that ADMIS misappropriated their trade secrets are insufficient. (*See, e.g.*, FAC Ex. 9 ¶ 3.) Nor have Plaintiffs adequately pleaded mail or wire fraud. "Where a plaintiff in a RICO claim alleges racketeering activity based on the predicate

---

[35] Plaintiffs' argument that Kadlec participated in the operation and management of the enterprise is inapt. (*See* Pls.' Kadlec Opp. Mem. at 20-21.) First, it is questionable that Plaintiffs have adequately alleged an enterprise. *See Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 440 (S.D.N.Y. 2019) ("A plaintiff may not simply string together various defendants and label them an enterprise.") (alterations omitted) (citing *Town of Mamakating v. Lamm*, No. 15-CV-02865, 2015 WL 5311265, at *9 (S.D.N.Y. Sept. 11, 2015), *aff'd*, 651 F. App'x 51 (2d Cir. 2016)). Regardless, the 'operation and management' test is an extremely rigorous test, and it is not enough to merely take directions and perform tasks that are necessary and helpful to the enterprise" nor "simply provide goods and services that ultimately benefit the enterprise." *See Democratic Nat'l Comm.*, 392 F. Supp. 3d at 441 (internal quotation marks and alterations omitted). Plaintiffs' allegations that Kadlec oversaw the issuance of false reports and payment of fees through ADMIS are not sufficient nor are their conclusory allegations that Kadlec "oversaw the [oral risk services agreement]." (Pls.' Kadlec Opp. Mem. at 21.)

acts of violating the mail or wire fraud statutes, he or she must prove three elements: (1) scheme to defraud, including proof of intent; (2) money or property as object of scheme; [and] (3) use of mails or wires to further the scheme." *Silvester v. Selene Fin., LP*, No. 18-CV-02425 (PMH), 2021 WL 861080, at *4 (S.D.N.Y. Mar. 8, 2021). Plaintiffs allege that "ADMIS entered into a financial transaction and issued electronic statements across internet communications and electronic transmission, withdrawing [a specified amount] as undisclosed 'transaction fees'" and that "ADMIS fraudulently concealed such transaction[s]" and concealed that the recipient of the fees was High Ridge. (*See, e.g.*, FAC Ex. 9, ¶ 1.) These allegations are insufficient to allege an intent to defraud. Despite Plaintiffs allegations that the fees were undisclosed, Plaintiffs also allege that Kumaran questioned Lazarra about at least one of the transaction fees and, thus, was aware that the fees were being charged. (*See* FAC Ex. 9 ¶ 2.) Moreover, Plaintiffs' allegations that the fees were unauthorized (*see, e.g.*, FAC ¶¶ 542-43) does not render the wire transfers or electronic statements fraudulent, nor does the fact that the fees allegedly were provided to High Ridge. Therefore, Plaintiffs have not adequately alleged mail or wire fraud as a predicate act. *See, e.g., Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (to allege mail fraud, plaintiff must, *inter alia* "explain why [communications] were fraudulent").

Finally, because I find that Plaintiffs do not adequately allege a substantive violation of RICO, any allegation of a RICO conspiracy in violation of 18 U.S.C. § 1962(d) (Count 12) also should be dismissed. *See First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004).

### C. <u>State Law Claims</u>

Because I recommend that Plaintiffs' federal claims be dismissed, I recommend that the Court decline to exercise supplemental jurisdiction over any remaining state law claims against

Kadlec. *See* 28 U.S.C. § 1367(c)(3); *see also Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir.2006) ("'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'") (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). In the alternative, I recommend that Plaintiffs' state law claims against Kadlec be dismissed for failure to state a claim.

Plaintiffs' fraud claims must be plead with particularity in accordance with Federal Rule of Civil Procedure 9(b). *See Tutor Perini Bldg. Corp. v. New York City Reg'l Ctr., LLC*, No. 20-CV-00731 (PAE), 2021 WL 965909, at *23 (S.D.N.Y. Mar. 15, 2021). To state a claim for fraud under New York law,[36] Plaintiffs must allege five elements: "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Id*. (quoting *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)).[37]

Plaintiffs' allegations do not meet this standard. Plaintiffs only non-conclusory allegations with respect to Kadlec personally are that Kumaran spoke with Kadlec at an expo in April 2018,

---

[36] Because the parties cite to New York law in their briefs, the Court applies New York law to Plaintiffs' state law claims. *See Tuckett v. Slade Indus., Inc.*, No. 16-CV-04081 (GHW), 2018 WL 3910821, at *4 (S.D.N.Y. Aug. 14, 2018) (where "the parties' briefs assume that New York substantive law governs the issues . . . such implied consent is . . . sufficient to establish the applicable choice of law.") (quoting *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009)).

[37] A similar standard applies to claims of fraud under the CEA. *See Walrus Master Fund Ltd. v. Citigroup Glob. Mkts., Inc.*, No. 08-CV-02404 (DAB), 2009 WL 928289, at *3 (S.D.N.Y. Mar. 30, 2009) ("To state a claim for fraud under § 4b of the Commodity Exchange Act a Plaintiff must allege (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; (3) materiality; (4) and reliance (5) in or connection with any order to make . . . any contract of sale of any commodity for future delivery.") (internal citation and quotation marks omitted). Accordingly, to the extent Plaintiffs assert a claim against Kadlec pursuant to CEA § 4b, 7 U.S.C. § 6b, it fails for the same reasons as Plaintiffs' state law fraud claim.

and later communicated with her via email, but failed to disclose information regarding the G&F Agreement, ADMIS' relationship with High Ridge and/or facts regarding the alleged unauthorized fees or alleged dissemination of Plaintiffs' account information to VIA.[38] (FAC ¶¶ 656-65.) Among other deficiencies, Plaintiffs have not adequately alleged that these omissions caused their alleged damages. Notably, these communications occurred in April 2018, long after Plaintiffs closed the account with ADMIS in June 2017.

Nor have Plaintiffs adequately alleged that Kadlec aided and abetted fraud. "To establish liability for aiding and abetting fraud under New York law, 'the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'" *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (quoting *Lerner*, 459 F.3d at 292). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Lerner*, 459 F.3d at 295 (internal quotation marks omitted). Plaintiffs rely on allegations that Kadlec participated in the oral risk services agreement and concealed that agreement, and related information, from ADMIS' customers. (*See* Pls.' Kadlec

---

[38] To the extent the FAC includes additional allegations regarding conduct by "ADMIS" or Defendants as a group, those allegations are insufficient to state a claim against Kadlec in his personal capacity. *See Tutor Perini Bldg. Corp.*, 2021 WL 965909, at *24 ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."). In their August 27, 2021 letter, Plaintiffs ask the Court to disregard this argument because Kadlec did not raise it in his motion. (*See* Pls.' 8/27/2021 Letter at 2-3.) However, the NFA Defendants' memorandum, on which Kadlec relies with respect to the state law claims, does raise the issue of group pleading. (*See* NFA Defs.' Mem. at 10.) Moreover, because Plaintiffs specifically address the argument that their fraud claims "against [Kadlec] do not sufficiently distinguish between him and ADMIS" (Pls.' Kadlec Opp. Mem. at 4), Kadlec was entitled to respond. *See, e.g., Zirogiannis v. Seterus, Inc.*, 221 F. Supp. 3d 292, 299 (E.D.N.Y. 2016) ("As Defendant's arguments are responsive to Plaintiff's memorandum of law in opposition, Defendant has not improperly asserted arguments for the first time in its memorandum of law in reply.") Accordingly, the Court finds that no further briefing is required.

Opp. Mem. at 15-16). However, the Court finds that these allegations, particularly with respect to Kadlec's involvement in the alleged oral risk services agreement, fail to meet the heightened standard of Rule 9(b).

Plaintiffs' misappropriation claim (Count 6) fails for the same reasons as their DTSA claim fails. *See supra*, Discussion Section III(A). Moreover, under New York law Plaintiffs would need to allege that Kadlec used their trade secrets, *see E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 453 (2018), which they have not done. Plaintiffs' fail to state a claim for conversion[39] (Count 7) because they have not plausibly alleged Kadlec's "dominion over [ ] property or interference with it, in derogation of [the] plaintiff's rights." *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 629 (2d Cir. 2020). Plaintiffs' aiding and abetting misappropriation and conversion claim (Count 8) fails because, as with Plaintiffs' aiding and abetting fraud claim, they do not allege plausibly allege "substantial assistance" by Kadlec. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012). Plaintiffs' claim for interference with economic activity[40] (Count 9) fails because they have not alleged Kadlec's interference with a third-party business relationship. *See Hadami*, 272 F.

---

[39] "Under New York law, '[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.'" *Fedele v. Marist Coll.*, No. 20-CV-03559 (VB), 2021 WL 3540432, at *8 (S.D.N.Y. Aug. 10, 2021) (quoting *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006)). "Money may be the subject of a conversion action only if it is specifically identifiable and segregated and there exists an obligation to return or otherwise treat in a particular manner the specific fund in question." *Id.* (quoting *In re Columbia Tuition Refund Action*, No. 20-CV-03208 (JMF), 2021 WL 790368, at *9 (S.D.N.Y. Feb. 26, 2021)).

[40] "Under New York law, a plaintiff suing for . . . tortious interference must prove that '(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means, and (4) the relationship is injured.'" *Hadami S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 602 (S.D.N.Y. 2017) (quoting *Goldhirsh Grp., Inc. v. Alpert*, 107 F.3d 105, 108-09 (2d Cir. 1997)). "[The] [c]onduct constituting tortious interference with business relations [must be] conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Id.* (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004)).

Supp. 3d at 602. Finally, Plaintiffs' civil conspiracy claim fails because "New York does not recognize an independent tort of conspiracy." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006).

## IV.   Injunctive Relief

In the original Complaint, Kumaran asked the Court to enjoin the NFA from administering arbitration. *See Kumaran*, 2020 WL 3630389, at *4. The Court dismissed that claim, finding that Kumaran "alleged nothing to suggest that the parties to the NFA arbitration did not agree to arbitrate, that they waived arbitration, or that the claims being arbitrated are not within the scope of the applicable arbitration agreement." *Kumaran*, 2020 WL 3630389, at *5. Although the Court granted Plaintiffs leave to replead a claim for injunctive relief, they have not remedied these deficiencies. In any event, Plaintiffs do not appear to be pursuing this relief. (*See* FAC ¶ 738.) Accordingly, I recommend that any claim for injunctive relief be dismissed.

## V.   Leave To Amend

"In this circuit, '[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.'" *Leneau v. Ponte*, No. 16-CV-00776 (GHW), 2018 WL 566456, at *18 (S.D.N.Y. Jan. 25, 2018) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). "However, '[r]easons for a proper denial of leave to amend include undue delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party.'" *Moniodes v. Autonomy Capital (Jersey) LP*, No. 20-CV-05648 (GHW), 2021 WL 3605385, at *8 (S.D.N.Y. Aug. 11, 2021) (quoting *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010)). "A plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading

deficiencies in its complaint." *Id*. (quoting *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014)). Because I find that Plaintiffs' CEA claims are time-barred, amendment of those claims would be futile. *See Levy*, 2017 WL 2533501, at *9 (denying leave to amend time-barred claims as futile). I also find that amendment of Plaintiffs' DTSA and RICO claims against Kadlec personally would be futile because there is no indication that better pleading could cure the pleading deficiencies. *See Cuoco v. Moritsugu*, 222 F.3d 99,112 (2d Cir. 2000) (where the "problem with [a complaint] is substantive [and] better pleading will not cure it," leave to amend should be denied as futile). Accordingly, I recommend that leave to amend be denied.[41]

## CONCLUSION

For the foregoing reasons, I recommend that Defendants' motions to dismiss be GRANTED.

**SO ORDERED.**

Dated:      New York, New York
             September 16, 2021

_____
STEWART D. AARON
United States Magistrate Judge

*          *          *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding

---

[41] Because I recommend dismissing Plaintiffs' federal claims and denying supplemental jurisdiction over their state law claims, I do not address leave to amend regarding Plaintiffs' state law claims.

three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party

may respond to another party's objections within fourteen days after being served with a copy.

Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the

Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an

extension of time for filing objections must be addressed to Judge Woods.

**THE FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF**

**OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).