SSK_Declaration_#4, Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMANTHA SIVA KUMARAN, <br> , et al, <br> *Plaintiffs,* <br><br> -against- <br><br> National Futures Association <br> et al <br> *Defendants,* | Case No:1:20:CV:03668-GHW-SDA <br><br> Related Case: 1: 20:CV:03873 <br> Related Case: 1: 20:CV:03871 <br><br> **DECLARATION IN SUPPORT** <br><br> **OF FRCP 25(c) SUBSTITUION <br> OF DISSOLVED NEFERTITI <br> RISK CAPITAL MANGEMENT, <br> LLC** |

## DECLARATION – IN SUPPORT OF MOTION TO SUBSTITUTE DISSOLCV NEFERTITI RISK CAPITAL MANAGEMENT, LLC

Pursuant to 28 USC 1746 and Local Rule III.3.(B) Plaintiff Samantha Siva Kumaran provides this Declaration in support of Plaintiffs Motion pursuant to FRCP 25(c).

1.  I am Samantha Siva Kumaran the individual Plaintiff in this action.

2.  On December 15, 2015 I formed a New York State Limited Liability Corporation called Nefertiti Risk Capital Management, LLC. ("NRCM") (**Exhibit 1** is a true and accurate copy of that certificate)

3.  The official seal and date on the Page 1 of the form states December 15, 2015 (Pg.1 Ex.1)

4.  The date received by New York State was December 14, 2015 (Pg. 3 Ex.1)

5.  On July 1, 2016 I passed my Series 3 examination as a Commodities Trading Advisor. The sponsoring entity was Nefertiti Risk Capital Management, LLC (**Exhibit 2** is a true and accurate copy of the test results).

6.  On January 18, 2017 and on other dates in December 2017 and January 2017, I consulted with Mr. Peter J.G. Toren, a licensed attorney practicing in New York, about the accounts being opened at ADMIS.

7.  Prior to opening the accounts at ADMIS, Mr. Toren had agreed to become a Co-Founder and Managing Member of a separate entity which was to be called Nefertiti Asset Management, LLC ("NAM") for purposes of becoming the G.P. of various commodities hedge funds.

8.   Until NAM was formed, Mr. Toren advised we could use the NRCM company that I had already formed, or my individual accounts for purposes of building a track record and trading commodities futures.

9.   Prior to opening the accounts at ADMIS, Mr. Toren and I had also agreed that he would serve as "in-house counsel" and managing member as "Chief Compliance Officer" for the Nefertiti entities in exchange for an additional specific number of Membership Units of NAM.

10.  On January 18, 2017, I signed account opening forms for Nefertiti Risk Capital Management, LLC   and a   Customer Agreement as the managing member with Defendant ADM Investor Services ("ADMIS")  (**Exhibit 3** is a true and accurate copy of the ADMIS opening forms).

11.  Prior to opening the accounts at ADMIS, Mr. Toren agreed to fund capital contributions into NAM, and to accept a role as Chief Compliance Officer and also as in-house counsel of NAM. (**Exhibits 5 and 6** are true and accurate copies of Mr. Toren's electronic signature as Chief Compliance Officer of NAM).

12.  Mr. Toren also agreed, to undertake the management role of Chief Compliance Officer of NRCM. (**Exhibits 7 and 8** are true and accurate copy of Mr. Toren's electronic signature as Chief Compliance Officer of NRCM).

13.  Mr. Toren in his capacity as attorney, reviewed all contracts with ADMIS prior to such being executed.

14.  On the advice of counsel Mr. Toren advised me that only NRCM and my individual names should be on the account opening forms.

15.  At the advice of counsel, on January 18, 2017, I supplied an incumbency certificate to ADMIS. (**Exhibit 4** is a true and accurate copy of the Incumbency Certificate).

16.  Reliant upon and at the advice of counsel, Mr. Toren advised me, that his monies could be transferred directly into the NRCM bank account.

17.  Acting on the advice of counsel, I agreed to accept Mr. Toren's subsequent cash capital contributions for NAM into the bank accounts of NRCM.

18.  Mr. Toren thus wired $25,000 to NRCM's bank account, for trading commodities futures options in NRCM's account with ADMIS.

19.   On or around January 24, 2017 I also agreed with an immediate family member, Dr. Wijayasuriya, who is an uncle, and resides in Lafayette, Louisianna, that he would also contribute $25,000 as a loan to NRCM for purposes of trading monies in NRCM's account at ADMIS.

20.   Acting on the advice of counsel Mr. Toren, those funds could be combined in the NRCM bank accounts and the ADMIS account. A separate subaccount was allocated for those funds.

21.   Since NRCM was owned and formed 100% by myself, we agreed that NRCM would not offer any membership units or interests in NRCM but instead, any capital contributions from Toren or other partners received would be considered capital contributions of NAM.

22.   Therefore at all times, I, individually, Samantha S. Kumaran, owned 100% of the membership units and interests of NRCM.

23.   I also consulted with and entered into a agreement with Mr. Kenneth Bock, to be on the Advisory Board of NRCM. Bock previously was the CEO of Munich Re, North Americas and has had a long standing career in enterprise risk management.

24.   Bock held no membership units in NRCM or any of the NAM entities, but provided external advice related to corporate matters of NRCM and NAM during all relevant periods January 2017 until November 2019 when the Arbitration was stayed.

25.   Mr. Toren and I agreed, that the initial valuation of NAM would be $3,000,000.

26.   We agreed that NAM would be formed under the Delaware LLC Act, and governed by the laws of Delaware.

27.   We agreed that I, in my individual capacity, Samantha Siva Kumaran, or through entities I solely owned, I would always own or control 51% of the Membership Units of NAM.

28.   In exchange for my 51%, we agreed that I would license into the companies use of my Intellectual Property ("IP") to NAM and all other software, trading and risk management modules for use in the trading of hedge funds. I would also trade the accounts managed by NAM or any other hedge funds.

29.   Mr. Toren and I agreed that I would also provide labor to the Nefertiti entities, however, subject to a full time salary of not less than $156,000 USD a year.

30.     Mr. Toren also agreed in his role as Chief Compliance Office and Co-Founder that he would contribute capital to cover my individual salary and cover other operating expenses of the Nefertiti entities.

31.   Mr. Toren agreed that he would contribute financial capital not just of salary and expenses, but several of the formation costs such as accountants, filing fees, legal formation costs and other office vendors.

32.   Those expenses were estimated at $24,000 a year, but would include additional one-time costs of legal, compliance and accounting fees which may exceed $35,000 in the first year.

33.   I also agreed to provide, in my individual capacity, that I would use, at my own expenses, the ownership of which would belong to me, my own office equipment, supplies, computers.

34.   In the start-up phase, I also agreed that I would contribute other sweat equity services such as filing administrative forms and general office work, all subject to and included in the baseline salary.

35.   Mr. Toren agreed to handle at his cost and expense the legal and compliance work for the Nefertiti entities in exchange for the additional specific Membership Units in NAM.

36.   Mr. Toren and I agreed that his cash capital contributions to NAM would be calculated at the rate of 1% in exchange for each $30,000 of capital contributed into NAM.

37.     I also agreed to contribute some cash contributions, at the same equity rate of 1% for each $30,000 in NAM which were funded from a separate business called The A Star Group, Inc or from individual personal monies. The same rate was also agreed to by other family members.

38.     Acting on the advice of counsel, during the period January 2017 until June 2017, Mr. Toren, using bank wire, contributed cash contributions of $40,000 USD into the NRCM bank accounts for the purposes of trading those funds as commodities futures interests at ADMIS.

39.     Acting on the advice of counsel, during the period January 2017 until June 2017, my Uncle, as a loan, contributed cash contributions of $25,000 USD into the NRCM bank account for the purposes of trading commodities futures interests at ADMIS.

40.     Acting on the advice of counsel, during the period January 2017 – June 2017, in addition The A Star Group, Inc, which is a corporation solely owned by myself, also wired $25,000 USD into the NRCM for purpose of trading commodities futures interests at ADMIS.

41.    At the advice of counsel the funds from my Uncle,  Mr. Toren and The A Star Group, Inc were placed in different sub-accounts at ADMIS without declaration of any commingled funds.

42.    The A Star Group, Inc is a New York S-Corporation 100% owned by Samantha Siva Kumaran. I formed in The A Star Group in 1993 and has been my sole source of livelihood during the period 1993 – 2015 as a risk management service provider and software consulting.

43.    All the foregoing arrangements were fully disclosed to the Introducing Broker Trey Lazzara, who was solely responsible for communications regarding the account opening at ADMIS.

44.    Toren's role in the Nefertiti companies was also fully disclosed to Trey Lazzara, and Toren was copied on several of the emails exchanged between myself and Lazzara between January 2017 and June 2017. (**Exhibit 9** is a true and accurate copy of communications disclosing Toren's roles in the G.P. in early emails in January 2017).

45.   At the time neither Mr. Toren nor I had any knowledge that High Ridge Futures, Boshnack and Rothman had guarantees on the account. We had no knowledge of any of their roles, including in risk management, or that they would acquire fully disclosed access to the account.

46.   If I had known I would never have opened the account at ADMIS.

47.    Acting on the advice of counsel, since NAM was still not yet formed, and the bank accounts of NAM had not been opened, Mr. Toren stated that he would place additional capital contributions, which were being used to fund start-up costs of NAM, and Nefertiti funds in general, as well as my own salary into the NRCM bank account.

48.    Acting at the advice of counsel, Mr. Toren wired such capital contributions to the NRCM bank account and also another bank account of a business entity owned by myself, The A Star Group, Inc during the period December 2016 and until around May 2017 which was the active period of the ADMIS account.

49.    At the time of opening the accounts at ADMIS, neither myself nor NRCM had become members of the NFA or were registered.

50.    Acting on the advice of counsel, the account opening forms at ADMIS were signed by NRCM, with myself as the sole representative.

51.  Originally I intended the account to be opened in my individual name. The account was opened in NRCM's name however,  I understood the account to be a pass-through account to myself individually, and I was the CTA, trader and intended beneficiary.

52.  The W9 form submitted also lists NRCM as a sole proprietor/single member LLC. (**Exhibit 11** is a true and accurate copy of the W9 Form filed).

53.  During the period of January 2017 – May 2017, acting at the advice of counsel, I also opened some of the account opening forms at ADMIS in my individual name. (**Exhibit 10** is a true and accurate copy of forms opened in my individual name).

54.  Even though I opened the account in NRCM's name, several account forms I opened them in my own name. (See **Exhibit 10** is a true and accurate copy of those forms)

55.  I did not know the distinction or difference in the sole proprietor or single member LLC.

56.  The account information form had requested I provide ADMIS my individual passport and personal photo identification.

57.  The contract ¶26 is intended to be enforced by and inure to the benefit of all successors, assigns, representatives and agents. (See **Exhibit 3** - ECF22.1 Customer Agreement ¶26)

58. Paragraph 26 of the ADMIS Customer Agreement, states, without limitation, that
¶26. This Agreement, including all authorizations, shall inure to the benefit of ADMIS, its successors and assigns and shall be binding upon Customer and Customer's personal representatives, executors, trustees, administrators, agents, successors, and assigns.

59. Paragraph 27 of the ADMIS Customer Agreement states that
¶27 Customer shall indemnify, defend and hold ADMIS, its affiliates, directors, officers, stockholders, employees, agents, successors and assigns harmless from and against any and all liabilities, claims, losses, damages, costs and expenses, including reasonable attorneys' fees and expenses, incurred by ADMIS, arising from (a) Customer's failure to fully and timely perform its obligations hereunder, or (b) any of Customer's representations and warranties made being untrue or incorrect. Customer also agrees to pay promptly to ADMIS any and all claims, losses, damages, costs and expenses, including reasonable attorneys' fees, incurred by ADMIS in enforcement of any of the provisions of this Agreement and any of the transactions contemplated hereunder, the collection of any amounts due hereunder, and the defense of any action or proceeding, including an arbitration proceeding, brought by Customer against ADMIS in which ADMIS is the substantially prevailing party.

60.  ADMIS have stated in filings, that Kumaran, individually, is the person they intend to enforce the former NRCM Agreements against, as NRCM has been dissolved.

61.     I was the sole trader on the ADMIS account, and any malfeasance or losses, have direct consequence to me individually as a CTA and my performance trading record.

62.   During the account trading January 2017 until May 22, 2017 I documented systemic failures in risk management and material errors on the ADMIS' portals which inaccurately reflected both margin and cash balances to trade. (20-CV-3871 Verified Complaint ECF89 ¶479-¶493 is a true and accurate copy of those risk management errors )

63.     I also documented significant errors and omission in the risk management department and reporting.

64.     The magnitude and frequency of the errors in risk management rendered performance under the ADMIS contracts impossible.

65.     In the verified Complaint filed in this action SAC, I notified Lazzara of gross negligence and excessive margin errors in the risk departments. (The 20-CV-3871 Verified Complaint ECF89 includes a true and accurate copy of the margin errors reported)

66.      During the account trading period,  I made several inquiries to the broker Lazzara about large errors and margin errors in the risk management department at ADMIS.

67.     At all times both ADMIS and Lazzara concealed the role High Ridge Futures were playing in the account and their role in risk management.

68.     On or around May 22, 2017 due to excessive margin errors, account interference in risk management, as well in misinformation on intraday margin, one of the accounts Account #64, suffered a large drawdown in excess of around $35,000.

69.     At that time, I was unaware that Robert Boshnack and Howard Rothman who run a competing CTA business, High Ridge Futures and various of their employees or affiliates, had been given discretionary authority on risk management and margin limits on my account.

70.     On May 23, 2017 both myself individually and NRCM became registered members of the NFA as a Commodities Trading Advisor ("CTA").

71.     On May 24, 2017. I was advised by the broker Lazzara, that ADMIS had moved to close my account.

72.     I later leaned it was Boshnack, Rothman and High Ridge who had moved to close the account, just one day after becoming an NFA Member.

73.     On or around June 6, 2017 I started withdrawing funds from the ADMIS account but the withdrawals were delayed due to an incorrect set-up of the account and an OFAC violation.

74.   On or around June 19, 2017 I withdrew all funds from the NRCM accounts and by June 30, 2017 NRCM terminated its business relationship with Lazzara and closed its accounts with ADMIS.

75.   In August 2017 NRCM repaid $10,000 to Peter Toren from trading capital from the ADMIS account.

76.   In or around August 2017 I started reconciling the accounts so that NRCM  could repay loans to my Uncle and for my own CTA reconciliation. During this reconciliation I uncovered the bank accounts did not reconcile.

77.   On or around September 20, 2017 I also learned that a third party, called High Ridge Futures, may have had access to the NRCM accounts or had been involved in communications.

78.   Toren, as CCO and in-house counsel agreed to act as counsel in any securities and commodities violations.

79.   I made several inquiries to the NFA, about their knowledge and approvals of ADMIS and High Ridge, but received no response and no answers. (**Exhibit 21** is a true and accurate copy of the Affidavit filed at *ECF*43.28 regarding those communications. Exhibit numbers in the *ECF*43.28 refer to exhibits filed also at *ECF*43 which are incorporated therein.)

80.   At the time, we also had no knowledge of the potential role of the NFA or any other parties.

81.   Toren and I agreed that a claim should be brought against ADMIS and/or Lazzara but, counsel advised there was insufficient information to ascertain the nature of the fraud or what had transpired.

82.   Toren, myself and Bock had at least two meetings in New York City, to discuss a course of action.

83.   On September 21, 2017 I also formed Nefertiti Holding Corporation ("NHC"), a New York State S-Corporation. The purpose of the company was to also serve as a management company of NAM. (**Exhibit 12** is a true and accurate copy of the formation documents)

84.   Toren agreed to be Secretary, or Treasure of the Company. (**Exhibit 13** is a true and accurate copy of Toren's signature as Secretary of NHC on various bank forms)

85.   Thereafter, Toren's capital contributions for purposes of forming and operating NAM were deposited to NHC's bank account and no longer to NRCM.

86.   At no time did NRCM give or allocate any membership interests or equity stake to any party, other than myself Samantha S. Kumaran who owned 100% of the membership interests.

87.   In or around October 2017 I repaid any loans to family members from the ADMIS account including repayment in full of the $25,000 plus some interest to my Uncle after the accounts at ADMIS were reconciled.

88.   My uncle has no further involvement or obligation with the Nefertiti entities.

89.   In March 2018, at the advice of counsel, and after several inquiries to the NFA led to a lack of response to any questions, we filed a notice of intent at the Arbitration. (See also **Exhibit 21**)

90.   Toren stated there was insufficient information to bring a claim in Federal Court as we had no facts on what role High Ridge Futures had played in the account.

91.   In or around May 2018, Toren and I both agreed to bring a potential claim at Arbitration under NRCM's name.

92.   I had also received communications from the NFA, that NFA promised to investigate compliance violations if we paid them $9,500.

93.   Reliant on information from the NFA, and without facts regarding NFA's role in the alleged fraud, Toren and I agreed we would split the Arbitration fee of $9,500.

94.   We agreed that I would be the sole representative at the Arbitration even though I was not a trained lawyer, and that because I was an NFA member, I would be the better person to handle the Arbitration.

95.   At the onset of the NFA NRCM Arbitration 18-ARB-5 Toren and I agreed that he would serve as in-house counsel and advise as an attorney behind the scenes.

96.   Toren agreed that he would submit legal invoices to the NFA Arbitration for NRCM, and in the initial filing of 18-ARB-5 approved that I submit a potential award of legal fees of $50,000 to be payable directly to him.

97.   Because I was on salary, we agreed that I would be the day-to-day person handling the filings as Toren said it would be better if I appeared Pro-Se, even though I had no experience at handling an arbitration, hearings, discovery, filing motions and the like.

98.  Toren and I also agreed that neither myself nor Toren, would take a contingency fee, as the litigation had caused damages to the hedge fund and the businesses, and that any monies would be used as capital to fund the business, for damage done by ADMIS, Lazzara and High Ridge.

99.  Prior to filing the Arbitration, and as a requisite to me handling the Arbitration, Toren agreed that he would continue to fund my salary at previously agreed rates and the company expenses throughout the Arbitration.

100.   We agreed that I any monies or recovery from the case would go into the business to operate and run the hedge fund.

101.   At the time of filing we reasonably anticipated the Arbitration would be completed within nine (9) months to a year. It was also not foreseeable to us, that the NFA would anyway become a party to the case or was involved.

102.   I was aware of NFA's obligation to provide a fair, expeditious and equitable hearing. I had learned from other members, that an NFA Arbitration usually concludes within twelve months. Therefore it was foreseeable to us at the time of paying the fee in May 2018 that the Arbitration would be fully concluded in May 2019.

103.   We also agreed that we would use that time period to trade other programs I was using, while the Arbitration was proceeding.

104.   We agreed Toren's capital contributions would count as capital contributions for the commodities side would be allocated as Membership Interests in Nefertiti Asset Management, LLC at previously agreed upon capital rates, and his capital contributions would be deposited into the bank account of Nefertiti Holding Corporation.

105.   Concurrently, on May 29, 2018 Toren and I formed Nefertiti Asset Management, LLC, with his role as Co-Founder and Chief Compliance Officer. (**Exhibit 14** is true and accurate copy of the formation certificate of NAM).

106.   Again in his role as Co-founder and Chief Compliance Officer, Toren paid for all formation costs including for registration of STORM Fund, LP. (**Exhibits 5 and 6** is a true and accurate copy of the emails of such formation)

107.   Toren also agreed to deposit $250,000 into a trading account owned by Nefertiti Holding Corporation so that we could continue building a track record in equities and such profits would go back to him.

108.   On formation of NAM, Toren and I ratified and incorporated all prior capital contributions as part of interests and Membership Units in NAM, and any capital contributions were transferred to NAM at the membership interest rates or debt previously agreed upon.

109.   At no time were Membership Interests or equity allocated to Mr. Toren in NRCM.

110.   The material terms that the parties agreed to that were ratified and as relates to funding, day-to-day operations, management the completion the launch of NAM and residual arbitration were to divide labor and capital as follow:-

    (a) I would trade the capital through the NAM or NHC entities as CTA, to offset operational costs and would concurrently handle the Arbitration, while at all times remaining on salary;

    (b) Toren would continue to fund my salary and company expenses at previously agreed rates through the Arbitration, and a one year track record of the funds, which would count towards capital contributions in NAM;

    (c) that until the first years trading performance had been completed, Toren would seed the funds with seed capital of $250,000 for the first year's trading at a 0:0 rate – meaning all profits would be returned to Toren;

    (d) I, in my individual capacity, would be the representative on the record of the Arbitration and Toren would advise as in-house counsel behind the scenes;

    (e) I would serves as Chief Executive Officer and CTA;

    (f) Toren would serve as Chief Compliance Officer and handle legal and compliance functions;

    (g) Toren would recover legal fees and expenses, on an hourly basis from NRCM, out of any legal fees award from the NRCM Arbitration for services actually rendered;

    (h) Toren would contribute financial capital and also provide legal support and compliance and I would contribute trading and full-time labor in exchange for which, I would receive a salary;

(i)   that any monies that were received as an award of settlement, would become assets of the company NRCM, and in turn NRCM, after expenses and legal costs,  NRCM would then, fund its own operating expenses going forward, and that neither Kumaran nor Toren would be individually entitled to any proceeds from the Arbitration; If NRCM was in surplus, then any such surplus would fund salary or other expenses going forward, and may also contribute capital to NAM or the STORM Fund.

(j)   after a two year track record in NAM, any futures profits would be used to repay prior capital contributions;

(k)   NAM would not inherit any liabilities, assets or rights of NRCM.

111.   In accordance with that agreement, Toren also agreed to assume the role of Secretary and Officer of Nefertiti Holding Corporation, and to begin trading, at the advice of counsel, funds were to be traded in the accounts held by the Nefertiti Holding Corporation. (**Exhibit 13** is a true and accurate copy of bank accounts with Toren agreeing to be Secretary).

112.   On May 22, 2018 in accordance with Toren's and my agreement we wired $9,500 to the NFA to commence the Arbitration, with only myself named on the forms. The initial estimated of damages supplied to ADMIS in the Arbitration included Toren's initial estimate of recovery of his legal fees of $50,000.

113.   Toren continued to cover the expenses and set-up of NAM and salary while the arbitration was ongoing by deposits to the Nefertiti Holding Corporation bank accounts.

114.   On August 3, 2018 Toren provided me with use of his Westlaw account and instructed me to look up the law myself.

115.   On August 6, 2018 the NFA sent out a scheduling order to Kumaran acting as representative of NRCM who was handling the matter. (**Exhibit 15** is a true and accurate copy of that letter also filed at 20-CV-3873 *ECF* 57-12)

116.   Up until this date there were no problems between Toren and myself in the business and Toren continued to undertake the roles of Chief Compliance Officer and co-founder of NAM.

117.   On September 5 , 2018, I provided Toren a copy of a document sent to me by the NFA which contained a  large list of compliance laws provided by the NFA for CTA's and CPO's that NRCM and NAM are required to certify they have read and complied with. The packet included

disclosures and registration as Chief Compliance Officer that was contained in the literature by the NFA that Toren was supposed to sign off as including his own registration at the NFA as "Chief Compliance Officer". (**Exhibit 16** is a true and accurate copy of the Compliance document)

118.   Since Toren has funded more than 10% of NRCM's operating capital during the period of the account trading and launch of NRCM, and also in his role as CCO, Toren was also required to register at the NFA.

119.   Toren then stated "he did not want his name" on the forms and did not want to comply with the NFA registrations for NRCM and NAM for himself as CCO.

120.   Shortly thereafter and Toren requested he no longer wanted to be the Chief Compliance Officer of NRCM and NAM and did not want his name on the documents as CCO.

121.   I then, in my individual capacity, had to take over all legal and compliance functions for NRCM and NAM, even though not qualified or trained to do so, and was not part of our agreement.

122.   On September 20, 2018 ADMIS filed a letter in the 18-ARB-5 which was served on NRCM, and sent to me, as I was the individual representative on the records, that Toren as "Co-founder" and "VP" of NRCM would be required to testify at any hearing. (**Exhibit 17 i**s a true and accurate copy of the excerpt from that letter also 20-CV-3873 *ECF*57-19).   ADMIS's listing of Toren's titles or management role in NRCM was incorrect.

123.   The next day on September 21, 2018 after receiving a copy of this letter, Toren instructed me to notify the NFA that our communications were protected by attorney-client privilege. (**Exhibit 18** is a true and accurate copy of his email).

124.   Even though not previously agreed at the time of filing and initiating the Arbitration, Toren then started asking me for substantial contingency fees from the NFA Arbitration 18-ARB-5 receive on behalf of NRCM, to be paid to him directly in his capacity as attorney.   Since the filing of the complaint Toren had not invested any time or performed any legal work on the arbitration.

125.   His demands included that he did not want his name to appear on the record, there was no obligation for him to be responsible for any work and if his new terms were not met, he would withhold his salary and capital from the Nefertiti companies.

126.   In or around October 2018, I contacted the NFA Arbitration and requested if an attorney could claim legal fees without making an appearance and they said no.

127.     Toren, was aware there were immediate filings deadlines, having seen a copy of **Exhibit 15,** and yet started withholding salary and capital, unless his demands for contingencies were met. His request was to be  paid "behind the scenes" , without making an appearance and without any commitment to take on any of the legal work or filing requirements.

128.     Toren was now a few months in arrears in his capital contributions to the Nefertiti entities, and therefore in my individual capacity, I had to started funding  both NRCM and NAM's overhead, starting on September 1, 2018.

129.     On October 12, 2018 ADMIS filed a response to the 18-ARB-5 admitting they had shared Claimant's confidential and proprietary CTA trading account with High Ridge Futures, under an arrangement for risk management services. (**Exhibit 19** is a true and accurate copy of the statements filed by ADMIS)

130.  A few days later I spoke to Arnold Porter, a law firm in their Washington DC office about the legalities of the various filings in the 18-ARB-5, ADMIS' statements about High Ridge, the dissemination of CTA proprietary trading records, unauthorized fees, documented margin errors in risk management,  purloining of funds, excessive margin errors, failures in risk management, and our lack of knowledge and consent to the foregoing.

131. Arnold Porter examined in detail some of the emails, communications and records pertaining to the accounts at ADMIS.

132. On October 22, 2022 Arnold Porter, by and through Mr. Dan Waldman, a Senior Counsel, agreed to file a whistleblower complaint at the CFTC on behalf of myself, individually, and NRCM, citing several violations of the Commodities Exchange Act, by ADMIS, Boshnack, Rothman, Felag, High Ridge Futures, Trey Lazzara and Lazzara Consulting.

133. Dan Waldman and Arnold and Porter, continue to represent me in any matter before the CFTC.

134. On October 24, 2018 Toren, while still in arrears in capital contributions, then demanded he was individually entitled to, as an attorney, up to an additional half of Arnold Porter's legal fees to diverted directly to him, personally from the CFTC matter, and if his demands were not met, he would "resign" from Nefertiti and withhold further capital to cover Nefertiti's expenses and suffocate my salary.

135. At no time did Toren contribute any legal work for the CFTC matter.

136. Since June 2018, Toren had also contributed very little to the NFA matter, leaving me to research all the compliance laws and regulations.

137. On October 25, 2018, now two months in arrears, Toren failed to deposit the required capital funding to Nefertiti, which was being used for agreed upon expenses and salary, while fully aware of the time commitments in responding to the legal matters, and demanded that unless he, individually, received these excessive "contingency fees" he would resign.

138. Toren then unilaterally demanded his title in the companies NAM and NRCM be changed to "Chief Litigation Officer" from "Chief Compliance Officer" and he would handle (without making an appearance) all the Arbitration and the CFTC matter.

139. Toren also demanded, that his prior capital contributions dating back to 2017 to NAM should retroactively be entitled to interest rates consummate with litigation funding rates of 100% a year, and that both Kumaran and NRCM owed him 100% ROI annually on his monies used as capital contributions to NAM, for signing a deal with Arnold and Porter.

140. His request was in his capacity as attorney, and made no allocation for persons actually doing the legal work, the actual legal costs and expenses to be incurred by the companies, salary of the managers of the companies, the attorneys fees and costs responding to the motions, and were conditioned on him not making an appearance, and leaving me doing the work and remaining on the record.

141. His new terms required he "not put his name on the record", and that I had to do the work, while his contingency fees came out of the company share while he did no work.

142. Under his proposal, by 2022 he wanted 5X times return on his capital, without doing any work on the cases, to be repaid first, while I inherited all the work by myself, unaided, and without compensation to qualified counsel to make an appearance.

143. Toren demanded that unless Kumaran and NRCM met his terms, to pay him the foregoing contingency fees – without making an appearance – or he would "resign".

144. Given his lack of work product between June 2018 and failure to do his share of the work, and at the advice of other counsel, the need to retain qualified counsel, both myself, and the Advisory Board of NRCM, we did not agree to such terms or new conditions.

145. On November 1, 2018 when his demands were not met, Toren enacted his threats and then purported to resign from NAM, NRCM and all Nefertiti entities. Toren indicated he wanted to "write off" his capital, all of his membership interests and capital.

146. As I understand such resignation is not permitted under the Delaware LLC Act or the New York LLC Act.

147. During September 1, 2018 – December 2018, as Toren was withholding capital till we met his usurious terms, I, in my individual capacity, undertook all obligations, liabilities, debts, assets and overhead expenses of all the Nefertiti companies, even though it was not our agreements to do so. All interests in an to NRCM were thus transferred to me.

148. After this, I, Samantha S. Kumaran, in my individual capacity, was left handling all the compliance and legal work without salary, for NRCM, NAM and other Nefertiti companies without any capital funding from Toren.

149. I, Samantha S. Kumaran, therefore, took over all the responsibilities of the companies, and was forced to work in indentured servitude without all previously agreed upon salary, and cover all obligations, and meet all debts, expenses and liabilities of the companies, including the NRCM Arbitration, which was already joined.

150. Because NRCM was now joined in the Arbitration, I was therefore now solely responsible for all filings and motions, and had to handle all aspects of any remaining business. There were now multiple deadlines pending at the 18-ARB-5 Arbitration

151. Because the Arbitration Panel was not even appointed until March 2019, the delays also caused by the NFA, caused mounting financial losses to NRCM – and thus myself.

152. I therefore was left as the sole person responsible for all obligations at the NFA, and responsibilities of NRCM, NAM and all financial responsibilities.

153. After September 1, 2018 I, in my individual capacity became responsible for all costs, expenses and liabilities of the Nefertiti companies.

154. After Toren purported to relinquish his membership interests in NAM and resign, NRCM's bank accounts continued to decline.

155. In my individual capacity, I was left incurring all costs and debts of the Nefertiti entities.

156. In May 2019 I travelled to Washington DC to meet with Waldman and the CFTC.

157.   During the period March 2019 – May 2019 I resumed discussions with Toren to try to resolve his interests in Nefertiti. Around this time Toren deposited some smaller moneys to cover expenses including various tax obligations and registration fees to NHC, while negotiations continued on his attempts to resign.

158.   After the trip to Washington DC, Toren then revised his demands for up to 50% contingency fees from any and all claims from the CFTC matter and also in the Arbitration against ADMIS and High Ridge, while continuing not to provide legal services he had originally agreed to provide, and without contributing to the legal and compliance.

159.    Toren contributed no legal work on the CFTC matter.

160.   Toren and I were not able to reach any resolution on his attempts to resign and leave the companies and I, in my individual capacity, continued indentured servitude in the ongoing legal problems from ADMIS.

161.   Toren's demands continued to insist on large contingency fees paid to him, without doing any of the legal work, without making an appearance, and  if his terms were not met, he would not honor the original capital contributions.

162.   During January 1, 2019 until December 19, 2019, as the sole owner, and real party of interest in NRCM,  I individually had to step into the shoes of handling, all legal and compliance, and individually paying any expenses or funding any costs or liabilities for NAM and NRCM.

163.   Since the NRCM bank account went to zero, I personally had to fund all costs, expenses and liabilities and NRCM became un-operational.

164.   I therefore in my individual capacity, now bound as a non-lawyer in an extensive proceeding, had to incur all losses, costs, legal and compliance fees, and expense related to the Nefertiti businesses after Toren attempted to resign.

165.   Since NRCM no longer had any monies, assets, capital, and the entity simply became defunct, both as a result of ADMIS/High Ridge fraud, the NFA's extraordinary delays to effectuate a timely Arbitration and then consequently Toren's resignation, during the period January 1 2019-December 2019 I, individually, had to fund all expenses, provide legal services, and overhead related to the continuing the Arbitration and the ongoing development of NAM and NHC which was also set back.

166.    On November 19, 2019 the Arbitration was permanently stayed due to a conflict with the NFA. By this time NRCM was completely un-operational, and the delays in the Arbitration itself had rendered the business dead.

167.    I remained as a registered CTA a responsible member at the NFA.

168.    By January 1, 2020  NRCM had completely ceased operations.

169.    During January 1, 2020 to December 1, 2020 NRCM, a result initially of the fraud by ADMIS, Boshnack, Rothman, and Lazzara and subsequent disruption of business relations, I in my individual capacity, continued to cover enforcement of all outstanding contracts, liabilities, and remaining outstanding business – which at this time – is solely the outstanding ADMIS contracts which was defrauded and caused the shut down of NRCM.

170.    All interests in and to the company have been transferred to me individually including any and all liabilities, assets, whether exiting before or after.

171.    NRCM was by this time then essentially shut down, and has no other commitments, other than the outstanding legal issue with ADMIS, Lazzara and Vision for defrauding the company and causing its demise.

172.    Because the NFA Arbitration was "permanently stayed"  I filed a Complaint in Federal Court in this action on May 18, 2020 to preserve all claims. (*ECF*1)

173.    I also thought that since NRCM passed through to me, and based on the facts several forms were signed in my individual name and the W9 listed both a sole proprietor and LLC,  NRCM was a sole proprietor since the liabilities.

174.    The Complaints (ECF1) filed on May 18, 2020 in this action 20-CV-3873 states
    ¶20 - Nefertiti Risk Capital Management, LLC was a minority women owned small business, sole proprietor and LLC, in New York NY that was a direct competitor of Vision. It was also a registered CTA. ADMIS, Vision and NFA, depleted its assets, property and trading strategies, to make the company un-operational, in deliberate and direct unfair competition, for Vision to destroy its competitors, in the scheme herein.

175.    At the time of filing the Complaint, because NRCM had ceased all business operations and had no further assets or monies. I, in my individual capacity, agreed to take over all remaining interests, obligations, assets, liabilities of NRCM, including any responsibilities of the outstanding arbitration or contracts with ADMIS as successor-in-interest.

176.    On July 30, 2020 NRCM accordingly withdrew its membership from the NFA. (**Exhibit 20** is a true and accurate copy of the date of such withdrawal).

177.    I, in my individual capacity, remain a registered member of the National Futures Association as a CTA and continue in my individual capacity.

178.    NRCM at this point was non-existent, held no further assets or property, all interests in the entities were transferred back to me. At no time did NRCM actually own any equipment, any physical assets, or any IP.

179.    The bank accounts of NRCM at this point had also been depleted.

180.    On September 29, 2020 I filed a Notice of Dissolution with New York State Division of Corporations (**Exhibit 22** is a true and accurate copy of the form filed  on September 2020).

181.    The form states that the reason for dissolution is "*Fraud, Theft, Vision, 20-Cv-3873, 20-CV-3871, 20-CV-3668 dissolution of capital.*" (See **Exhibit 22)**. The date filed on the form was December 15, 2015 which was the date stamped on the form by New York State. (See Exhibit 1)

182.    I paid in full the dissolution fee with the required money order for Sixty Dollars ($60) payable to the New York State – (**Exhibit 23** is a true and accurate copy of the money order sent)

183.    The forms and money order were sent Certified Mail with tracking. (**Exhibit 24** is a true and accurate copy of the receipt for certified mail).

184.    On September 30, 2020, after filing the dissolution notice, I then filed a First Amended Complaint in this action 20-CV-3873 on behalf of myself in my individual capacity without any mention of claims on behalf of NRCM. (A true and accurate copy of the Complaint is filed at **ECF15**)

185. The Complaint states at ¶24 that "NRCM has been dissolved and has asserted no claims here" and also states that  ¶56 - NRCM is no longer in existence (ECF15 ¶24, ¶57).

186. Based on the my filing on September 29, 2020 I also verified the First Amended Complaint on February 9, 2020.

187. I brought two claims as Successor-in-Interest Counts 12 and 13. (**20-CV-3873** *ECF*15)

188. The Complaint also states ¶390 "If not rescinded, ADMIS and Plaintiff had a valid customer agreement, which is binding and inures to the benefit of its successors  Kumaran, individually, is the successor-in-interest to all assets, liabilities, and all affairs of NRCM,", and ¶377-¶379 – As stated

supra, and included in Exhibit 5, ADMIS made material representations, that were required to be disclosed under law and the CEA, to induce Plaintiff to open a Customer Agreements. Plaintiff reasonable relied on the fraudulent representations, misstatements and to its detriment was induced to entrust its trading strategies, trade secrets, funds, property and its CTA business to ADMIS. The misrepresentations were material, and were a substantial factor and substantially contributed to Plaintiff decision to manifest assent to the Customer Agreement. Kumaran as the successor-in-interest to the Customer Agreement has the right to rescind the Agreement.

189. On December 1, 2020 ADMIS filed a response to their motion to compel and acknowledged that I, Samantha S. Kumaran, was successor-in-interest to NRCM, and did not oppose my standing as successor-in-interest. (*ECF* 22)

190. On November 13, 2020 I filed a motion at the NFA stating I was the successor in interest to NRCM, which referred to the November 19, 2019 that the former Panel had made the stay "permanent" <u>unless lifted within 12 months</u>. To preserve NRCM's claims, I requested that the stay be extended "while" the NFA Arbitration continue. The motion was filed in my capacity as successor-in-interest. (**Exhibit 25** is a true and accurate copy of that filing listing me as Successor-In-Interest)

191. On November 23, 2020 ADMIS, High Ridge Futures, Boshnack, Rothman, Lazzara and Lazzara Consulting and all remaining arbitration defendants, represented by Mr. Doyle, filed a motion to oppose extending the stay while the NFA matter continued and instead moved to that *"Respondents request that the Panel deny Ms. Kumaran's Motion to Extend the Stay and enforce its November 18, 2019 Order by <u>deeming this arbitration permanently stayed and dismissing the case</u>."* (**Exhibit 26** is a true and accurate copy of that filing).

192. In that filing counsel Mr. Doyle who represents all Arbitration Defendants, stated they intend to hold me, Ms. Kumaran individually liable for all ADMIS' legal fees under the ADMIS Customer Agreement, as Successor-in-Interest.

193. On November 25, 2020 I responded to ADMIS' letter, also stating the "Respondents request is essentially to seek a final order of termination on my rights, without any hearing, without any adjudication in an arbitration that as of today has no proper panel or Chairperson." (**Exhibit 27** is a true and accurate copy of that filing).

194. On January 15, 2021, Respondents request was adopted in part and the Panel issued an Order stating the "This matter is permanently stayed until such time a court instructs NRCM it must arbitrate at NFA." (**Exhibit 28** is true and accurate copy of that Order)

195. Concurrently, while moving the Arbitration for a "permanent stay", ADMIS moved the Court to compel Arbitration on December 1, 2020 (**ECF22** is a copy of that filing)

*196.* Concurrently in case 20-CV-3668, the Court had issued an Order on October 24, 2022 that NRCM needed to retain counsel. This was without regard to the facts of NRCM being dissolved. Judge Aaron's October 6, 2020 Order stated "*I recommend that Kumaran, who is proceeding pro se, be given leave to amend her claim for injunctive relief and that NRCM be allowed to do so as well, if it appears by counsel".* (See 30-CV-3668 *ECF*33 and *ECF*34)

197. Therefore, given the direction of the Court, I appointed counsel for NRCM on December 22, 2020.

198. During the period January 2021 – December 2021 NRCM has ceased its operations, had no further business, and no monies in any accounts and I, Samantha S. Kumaran have undertaken all obligations,  liabilities and outstanding business – which at this stage only involves the expired and fraudulently induced contracts with ADMIS.

199. Any compensation for counsel and expenses on behalf of NRCM were and are being paid individually by myself, and therefore the entity is a non-existent shell, that really inures to myself.

200. On January 26, 2021 in oral conference, all Vision Defendants consented to NRCM being added back to the Complaint and filing an amended complaint in case 20-CV-3871.

201. On February 10, 2021 in oral argument, in my individual capacity, I, in my individual capacity, appearing *Pro-Se,* was deemed to make an oral motion to add NRCM back to the existing First Amended Complaint in this action. (ECF63 is a true and accurate copy of the transcript related to that addition).

202.  ADMIS consented on the record to NRCM being added back and preserving its claims.

203. In that oral conference I also stated that New York State through Governor Cuomo were significantly backed-up in processing the dissolution forms for limited liability corporations. (20-CV-3873 ECF60 Transcript at 6-12 is a true and accurate copy of those statements on the record). Transcript 20-CV-3873 ECF60 Page 5 Ln 23-25

     MS. KUMARAN And I don't think it has been resolved by the
     Court whether the successor-in-interest claims could still
     be preserved by me, in which case, there
Transcript 20-CV-3873 ECF60 - Pg. 6
     is no reason for NRCM to appear and have counsel. However, to
     the extent it is needed, then that's why NRCM has appeared in
     all three cases.
     THE COURT: Okay. Thank --
     MS. KUMARAN: I hope I explained that clearly.
     THE COURT: Yes. Thank you. So right now I'm looking at your
     Amended Complaint in paragraph 24, which 8 presently reads,
     "NRCM has been dissolved and has asserted 9 no claims
     here." In essence, what you're trying to do is 10 basically
     amend paragraph 24 to say, "NRCM has been 11 dissolved and
     is a plaintiff here to preserve any claims 12 that NRCM
     may have"?
     MS. KUMARAN: That's correct. Because, to the extent that I
     can't as the successor preserve that claim -- and I don't
     know if this will come down to some technicality -- I know
     that the company's been dissolved, at least we filed for
     it to be dissolved. And I don't know if Governor Cuomo is
     getting so many businesses filing them that they're backed
     up and actually issuing it. But it was filed with the
     certificate and the payment on the 29th. So based on that,
     I had, when I filed the Complaint, genuinely believed that
     I am able as a successor to preserve its claims. But if
     the Court is to later rule that no, only NRCM can do that,
     that's why counsel is back in. So it's

Transcript 20-CV-3873 ECF60 - Pg. 7

     sort of an either/or. I don't want to --
     THE COURT: Yes. Okay, so I deem you to have just made an oral
     motion to amend paragraph 24 of your Amended Complaint to say
     -- to add NRCM as a plaintiff and to amend paragraph 24 of the
     Amended Complaint to indicate that NRCM has been dissolved but
     is named as a plaintiff herein to preserve any claims that
     NRCM may have.
     What is ADM Investor Services' response to that oral motion? 1
     MR. SCHUMACHER: If it's just --
     THE COURT: Do you oppose it?
     MR. SCHUMACHER: We don't oppose it, as you --
     THE COURT: Okay. The motion is granted. I am going to enter
     an order today stating that during this call, an oral
     motion was made by the plaintiff to add NRCM as a plaintiff
     and to amend paragraph 24 of the Amended Complaint to read,
     "NRCM has been dissolved and is named as a plaintiff herein
     in order to preserve any claim that NRCM may have; and that

```
motion was granted without opposition from ADM Investor
Services, Inc.
```

204. ADMIS did not object to me, in my individual capacity, making a Pro-Se Motion on behalf of NRCM in the February 10, 2021 conference. ADMIS also did not opposed NRCM preserving its claims in this District. ADMIS did not dispute that I was the rightful successor-in-interest.

205. On June 7, 2021 the Court issued an Order in 20-CV-3873 *ECF* 63 also stating that to the extent Kumaran is bringing any claims as Successor-in-Interest, they were also subject to the NRCM Arbitration. The FAC only asserts two claims Counts 12 and 13 as Successor-in-Interest.

206. ADMIS failed to raise any objection to the R&R *ECF* 63 dated June 7, 2021, which are required to be raised within 14 days.

207. On February 18, 2022 the Court held oral argument in person in the Courthouse Room 12C.

208. I appeared alongside counsel and still stated that

```
MS. KUMARAN: I understand. I had thought it was the
day that it was dissolved is the date that it's certified
and stamped and the check is mailed that is certified. The
money order was made the day before.
THE COURT: Thank you. I take no position on that issue at
this time. I am only resolving the issues presented in the
motions for review. Any issues should, of course, be
brought in the first instance to Judge Aaron within the
scope of the reference.
```

209. On February 23, 2022 I called New York State to inquire why the finalization of the dissolution of NRCM that was filed on September 29, 2020 had taken so long. There was a long hold time, and they advised me they were still in arrears in the filings. I provided my DOS # and they asked me to call back.

210. On February 24, 2022 I emailed them copies of the money order and older forms sent on September 29, 2020. On February 24, 2022 I again called New York State to inquire why the finalization of the dissolution of NRCM had not been completes.

211. On February 26, 2020 I spoke to another representative on the phone, I was told that New York State were more than six(6) months in arrears in processing forms.

212. The agent at New York State Division of Corporations stated that they do not retain records for more than 12 months, so any prior filings or letters had been deleted from their system.

213. I was advised that the prior filing had a mismatch on the date I used of December 15, 2015 and that their date in their records was December 14, 2015, which may have delayed its processing. (**Exhibit 1** and is a true copy of the mismatch of the dates, Pg.1 states December 15, 2015 and Pg. 3 states December 14, 2015).

214. I was also told that I needed to include a facsimile number on the form for return correspondence as they do not use email.

215.  I was also advised to refile the forms as "expedited" and to use a Credit Card as opposed to a Money Order – so that payments could be traced to the date it was charged.

216.  On February 28, 2022 I refaxed the dissolution notice with the corrected date on the form to show December 14, 2022, and paid an additional $25 fee to expedite dissolution. (**Exhibit 29** is a true and accurate copy of the second dissolution notice that was faxed to the New York State Division of Corporations).

217. On March 1, 2022 the Court held a telephonic conference regarding Mr. August withdrawing as counsel for NRCM. (ECF95).

218. In oral conference on that date, the Court stated that it would issue a stay of these proceedings so that counsel could withdraw and allow 30 days to replace counsel.

219. On March 2, 2022 the Court's order staying these actions was entered into the docket . (ECF96) The Court's order stayed all three (3) actions.

220. On  March 2, 2022 on the same date, after the entry of the Court Ordered stay, New York State finally listed NRCM as dissolved, even though the process had been started in September 29, 2020. (**Exhibit 30** is a true and accurate copy of the dissolution listing showing on New York State)

221. Because the actions were stayed I could not notify or communicate with the Court to notify them of the change.

222. The Court's March 2 2022 (ECF96) stated in part that

> If no attorney enters an appearance on behalf of the Corporate Plaintiffs by that date, the Court may dismiss their claims for failure to prosecute. *See Glob Auto, Inc. v. Hitrinov*, No. 13-cv-2479, 2015 WL 5793383, at *5 (E.D.N.Y. Sept. 30, 2015) (explaining that "[d]istrict courts in this Circuit have exercised their discretion to dismiss an action for failure to prosecute where a corporate plaintiff fails to obtain counsel after being directed to do so and being warned of the consequences of inaction"); *see also United States ex rel. Reliable Constr. PM, Inc. v. Land Frog, Inc.*, No. 13-CV-7351, 2015 WL 740034

(E.D.N.Y. Feb. 20, 2015); *Negrin v. Kalina*, No. 09 Civ. 6234, 2013 WL 5925916 (S.D.N.Y. Nov. 5, 2013).

223. Therefore in compliance with the Court's order, and because there was no ability to address the dissolution during the stay, I appointed counsel for NRCM along with NAM and NHC to enter an appearance in compliance with *ECF* 96 on April 1, 2022 until the successor-in-interest motion was resolved.

224. The Court's order was express in its direction that unless counsel appears for the entities by this date, their claims may be dismissed. (See *ECF* 96)

225. On April 1, 2022, as soon as the stay was removed, I filed a letter to the Court in 20-CV-3873 *ECF* 102, notifying this Court of the dissolution, stating that I would be filing an affidavit shortly.

226. On April 4, 2022 I phoned New York State Division of Corporations to inquire if there were any further wind up procedures needed for single member LLC.

227. I spoke to Agent #61676 and was advised that since it was an LLC and not a corporation, Business Law 703 did not apply, and since I was the only member (a single member pass through) a consent letter from the Department of Finance was not required, no other procedures were required and that a one person disregarded LLC does not need consent. Therefore no further paperwork was needed as NRCM was now dissolved.

228. On April 4, 2022 in oral conference in this action 20-CV-3873 I also alerted the Court that NRCM had been dissolved and I was planning to file an affidavit to that end shortly.

229. On April 5, 2022 I spoke again to New York State Division of Corporation and the Finance Department. I spoke to Agent #63600 and was again advised that a Certificate of Dissolution is not needed for a single member LLC, and it is only used for large corporations. I was told there is nothing further to file and that New York Bus. Law 703 does not apply to LLC's.

230. As such, I was advised there are no further business obligation or filing, since I am a single-member LLC and NRCM no longer exists.

231. After dissolution, I have also recently been contacted, unsolicited, by a person from Austin, Texas – called Mr. Ty Ball. He reached out to me having found my name related to this case, against Mr. Lazzara.

232. He advised that there were approximately sixty disgruntled investors in the Austin, Texas area who had been financially defrauded by Mr. Lazzara and lost substantial moneys with one of Lazzara's other businesses LT Oil, LLC.

233. He said there were several witnesses and other business partners of his who have had to either close their businesses or file bankruptcy, after financial misrepresentations from Trey Lazzara.

234. NRCM's dissolution having becoming a victim of fraud, is consistent with a pattern of misrepresentation and fraud that is now coming to light from not just one, but dozens of other witnesses willing to testify against Lazzara.

235. Recently, since dissolution of NRCM, a Mr. Dean Dresser also contacted me from Austin Texas, and said he and his wife had been defrauded by Mr. Lazzara in amounts up to several hundred thousand dollars due to misrepresentation and dishonest business conduct by Lazzara oil ventures.

236. Accordingly there are now up to 60 witnesses willing to testify in this hearing as character witnesses against Mr. Lazzara who have lost substantial moneys, and are reaching out, unsolicited, to testify about his misrepresentation and other dishonest financial dealings.

237. NRCM is completely dissolved as a result of Lazzara's fraudulent inducement of these accounts on behalf of ADMIS. From the recent contacts, NRCM appears to be just  another business he has added to his apparently long list of victims of fraud and misrepresentation.

238. I have also individually lost substantial amounts of money and capital as a result of the fraud, and continue to absorb exorbitant financial damages.

239. All interests including liabilities that are remaining, as NRCM is now dissolved, are transferred to and inherited to me in my individual capacity. Accordingly in my individual capacity, I have agreed to inherit all remaining assets, liabilities and contractual commitments of NRCM, including in regards to this arbitration, litigation and outstanding contracts.

240. On April 11, 2022 I received a letter from the NFA regarding the Arbitration (**Exhibit 31** is a true and accurate copy of that email)

241. That email states "*until Ms. Kumaran asks NFA to proceed with NRCM's claims against ADMIS at NFA, the stay will remain in place.*"

242. I, in my individual capacity , have assumed all further interests and responsibilities, including any assets or liabilities,  regarding the defrauded and dissolved NRCM, including in the arbitration.

243. I, in my individual capacity, continue to advocate the prior interests of NRCM in any arbitration, and accordingly seek to do so in this Court.

244. Thus, since filing of the notice of dissolution, I have assumed responsibility for all of NRCM's legal and financial obligations, including any liability that may arise from NRCM's activities that are the subject of this litigation.

245. I declare, certify, verify, or state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

246.    In lieu of an affidavit sworn under oath, federal law allows an "unsworn declaration, certificate, verification, or statement, in writing, of [a] person which is subscribed by him, as true under penalty of perjury, and dated" to have the same force and effect as an affidavit or other sworn statement. [1]


Respectfully submitted,
//SSK//
Samantha S. Kumaran
Individual Plaintiff

Executed on May 6, 2022

---

[1] *See* 28 U.S.C. § 1746; *see also Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002) (while an affidavit is required to be sworn to by the affiant in front of an officer authorized to administer oaths, 28 U.S.C. § 1746 allows for "unsworn declarations under penalty of perjury" to support any matter that legally requires an affidavit to support it). If this unsworn declaration under penalty of perjury is executed outside of the United States, section 17 46 requires that it be substantially in the following form: 'I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).'